## 2021 CA 002196 B LINCOLN HOLDINGS LLC et al Vs. FACTORY MUTUAL INSURANCE COMPANY FLRS

Case Type:
Civil II

Case Status:
Open

File Date:
07/01/2021

Action:
Complaint for Breach of Contract Filed

Status Date:
07/01/2021

Next Event:
10/01/2021

[ All Information ] [ Party ] [ Event ] [ Docket ] [ Receipt ] [ Disposition ]

### Party Information

**LINCOLN HOLDINGS LLC**
- Plaintiff

| | Alias |
| --- | --- |
| Disposition | |
| Disp Date | **Party Attorney** |
| | Attorney |
| | SCHLESINGER, MATTHEW J |

**LINCOLN HOCKEY LLC**
- Plaintiff

| | Alias |
| --- | --- |
| Disposition | |
| Disp Date | **Party Attorney** |
| | Attorney |
| | SCHLESINGER, MATTHEW J |

**LINCOLN MYSTICS LLC**
- Plaintiff

| | Alias |
| --- | --- |
| Disposition | |
| Disp Date | **Party Attorney** |
| | Attorney |
| | SCHLESINGER, MATTHEW J |

**DC ARENA L.P.**
- Plaintiff

| | Alias |
| --- | --- |
| Disposition | |
| Disp Date | **Party Attorney** |
| | Attorney |
| | SCHLESINGER, MATTHEW J |

**WASHINGTON BULLETS L.P.**
- Plaintiff

| | Alias |
| --- | --- |
| Disposition | |
| | **Party Attorney** |

- ◦ Disp Date
- ◦

| • Attorney |
| SCHLESINGER, MATTHEW J |

**FACTORY MUTUAL INSURANCE COMPANY**
- Defendant

- •
- ◦ Disposition
- ◦
- ◦ Disp Date
- ◦

| Alias |

| Party Attorney |

---

### Events

| Date/Time | Location | Type | Result | Event Judge |
|-----------|----------|------|--------|-------------|
| 10/01/2021 09:30 AM | Courtroom 100 | Initial Scheduling Conference-60 | | |

---

### Docket Information

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 07/01/2021 | Complaint for Breach of Contract Filed  Receipt: 475193  Date: 07/02/2021 | |
| 07/01/2021 | eComplaint Filed. Submitted 07/01/2021 13:45. ts.<br>Attorney: SCHLESINGER, Mr MATTHEW J (429689)<br>LINCOLN HOLDINGS LLC (Plaintiff); LINCOLN HOCKEY LLC (Plaintiff); LINCOLN MYSTICS LLC (Plaintiff); DC ARENA L.P. (Plaintiff); WASHINGTON BULLETS L.P. (Plaintiff); | Image |
| 07/02/2021 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 10/01/2021    Time: 9:30 am<br>Judge: SADDLER, FERN FLANAGAN    Location: Courtroom 100 | |
| 07/02/2021 | Issue Date:  07/02/2021<br>Service:  Summons Issued<br>Method:  Service Issued<br>Cost Per:  $<br><br>  FACTORY MUTUAL INSURANCE COMPANY<br>  270 Central Ave<br>  JOHNSTON, RI  02919<br>  Tracking No: 5000234805 | |
| 07/02/2021 | Complaint Package eServed to Filer | Image |
| 07/09/2021 | Affidavit of Service of Summons & Complaint on Codi Jones Filed.  Submitted 07/09/2021 18:18. AV<br>Attorney: SCHLESINGER, Mr MATTHEW J (429689)<br>FACTORY MUTUAL INSURANCE COMPANY (Defendant); | Image |
| 07/09/2021 | Proof of Service<br>Method    : Service Issued<br>Issued    : 07/02/2021<br>Service   : Summons Issued<br>Served    : 07/02/2021<br>Return    : 07/09/2021<br>On        : FACTORY MUTUAL INSURANCE COMPANY<br>Signed By : Codi Jones<br><br>Reason    : Proof of Service<br>Comment   : | |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| | Tracking #: 5000234805 | |
| | | |

### Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|----------------|--------------|---------------|----------------|
| 475193 | 07/02/2021 | MATTHEW J SCHLESINGER | $120.00 |
| Total | Total | Total | Total |
| | | | $120.00 |

### Case Disposition

| Disposition | Date | Case Judge |
|-------------|------|------------|
| Undisposed | | |

Filed
D.C. Superior Court
07/01/2021 13:45PM
Clerk of the Court

BENEDICT M. LENHART
MATTHEW J. SCHLESINGER
RUKESH A. KORDE
KRISTIN M. COBB
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5906
Email: blenhart@cov.com
mschlesinger@cov.com
rkorde@cov.com
kcobb@cov.com

Attorneys for Plaintiffs

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINCOLN HOLDINGS LLC, LINCOLN HOCKEY LLC, LINCOLN MYSTICS LLC, WASHINGTON BULLETS L.P., AND DC ARENA L.P., <br><br> 627 North Glebe Road <br> Arlington, Virginia 22203-2144 <br><br>     Plaintiffs, <br><br>     v. <br><br> FACTORY MUTUAL INSURANCE COMPANY, <br><br> 270 Central Ave <br> Johnston, Rhode Island, 02919-4923 <br><br>     Defendant. | Docket No. _____ <br><br> **CIVIL ACTION** <br><br> **COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY RELIEF, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND MONEY DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................. 4

THE PARTIES .................................................................................................... 10

JURISDICTION AND VENUE .......................................................................... 11

FACTUAL ALLEGATIONS .............................................................................. 12

I.     MONUMENTAL SPORTS PURCHASED INSURANCE TO PROTECT
ITSELF AGAINST CATASTROPHES. ....................................................... 12

II.    COVID-19 AND THE COVID-19 VIRUS CAUSE COVERED PHYSICAL
LOSS AND DAMAGE. ................................................................................ 18

    A.    COVID-19 Is A Deadly Communicable Disease. ............................... 18

    B.    The COVID-19 Virus Can Be Transmitted In Many Ways. .............. 20

    C.    The COVID-19 Virus Causes Physical Loss And Damage, In Part By
Rendering Air And Property Unsafe And Unusable. .......................... 23

III.   MONUMENTAL SPORTS SUFFERED THE TYPES OF LOSSES THE ALL
RISKS POLICIES INSURE AGAINST. ...................................................... 28

    A.    Monumental Sports' Insured Properties Suffered Physical Loss and
Damage .............................................................................................. 30

    B.    The COVID-19 Virus Damage Forced Monumental Sports To Repair And
Restore Its Property And To Take Expensive Measures To Mitigate Its
Losses. ............................................................................................... 33

    C.    Government Orders Resulting From Viral Damage Prevented Fans From
Attending Sporting Events. ................................................................ 35

IV.   MONUMENTAL SPORTS SUFFERED HUNDREDS OF MILLIONS IN
LOSSES. ..................................................................................................... 38

V.    THE ALL RISKS POLICIES COVER MONUMENTAL SPORTS' LOSSES. ............. 40

    A.    The All Risks Policies Cover Monumental Sports' Property Damage and
Repair Costs. ...................................................................................... 41

    B.    The All Risks Policies Cover Monumental Sports' Massive Business
Interruption Losses and Extra Expenses. ........................................... 42

# TABLE OF CONTENTS

**Page**

C.    The All Risks Policies Cover Monumental Sports' "Civil Authority" Losses. .................................................................................................. 44

D.    The All Risks Policies Cover The Losses Monumental Sports Sustained Given The Danger Of Accessing Insured Locations Due To Nearby Viral Property Damage And Loss. ................................................................. 46

E.    The All Risks Policies Cover Monumental Sports' Communicable Disease Losses. .................................................................................................. 47

F.    The All Risks Policies Cover The Losses Monumental Sports Sustained To Protect Its Property And Mitigate Its Losses. ................................... 49

G.    Numerous Other Provisions Of The All Risks Policies Cover Monumental Sports' Losses. ......................................................................... 49

VI.    FACTORY MUTUAL FAILED TO HANDLE MONUMENTAL SPORTS' CLAIMS PROPERLY AND REFUSED TO HONOR ITS PROMISE. ......................... 50

FIRST CAUSE OF ACTION (For Breach of Contract Against Factory Mutual) ...................... 52

SECOND CAUSE OF ACTION (For Declaratory Relief Against Factory Mutual) ................. 54

THIRD CAUSE OF ACTION (For Breach of Implied Covenant of Good Faith and Fair Dealing Against Factory Mutual) ................................................................. 56

PRAYER FOR RELIEF ................................................................................................ 57

Plaintiffs, Lincoln Holdings LLC (d/b/a "Monumental Sports & Entertainment"), DC Arena L.P., Lincoln Hockey LLC, Lincoln Mystics LLC, and Washington Bullets L.P. (collectively "Monumental Sports"), bring this action to compel its Insurer, Defendant Factory Mutual Insurance Company ("Factory Mutual"), to honor its promise to protect Monumental Sports against damage to and loss of its property and attendant loss of income resulting from COVID-19.

## NATURE OF THE ACTION

1.      Monumental Sports is in the business of providing live, exciting sports and entertainment experiences for thousands of fans in indoor arenas around Washington, D.C., the nation's capital.  Monumental Sports' primary goal is to entertain and delight the community with professional sports teams to cheer on and support, as well as a variety of other entertainment events to enjoy, from concerts to Monster Trucks to Disney on Ice, in all cases, live and in person, together with thousands of other people.  Monumental Sports owns the National Hockey League's Washington Capitals (the 2018 Stanley Cup Champions), the National Basketball Association's Washington Wizards, the Women's National Basketball Association's Washington Mystics (the 2019 WNBA Champions), as well as Capital One Arena, one of the most important public entertainment spaces in the Washington, D.C. metro area.

2.      In March 2020, due to the COVID-19 virus and COVID-19, the seasons of the Capitals, Wizards, and Mystics were suspended, and all events at Monumental Sports' indoor arenas were canceled or postponed indefinitely.  For over a year, until April 2021, Monumental Sports was prevented from providing its fans with perhaps the most powerful platform sports and entertainment offers:  the opportunity to congregate with one another, to cheer on their favorite team or musician together, and to celebrate shoulder-to-shoulder as one community in a downtown setting.

4

3.     Monumental Sports is not only a brand, but a standard recognized globally in sports, entertainment, and media, with much of its success due to its extraordinary fan base.  Its business is dependent upon bringing tens of thousands of people together in indoor arenas—chief among them Capital One Arena, but also EagleBank Arena (home of George Mason University's men's and women's basketball teams) and D.C.'s Entertainment & Sports Arena (home of the Mystics)—to enjoy professional hockey and basketball, as well as music and other entertainment.  Capital One Arena is home to the Wizards and the Capitals as well as the Georgetown University Hoyas men's basketball team and averages 220 events per year.  Beyond sports, Monumental Sports' arenas host many other entertainment events, including concerts, theatrical performances, children's entertainment activities, conventions, and graduations. Monumental Sports provides first-class customer service to anyone who steps into its arenas, and is committed to innovation, inspiration, and the unification of fans and people from all across the D.C.-metro area and the world.

4.     Monumental Sports bought—at significant expense—best-in-class "all risks" business interruption insurance policies from Factory Mutual (collectively, "the All Risks Policies").  The All Risks Policies broadly cover "All Risk of Physical Loss or Damage."  The All Risks Policies promise to protect Monumental Sports against loss of revenue and certain expenses if it cannot use its arenas or other insured properties due to the impact of some external physical peril.  These covered perils include both known and, more importantly, novel, unknown risks.  COVID-19 and the COVID-19 virus are exactly these types of perils.  In short, Monumental Sports purchased the All Risks Policies to cover precisely the losses that it suffered because of an unimaginable, multi-arena, worldwide, series of physical catastrophes.

5.      COVID-19 and the COVID-19 virus caused unprecedented physical loss and damage to Monumental Sports' properties, at levels far worse than the physical loss and damage caused by many "traditional" natural disasters like hurricanes, floods, or tornadoes.  COVID-19 and the COVID-19 virus caused physical changes to the air, surfaces, and interior spaces of the arenas and other insured properties and rendered such arenas and other insured properties physically unusable for their intended purposes.  COVID-19 and the COVID-19 virus resulted in government orders forbidding access to the arenas or other insured properties due to the damage caused, and risks posed by COVID-19 and the COVID-19 virus.

6.      Factory Mutual sold Monumental Sports expansive coverage specifically designed to cover such losses.  The All Risks Policies cover:  a) lost income resulting from "physical loss or damage of the type insured" to Monumental Sports' properties; b) lost income that Monumental Sports lost as a result of orders of "civil or military authority" that limit, restrict, or prohibit access to arenas and other insured properties such as the arenas because of physical damage—such as that caused by COVID-19—in the vicinity of the insured properties; and c) the costs to "repair" property that is lost or damaged because of physical loss or damage such as COVID-19 and the COVID-19 virus.

7.      In addition to selling broad coverage, Factory Mutual—in an effort to make its policies more marketable—chose not to include the broad virus or pandemic exclusion that most other insurers used to remove coverage for all losses in any way related to viruses or pandemics. Rather, Factory Mutual adopted a narrower and fundamentally different exclusion (called either a "contamination exclusion" or "pollution exclusion") under the All Risks Policies that does not bar the types of COVID-19 losses suffered by Monumental Sports.

8.      As explained below, the COVID-19 virus caused physical loss or damage to critical, insured properties upon which Monumental Sports' entire business depends.  Until March 2020, Capital One Arena, for example, routinely hosted more than 18,000 fans at a time for its events.  Capital One Arena's primary purpose is to host these large numbers of fans together in a crowded, indoor space to watch and vocally cheer on (with food and beverage) Washington, D.C.'s Wizards and Capitals and other events night after night.  Abruptly, due to the COVID-19 virus and COVID-19, hosting fans at Monumental Sports' venues became physically impossible starting in March 2020.   From that time until April 2021, zero fans or spectators were allowed in any D.C. venues, including Capital One Arena and the Entertainment & Sports Arena.  Even after April 2021, when the D.C. government agreed to permit fans to attend games at Capital One Arena due to the substantial safety measures undertaken by Monumental Sports, as well as the rapidly increasing availability of the COVID-19 vaccines, capacity was capped at 10% until it was increased to 25% on May 16 and further increased to 50% on May 28, 2021.  The District's opening was too late for the Capitals, who were eliminated from the National Hockey League's ("NHL") playoffs on May 23, and barely in time for the Wizards to play their last two home playoff games on May 29 and May 31 in front of a 50% capacity crowd before they were eliminated from the National Basketball Association's ("NBA") playoffs, the result being that the Capitals' and the Wizards' entire 2020-2021 seasons were essentially played without fans (and without the revenue generated by fan attendance).

9.      Infected individuals spew COVID-19 and the COVID-19 virus into the air where some hangs in the air and some falls to surfaces.  The presence of COVID-19 and the COVID-19 virus in Capital One Arena, along with a further influx of the COVID-19 virus that would come with fans (prior to the wide availability of vaccines), made the physical use of that arena

impossible for its intended purpose—to host thousands of fans side by side for sporting and other events.  The same is true of other Monumental Sports arenas, such as EagleBank Arena, the home of George Mason University basketball, and D.C.'s Entertainment & Sports Arena, the home of the Washington Mystics.

10.     Additionally, numerous, unprecedented government orders were issued that prohibited fans from entering arenas and attending games, concerts, and other events, due to the presence of the COVID-19 virus and the dangers COVID-19 poses to public health (prior to the wide availability of effective vaccines).

11.     Between Capital One Arena and the other indoor arenas Monumental Sports uses, Monumental Sports had to cancel over 100 events and, when it could eventually hold certain events (such as Wizards and Capitals games), it had to hold them without any fans at all for over 80% of the 2020-21 NBA and NHL seasons.  At least approximately over 40% of Monumental Sports' revenue comes from local, ticketed, fan-intensive games, concerts, and other events, and such revenue was practically eliminated from March 2020 to April 2021.  Monumental Sports has lost hundreds of millions in revenue as a result of the presence of the COVID-19 virus in its arenas.

12.     At the same time, Monumental Sports had to spend millions physically repairing and restoring the physical damage and physical loss of use COVID-19 caused and to make Capital One Arena, and Monumental Sports' other facilities and arenas, safe to host events and fans.  Those repairs include new or modified HVAC systems to reduce the COVID-19 virus spread, Plexiglas barriers, touchless entry and payment systems, significant physical rearrangements of interior spaces, and continuous disinfection.

13.     In selling the All Risks Policies to Monumental Sports, Factory Mutual promised to pay $1 billion for each "occurrence," defined to include the losses "arising out of or caused by one discrete event of physical loss or damage," with no cap on the number of such occurrences.

14.     Factory Mutual also correctly argued in litigation before the pandemic began that the term "physical loss or damage" covers physical loss of use of insured property caused by an unforeseen external peril, even without a physical alteration of that property. *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 at 3, n.1 ("loss of functionality . . . constitutes physical loss or damage," and "[a]t best for defendant Federal, 'physical loss or damage,' which is undefined, is susceptible of more than one reasonable interpretation and is therefore ambiguous").

15.     However, when called upon to comply with its contractual obligations by Monumental Sports, Factory Mutual took the opposite position, preemptively denying coverage on the flawed view that COVID-19 and the COVID-19 virus do not cause physical loss or damage within Monumental Sports' arenas and other insured properties.  Factory Mutual made this determination precipitously, without adequately investigating the ways in which COVID-19 and the COVID-19 virus caused loss and damage to Monumental Sports' properties.  In so doing, Factory Mutual abandoned its promise to "work closely with [Monumental Sports] *before*, *during*, and *after* a loss."[1]

16.     Because Monumental Sports suffered massive losses covered under the All Risks Policies, and because Factory Mutual refuses to honor its promise, Monumental Sports asks this Court to issue declaratory relief and to award money damages for Factory Mutual's breach of its

---

[1]     FM Global, *Why FM Global? Creating Resilience Means Creating Success*, https://www.fmglobal.com/about-us/why-fm-global (last visited June 28, 2021) (emphasis in original).

contracted commitments and for Factory Mutual's failure to handle its insurance claims in good faith.

## THE PARTIES

17.     Plaintiff Lincoln Holdings LLC, d/b/a Monumental Sports & Entertainment, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the District of Columbia.

18.     Plaintiff Lincoln Hockey LLC (owner of the Washington Capitals, herein referred to as, the "Capitals") is a subsidiary of Monumental Sports & Entertainment and limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Arlington, Virginia.

19.     Plaintiff Lincoln Mystics LLC (owner of the Washington Mystics, herein referred to as, the "Mystics") is a subsidiary of Monumental Sports & Entertainment and a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the District of Columbia.

20.     Plaintiff Washington Bullets L.P. (owner of the Washington Wizards, herein referred to as, the "Wizards") is a subsidiary of Monumental Sports & Entertainment and a limited partnership organized and existing under the laws of the District of Columbia, with its principal place of business in the District of Columbia.

21.     Plaintiff DC Arena L.P. (owner of Capital One Arena) is a subsidiary of Monumental Sports & Entertainment and a limited partnership organized and existing under the laws of the District of Columbia, with its principal place of business in the District of Columbia.

22.     Each Plaintiff, directly or indirectly, has management control over, or an economic interest in, entities that both are also insureds under the All Risks Policies and have suffered covered losses as a result of the events described herein.

23.     Defendant Factory Mutual Insurance Company ("Factory Mutual") is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Johnston, Rhode Island.  At all times relevant hereto, Factory Mutual was licensed to do business, and was doing and transacting business in the District of Columbia.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction over the claims asserted in this Complaint pursuant to D.C. Code § 11-921.

25.     The Court has personal jurisdiction over Factory Mutual pursuant to D.C. Code § 13-423 because it is an insurance company registered with the Department of Insurance, Securities, and Banking, licensed to provide insurance in the District of Columbia, and it contracted to provide insurance policies to Monumental Sports, many of which are located in the District of Columbia, and this suit arises from a dispute over those policies.

26.     Factory Mutual also, by the express terms of its All Risks Policies, consented to the jurisdiction of the United States of America, which includes the District of Columbia.

27.     Monumental Sports has suffered substantial losses in the District of Columbia. The Capitals, Wizards, and Mystics all play their home games in the District of Columbia. Because of COVID-19 related cancellations and restrictions in the District of Columbia, each team has suffered substantial amounts of losses in the District of Columbia.

28.     Venue is proper in this Court pursuant to D.C. Code § 31-1303 as the obligations under the contracts at issue were to be performed, the defendants do business, and the events that led to this dispute occurred, in large part, in the District of Columbia.

## FACTUAL ALLEGATIONS

I.    **MONUMENTAL SPORTS PURCHASED INSURANCE TO PROTECT ITSELF AGAINST CATASTROPHES.**

29.    To protect its significant property and business income interests, and in exchange for a very high premium, Monumental Sports purchased best-in-class, all risks policies from Factory Mutual (the "Policies" or the "All Risks Policies") for which Factory Mutual has for many years collected many millions in premiums.  There are two relevant All Risks Policies: Policy Nos. 1056084 and 1068228 (attached to and made part of this Complaint at Exhibits A and B).

30.    Policy No. 1056084 covers the period from August 1, 2019 to July 31, 2020.

31.    Policy No. 1068228 covers the period from August 1, 2020 to July 31, 2021.

32.    The All Risks Policies insure Lincoln Holdings LLC, and its subsidiaries, including each of the other named Plaintiffs.

33.    All Risks insurance policies cover just that:  *all* risks of physical loss or damage, including risks that are, by definition, novel, unknown or unimaginable, unless the policy specifically and conspicuously excludes that risk.  The All Risks Policies cover loss resulting from natural and man-made disasters that physically impair the operations of a business. Monumental Sports' All Risks Policies cover up to $1 billion in losses for any one "occurrence," and cover an unlimited number of "occurrences."[2]  So, each provides significantly more than $1

---

[2]    The All Risks Policies define "occurrence" in pertinent part as "the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage."  Said otherwise, the All Risks Policies' limits of liability apply on a "per occurrence" basis, and if more than one "occurrence" takes place, then Factory Mutual may have to pay up to its full $1 billion in limits for each such occurrence.

billion in coverage assuming more than one event causes physical loss or damage in any particular policy period.

34.     The All Risks Policies expressly promise coverage for the wide array of massive losses Monumental Sports now faces due to COVID-19, including, for example, losses from a communicable disease, losses sustained when a communicable disease physically alters air and surfaces within Monumental Sports' arenas, making them unfit for their intended uses, losses sustained when government orders prohibit fan attendance at games, and losses sustained when viral damage makes travel to or from Monumental Sports' arenas dangerous and difficult.[3]

35.     The All Risks Policies provide a basic coverage grant which "covers [insured] property . . . against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except" as specifically and conspicuously excluded.  Ex. A at 8; Ex. B at 8.  The All Risks Policies nowhere define, and thus nowhere narrow the meaning, of either "ALL RISKS" or "PHYSICAL LOSS OR DAMAGE."  Factory Mutual has argued in litigation that "loss of functionality" constitutes such physical loss or damage, even when the property is not physically altered.  *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 at 3, n.1 ("Numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage."); *see also id.* at 6 ("physical loss or damage" does not require proving "demonstrable structural damage or alteration to property").

36.     The All Risks Policies also cover business interruption losses, in a section captioned "Time Element."  Specifically, the All Risks Policies cover "TIME ELEMENT

---

[3]     Factory Mutual has a long history of offering broad coverage to its members. Particularly during the "soft" markets in the late 1990s and early 2010s, Factory Mutual companies expanded their coverage in many significant ways, including issuing new forms, increasing the limits of liability they were willing to write, and engaging in advertising campaigns touting their broad coverage.

loss . . . directly resulting from physical loss or damage of the type insured[] to," *inter alia*, "Real Property" and "Personal Property." Ex. A at 44; Ex. B at 45.  This coverage is referred to as Time Element coverage because it covers losses during the time period when, for example, ordinary business operations are curtailed (called "the Period of Liability").

37.     The Period of Liability starts at "the time of physical loss or damage" in question and ends "when with due diligence and dispatch the building and equipment could be: (i) repaired and replaced; and (ii) made ready for operations, *under the same or equivalent physical and operating conditions that existed prior to the damage*." Ex. A at 52; Ex. B at 53.  (Emphasis added).

38.     The Time Element provision of the All Risks Policies covers Monumental Sports' financial losses due to its inability to operate normally or use Monumental Sports property normally because of physical losses and damage, including the physical damage and loss COVID-19 and the COVID-19 virus cause.

39.     Covered losses include, among others, the "Actual Loss Sustained," that is, the lost "total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured." Ex. A at 46; Ex. B at 47.  They also include Extra Expense, the "extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business" during the interruption.  Ex. A at 49; Ex. B at 50.

40.     The All Risks Policies also extend Time Element coverage to include losses incurred when, among other things:

- Monumental Sports suffers loss due to an order of *civil authority* that limits, restricts, or prohibits partial or total access to an insured location if the order is the direct result of physical damage of the type insured at or within five statute miles of an insured location;

14

- Monumental Sports suffers loss when ***ingress to or egress from*** insured locations is partially or totally prevented, interrupting Monumental Sports' business "whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to the property of the type insured";

- Monumental Sports must make ***rental payments*** made on property that is wholly or partially untenantable or unusable;

- Monumental Sports incurs ***lost rent***; and

- Monumental Sports suffers loss because of physical loss or damage at the location of customers, suppliers, contract manufacturers or contract service providers, and the location of any company under a royalty, licensing fee, or commission agreement with the Insured (known as "**contingent time element locations**").

41.     Unlike most property policies, the All Risks Policies sold here by Factory Mutual add two additional coverages:  one for costs incurred to clean up "communicable disease," and another for revenue losses resulting from such disease. "Communicable Disease" is defined in part as a disease which is "transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges."  Ex. A at 76; Ex. B at 77.  Factory Mutual has repeatedly conceded that COVID-19 and the COVID-19 virus qualifies as a "Communicable Disease."

42.     Losses that fall under, and are able to satisfy the requirements of, both the coverage for Time Element losses and the coverage for communicable disease are covered by ***both***.  The Communicable Disease coverage extensions have a relatively small sublimit, and some losses would satisfy only that coverage, and would thus be subject to that sublimit. However, the All Risks Policies nowhere say that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as Monumental Sports' COVID-19 losses—satisfy both the Communicable Disease coverage promise and other coverage promises. Nor do the All Risks Policies state that other coverages do not apply if the Communicable Disease coverage does.

43.     By contrast, Factory Mutual included such limiting language in other provisions

within the very same All Risks Policies.  For example, the provisions relating to Data Programs

and Software explicitly state that losses covered under that section are "excluded from coverage

elsewhere in this Policy."  *See, e.g.,* Exhibit A at 24–25; *see also id.* at 40 (Terrorism coverage

including identical language); *id.* at 55–56 (Off Premises Data Services Time Element coverage

including identical language).  Factory Mutual chose to omit that limiting language from both

Communicable Disease provisions.  Business interruption loss for a communicable disease (if it

causes physical loss or damage) is covered under the Time Element provisions even if also

covered under the Communicable Disease provisions.

44.     No exclusion in the All Risks Policies precludes coverage for Monumental Sports

for losses or damage due to communicable disease, including COVID-19, or due to the virus that

causes COVID-19.  In fact, Factory Mutual chose not to use either a pandemic or virus exclusion

such as the Insurance Services Office's ("ISO") virus exclusion used by many insurers since

2006.  The ISO exclusion—used by other insurers but deliberately omitted by Factory Mutual

from the All Risks Policies—states:  "We will not pay for loss or damage caused by or resulting

from any virus, bacterium or other microorganism that induces or is capable of inducing physical

distress, illness or disease."

45.     Another broad virus exclusion—used by other insurance companies but not used

by Factory Mutual— removes coverage for "loss, damage, or expense caused directly or

indirectly or resulting from . . . disease, sickness, any conditions of health, bacteria, or virus."

*Boulevard Carroll Entm't Grp., Inc. v. Fireman's Fund Ins. Co.*, 2020 WL 7338081, at *1

(D.N.J. Dec. 14, 2020) (internal quotations omitted).  That language further excludes virus-

related losses "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." *Id.*

46.     Factory Mutual chose not to include the aforementioned exclusionary language in its policies.  As is relevant here, the All Risks Policies contain only a narrow "contamination exclusion," understood by insurers and policyholders alike to apply narrowly and only to "environmental pollution," as that phrase is traditionally understood.  The exclusion provides in relevant part:

> D.     This Policy excludes the following **unless directly resulting from other physical damage not excluded by this Policy:**
>
> 1)     contamination, and any **cost** due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If contamination due only to the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy, then only physical damage caused by such contamination may be insured. (Emphasis added.)
>
> Ex. A at 21; Ex. B at 22.

47.     Because the All Risks Policies specifically cover communicable disease (such as COVID-19), this exclusion does not apply to communicable disease or any virus that causes communicable disease (such as the COVID-19 virus).

48.     The All Risks Policies define "contamination" as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."  Ex. A at 77; Ex. B at 78.  While this definition refers to "virus" and "disease causing or illness causing agent," it does not refer to "communicable disease," which is expressly covered by the All Risks Policies.  Indeed, Factory Mutual readily concedes that the exclusion does not apply to communicable diseases.  Thus, the exclusion may apply to non-communicable disease viruses (of which there are many, and which

may cause extensive physical loss or physical damage), but it does not apply to viruses that cause communicable disease (such as COVID-19).

49.     In addition to not applying to communicable disease, the exclusion also does *not* apply to "loss" or lost revenue—the key loss at issue here.  Quoting the Factory Mutual Policies, the exclusion applies to "Contamination, and the cost of contamination . . ."  (The exclusion then goes on to give several examples of "cost of contamination.").  But "costs" refers to amounts incurred or spent, not to revenue that could not be earned.

## II.     COVID-19 AND THE COVID-19 VIRUS CAUSE COVERED PHYSICAL LOSS AND DAMAGE.

50.     Factory Mutual itself acknowledges in its own guidance that a virus can cause physical damage.  In "Talking Points" that Factory Mutual distributed to its claim personnel, Factory Mutual stated that "[a] virus will *typically* not cause physical damage" (emphasis added).  Putting aside the accuracy of this statement, the COVID-19 virus is not typical.  The COVID-19 virus has clearly caused physical loss and damage, and has caused significant physical loss and damage to Monumental Sports' property.

51.     But before even receiving Monumental Sports' insurance claims, Factory Mutual denied that the COVID-19 virus causes physical loss or damage to property.  It did so, upon information and belief, without consulting any epidemiologists, chemists, medical doctors, or specialists in viral disease, or assessing the damage the COVID-19 virus causes to air and surfaces.  Science and plain observation demonstrate that the dangerous and potentially fatal COVID-19 virus damages and alters property, including in indoor air and surfaces, by rendering that property lost, unsafe, and unfit for normal use.

### A.     COVID-19 Is A Deadly Communicable Disease.

52.     COVID-19 is a deadly communicable disease caused by a coronavirus known as SARS-CoV-2 (referred to herein as "SARS-CoV-2" or "the COVID-19 virus").

53.     The COVID-19 virus can cause serious systemic illness and death.[4]  As of June 28, 2021, there have been over 181 million confirmed cases of COVID-19 (over 33 million of them in the United States) and over 3.8 million deaths worldwide.  Due to the rapid spread and pervasive presence of COVID-19 across the planet, the COVID-19 virus was presumed to be present or imminently present everywhere.

54.     Images depict SARS-CoV-2 as looking like a golf ball with protrusions called "spike proteins," which are the main components of the virus that interact with other surfaces.[5]



55.     Not all viruses cause communicable diseases or are even harmful.  Many viruses do not infect humans, and many that do cannot be transmitted from human to human.  Further, not all viruses that cause communicable disease cause the type of loss or damage to property that the COVID-19 virus causes (making common surfaces and indoor air sufficiently dangerous as

---

[4]     *See* John A. Lednicky et al., *Viable SARS CoV-2 in the air of a hospital room with COVID-19 patients*, INTERNATIONAL JOURNAL OF INFECTIOUS DISEASES (Sept. 15, 2020), https://www.ijidonline.com/article/S1201-9712(20)30739-6/fulltext (last visited June 28, 2021).

[5]     *See* Nancy Fliesler, *Capturing SARS-CoV-2's shape-shifting spike protein*, Boston Children's Hospital (July 21, 2020), https://answers.childrenshospital.org/sars-cov-2-spike-protein/ (last visited June 28, 2021).

to make large gatherings unsafe without significant precautions and widely available vaccines), or prompt authorities to issue shelter in place orders or other civil restrictions.  The COVID-19 virus is a rare exception that, because of its particular nature and characteristics, meets all of these criteria:  it causes disease; the disease is communicable; it causes physical loss and damage; and has thereby led to hundreds of orders prohibiting anything other than very small gatherings (prior to the wide availability of effective vaccines).

**B.      The COVID-19 Virus Can Be Transmitted In Many Ways.**

56.      As has become known during the pandemic, the COVID-19 virus is uniquely dangerous, both due to the dangers of exposure and due to the many ways it can be transmitted, and is particularly harmful to indoor air and surfaces—both of which are property capable of being damaged.

57.      Persons with COVID-19 expel the COVID-19 virus as they talk, yell, cheer, sing, cough, sneeze, or even just breathe.  It has been reported that such individuals release tiny virus bearing particles that can remain suspended "for indefinite periods";[6] a single sneeze releases a cloud of viral droplets;[7] and normal breathing and talking can spread the virus six feet or more.[8] Many of these particles make contact, adhere to, and physically alter the surfaces of nearby property, as explained below.  Infected individuals also deposit these particles by touching

---

[6]      Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited June 28, 2021).

[7]      *See* Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions,* JAMA Insights (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited June 28, 2021).

[8]      *See How COVID-19 Spreads*, CDC (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 28, 2021).

surfaces after touching their eyes or nose.  Research has shown that because the risk of disease

transmission increases substantially in enclosed environments, the COVID-19 virus poses a

significant risk to indoor spaces.[9]  And because the virus renders otherwise inert materials

dangerous, viral contact with property means significant damage and loss.

58.     Expelled respiratory secretions typically take on two main forms:  (1) droplets of

respiratory fluids containing the virus, and (2) aerosol particles (also called "droplet nuclei") that

likewise contain the virus.  In addition to the virus, both droplets of respiratory fluids and droplet

nuclei largely consist of water and mucus.  Droplet nuclei are usually smaller than 5 microns,

invisible to the naked eye and remain suspended in the air ("aerosolized") for significant periods.

Droplets are similarly invisible to the naked eye, but due to their larger size, they typically come

to rest on nearby surfaces.  We refer herein to droplets of respiratory fluids and droplet nuclei as

"viral droplets."

---

[9]     *See* Jianyun Lu et al., *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China,* 2020, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited June 28, 2021); *see also* Keun-Sang Kwon et al., *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea,* 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://pubmed.ncbi.nlm.nih.gov/33258335 (last visited June 28, 2021); Shin Young Park et al., *Coronavirus Disease Outbreak in Call Center, South Korea,* EMERGING INFECTIOUS DISEASES, Vol. 26, No. 8 (Aug. 2020), https://wwwnc.cdc.gov/eid/article/26/8/20-1274_article (last visited June 25, 2021); Lea Hamner et al., *High SARS-CoV-2 Attack Rate Following Exposure at Choir Practice — Skagit County, Washington, March 2020,* MORBIDITY AND MORTALITY WEEKLY REPORT Vol. 69 No. 19 (May 15, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e6.htm (last visited June 28, 2021); Leah F. Moriarty et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships—Worldside, February-March 2020,* MORBIDITY AND MORTALITY WEEKLY REPORT VOL. 69 NO. 12 (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited June 28, 2021).

59.     It has been reported that the incubation period for COVID-19—*i.e.*, the time

between exposure to the COVID-19 virus and symptom onset—can be up to 14 days,[10] and other

sources recognize the potential for longer "pre-symptomatic" periods.  Recent studies have found

that "viral loads"—that is, the concentration of virus in an infected person—in pre-symptomatic

individuals can be even higher than the viral loads among symptomatic individuals.[11]  The CDC

estimates that 30% of infected individuals never show symptoms of infection (called

"asymptomatic" carriers).[12]  Similar to pre-symptomatic individuals, the viral loads of

asymptomatic individuals can be higher than the loads among symptomatic carriers.[13]  The CDC

estimates that the majority of COVID-19 transmission results from pre- and asymptomatic

carriers.[14]  The CDC estimates that the number of people in the United States who have been

infected with COVID-19 is likely to be 10 times higher than the number of reported cases.[15]

---

[10]     *See Coronavirus disease 2019 (COVID-19) Situation Report—73*, World Health Organization (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf (last visited June 28, 2021).

[11]     *See* Melissa M. Arons et al., *Presymptomatic SARS-CoV-2 Infections and Transmission in a Skilled Nursing Facility*, New England Journal of Medicine (Apr. 24, 2020), https://www.nejm.org/doi/full/10.1056/NEJMoa2008457 (last visited June 25, 2021); Monica Ghandi et al., *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19* (Apr. 24, 2020), https://www.nejm.org/doi/full/10.1056/nejme2009758 (last visited June 28, 2021).

[12]     *See COVID-19 Pandemic Planning Scenarios*, CDC (Mar. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited June 28, 2021).

[13]     *See supra* note 11.

[14]     *See* Michael A. Johansson et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Network (Jan. 7, 2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707 (last visited June 28, 2021); *see also* Seyed M. Moghadas et al., *The Implications of Silent Transmission for the Control of COVID-19 Outbreaks*, 117 PNAS 17,513 (July 28, 2020), https://www.pnas.org/content/117/30/17513 (last visited June 28, 2021).

[15]     Lena H. Sun and Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported*, Wash. Post (June 28, 2020),

**C.** **The COVID-19 Virus Causes Physical Loss And Damage, In Part By Rendering Air And Property Unsafe And Unusable**.

60.     The COVID-19 virus directly causes physical loss and damage to property by, among other things: (1) physically altering both indoor air and property surfaces, making them unfit for their intended use, and (2) altering the molecular structure of, and changing from safe to dangerous, the physical surfaces of otherwise inert property.[16]  COVID-19 and the COVID-19 virus has caused all of these types of physical loss and damage to Monumental Sports' arenas and other insured locations.  As a result, Monumental Sports was unable use its arenas for their intended purpose—to host fans or more than a small number of fans—for significant portions of 2020 and 2021, absent extensive repairs and remedial measures and, now, the wide availability of effective vaccines.  In fact, the presence of COVID-19 and the COVID-19 virus, and the effects they have on closed-air spaces and property, caused civil authorities to impose unprecedented restrictions, prohibiting, among other things, fans from attending hockey games, basketball games, and other live events.

### 1.     The COVID-19 Virus Damages Air in Enclosed Spaces.

61.     As set forth above, studies have shown that the COVID-19 virus physically alters the air—particularly indoor air—rendering it unsafe.  *See supra* Paragraphs 52-59.  Additionally, COVID-19 virus studies have found that virus-laden aerosols can migrate substantial distances

---

https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited June 28, 2021).

[16]     Edris Joonaki et al., *Surface Chemistry Can Unlock Drivers of Surface Stability of SARS-CoV-2 in a Variety of Environmental Conditions,* NATIONAL LIBRARY OF MEDICINE (Sept. 10, 2020), https://pubmed.ncbi.nlm.nih.gov/32838053/ (last visited June 28, 2021).

through ventilation systems.[17]  For example, a study found the COVID-19 virus in the HVAC system of a hospital ward, detecting the virus more than 180 feet from the source thereof, patients infected with COVID-19,[18] and another study found that viable particles of the virus were present more than two meters away from the source thereof, patients infected with COVID-19.[19]

62.    COVID-19 virus studies have also found that the virus can spread through the air and settle on surfaces.  One study found that air flow caused by an HVAC system likely led to virus deposits in places where immobile patients did not go, such as under the bed or on the windowsill.[20]  Based on "epidemiological evidence suggestive of [COVID-19 virus] transmission through aerosol,"[21] the Environmental Protection Agency ("EPA"), the Occupational Safety and Health Administration ("OSHA"), and the CDC called for the modification of ventilation and HVAC systems by, for example, increasing ventilation with outdoor air.[22]  Medical researchers have advised that specialized air filtration systems be used to

---

[17]    Karolina Nissen et al., *Long-Distance Airborne Dispersal of SARS-CoV-2 in Covid-19 Wards*, Scientific Reports (Nov. 11, 2020), https://www.nature.com/articles/s41598-020-76442-2 (last visited June 28, 2021); *see supra* Jianyun Lu et al., note 9.

[18]    *See id.*

[19]    *See supra* Lednicky, et al., note 4.

[20]    *See* Joshua L. Santarpia, et al, *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care*, Scientific Reports (July 29, 2020), https://www.nature.com/articles/s41598-020-69286-3 (last visited June 28, 2021); Yuan Liu et al., *Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals*, NATURE (June 25, 2020), https://www.nature.com/articles/s41586-020-2271-3 (last visited June 28, 2021).

[21]    *Indoor Air and COVID-19 Key References and Publications*, United States Environmental Protection Agency (2021), https://www.epa.gov/coronavirus/indoor-air-and-covid-19-key-references-and-publications (last visited June 28, 2021) (capitalization omitted).

[22]    *Indoor Air and Coronavirus* (COVID-19), United States Environmental Protection Agency (2020), https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19 (last visited June 25, 2021); *COVID-19 Employer Information for Office Buildings*, Centers for Disease Control (Apr. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/office-

restore the air to its pre-COVID-19 infected state.[23]   The purpose of these suggestive measures is to attempt to physically restore the composition of the air by, among other things, diluting the concentration of virus particles or by trapping and removing them.

**2.      The COVID-19 Virus Physically Damages And Alters Otherwise Safe Surfaces.**

63.      The COVID-19 virus damages property by adhering to and altering the structure of its surface.  Specifically, it has been reported that the virus changes the surfaces of that property as its spike proteins become entangled with, bound to, and part of the molecular surface of the materials with which it comes into contact.  When that happens, the surfaces change in scientifically measurable and quantifiable ways.  Moreover, as studies have shown, these materials then become infectious when touched, making them unfit for use.[24]   This is a form of physical damage.

64.      Different surfaces are comprised of different molecules and the differences in the molecular makeup of surfaces impacts the ability, or inability, of viruses in general to interact with, bind to, and physically change the surface itself.  The molecules of the spike protein and its glycan shield —a sugary barrier that helps the virus evade the immune system—however, can interact with and bind to many different types of surfaces, meaning they can impair new surfaces quickly.

---

buildings.html (last visited June. 28, 2021); *Guidance on Preparing Workplaces for COVID-19*, Occupational Safety and Health Administration (2020), https://www.osha.gov/Publications/OSHA3990.pdf (last visited June 28, 2021).

[23]      Zeynep Tufeckci, *We Need to Talk About Ventilation*, THE ATLANTIC (July 30, 2020), https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairbornetransmission/614737/ (last visited June 28, 2021).

[24]      Similar deposits of viral droplets on surfaces could be made by an infected person through touching (e.g., sneezing or coughing into hand and then grabbing a railing).

65.     Studies by the National Institutes of Health ("NIH") and other researchers have found that the COVID-19 virus remains viable—*i.e.*, capable of infecting persons who come in contact with it—for at least seven days on a range of common surfaces (glass, stainless steel, and money) left at room temperature,[25] and parts of the virus can remain for far longer, even after cleaning.

66.     Surfaces already infected by the COVID-19 virus can further spread the virus. This mode of transmission—via objects and surfaces—is known as "fomite transmission." Fomite transmission has been demonstrated as a highly efficient mode of transmission for viruses, to spread both from object-to-hand and from hand-to-mouth.[26]  Studies have shown fomites transform the surface of property into a potentially deadly COVID-19 virus transmission vector.[27]

67.     The WHO has described fomite transmission as follows:

> Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites . . . .  Viable SARS-CoV-2 virus and/or RNA . . . can be found on those surfaces for periods ranging from hours to days, depending on the ambient environment (including temperature and humidity) and the

---

[25]     *See* Shane Riddell et al., *The Effect of Temperature on Persistence of SARS-CoV-2 on Common Surfaces*, 17 VIROLOGY J. 145 (Oct. 7, 2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited June 28, 2021); G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agent*s, J. OF HOSPITAL INFECTION (Feb. 6, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited June 28, 2021).

[26]     Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020,* 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited June 28 2021).

[27]     A. Meiksin, Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-ofcovid19-transmission-including-indirect-transmission-mechanisms-a-mathematicalanalysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited June 28, 2021).

> type of surface, . . . .  Therefore, transmission may also occur
> indirectly through touching surfaces in the immediate environment
> or objects contaminated with virus from an infected person . . . .[28]

68.     In addition to the studies cited by the WHO, numerous other articles have

acknowledged fomites as a mode of virus transmission, including:  (1) a study of a COVID-19

outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes

of the "rapid spread of SARS-CoV-2" in a shopping mall;[29] (2) a NIH study finding that the

COVID-19 virus survives for extended periods on copper, plastic, and stainless steel, and

suggesting that people may contract the virus through the air and after touching contaminated

objects;[30] and (3) a CDC research letter concluding that "fomite transmission might be an

important source of risk for SARS-CoV-2."[31]

69.     While masks and personal protective equipment help prevent fomite transmission,

effective prevention or reduction of fomite transmission also requires "a comprehensive package

of preventive measures" and "environmental cleaning and disinfection."[32]  CDC guidance

recommends the sanitization of public surfaces.[33]  Critically, it has been reported that ordinary

---

[28]     *Transmission of SARS-CoV-2: implications for infection prevention precautions*, World
Health Organization (July 9, 2020), https://www.who.int/news-
room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-
precautions (last visited June 28, 2021).

[29]     Jing Cai *supra* note 26.

[30]     *New coronavirus stable for hours on surfaces*, National Institutes of Health (Mar. 17,
2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces
(last visited June 28, 2021).

[31]     Alicia Kraaya et al., *Risk for Fomite-Mediated Transmission of SARS-CoV-2 in Child
Daycars, Schools, Nursing Homes and Offices*, EMERGING INFECTIOUS DISEASES (Apr. 2021),
https://pubmed.ncbi.nlm.nih.gov/33575002/ (last visited June 28, 2021).

[32]     *Supra* note 28.

[33]     *Running Errands and Food Delivery*, Centers for Disease Control (Jan. 8, 2021),
https://www.cdc.gov/coronavirus/2019-ncov/easy-to-read/essential-goods-services.html (last
visited June 28, 2021).

disinfection aimed at cleaning the virus cannot entirely and adequately remove the virus, as

portions of the virus remain, and thus the physical impacts of the virus on surfaces remain.[34]

### III. MONUMENTAL SPORTS SUFFERED THE TYPES OF LOSSES THE ALL RISKS POLICIES INSURE AGAINST.

70.     Monumental Sports' mission is to provide a wide-variety of indoor sporting

events and other entertainment to the Washington, D.C. community and those who visit it.

Monumental Sports owns three professional sports teams, the Capitals, Wizards, and Mystics, as

well as Capital One Arena, where the Capitals and Wizards play.  Monumental Sports also

manages EagleBank Arena, home of George Mason University basketball and host to myriad

events.  The Mystics play at a third indoor arena, D.C.'s Entertainment & Sports Arena.  Capital

One Arena alone seats 20,000 fans and welcomes nearly 3 million people each year across more

than 220 sports and entertainment events.  Monumental Sports' business and revenue, therefore,

depends on playing games and booking events for fans to attend at its indoor arenas, and

attracting thousands of people to attend those events.

71.     The Capitals are one of the NHL's 32 current professional hockey teams.  The

Capitals have consistently been one of the best teams in the NHL, and in 2018 they captured the

Stanley Cup—the District's first major professional sports championship in nearly 30 years.  The

fan turnout for the championship parade alone—over 100,000 fans and 800,000 metro riders—

illustrates the impact the Capitals have on this community.  With their non-stop, physical

gameplay and longtime star players, like Alexander Ovechkin, a Capitals player since 2004, the

experience the team provides to its fans is unmatched.  The official capacity for hockey games at

---

[34]     Nicolas Castano et al., *Fomite transmission and disinfection strategies for SARS-CoV-2 and related viruses*, Cornell University (May 23, 2020), https://arxiv.org/abs/2005.11443 (last visited June 28, 2021).

Capital One Arena, the Capitals' home venue, is 18,573.  Before the pandemic forced the postponement of the end of the 2019-2020 season, the previous 492 Capitals home games had sold out, dating back to 2008.

72.    The Wizards are one of the NBA's 30 professional basketball teams.  Previously named the Washington Bullets, the Wizards have been Washington, D.C.'s NBA basketball team since 1973 and in that time have garnered 29 playoff appearances and one NBA Championship Title.  The Wizards draw basketball fans of all ages to see the team's current playmakers, like Bradley Beal and Russell Westbrook, both perennial all-stars, battle it out against some of the nation's top opponents.  Beal and Westbrook embody the high energy, high output work ethic that Monumental Sports provides across all of its platforms.  Capital One Arena has played host to legends of the game, including arguably the greatest basketball player ever, Michael Jordan, a former member of the Wizards.  The official capacity for basketball games at Capital One Arena, the Wizards home venue, is 20,476.  Prior to the shutdown, over 530,000 fans attended Wizards home games at Capital One Arena in the 2019-2020 season.

73.    The Mystics are one of the Women's National Basketball Association's ("WNBA") 12 professional basketball teams.  The Mystics have been Washington, D.C.'s WNBA basketball team since 1998.  Like the Wizards and Capitals, the Mystics are league champions, winning their first WNBA Championship in 2019, and have appeared in the playoffs seven times.  Their current roster includes 2019 WNBA MVP Elena Delle Donne, a role model for young basketball players everywhere.  The official capacity for basketball games at D.C.'s Entertainment & Sports Arena, the Mystic's home venue, is 4,200.  In only 16 games in 2019, over 61,000 fans attended Mystics home games at Entertainment & Sports Arena.

74.     Washington, D.C. is one of most cosmopolitan cities in the world; home to diplomats and dignitaries from nearly every nation—and residents who speak nearly 170 different languages.  Monumental Sports' teams reflect the international nature of its community with players from all over the world.  Rising Wizards star Rui Hachimura is the first-ever Japanese-born athlete drafted into the NBA, and Deni Avdija, the highest ranked Israeli player drafted in the NBA, joined the Wizards in December.  Emma Meesseman, the Mystics' WNBA 2019 Finals MVP, is from Belgium.  The Capitals' roster features players from 10 different countries, with Alex Ovechkin leading the team as the first Russian captain in NHL history to win the Stanley Cup.

75.     Monumental Sports uses Capital One Arena, EagleBank Arena, and Entertainment & Sports Arena for more than just games and practices for sports teams—these venues host many other events each year including concerts, conventions, and graduations.

76.     Monumental Sports sustained significant physical damage to and loss of its property as a result of the COVID-19 virus[35] (*see* Section III.A below), and that physical damage and loss resulted in the loss of significant revenue and forced Monumental Sports to undertake significant, costly steps to resume and continue operations (*see* Section III.B below).  In addition, as a result of property damage and loss proximate to Monumental Sports' property, local governments issued orders that prevented or curtailed Monumental Sports' operations (*see* Section III.C below).

**A.     Monumental Sports' Insured Properties Suffered Physical Loss and Damage**

---

[35]     It was only in April 2021, more than one year after Capital One Arena was forced to close due to COVID-19, that Capital One Arena was permitted to host any fans—and then only at 10% of capacity (increasing to 25% on May 14 and 50% on May 28).  Similarly, EagleBank Arena, located in Fairfax, Virginia, a 10,000 seat arena, was allowed to host a mere 250 fans starting in late November 2020.

77.     As detailed below, infectious individuals were present at each of the arenas and properties at issue.  Reported local prevalence rates in D.C. and Virginia reached materially dangerous levels, and, given limited testing and other logistical issues, particularly in the early days of the pandemic, reported prevalence rates significantly understate actual prevalence rates. Since the start of the pandemic in March 2020, the District of Columbia has had over approximately 49,000 reported cases of COVID-19 and over 1,100 deaths; Maryland has had over approximately 462,000 reported cases of COVID-19 and over 9,700 deaths; and Virginia has had over 679,000 reported cases of COVID-19 and over 11,300 deaths.[36]  Accordingly, in addition to confirmed on-site cases, reported statistics—as was learned as the pandemic progressed—demonstrate that infectious individuals were present at each arena and location prior to the closure of the arenas in March 2020.  In addition, upon information and belief, numerous infectious individuals were present at other insured properties owned or used by Monumental Sports, including practice facilities and offices, causing damage to and loss of those properties as well.

78.     In May 2020, a Monumental Sports contractor with COVID-19 was present at Capital One Arena.  Between December 2020 and April 2021, 17 individuals who were tested at Capital One Arena were positive for COVID-19.  In addition, infections among hockey and basketball teams and in Monumental Sports' arenas and adjacent property continue:  in January 2021, six Wizards players tested positive for COVID-19 and another three players were placed under the NBA's COVID-19 protocols.  At that time, those players were playing games at Capital One Arena and practicing at the Wizards practice facility at the Entertainment & Sports

---

[36]     *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2021/us/covid-cases.html (last visited June 28, 2021).

Arena; and four Capitals players, who were playing games at Capital One Arena and practicing at their practice facility, were placed under the NHL's COVID-19 protocols. In May 2021, two Capitals players were placed under the NHL's COVID-19 protocols.[37] Further, a number of members of the George Mason men's basketball team and staff, who play at EagleBank Arena, tested positive for COVID-19 in late 2020 and early 2021.

79. In February and March 2020, approximately 505,000 people attended events at Capital One Arena, including at: eleven Wizards basketball games; eight Capitals hockey games; five Georgetown University Hoyas basketball games; several Disney On Ice events; concert performances by Post Malone, Marc Anthony, Aventura, and The Lumineers; a Worldwide Wrestling Entertainment ("WWE") show; and a comedic performance by Martin Lawrence. Between February and March 2020, when the COVID-19 virus was spreading rapidly throughout the D.C. metro region, EagleBank Arena and Entertainment and Sports Arena hosted thousands of people, including at: eight George Mason basketball games, the First Round of the A10 Women's Basketball Tournament, two performances of Paw Patrol Live and three concerts at EagleBank Arena, and three Capital City Go-Go (NBA G League) games at the Entertainment and Sports Arena.

80. Additionally, several high traffic, high volume food vendors—McDonalds, Chipotle, and Dunkin' Donuts—and other businesses are or were located in Capital One Arena. And, Capital One Arena is located above one of Washington, D.C.'s busiest metro stations, and access to the metro is located in close proximity to the entrance of the arena. In February 2020

---

[37] The NBA and NHL's COVID-19 protocols prevent anyone who has tested positive, or been in contact with someone who tested positive for COVID-19, from attending team workouts, games, or facilities during an extended period of time.

alone, over 23,000 people used this metro stop on a daily basis.[38]  Given their proximity, some

air from the metro seeps into Capital One Arena.

81.     Because numerous infectious individuals carried the COVID-19 virus in and onto

Monumental Sports' locations, *i.e.*, in and onto insured properties, each of those properties

sustained physical loss and damage.  Had Monumental Sports continued to host fans, the air and

surfaces in the arenas would have continually been infected and would have been unsafe.  And

because until only recently Monumental Sports had not been able to open its arenas to fans, or

many fans, without an influx of COVID-19 and the COVID-19 virus, its arenas have been

physically harmed and physically unavailable for use for their intended purpose or safe

occupancy.

**B.     The COVID-19 Virus Damage Forced Monumental Sports To Repair And Restore Its Property And To Take Expensive Measures To Mitigate Its Losses.**

82.     As discussed above in Section III.C, the EPA and CDC have recommended severe

and dramatic interventions to help reduce exposure to the COVID-19 virus.  Further, since the

onset of the pandemic Monumental Sports has been working diligently with its League partners,

the District of Columbia, and medical experts with MedStar Health to establish and implement

health and safety protocols that follow guidelines established by the CDC.  In addition to

prohibiting fans from attending games, Monumental Sports had to implement these and other

measures to reduce the amount of the COVID-19 virus present in and on its insured properties

and attempt to make property safe for its intended use.

---

[38]     *See Rail Ridership Data Viewer,* Washington Metropolitan Area Transit Authority, https://www.wmata.com/initiatives/ridership-portal/Rail-Data-Portal.cfm (last visited June 28, 2021).

83.     Monumental Sports retained the expertise of ME Engineers for a full HVAC study and response plan to upgrade existing arena HVAC systems and recommend improvements for mitigation of spreading airborne infectious diseases.  It implemented those recommendations, installing upgraded air filtration systems (*e.g.*, MERV 13 air filters), deploying portable air cleaners, and increasing outdoor air ventilation.  Because of the physical loss and damage caused by the COVID-19 virus, Capital One Arena could not re-open to the public without these repairs and modifications to its air ventilation systems.

84.     Monumental Sports also physically altered interior spaces at Capital One Arena to mitigate the spread of COVID-19, and attendant property damage and loss, by installing protective Plexiglas partitions at points of sale and limiting access to parts of the arenas.

85.     Additionally, Monumental Sports enhanced its employee training programs to include heightened sanitization procedures, installed hand sanitizer stations stocked with EPA-approved sanitizing products, including over 150 hand sanitizer stations in Capital One Arena, and purchased specialized sanitization equipment to limit potential airborne pathogens, including 47 state-of-the-art air sanitizing ceiling light fixtures in Capital One Arena.

86.     Once it was allowed to have games in late December 2020 (albeit without fans), Monumental Sports issued a number of protocols to help staff, players, and others needed to operate games to stay safe, including:  requiring that face masks be worn inside Capital One Arena; requiring everyone entering Capital One Arena to complete a short, health screening questionnaire prior to admittance; requiring staff to maintain six feet of distance; and requiring testing for certain players based on league requirements. Once it was allowed to host fans at games, Monumental Sports issued additional protocols to help staff, players, and fans stay safe, including:  issuing all tickets electronically; selling tickets in pods of one to four seats and placed

in a staggered manner throughout each seating section to maintain six feet of distance between pods and groups of ticket holders; issuing set windows of time for fans to enter the arena and make their way to their seats; requiring fans to enter Capital One Arena through specific, dedicated points of entry; and restricting concession items.[39]

87.     Monumental Sports has similarly made repairs to EagleBank Arena and the practice facility at Entertainment & Sports Arena by installing Plexiglas partitions at high traffic areas and limiting access to parts of the arenas, as well as installing hand sanitizer stations.

88.     Monumental Sports has incurred substantial expenses to implement such repairs and modifications to its insured properties as a result of the COVID-19 virus.  These extra expenses are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

### C.     Government Orders Resulting From Viral Damage Prevented Fans From Attending Sporting Events.

89.     To protect individuals from coming into contact with surfaces and air damaged by and containing the COVID-19 virus, local governments across the United States issued orders prohibiting or limiting all non-essential public and private gatherings.  Those orders restricted Monumental Sports from hosting basketball and hockey games and other events and restricted the public from attending basketball and hockey games and other events, *i.e.*, from using and accessing Monumental Sports' property as it was intended.  Below is a survey of the orders in D.C. and Virginia.

---

[39]     *Monumental Sports & Entertainment Continues to Focus on Health and Safety as Capital One Arena Opens to Washington capitals and Wizards Fans Beginning Next Week,* Monumental Sports, https://monumentalsports.com/2021/04/monumental-sports-entertainment-continues-focus-on-health-and-safety-as-capital-one-arena-opens-to-washington-capitals-and-wizards-games-fans-beginning-next-week/ (last visited June 28, 2021).

90.    **The District of Columbia**, by March 12, 2020, had ten known positive cases of

COVID-19 (though given significant testing limitations and pre- and asymptomatic carriers,

actual numbers were almost certainly much higher).[40]  On March 13, 2020, the DC Department

of Health prohibited mass gatherings, defined as events bringing more than 250 persons together,

including at stadiums or arenas.[41]  Subsequent orders issued throughout 2020 and continuing into

2021 continued to prohibit mass gatherings, including at stadiums or arenas, and closed all non-

essential businesses.[42]

91.    D.C.'s Mayor, Muriel Bowser, further prohibited mass gatherings because the

scientific evidence showed "that the most effective approach to slowing the community

transmission of communicable diseases like COVID-19 is through limiting public activities and

engaging in social distancing."[43]  The Mayor's March 24, 2020 order required that "essential

businesses" permitted to remain open must follow "Social Distancing Requirements" including

"[r]egular cleaning [of] high-touch surfaces."[44]  That is, restoring damaged, infectious property

to a safe state.  As of March 22, 2021, more than a year after Monumental Sports' venues shut

their doors due to COVID-19, Washington, D.C.'s professional sports teams were finally given

---

[40]    *See* Government of the District of Columbia, *Coronavirus Data Update: March 15*, https://coronavirus.dc.gov/release/coronavirus-data-update-march-15 (last visited June 28, 2021).

[41]    Notice of Emergency Rulemaking, Department of Health, District of Columbia (Mar. 13, 2020), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/release_content/attachments/DOH_Rulemaking_Mass-Gatherings.pdf (last visited June 28, 2021).

[42]    *See, e.g.,* Mayor's Order 2020-053, District of Columbia (Mar. 24, 2020) https://coronavirus.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-053%20Closure%20of%20Non-Essential%20Businesses%20and%20Prohibiti....pdf (last visited June 28, 2021).

[43]    *Id.*

[44]    *See id.*

the opportunity to apply for a waiver from the city government to grant them the ability to host fans in limited capacity.[45] On June 11, 2021, large sports and entertainment venues in D.C. were permitted to resume full normal operations.[46]

92.   **Virginia**, by March 22, 2020, had 219 known positive cases of COVID-19.[47] On March 23, 2020, Governor Northam began closing public access to recreational and entertainment businesses, including indoor sports facilities and hockey rinks.[48] These orders also required businesses to adhere to "enhanced sanitizing practices on common surfaces"[49] to protect people from touching damaged, infectious surfaces. It was only as of May 15, 2021, when indoor sports venues were allowed to have 50% percent occupancy or 1,000 persons, whichever was less.[50] Accordingly, EagleBank Arena, located in Virginia, was permitted to operate at only 10% capacity (1,000 fans for 10,000 seats) one year after shutting down due to COVID-19.

---

[45]   Coronavirus (COVID-19) Situational Update, DC Health, at Slide 23 (Mar. 15, 2021) https://mayor.dc.gov/sites/default/files/dc/sites/coronavirus/release_content/attachments/Situational-Update-Presentation_03-15-21.pdf (last visited June 28, 2021).

[46]   Coronavirus (COVID-19) Situational Update, DC Health, at Slide 4 (May 17, 2021) https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/release_content/attachments/Situational-Update-Presentation_May_17_2021_.pdf (last visited June 28, 2021).

[47]   Laura Taylor, *219 total coronavirus cases confirmed in Virginia*, WSET (Mar. 22, 2020), https://wset.com/news/coronavirus/3-deaths-and-219-total-coronavirus-cases-confirmed-in-virginia (last visited June 28, 2021).

[48]   *See, e.g.*, Executive Order Number Fifty-Three (2020), Commonwealth of Virginia Office of the Governor (Mar. 23, 2020) https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf (last visited June 28, 2021).

[49]   *Id.*

[50]   Executive Order Seventh Amended Number Seventy-Two (2021) and Order of Public Health Emergency Nine, Commonwealth of Virginia Office of the Governor (May 14, 2021) https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-72-SEVENTH-AMENDED-and-Order-of-Public-Health-Emergency-Nine-Easing-of-Commonsense-Surge-Restrictions-Due-to-Novel-Coronavirus-(COVID-19).pdf (last visited June 28, 2021).

93.     Each such order was issued to, among other things, keep people from coming into contact with damaged property, *i.e.*, property whose surfaces had been altered by the attachment of the COVID-19 virus or viral droplets, rendering that property unfit for its intended purpose. *See, e.g., supra* Section II.

94.     By March 30, 2020, each of the arenas owned or used by Monumental Sports' was subject to one or more civil authority orders that prohibited, severely impaired, or restricted normal arena operations.

95.     The initial orders shut down Monumental Sports' operations.  Government orders prohibited fans from attending NBA, NHL, or WNBA games in arenas owned or used by Monumental Sports for over a year.  Only in April 2021 did Monumental Sports receive a waiver from the District of Columbia to host fans and then only to operate at 10% of capacity.  These orders, and other orders, have prohibited, limited, restricted, or impaired access to Monumental Sports' arenas and other insured properties, precluding its teams from playing hockey and basketball and precluding any other events from occurring under pre-COVID-19 conditions.

96.     Damage caused by COVID-19 and the COVID-19 virus to property in and around Monumental Sports' insured properties, including the Gallery Place metro stop at Capital One Arena, made travel difficult and dangerous in and around the arenas.  In particular, the risk of coming into contact with property that had COVID-19 and the COVID-19 virus on its surface created meaningful risks and made traveling to and from Monumental Sports' property nearly impossible.

## IV.     MONUMENTAL SPORTS SUFFERED HUNDREDS OF MILLIONS IN LOSSES.

97.     COVID-19 and the COVID-19 virus devastated Monumental Sports, causing widespread physical loss and damage that resulted in hundreds of millions of dollars in losses. Because its business depends upon using its arenas to host fans, Monumental Sports bought

insurance to protect itself against the financial consequences (including the loss of revenue and extra expenses) resulting from the inability to operate after loss or damage sustained at their properties *and* against the costs of restoring such damaged property.

98.     Monumental Sports earns revenue from arena-related activities, such as ticket sales, concessions, parking, and in-arena merchandise sales—all of which rely on fans attending games or events.  These revenues make up a significant portion of Monumental Sports' income.

99.     The COVID-19 virus—and the damage to and loss of property it caused—forced Monumental Sports to cancel or postpone at least 60 events at Capital One Arena in 2020, including dozens of Capitals and Wizards games, dozens of concerts (*e.g.*, Billie Eilish, Harry Styles, Janet Jackson, The Weeknd, Rage Against the Machine, Bon Jovi), and other entertainment events, like WWE and Dude Perfect.

100.    Likewise, Monumental Sports was forced to cancel or postpone at least 40 events at the EagleBank Arena in 2020.  Those cancellations included numerous performances of Sesame Street Live, Disney On Ice, Harlem Globetrotters, WWE, and many high school graduations

101.    The COVID-19 virus—and the damage to and loss of property it caused—forced the NHL, NBA, and WNBA to cancel a significant number of games during the 2019-2020 season—games that were to be played at Monumental Sports' insured arenas, including the entire 2020 Mystics season that was to be played at D.C.'s Entertainment & Sports Arena.  These cancellations caused Monumental Sports to lose substantial income and incur material expenses. The losses and expenses extended into 2021 as the NHL had to limit its 2020-2021 season to 56 rather than the traditional 82 games, and the NBA had to limit its 2020-2021 season to 72 instead of the usual 82 games—with home games planned to be played at Capital One Arena.

102.     Because of COVID-19 and the COVID-19 virus, the resulting difficulty and dangers traveling to or from Monumental Sports' arenas and the associated government orders, Monumental Sports could not open its doors in Washington, D.C. to any fans for over 13 months——from March 12, 2020 through April 21, 2021.

103.     When Monumental Sports was finally able to host fans at Capital One Arena, it was limited to 10% capacity, or approximately 2,100 fans.  This 10% capacity limit allowed Entertainment & Sports Arena to hold only around 400  people.  EagleBank Arena was able to host 250 fans for the George Mason University men's basketball team's games for its 2020-2021 season, but was unable to schedule other events for 2021 while capacity restrictions were in place.

104.     In addition to Monumental Sports' inability to conduct normal arena operations, upon information and belief, its suppliers, licensees, and others also have suffered their own physical loss or damage at their premises resulting from the COVID-19 virus that in turn led to additional losses to Monumental Sports.

## V.     THE ALL RISKS POLICIES COVER MONUMENTAL SPORTS' LOSSES.

105.     As set forth in the attached copies of the All Risks Policies, Monumental Sports and its subsidiaries are insured under the All Risks Policies.  *See* Ex. A at 8; Ex. B at 8.

106.     Each entity seeking insurance coverage with respect to insured properties is covered under the All Risks Policies.

107.     As described above, Monumental Sports suffered material physical loss and damage to property insured by the All Risks Policies.  As explained in Sections V.A to V.G below, these losses fall within the coverage promises of the All Risks Policies.

108.     Monumental Sports gave timely notice of its claims under Policy No. 1056084.

109.     Monumental Sports gave timely notice of its claims under Policy No. 1068228.

110.    Monumental Sports paid the full premium for Policy No. 1056084.

111.    Monumental Sports paid the full premium for Policy No. 1068228.

112.    Monumental Sports has satisfied, is excused from performing, or Factory Mutual

has waived or is estopped from insistence upon performance of, all conditions of the All Risks

Policies, including but not limited to payment of required premiums, provision of timely notice

of claim, and submission of a Proof of Loss.

113.    The All Risks Policies provide several types of coverage that insure Monumental

Sports' massive losses relating to COVID-19.  As detailed below, these include coverages for:

a) property damage and for the costs to repair property; b) lost income (called Time Element)

losses and extra expenses resulting from physical loss or damage to property; c) losses due to

orders of civil authority issued due to COVID-19; d) losses caused by the inability to access

insured properties due to nearby viral property damage and loss; e) losses covered under the

Communicable Disease coverage; and f) losses covered by other provisions of the All Risks

Policies.

**A.      The All Risks Policies Cover Monumental Sports' Property Damage and
Repair Costs.**

114.    The All Risks Policies specifically "insure[]" the "Real Property" and "Personal

Property" of Monumental Sports and its entities "against ALL RISKS OF PHYSICAL LOSS OR

DAMAGE."  As explained above, the COVID-19 virus caused physical loss and damage to both

real and personal property of Monumental Sports.

115.    In the event of such damage to or loss of insured property, the All Risks Policies

promise to pay Monumental Sports "the cost to repair" that property or alternatively, to pay

Monumental Sports the "actual cash value" of such property if it "is useless to the Insured," *i.e.*,

the policyholders.  In addition, the All Risks Policies promise to pay for the "reasonable and

necessary costs incurred for the temporary repair of insured physical damage to insured property . . . and to expedite the permanent repair or replacement" thereof.  As explained above, the COVID-19 virus caused physical loss and damage to both real and personal property of Monumental Sports.

116.    Monumental Sports incurred costs to repair physical damage and loss caused to its arenas and other insured locations including by, among other things, installing upgraded air filtration systems and implementing additional and heightened sanitization procedures.  The latter required purchasing specialized sanitization equipment to limit potential airborne pathogens (including ultraviolet germicidal irradiation equipment).

117.    Monumental Sports' repair costs are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

**B.    The All Risks Policies Cover Monumental Sports' Massive Business Interruption Losses and Extra Expenses.**

118.    The All Risks Policies "insure[] TIME ELEMENT loss . . . directly resulting from physical loss or damage of the type insured" both to insured property and to property "used by the Insured."  Each Policy computes the Policyholder's TIME ELEMENT loss as the amount that it would have earned had no loss occurred less the amount it did in fact earn.  Time Element losses are covered during the PERIOD OF LIABILITY, which for "building and equipment" starts "from the time of physical loss or damage of the type insured," and ends "when with due diligence and dispatch the building and equipment could be: (i) repaired and replaced; and (ii)

made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage."[51]

119.    Despite the fact that the term "TIME ELEMENT" appears in all capital letters, the All Risks Policies nowhere define that term.

120.    The All Risks Policies also cover "reasonable and necessary extra costs incurred by the Insured . . . during the PERIOD OF LIABILITY . . . to temporarily continue as nearly normal as practicable the conduct of the Insured's business; [and to] temporarily us[e] property or facilities of the Insured or others".

121.    As shown in Section III.A above, Monumental Sports has suffered direct physical loss and damage of the type insured under the All Risks Policies to property insured by those policies.

122.    As explained in Section IV above, due directly to physical loss to its insured properties, Monumental Sports sustained losses of gross earnings, losses of other operational earnings, losses of gross profits, diminished sales, and incurred additional operating expenses, extra expenses, increases in the cost of doing business, costs to prevent or mitigate losses, claim preparation costs, leasehold and rental losses, and other covered losses.

123.    Monumental Sports has undertaken numerous measures to repair and replace building and equipment and make Monumental Sports facilities ready for operations, in response to the presence of the COVID-19 virus.  Some of these measures include modifications to its

---

[51]    The PERIOD OF LIABILITY applies to "all TIME ELEMENT COVERAGES" with certain exceptions, including for GROSS PROFIT Time Element coverage, which starts "from the time of physical loss or damage of the type insured," and ends "not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section," or a 12 month period for most properties, "during which period the results of the business shall be directly affected by such damage."

HVAC systems; Plexiglas barriers; touchless entry and payment systems; revised arrangements of interior spaces, revised interior traffic flows; and continuous deep cleaning.  These alterations and modifications are ongoing, but have not yet allowed Monumental Sports to resume operations "under the same or equivalent physical and operating conditions that existed prior to the damage."

124.    While Monumental Sports took steps to reduce and mitigate its losses, damages and expenses, it has not been able to further and materially do so through the use of property or services owned or controlled by others, the use of property or services obtainable from other sources, working extra time or overtime, or the use of inventory.

125.    Monumental Sports' Business Interruption losses are ongoing and continuing.

126.    Monumental Sports has incurred reasonable and necessary extra expenses to temporarily continue as nearly normal as practicable the conduct of its business due to the suspension of operations, including but not limited to extra expenses for COVID-19 screening and testing, housing, sanitizing supplies, physical and structural modifications, security at facilities, and other operational changes.  These expenses were above and beyond those that usually would have been incurred in conducting Monumental Sports' business during the same period had no physical loss or damage occurred.

C.    **The All Risks Policies Cover Monumental Sports' "Civil Authority" Losses**.

127.    The All Risks Policies "cover[] the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometres of it."

128.     As set forth in Section III.C above, state and local authorities in each city and/or state where Monumental Sports property is located, including without limitation the District of Columbia and Virginia, issued orders that "limit[ed], restrict[ed] or prohibit[ed] partial or total access to insured location[s]."  As set forth in Section III.C. above, each such order was issued as "the direct result of physical damage of the type insured" either at insured locations or within five or fewer statute miles of such locations.

129.     The governmental orders limiting, restricting, and prohibiting access to Monumental Sports' insured locations were issued because of physical and structural damage caused by the physical presence of the COVID-19 virus on furniture, doors, floors, bathroom facilities, and other surfaces; and in the air within offices, restrooms, shops, concourses, and HVAC systems at properties within one to five miles of Monumental Sports' insured locations..

130.     Many of these orders refer to the COVID-19 virus as a basis for prohibiting access to businesses, including hockey and basketball arenas and other facilities at issue here. *See supra* Section III.C.  All such orders were issued to, in part, prevent people from coming into contact with and touching damaged property, the surfaces of which had been altered by the adherence of COVID-19 viruses, and air, the composition of which had been and would be significantly altered by aerosolized viral droplets.  The physical loss and damage caused by COVID-19 is of the type insured by the All Risks Policies generally as well as by the Communicable Disease provision specifically.

131.     Monumental Sports has sustained actual losses due to the orders of civil authority described in Section III.C above.  Monumental Sports has incurred reasonable and necessary expenses, due to the orders of civil authority described in Section III.C above, to temporarily continue as nearly normal as practicable the conduct of its business.

132.    Monumental Sports' expenses due to orders of civil authority are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

**D.    The All Risks Policies Cover The Losses Monumental Sports Sustained Given The Danger Of Accessing Insured Locations Due To Nearby Viral Property Damage And Loss.**

133.    The All Risks Policies "cover[] the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured."

134.    The widespread presence of COVID-19 and the COVID-19 virus, fomites, and respiratory droplets or droplet nuclei made traveling to or from Monumental Sports' facilities significantly more difficult and dangerous, and damaged, among other things, real and personal property necessary for safe travel to and from Monumental Sports' facilities.

135.    Said otherwise, due to physical damage—the alteration and damage to surfaces as described above (*see* Section II)—to everything from door knobs and elevator buttons to seats in subways, busses and cars, travel to and from Monumental Sports' arenas became quite dangerous.  Likewise, air in subway cars, busses, taxis and ride-sharing vehicles was similarly and significantly altered—damaged—by aerosolized viral droplets.  Travel became quite dangerous and difficult given this damage.

136.    As a result of these partial or total preventions or impairments of ingress to and egress from Monumental Sports' facilities, the operations and business of each Monumental Sports insured entity was interrupted.

137.    As explained in Section IV above, Monumental Sports has sustained actual losses and has incurred extra expenses due to the necessary interruption of its business because of the partial or total physical prevention and impairment of ingress to or egress from insured property as a result of physical damage to the type insured by the policy (including, *inter alia*, the actual presence of communicable disease) to property of the type insured by the policy, namely real and other property, among other things.

138.    Monumental Sports' extra expenses due to prevention of ingress/egress are other than those that usually would have been incurred in conducting business during the same period had no physical loss or damage occurred.

**E.      The All Risks Policies Cover Monumental Sports' Communicable Disease Losses.**

139.    As explained in Section I above, the All Risks Policies provide explicit coverage for Communicable Disease.  The All Risks Policies contain two grants of coverage related to Communicable Disease.

140.    The All Risks Policies extend coverage to COMMUNICABLE DISEASE RESPONSE COSTS if any "location owned, leased, or rented by the Insured has the actual not suspected presence of communicable disease and access to such location is limited, restricted, or prohibited by: 1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or 2) a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease," the All Risks Policies cover the "reasonable and necessary costs incurred by the Insured at such location with the actual not suspected presence of communicable disease" including for the "cleanup, removal and disposal of the actual not suspected presence of communicable diseases from insured property."

141.    The All Risks Policies also include a coverage extension for INTERRUPTION
BY COMMUNICABLE DISEASE, which "covers the Actual Loss Sustained and EXTRA
EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such location with the
actual not suspected presence of communicable disease" and "access to such location is limited,
restricted or prohibited [for more than 48 hours] by: 1) an order of an authorized governmental
agency regulating the actual not suspected presence of communicable disease; or 2) a decision of
an Officer of the Insured as a result of the actual not suspected presence of communicable
disease."

142.    The communicable disease COVID-19 and the COVID-19 virus (the disease
causing agent) was actually present at Monumental Sports' locations because hockey and
basketball players, coaches, staff, employees, contractors, vendors, and/or patrons carrying the
communicable disease COVID-19 were present at one or more insured properties during the
period of liability.

143.    Access to one or more insured properties was limited, restricted, or prohibited as a
result of orders of authorized governmental agencies regulating the actual presence of the
communicable disease COVID-19 and the COVID-19 virus, and the decisions of an officer of
Monumental Sports as a result of the actual presence of the communicable disease COVID-19
and the COVID-19 virus at insured properties for a period of more than 48 hours.

144.    Monumental Sports sustained actual loss and incurred extra expense during the
period when its insured property was inaccessible due to the actual presence of COVID-19 on
the property.  Such extra expenses were other than those that usually would have been incurred
in conducting Monumental Sports' business during the same period had no loss occurred.

145.    Monumental Sports incurred reasonable and necessary costs for the cleanup, removal, and disposal of the actual presence of the communicable disease COVID-19, including the cleanup, removal, and disposal of materials contaminated with the COVID-19 virus.

146.    Monumental Sports incurred reasonable and necessary costs for public relations and related services resulting from the presence of COVID-19 on insured property.

**F.      The All Risks Policies Cover The Losses Monumental Sports Sustained To Protect Its Property And Mitigate Its Losses.**

147.    The All Risks Policies cover "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property."

148.    Monumental Sports incurred reasonable and necessary costs for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage from the COVID-19 virus and COVID-19 to such insured property.

149.    Monumental Sports sustained actual loss during the period beginning 48 hours before and lasting until 48 hours after the need to take reasonable action for the temporary protection and preservation of property insured by the All Risks Policies to prevent impending physical loss or damage to such property, including the cost of and losses caused by closing arenas, protecting and preserving property at arenas, and ensuring that arena property is not damaged by the COVID-19 virus or COVID-19.

**G.      Numerous Other Provisions Of The All Risks Policies Cover Monumental Sports' Losses.**

150.    In addition to the losses and coverages described above, Monumental Sports' COVID-19 losses are covered under any and all other coverages under the All Risks Policies that

49

may apply. These include but are not limited to Contingent Time Element and Claims Preparation Cost coverage.

151.     DC Arena L.P. has sustained actual loss of rental income for leases at properties that have become wholly or partially untenantable or unusable due to impairment by the COVID-19 virus and COVID-19 and related concerns, including but not limited to the fair rental value of properties they occupy, reasonably expected rental income from unoccupied or unrented portions of properties, and rental income from the rented portions of such property under leases, contracts or agreements in force at the time of the loss.  Several Monumental Sports insured entities have also sustained losses in the form of rent paid for facilities they have been unable to use because of orders, physical damage, or physical loss, as described more fully above.

152.     Monumental Sports sustained actual loss and incurred extra expense directly resulting from physical loss or damage of the type insured to property of the type insured at locations of direct customers, suppliers, contract manufacturers or contract service providers, and/or companies under a royalty, licensing fee or commission agreement.  For example, Monumental Sports relies on several suppliers to deliver food and drinks, equipment and more to its properties.  The physical loss or damage to the suppliers' properties disrupted service and delivery to Monumental Sports causing them to suffer losses.

## VI.     FACTORY MUTUAL FAILED TO HANDLE MONUMENTAL SPORTS' CLAIMS PROPERLY AND REFUSED TO HONOR ITS PROMISE.

153.     On April 23, 2020, Monumental Sports reported to Factory Mutual that it had experienced a loss at all locations provided on the Schedule of Locations (Exhibit A, at Appendix A).

154.     Factory Mutual has not acknowledged coverage for the general business interruption, civil authority or other claims like those presented here by Monumental Sports.

For example, on September 16, 2020, Factory Mutual wrote to Monumental Sports stating that "[t]he presence of COVID-19 at an insured location does not constitute 'physical damage of the type insured' as required under this provision. Accordingly, the Policy's Civil or Military Authority provision (and other Policy provisions requiring physical loss or damage of the type insured) do not respond based on the information presented."

155.     Factory Mutual took the position that COVID-19 and the COVID-19 virus do not cause "physical loss or damage" despite the fact that the virus rendered Monumental Sports' insured arenas and other properties unfit for their intended use. Factory Mutual also took that position notwithstanding that that it argued in litigation that a mold infestation that "rendered" insured property "unfit for its intended use" constituted "physical loss or damage. *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 at 3. In that case, Factory Mutual went on to assert that "[a]t best," the term "'physical loss or damage,' which is undefined, is susceptible of more than one reasonable interpretation and is therefore ambiguous." *Id.* at 3 n.1. Now Factory Mutual is taking the contrary position that "physical loss or damage" is unambiguous and that COVID-19 and the COVID-19 virus do not constitute insured physical loss or damage, even when they render properties—such as Monumental Sports' arenas—unfit for their intended use.

156.     Additionally, upon information and belief, Factory Mutual failed to conduct a medical, chemical, chemical engineering, civil engineering, statistical, or biostatistical investigation before taking the position that impairment of property by the COVID-19 virus did not constitute physical loss or damage under the policies it had sold to many policyholders, including Monumental Sports.

157.     Upon information and belief, Factory Mutual also did not consult any medical doctors, infectious disease experts, biologists, chemists, civil or building engineers or other relevant experts prior to publicly saying that COVID-19 or the COVID-19 virus do not cause physical loss or damage or denying Monumental Sports' claims.

158.     Further, Factory Mutual arrived at the conclusion that COVID-19 and the COVID-19 virus do not cause physical loss or damage despite never sending an adjuster to inspect or visit any of Monumental Sports' properties to investigate its claims.

159.     Factory Mutual's September 16, 2020 letter to Monumental Sports is consistent with a set of "Talking Points" prepared by Factory Mutual to ensure that Factory Mutual's adjusters shunt all COVID-19 claims into limited Communicable Disease Coverage, despite the realities of the harm caused by COVID-19 and the COVID-19 virus.

160.     Upon information and belief, Factory Mutual failed to properly investigate whether Monumental Sports' property was lost or damaged because it already had decided—without considering sufficient scientific evidence—that viruses do not cause physical loss or damage.  This decision, without facts or analysis, contradicts settled, proper insurance claim-handling procedures and represents Factory Mutual's negligent conduct in handling Monumental Sports' claims.  Moreover, Factory Mutual, knowing it had already decided that COVID-19 and the COVID-19 virus do not cause "physical loss or damage," nonetheless sent Monumental Sports letter after letter asking for information about the basis for Monumental Sports' claims.

## FIRST CAUSE OF ACTION
### (For Breach of Contract Against Factory Mutual)

161.     Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 160 of this Complaint, inclusive, as though set forth fully herein.

162.    Factory Mutual's All Risks Policies are valid and enforceable contracts between Plaintiffs and Factory Mutual.

163.    Plaintiffs have satisfied, are excused from performing, or Factory Mutual has waived or is estopped from insistence upon performance of, all conditions of the All Risks Policies, including but not limited to payment of required premiums, provision of timely notice of claim, and submission of a Proof of Loss.

164.    Factory Mutual agreed in its insurance contract to provide insurance coverage for all risks of physical loss or damage not otherwise excluded.

165.    The COVID-19 virus have caused and continues to cause physical loss and/or damage to Plaintiffs' properties and to properties within five miles of Plaintiffs' insured locations.

166.    The Plaintiffs have suffered actual losses and incurred extra expense due to physical loss and damage caused by the COVID-19 virus, a risk not excluded by the All Risks Policies.

167.    No exclusion in the All Risks Policies applies to preclude or limit coverage.

168.    As is set forth more fully above, Factory Mutual is contractually obligated under the All Risks Policies to indemnify Plaintiffs for the full amount of their losses.

169.    Factory Mutual refused to indemnify Plaintiffs' for their losses and expenses in breach of the All Risks Policies.

170.    As a direct and proximate result of its breaches of contract, Factory Mutual has deprived Plaintiffs of the benefits of the insurance contracts for which substantial premiums were paid, which entitles Plaintiffs to money damages, including interest according to law.

171.     Plaintiffs' losses as a result of Factory Mutual's breaches of contract are continuing, and Plaintiffs reserve the right to seek the full and exact amount of its damages at the time of trial.

## SECOND CAUSE OF ACTION
### (For Declaratory Relief Against Factory Mutual)

172.     Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 160 of this Complaint, inclusive, as though set forth fully herein.

173.     Plaintiffs seek a declaration of the parties' rights and duties under Factory Mutual's All Risks Policies in accordance with D.C. Super. Ct. R. Civ. Pro. 57.

174.     An actual and justiciable controversy exists between Plaintiffs and Factory Mutual concerning Factory Mutual's contractual duties to indemnify Plaintiffs' claims for real property losses, time element losses, and other losses, costs, and expenses under Factory Mutual's All Risks Policies.

175.     The controversy between Plaintiffs and Factory Mutual is ripe for judicial review.

176.     The controversy is of sufficient immediacy to justify the issuance of declaratory relief.

177.     Plaintiffs accordingly seek a declaration from the Court that:

- Each coverage provision identified in the Complaint is triggered by Plaintiffs' claims;

- No exclusion in the All Risks Policies apply to preclude or limit coverage for Plaintiffs' claims;

- Plaintiffs have satisfied or been excused from satisfying, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the All Risks Policies;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their claims of real property losses, time element losses, extra expense, and other losses sustained as a result of direct loss or damage to property due to the COVID-19 virus and/or COVID-19;

54

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for GROSS EARNINGS or GROSS PROFITS loss, at Plaintiffs' election, during the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for EXTRA EXPENSE incurred to continue business during the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their time element losses and extra expense as a result of orders of civil authority that have limited, restricted, or prohibited access to insured properties as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations within five miles therof;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their time element losses and extra expense wherever ingress to or egress from insured property has been partially or totally prevented as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their lost rent and actual loss sustained with respect to rental properties;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their lost GROSS EARNINGS incurring during the Extended Period of Liability after the end of the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for losses and extra expense associated with physical loss of or damage to contingent time element properties;

- Factory Mutual is contractually obligated under its U.S. All Risks Policies to indemnify Plaintiffs for response costs and time element losses and extra expense as a result of the actual presence of communicable disease at insured locations;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for actual loss sustained to prevent and costs incurred to temporarily protect actual or impending physical loss or damage to insured property; and

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their claims preparation costs.

## THIRD CAUSE OF ACTION
### (For Breach of Implied Covenant of Good Faith and Fair Dealing Against Factory Mutual)

178.   Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 160 of this Complaint, inclusive, as though set forth fully herein.

179.   Parties to every commercial contract, including insurance contracts, owe each other a duty of good faith and fair dealing. Accordingly, Factory Mutual agreed to act in good faith and deal fairly with Monumental Sports when it entered into the insurance contract and accepted its premium payments.

180.   The totality of the circumstances relevant to this matter reflect that Factory Mutual's conduct has been in violation of the implied covenant of good faith and fair dealing inherent in that contract.

181.   Factory Mutual had no valid reason to deny Monumental Sports coverage or refuse to pay Monumental Sports' claims.

182.   Factory Mutual knew or recklessly disregarded the fact that no reasonable basis for denying Monumental Sports coverage existed.

183.   Factory Mutual acted unreasonably in denying Monumental Sports coverage and knew of or was conscious of the fact that its conduct was unreasonable.

184.   Among other things, Factory Mutual:

- presumptively denied coverage for losses clearly covered by the All Risks Policies; and

- disregarded facts and evidence showing that the COVID-19 virus causes direct physical loss or damage to property.

185.   Factory Mutual's conduct is unreasonable because of the specific All Risks Policies it sold Monumental Sports. Factory Mutual knew viruses cause direct physical loss or damage to property within the meaning of its All Risks Policies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

(1)     A declaratory judgment in favor of Plaintiffs and against Factory Mutual declaring that:

   a)  Each coverage provision identified in the Complaint is triggered by Plaintiffs' claims;

   b)  No exclusion in the All Risks Policies applies to preclude or limit coverage for Plaintiffs' claims;

   c)  Plaintiffs have satisfied or been excused from satisfying, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the All Risks Policies;

   d)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their real property losses, time element losses, extra expense, and other losses sustained as a result of direct loss or damage to property due to the COVID-19 virus and/or COVID-19;

   e)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for GROSS EARNINGS or GROSS PROFITS loss, at Plaintiffs' election, during the Period of Liability;

   f)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for EXTRA EXPENSE incurred to continue business during the Period of Liability;

   g)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their time element losses and extra expense as a result of orders of civil authority that have impaired, limited, restricted, or prohibited access to insured properties as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations within five miles;

   h)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their time element losses and extra expense wherever ingress or access to, or egress from, insured property has been impaired or partially or totally prevented as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations;

   i)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their lost rent and actual loss sustained with respect to rental properties;

57

j)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their lost GROSS EARNINGS incurring during the Extended Period of Liability after the end of the Period of Liability;

k)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for losses and extra expense associated with physical loss or damage to contingent time element properties;

l)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for response costs and time element losses and extra expense as a result of the actual presence of communicable disease at insured locations;

m)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for actual loss sustained to prevent and costs incurred to temporarily protect actual or impending physical loss or damage to insured property; and

n)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their claims preparation costs;

(2)  Compensatory and consequential damages in an amount to be proven at trial;

(3)  Pre-judgment and post-judgment interest as provided by law;

(4)  An award of court costs and attorneys' fees;

(5)  Interest on such court costs and attorneys' fees and costs;

(6)  Exemplary and punitive damages; and

(7)  Such other and further relief as this Court finds just and proper.

Dated:  June 29, 2021                COVINGTON & BURLING LLP


By:   _/s/ Matthew J. Schlesinger_____
Matthew J. Schlesinger
D.C. Bar No. 429689
Covington & Burling LLP
One CityCenter
850 Tenth Street Northwest
Washington, DC 20001
(202) 662-6000
mschlesinger@cov.com

Attorneys for Plaintiffs

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial of all issues so triable pursuant to D.C. Super. Ct. R. Civ. Pro. 38.

Dated:  June 29, 2021                         COVINGTON & BURLING LLP


By:    */s/ Matthew J. Schlesinger*
          Matthew J. Schlesinger

Attorneys for Plaintiffs

# EXHIBIT A



**Factory Mutual Insurance Company**
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

# MUTUAL CORPORATION
# NON-ASSESSABLE POLICY

## DECLARATIONS

| **Policy No.** | **Previous Policy No.** | **DATE OF ISSUE** |
|---|---|---|
| 1056084 | 1040235 | 31 July 2019 |
| **Account No.** | **Replaces Binder No.** | |
| 1-34105 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

> **INSURED:**
>
> Lincoln Holdings LLC
>
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the 1st day of August 2019 to the 1st day of August 2020 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this  31st day of  July 2019.

Authorized Signature

Secretary

President

Countersigned (if required) this          day of

Agent

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.



Factory Mutual Insurance Company
Johnston, Rhode Island
A Mutual Corporation

This policy is Non-Assessable.

It is important that the written
portions of all policies covering
the same property read exactly
alike. If they do not, they should
be made uniform at once.

In case of loss notify the company
or its local agent at once in writing.

7019 (9/01)

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

## EXTRACTS FROM CHARTER OF THIS COMPANY
### Granted by the General Assembly of the State of Rhode Island

SECTION 5:   Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10:  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

## EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
### Adopted July 13, 2000

ARTICLE 1 – MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.

7019 (9/01)

## DECLARATIONS PAGE

## DECLARATIONS

1.   NAMED INSURED AND MAILING ADDRESS ..................................................................1
2.   POLICY DATES ........................................................................................................................1
3.   INSURANCE PROVIDED ........................................................................................................1
4.   PREMIUM ...................................................................................................................................2
5.   PREMIUM PAYABLE ..............................................................................................................2
6.   LOSS ADJUSTMENT/PAYABLE ..........................................................................................2
7.   TERRITORY ..............................................................................................................................3
8.   JURISDICTION .........................................................................................................................3
9.   CURRENCY ...............................................................................................................................3
10.  LIMITS OF LIABILITY ...........................................................................................................3
11.  DEDUCTIBLES ..........................................................................................................................7

## PROPERTY DAMAGE

1.   INSURED PROPERTY ..............................................................................................................9
2.   EXCLUDED PROPERTY .........................................................................................................9
3.   EXCLUSIONS ..........................................................................................................................10
4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ...............................14
5.   VALUATION ............................................................................................................................15
6.   ADDITIONAL COVERAGES ................................................................................................17
     CYBER ADDITIONAL COVERAGES .................................................................................17
     A.   DATA RESTORATION ...............................................................................................17
     B.   DATA SERVICE PROVIDER PROPERTY DAMAGE ..........................................19
     OTHER ADDITIONAL COVERAGES ................................................................................20
     A.   ACCIDENTAL INTERRUPTION OF SERVICES ..................................................20
     B.   ACCOUNTS RECEIVABLE .......................................................................................20
     C.   AUTOMATIC COVERAGE ........................................................................................21
     D.   BRANDS AND LABELS ..............................................................................................22
     E.   CLAIMS PREPARATION COSTS .............................................................................22
     F.   COMMUNICABLE DISEASE RESPONSE ..............................................................23
     G.   CONSEQUENTIAL REDUCTION IN VALUE .........................................................23
     H.   CONTROL OF DAMAGED PROPERTY ..................................................................24
     I.   DEBRIS REMOVAL ....................................................................................................24
     J.   DECONTAMINATION COSTS ..................................................................................24
     K.   ERRORS AND OMISSIONS .......................................................................................25
     L.   EXPEDITING COSTS ..................................................................................................25
     M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS .....................................26
     N.   INSTALLMENT OR DEFERRED PAYMENTS ........................................................27
     O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL ......27
     P.   LAW AND ORDINANCE .............................................................................................28
     Q.   LOSS PAYMENT INCREASED TAX LIABILITY ..................................................29

R.     MACHINERY OR EQUIPMENT STARTUP OPTION .......................................................... 29
S.     MISCELLANEOUS PROPERTY ...................................................................................... 30
T.     OPERATIONAL TESTING ........................................................................................... 31
U.     PROTECTION AND PRESERVATION OF PROPERTY ...................................................... 31
V.     SERVICE INTERRUPTION PROPERTY DAMAGE .......................................................... 32
W.     TEMPORARY REMOVAL OF PROPERTY ..................................................................... 33
X.     TERRORISM ............................................................................................................. 33
Y.     TRANSPORTATION ................................................................................................... 34

**TIME ELEMENT**

1.     LOSS INSURED ............................................................................................................. 37
2.     TIME ELEMENT COVERAGES ....................................................................................... 38
     A.     INSURED OPTION .................................................................................................... 38
     B.     GROSS EARNINGS ................................................................................................... 38
     C.     GROSS PROFIT ........................................................................................................ 40
     D.     EXTRA EXPENSE ..................................................................................................... 42
     E.     LEASEHOLD INTEREST ............................................................................................ 43
     F.     RENTAL INSURANCE ............................................................................................... 44
3.     PERIOD OF LIABILITY ................................................................................................. 45
4.     TIME ELEMENT EXCLUSIONS ..................................................................................... 47
5.     TIME ELEMENT COVERAGE EXTENSIONS ..................................................................... 48
     CYBER TIME ELEMENT COVERAGE EXTENSIONS ......................................................... 48
     A.     DATA SERVICE PROVIDER TIME ELEMENT ............................................................. 48
     B.     OWNED NETWORK INTERRUPTION .......................................................................... 50
     SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS ............................................. 50
     A.     CIVIL OR MILITARY AUTHORITY ............................................................................ 50
     B.     CONTINGENT TIME ELEMENT EXTENDED ............................................................... 51
     C.     INGRESS/EGRESS .................................................................................................... 52
     D.     LOGISTICS EXTRA COST ........................................................................................ 53
     E.     SERVICE INTERRUPTION TIME ELEMENT ............................................................... 54
     ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS ............................................... 55
     A.     ATTRACTION PROPERTY ........................................................................................ 55
     B.     CRISIS MANAGEMENT ............................................................................................ 56
     C.     DELAY IN STARTUP ................................................................................................ 57
     D.     EXTENDED PERIOD OF LIABILITY ........................................................................... 57
     E.     INTERRUPTION BY COMMUNICABLE DISEASE ......................................................... 58
     F.     ON PREMISES SERVICES ......................................................................................... 59
     G.     PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT ......................... 59
     H.     RELATED REPORTED VALUES ................................................................................. 59
     I.     RESEARCH AND DEVELOPMENT .............................................................................. 59
     J.     SOFT COSTS ........................................................................................................... 60

**LOSS ADJUSTMENT AND SETTLEMENT**

1.     REQUIREMENTS IN CASE OF LOSS ............................................................................... 61
2.     CURRENCY FOR LOSS PAYMENT ................................................................................. 62

3.     PARTIAL PAYMENT OF LOSS SETTLEMENT ....................................................62
4.     COLLECTION FROM OTHERS ...........................................................................62
5.     SUBROGATION ..................................................................................................62
6.     COMPANY OPTION ...........................................................................................63
7.     ABANDONMENT ................................................................................................63
8.     APPRAISAL .......................................................................................................63
9.     SUIT AGAINST THE COMPANY .........................................................................64
10.    SETTLEMENT OF CLAIMS .................................................................................64

## GENERAL PROVISIONS

1.     CANCELLATION/NON-RENEWAL ......................................................................65
2.     INSPECTIONS....................................................................................................65
3.     PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS ...................................66
4.     LIBERALIZATION .............................................................................................66
5.     MISREPRESENTATION AND FRAUD ..................................................................66
6.     LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS ...............67
7.     OTHER INSURANCE..........................................................................................68
8.     POLICY MODIFICATION ...................................................................................68
9.     REDUCTION BY LOSS.......................................................................................69
10.    SUSPENSION ....................................................................................................69
11.    TITLES .............................................................................................................69
12.    ASSIGNMENT ...................................................................................................69
13.    DEFINITIONS ...................................................................................................69
SCHEDULE OF LOCATIONS ..................................................................... APPENDIX A
SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, FORM FMG7308
CYBER OPTIMAL RECOVERY ENDORSEMENT

# DECLARATIONS

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## 1.   NAMED INSURED AND MAILING ADDRESS

Lincoln Holdings LLC, Lincoln Holdings LLC dba Monumental Sports & Entertainment, Lincoln Holdings LLC dba Monumental Sports* Entertainment, Lincoln Holdings GP LLC, Lincoln Ballston LLC, Lincoln Hockey LLC, Lincoln Mystics LLC, Washington Sports & Entertainment Limited Partnership, Washington Sports & Entertainment, Inc., DC Arena L.P., DC Arena L.P. dba Capital One Arena, Washington Bullets, L.P., Centre Group Limited Partnership, Monumental Ticketing Limited Partnership, AP Tickets, Inc., Lincoln Hockey LLC dba Washington Capitals, Washington Bullets L.P. dba Washington Wizards, Monumental Sports & Entertainment Foundation, Washington Sports LLC, Washington Sports GP LLC, Monumental Sports Network LLC, Washington Capitals Enterprises Company, WAS Club LP GP LLC, WAS Club LP, Anacostia Sports LLC, Monumental RSN LLC, Monumental eSports LLC, Lincoln NBADL LLC, Lincoln NBA2K LLC, Lincoln NBADL LLC dba Capital City Co-Co, Lincoln NBA2K LLC dba Wizards District Gaming, Lincoln Productions, LLC and Lincoln St. E's, LLC and any subsidiary, and Lincoln Holdings LLC's interest in any partnership or joint venture in which Lincoln Holdings LLC has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured," including legal representatives.

627 North Glebe Road
Arlington, Virginia 22203-2144

## 2.   POLICY DATES

The term of this Policy is:

FROM: 01 August 2019 at 12:01 a.m., Standard Time;
TO:      01 August 2020 at 12:01 a.m., Standard Time,

at the **location** of property involved as provided in this Policy.

## 3.   INSURANCE PROVIDED

The coverage under this Policy applies to property described on the Schedule of Locations or covered under the terms and conditions of the AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY provisions, unless otherwise provided.

Schedule of Locations are as listed on the Schedule of Locations attached to this Policy.

### 4.    PREMIUM

This Policy is issued in consideration of an initial premium.

### 5.    PREMIUM PAYABLE

Lincoln Holdings LLC pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of Lincoln Holdings LLC.

### 6.    LOSS ADJUSTMENT/PAYABLE

Loss, if any, will be adjusted with and payable to Lincoln Holdings LLC, or as may be directed by Lincoln Holdings LLC.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.

U.S. Bank Association as Collateral Agent under the Security and Accounts Agreement dated May 24, 2018 with DC Arena L.P.

As respects the Medstar Capitals Iceplex at 627 North Glebe Road, Arlington, Virginia the following are named as additional named insureds as their interests may appear:

Arlington County, Virginia
Attn:  Director Department of Management & Finance
#1 Courthouse Plaza, 2100 Clarendon Boulevard, Suite 501
Arlington, Virginia

Industrial Development Authority of Arlington County, Virginia
#1 Courthouse Plaza, 2100 Clarendon Boulevard, Suite 501
Arlington, Virginia

The May Department Stores Company
Attn:  General Counsel
611 Olive Street
St. Louis, Missouri

When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance.  The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

## 7.  TERRITORY

Coverage as provided under this Policy applies in Canada, the United States of America and the Commonwealth of Puerto Rico.

As respects MISCELLANEOUS PROPERTY, coverage as provided under this Policy coverage applies worldwide except does not apply in:

Afghanistan; Albania; Algeria; Angola; Armenia; Azerbaijan; Bangladesh; Belarus; Belize; Benin; Bhutan; Bolivia; Bosnia and Herzegovina; Botswana; Burkina Faso; Burundi; Cambodia; Cameroon; Central African Republic; Chad; Cote D'Ivoire; Cuba; Democratic Republic of the Congo; Djibouti; Egypt; Equatorial Guinea; Eritrea; Ethiopia; Fiji; Gabon; Gambia; Georgia; Ghana; Grenada; Guatemala; Guinea; Guinea-Bissau; Guyana; Haiti; Honduras; Jammu and Kashmir in India; Iran; Iraq; Israel; Gaza Strip, West Bank and territories north of Latitude 32.80 N in Israel; Kenya; Laos; Lebanon; Lesotho; Liberia; Libya; Madagascar; Malawi; Mali; Mauritania; Mauritius; Moldova; Mongolia; Montenegro; Montserrat; Mozambique; Myanmar; Namibia; Nepal; Niger; Nigeria; North Korea; Pakistan; Papua New Guinea; Aksai Chin and Trans-Karakoram Tract in People's Republic of China; Republic of the Congo; Chechen Republic of the Russian Federation; Rwanda; Senegal; Seychelles; Sierra Leone; Somalia; Sri Lanka; South Sudan; Sudan; Swaziland; Syria; Tajikistan; Tanzania; Timor-Leste; Togo; Tunisia; Agri, Batman, Bingol, Bitlis, Diyarbakir, Elazig, Hakkari, Igdir, Mardin, Mus, Sanliurfa, Siirt, Sirnak and Van in Turkey; Turkmenistan; Uganda; Ukraine; Crimea Region of Ukraine; Uzbekistan; Venezuela; Yemen; Zambia; and Zimbabwe.

## 8.  JURISDICTION

This Policy will be governed by the laws of the United States of America.

Any disputes arising hereunder will be exclusively subject to the jurisdiction of the United States of America.

## 9.  CURRENCY

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Organization for Standardization (ISO) 4217, edition in effect at the inception of this Policy.

## 10.  LIMITS OF LIABILITY

The Company's maximum limit of liability in an **occurrence**, including any insured TIME ELEMENT loss, will not exceed the Policy limit of liability of USD 1,000,000,000 subject to the following provisions:

A.   Limits of liability and time limits stated below or elsewhere in this Policy are part of, and not in addition to, the Policy limit of liability.

B.   Limits of liability apply per **occurrence**, unless otherwise stated.

C.   Limits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

1)   when a limit of liability applies as an **annual aggregate**, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

2)   when a limit of liability applies to a **location** or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all **locations** arising from physical loss or damage at such **location** or to such other specified property.

D.   Should an **occurrence** result in liability payable under more than one policy issued to the Named Insured by the Company, or its **representative company(ies)**, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy.

Applicable Limits of Liability/Time Limits:

| | |
|---|---|
| ATTRACTION PROPERTY | 30 days |
| AUTOMATIC COVERAGE | 90 days, not to exceed USD 10,000,000 per **location** |
| CIVIL OR MILITARY AUTHORITY | 30 days |
| CLAIMS PREPARATION COSTS | USD 50,000 |
| COMMUNICABLE DISEASE RESPONSE | USD 1,000,000 **annual aggregate**<br><br>The Company's maximum limit of liability for INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD 1,000,000 **annual aggregate**. |
| CONTINGENT TIME ELEMENT EXTENDED | USD 25,000,000 |
| CRISIS MANAGEMENT | 30 days |

11

| cyber event | 1. USD 1,000,000 **annual aggregate** for DATA RESTORATION and OWNED NETWORK INTERRUPTION combined<br><br>2. USD 1,000,000 **annual aggregate** for DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined<br><br>3. USD 25,000,000 **annual aggregate** for physical loss or damage to stock in process or finished goods manufactured by or for the Insured caused by or resulting from a **cyber event** that impacts the processing, manufacturing, or testing of such property or while it is otherwise being worked on |
|---|---|
| DATA RESTORATION | USD 10,000,000 **annual aggregate** |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined | USD 5,000,000 **annual aggregate** |
| **earth movement** | USD 250,000,000 **annual aggregate** |
| ERRORS AND OMISSIONS | USD 100,000,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD 100,000,000 |
| EXTENDED PERIOD OF LIABILITY | 90 days, not to exceed USD 10,000,000 |
| **fine arts** | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable fine arts** not on a schedule on file with the Company |
| fines or penalties for breach of contract or for late or noncompletion of orders combined | USD 100,000 |
| **flood** | USD 250,000,000 |
| GROSS PROFIT | 12 months, not to exceed 365 days for Ordinary Payroll |

| | |
|---|---|
| INGRESS/EGRESS | 30 days |
| INTERRUPTION BY COMMUNICABLE DISEASE | 365 days, not to exceed USD 1,000,000 **annual aggregate**<br><br>The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD 1,000,000 **annual aggregate**. |
| LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL | USD 50,000 **annual aggregate** |
| LOGISTICS EXTRA COST | 180 days, not to exceed 200% of the **normal cost** |
| MISCELLANEOUS PROPERTY | 1.  USD 10,000,000 per **location** for property at a **location**<br><br>2.  USD 10,000,000 for property not at a **location** |
| Ordinary Payroll | 365 days |
| SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined | USD 25,000,000 |
| TERRORISM | USD 5,000,000 **annual aggregate**, not to exceed the following:<br><br>1.  USD 5,000,000 **annual aggregate** for AUTOMATIC COVERAGE, ERRORS AND OMISSIONS, MISCELLANEOUS PROPERTY and TEMPORARY REMOVAL OF PROPERTY combined<br><br>2.  USD 5,000,000 **annual aggregate** for **flood** when caused by or resulting from **terrorism**<br><br>The limits for TERRORISM shall not include the **actual cash value** portion of fire damage caused by **terrorism**.<br><br>The limits for TERRORISM do not apply to the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S). |

| valuable papers and records | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable valuable papers and records** not on a schedule on file with the Company |
|---|---|

## 11.   DEDUCTIBLES

Subject to the deductible general provisions stated below, in each case of loss covered by this Policy the following deductibles apply per **occurrence**, for all coverages involved, unless otherwise stated:

| cyber event | USD 250,000 for DATA RESTORATION and OWNED NETWORK INTERRUPTION |
|---|---|
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT | USD 250,000 |
| flood | USD 50,000 per **location** |
| LOGISTICS EXTRA COST | USD 25,000 |
| All Other Loss | USD 25,000 |

Deductible General Provisions:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified above, and only for its share of that greater amount.

A.   For SERVICE INTERRUPTION loss, when a deductible is not specifically stated as applying to SERVICE INTERRUPTION, the deductible applied to the SERVICE INTERRUPTION loss will be the deductible that would apply if the cause of the interruption happened at the insured **location** that sustains the interruption of the specified services.

B.   For CONTINGENT TIME ELEMENT EXTENDED loss, when a deductible is not specifically stated as applying to CONTINGENT TIME ELEMENT EXTENDED, the deductible for CONTINGENT TIME ELEMENT EXTENDED loss will be determined as though the **contingent time element location** was an insured **location** under this Policy.

C.   The stated earthquake deductible will be applied to earthquake loss.  The stated **flood** deductible will be applied to **flood** loss.  The stated **wind** deductible will be applied to **wind** loss.  The provisions of item E below will also be applied to each.

D.    When this Policy insures more than one **location**, the deductible will apply against the total loss covered by this Policy in an **occurrence** except that a deductible that applies on a per **location** basis, if specified, will apply separately to each **location** where the physical damage happened regardless of the number of **locations** involved in the **occurrence**.

E.    Unless stated otherwise, if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable.  For the purposes of this provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible.  If two or more deductibles apply on a per **location** basis in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**.

F.    When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:

Property Damage – % of the value, per the Valuation clause(s) of the PROPERTY DAMAGE section, of the property insured at the **location** where the physical damage happened.

Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.

G.    For insured physical loss or damage:

1)   to insured fire protection equipment; or

2)   from water or other substance discharged from fire protection equipment of the type insured,

the applicable deductible applying to items 1 or 2 above only will be reduced by fifty percent (50%), per **occurrence**.  However, this provision will not apply to loss or damage resulting from fire or **earth movement** regardless of whether claim is made for such fire or **earth movement**.

# PROPERTY DAMAGE

## 1.    INSURED PROPERTY

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, to the extent of the interest of the Insured in such property:

A.    Real Property, including new buildings and additions under construction, in which the Insured has an insurable interest.

B.    Personal Property:

    1)    owned by the Insured.

    2)    consisting of the Insured's interest as a tenant in improvements and betterments.  In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

    3)    of officers and employees of the Insured.

    4)    of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

    5)    of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to Personal Property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an insured **location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

## 2.    EXCLUDED PROPERTY

The following exclusions apply unless otherwise stated in this Policy:

This Policy excludes:

A.    currency, money, notes or securities.

B.    precious metal in bullion form.

16

C.    land and any substance in or on land.  However, this exclusion does not apply to:

    1)   landscape gardening.

    2)   car parks, parking lots, pavement, roadways, railways, transformer enclosures or walkways.

    3)   fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures.

D.    water.  However, this exclusion does not apply to:

    1)   water that is contained within any enclosed tank, piping system or any other processing equipment.

E.    animals, standing timber or growing crops.

F.    watercraft or aircraft, except when unfueled and manufactured by the Insured.

G.    vehicles of officers or employees of the Insured or vehicles otherwise insured for physical loss or damage.

H.    underground mines or mine shafts or any property within such mine or shaft.

I.    dams or dikes.

J.    property in transit, except as otherwise provided by this Policy.

K.    property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the INSTALLMENT OR DEFERRED PAYMENTS coverage of this Policy.

L.    electronic data, programs or software, except when incorporated into physical goods intended to be sold as:

    1)   finished goods manufactured by the Insured; or

    2)   other merchandise not manufactured by the Insured,

or as otherwise provided by the DATA RESTORATION coverage of this Policy.

## 3.   EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

A.    This Policy excludes:

    1)   indirect or remote loss or damage.

2)   interruption of business, except to the extent provided by this Policy.

3)   loss of market or loss of use.

4)   loss or damage or deterioration arising from any delay.

5)   mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6)   loss from enforcement of any law or ordinance:

    a)   regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

    b)   requiring the demolition of any property, including the cost in removing its debris;

except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy.

7)   loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

B.   This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   nuclear reaction or nuclear radiation or radioactive contamination.  However:

    a)   if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

    b)   this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured **location**.  This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

This exclusion B1 and the exceptions in B1a and B1b do not apply to any act, loss or damage which also comes within the terms of exclusion B2b of this EXCLUSIONS clause.

2)   a)   hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

        (i)   government or sovereign power (de jure or de facto);

**18**

(ii) military, naval or air force; or

(iii) agent or authority of any party specified in i or ii above.

b) discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

c) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d) seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e) risks of contraband, or illegal transportation or trade.

f) **terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the TERRORISM coverage of the Policy.  However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to property insured.  This coverage exception for such resulting fire loss or damage does not apply to:

(i) direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

(ii) any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided in this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2b of this EXCLUSIONS clause then item B2b applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2c of this EXCLUSIONS clause then item B2c applies in place of this item B2f exclusion.

If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

3)  any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

    a)  by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

    b)  by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured.  This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause.  In no event does this Policy cover loss by theft by any individual specified in a or b above.

4)  lack of the following services:

    a)  incoming electricity, fuel, water, gas, steam or refrigerant;

    b)  outgoing sewerage;

    c)  incoming or outgoing voice, data or video,

all when caused by an event off the insured **location**, except as provided in the DATA SERVICE PROVIDER and SERVICE INTERRUPTION coverages of this Policy.  But, if the lack of such a service directly causes insured physical damage on the insured **location**, then only that resulting damage is insured.

C.  This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1)  faulty workmanship, material, construction or design from any cause.

2)  loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3)  deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

4)  settling, cracking, shrinking, bulging, or expansion of:

    a)  foundations (including any pedestal, pad, platform or other property supporting machinery).

      b)  floors.

      c)  pavements.

      d)  walls.

      e)  ceilings.

      f)  roofs.

5)  a)  changes of temperature damage (except to machinery or equipment); or

      b)  changes in relative humidity damage,

      all whether atmospheric or not.

6)  insect, animal or vermin damage.

7)  loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

D.    This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)  **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

2)  shrinkage.

3)  changes in color, flavor, texture or finish.

## 4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows.

A.    This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

B.   Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage.  This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such covered resulting physical loss or damage does not include any loss, cost or expense described in A or B above.  If such covered resulting physical loss or damage happens, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.

## 5.   VALUATION

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the place of the loss, and for no more than the interest of the Insured.

Unless stated otherwise in an Additional Coverage, adjustment of physical loss to property will be subject to the following:

A.   On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B.   On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.   On raw materials, supplies or other merchandise not manufactured by the Insured:

1)   if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

2)   if not repaired or replaced, the **actual cash value**.

D.   On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation.  These costs will not include research, engineering or any costs of restoring or recreating lost information.

E.    On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy and shall be subject to the limit(s) of liability for TERRORISM, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

F.    On all other property, the lesser of the following:

1)    The cost to repair.

2)    The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)    The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)    The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)    The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)    The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

7)    The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)    The **actual cash value** if such property is:

a)    useless to the Insured; or

b)    not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured **location** under this Policy.  This item does not extend to LAW AND ORDINANCE.

**6.**   **ADDITIONAL COVERAGES**

This Policy includes the following Additional Coverages for insured physical loss or damage.

These Additional Coverages:

1)   are subject to the applicable limit of liability;

2)   will not increase the Policy limit of liability; and

3)   are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

**CYBER ADDITIONAL COVERAGES**

**A.**   **DATA RESTORATION**

This Policy covers insured **physical loss or damage to electronic data, programs or software**.

With respect to **physical loss or damage to electronic data, programs or software** caused by or resulting from a **cyber event**, this Additional Coverage will apply when the time to recreate or restore such data, programs or software with due diligence and dispatch is in excess of 48 hours.

For the purposes of this Additional Coverage, insured data, programs or software can be anywhere worldwide, including while in transit, except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

This Additional Coverage also covers:

1)   the cost of the following reasonable and necessary actions taken by the Insured provided such actions are taken due to actual insured **physical loss or damage to electronic data, programs or software**:

   a)   actions to temporarily protect and preserve insured electronic data, programs or software.

   b)   actions taken for the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   c)   actions taken to expedite the permanent repair or replacement of such damaged property.

2) the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**.  In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when incorporated into physical goods intended to be sold as:

1) finished goods manufactured by the Insured; or

2) other merchandise not manufactured by the Insured.

DATA RESTORATION Exclusions: As respects DATA RESTORATION, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, B1, B2, B3a and B4.

2) the following additional exclusions apply:

This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

a) errors or omissions in processing or copying.

b) loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

c) deterioration, inherent vice, vermin or wear and tear.

DATA RESTORATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) the cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2) if not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

B.    **DATA SERVICE PROVIDER PROPERTY DAMAGE**

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Additional Coverage:

1)    facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2)    an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Additional Coverage will apply when the period of interruption of **off-premises data processing or data transmission services** as described below is in excess of 24 hours.

The period of interruption of **off-premises data processing or data transmission services** is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1)    The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)    The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

DATA SERVICE PROVIDER PROPERTY DAMAGE Exclusions: As respects DATA SERVICE PROVIDER PROPERTY DAMAGE, the following applies:

1)    Items B4 and C5 of the EXCLUSIONS clause in this section do not apply except for B4 with respect to:

  a)    incoming electricity, fuel, water, gas, steam or refrigerant; and

  b)    outgoing sewerage.

2)   The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b)   **terrorism**.

## OTHER ADDITIONAL COVERAGES

## A.   ACCIDENTAL INTERRUPTION OF SERVICES

This Policy covers physical damage resulting from changes in temperature or relative humidity to insured property at an insured **location** when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at the insured **location**.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

## B.   ACCOUNTS RECEIVABLE

This Policy covers the following directly resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit:

1)   any shortage in the collection of accounts receivable.

2)   the interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum.  Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

3)   the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.

4)   any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

Accounts receivable records will include accounts receivable records stored as electronic data.

In the event of loss, the Insured will:

1) use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2) reduce loss by use of any suitable property or service:

    a) owned or controlled by the Insured; or

    b) obtainable from other sources.

3) reconstruct, if possible, accounts receivable records so that no shortage is sustained.

The settlement of loss will be made within 90 days from the date of physical loss or damage. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company. All recoveries exceeding the amount paid will belong to the Insured.

ACCOUNTS RECEIVABLE Exclusions: As respects ACCOUNTS RECEIVABLE, the following additional exclusions apply:

This Policy does not insure against shortage resulting from:

1) bookkeeping, accounting or billing errors or omissions; or

2) a) alteration, falsification, manipulation; or

    b) concealment, destruction or disposal,

of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

## C.  AUTOMATIC COVERAGE

This Policy covers insured physical loss or damage to insured property at any **location** purchased, leased or rented by the Insured after the inception date of this Policy.

This Additional Coverage applies:

1) from the date of purchase, lease or rental,

2) until the first of the following:

    a) the **location** is bound by the Company.

    b)  agreement is reached that the **location** will not be insured under this Policy.

    c)  the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The time limit begins on the date of purchase, lease or rental.

## D.   BRANDS AND LABELS

If branded or labeled insured property is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

1)   stamp "salvage" on the property or its containers; or

2)   remove or obliterate the brands or labels,

if doing so will not damage the property.

The Insured must relabel such property or its containers to be in compliance with any applicable law.

## E.   CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1)   of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2)   the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1)   attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2)   loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.

### F.   COMMUNICABLE DISEASE RESPONSE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1) cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions: As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) **terrorism**.

### G.   CONSEQUENTIAL REDUCTION IN VALUE

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from insured physical loss or damage to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

## H.    CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by the Insured as follows:

1) the Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2) the Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3) property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4) any salvage proceeds received will go to the:

    a) Company at the time of loss settlement; or

    b) Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

## I.    DEBRIS REMOVAL

This Policy covers the reasonable and necessary costs incurred to remove debris from an insured **location** that remains as a direct result of insured physical loss or damage.

This Additional Coverage does not cover the costs of removal of:

1) contaminated uninsured property; or

2) the **contaminant** in or on uninsured property,

whether or not the **contamination** results from insured physical loss or damage.  This Additional Coverage covers the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

## J.    DECONTAMINATION COSTS

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** results from an insured event.

### K.    ERRORS AND OMISSIONS

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1)   in the description of where insured property is physically located;

2)   to include any **location**:

    a)   owned, leased or rented by the Insured on the effective date of this Policy; or

    b)   purchased, leased or rented by the Insured during the term of this Policy; or

3)   that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

### L.    EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1)   for the temporary repair of insured physical damage to insured property;

2)   for the temporary replacement of insured equipment suffering insured physical damage; and

3)   to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

**M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS**

This Policy covers insured physical loss or damage to **fine arts** and **valuable papers and records** while anywhere within this Policy's TERRITORY, including while in transit.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Exclusions: As respects FINE ARTS AND VALUABLE PAPERS AND RECORDS, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, A7, B1, B2, B3a and B4.

2)   the following additional exclusions apply:

This Policy excludes:

a)   currency, money, securities.

b)   errors or omissions in processing or copying of **valuable papers and records**, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

c)   deterioration, inherent vice, or wear and tear, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

d)   fungus, mold or mildew unless directly resulting from other physical damage not excluded by this Policy.

e)   loss or damage to **fine arts** from any repairing, restoration or retouching process.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   the cost to repair or restore such property to the physical condition that existed on the date of loss.

2)   the cost to replace.

3)   the value, if any, designated for the item on the schedule on file with the Company.

If a **fine arts** article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.

**N.   INSTALLMENT OR DEFERRED PAYMENTS**

This Policy covers insured physical loss or damage to personal property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)   pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)   from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

3)   to the extent the buyer continues payments.

4)   not within the TERRITORY of this Policy.

INSTALLMENT OR DEFERRED PAYMENTS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   total amount of unpaid installments less finance charges.

2)   **actual cash value** of the property at the time of loss.

3)   cost to repair or replace with material of like size, kind and quality.

**O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL**

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of the actual not suspected presence of **contaminant(s)** from uninsured property consisting of land, water or any other substance in or on land at the insured **location** if the release, discharge or dispersal of such **contaminant(s)** is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of **contamination** from such property:

1)   at any **location** insured for Personal Property only.

2)   at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY coverage provided by this Policy.

3)   when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

## P.   LAW AND ORDINANCE

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

1)   such law or ordinance is enforced as a direct result of insured physical loss or damage at an insured **location**;

2)   such law or ordinance is in force at the time of such loss or damage; and

3)   such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

1)   demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

2)   repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

The Company's maximum liability for this Coverage A at each insured **location** in any **occurrence** will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

1)   the reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

2)   the cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

LAW AND ORDINANCE Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced, the loss amount will be the difference between:

1)   the **actual cash value**; and

2)   the cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

LAW AND ORDINANCE Exclusions: As respects LAW AND ORDINANCE, the following additional exclusions apply:

This Policy does not cover:

1)   any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

2)   any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

## Q.   LOSS PAYMENT INCREASED TAX LIABILITY

This Policy covers the increase in tax liability as described herein incurred by the Insured.

Coverage A:

The increase in tax liability from an insured loss at an insured **location** if the tax treatment of:

1)   the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or

2)   the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss happened.

## R.   MACHINERY OR EQUIPMENT STARTUP OPTION

After insured machinery or equipment that has sustained insured physical loss or damage is repaired or replaced and such machinery or equipment is undergoing startup, the following applies:

If physical loss or damage of the type insured directly results to such machinery or equipment from such startup, the Insured shall have the option of claiming such resulting insured damage as part of the original event of physical loss or damage or as a separate **occurrence**.

This Additional Coverage applies only:

1) to the first startup event after the original repair or replacement; and

2) when the first startup event happens during the term of this Policy or its renewal issued by the Company.

For the purposes of this Additional Coverage, startup means:

1) the introduction into machinery or equipment of feedstock or other materials for processing or handling;

2) the commencement of fuel or energy supply to machinery or equipment.

**S.    MISCELLANEOUS PROPERTY**

This Policy covers insured physical loss or damage to:

1) insured property;

2) property of the type insured that is under contract to be used in a construction project at an insured **location**:

   a) from the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier;

   b) while such property is located at a storage site; and

   c) while such property is in transit from a storage site to another storage site or to a construction project at an insured **location**,

that does not include any such property owned or rented by the contractor;

while anywhere within this Policy's TERRITORY, including while in transit.

This Additional Coverage excludes property covered elsewhere in this Policy.

MISCELLANEOUS PROPERTY Exclusions: As respects MISCELLANEOUS PROPERTY, the following additional exclusions apply:

1) This Policy excludes:

   a) **transmission and distribution systems** not at a **location**.

   b) property insured under import or export ocean marine insurance.

   c) property shipped between continents.

d) airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

e) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

2) This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

## T.    OPERATIONAL TESTING

This Policy covers insured physical loss or damage to insured property during the **period of operational testing**.

This Additional Coverage excludes property, including stock or material, manufactured or processed by the Insured.

## U.    PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2) reasonable and necessary:

a) fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

b) costs incurred of restoring and recharging fire protection systems following an insured loss.

c) costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in this section of the Policy.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## V.    SERVICE INTERRUPTION PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION PROPERTY DAMAGE Exclusions: As respects SERVICE INTERRUPTION PROPERTY DAMAGE, the following applies:

1) The exclusions in the EXCLUSIONS clause in this section do not apply except for:

   a)  A1, A2, A3, A6, B1, B2, and

   b)  B4 with respect to incoming or outgoing voice, data or video, and

   c)  D1 except with respect to fungus, mold or mildew.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a)  **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b)  **terrorism**.

**W.   TEMPORARY REMOVAL OF PROPERTY**

When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

1)   while at the premises to which such property has been moved; and

2)   for physical loss or damage as provided at the insured **location** from which such property was removed.

This Additional Coverage does not apply to property:

1)   insured, in whole or in part, elsewhere in this Policy.

2)   insured, in whole or in part, by any other insurance policy.

3)   removed for normal storage, processing or preparation for sale or delivery.

**X.   TERRORISM**

This Policy covers physical loss or damage to property as described in the INSURANCE PROVIDED provision caused by or resulting from **terrorism**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage does not cover loss or damage which also comes within the terms of either item B2a or B2c of the EXCLUSIONS clause in this section of the Policy.

This Additional Coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

1)   that involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, or radioactive force, whether in time of peace or war and regardless of who commits the act; or

2)   that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3) in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

4) that involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## Y.   TRANSPORTATION

This Policy covers the following personal property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

1) owned by the Insured.

2) shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

3) of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

4) of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

   a) when shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer.

   b) when shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer.

Coverage Attachment and Duration:

1) This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.

2) However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

This Additional Coverage:

1) covers general average and salvage charges on shipments covered while waterborne.

2) insures physical loss or damage caused by or resulting from:

   a) unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

   b) improper parties having gained possession of property through fraud or deceit.

Additional General Provisions:

1) This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

2) The Insured has permission, without prejudicing this insurance, to accept:

    a) ordinary bills of lading used by carriers;

    b) released bills of lading;

    c) undervalued bills of lading; and

    d) shipping or messenger receipts.

3) The Insured may waive subrogation against railroads under side track agreements.

Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

TRANSPORTATION Exclusions: As respects TRANSPORTATION, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1 through A4, B1 through B4, C1, C3, C5, C6, D1 through D3.

2) the following additional exclusions apply:

This Policy excludes:

    a) samples in the custody of salespeople or selling agents.

    b) property insured under import or export ocean marine insurance.

    c) waterborne shipments, unless:

        (i) by inland water; or

        (ii) by coastal shipments.

    d) waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

    e) airborne shipments unless by regularly scheduled passenger airlines, air freight carriers or NBA, WNBA, NHL, NBA G-League, NBA 2K League, Washington Valor or Baltimore Brigade chartered flights that transport basketball, football, gaming, and hockey uniforms, equipment and supplies for the Washington Wizards, Washington Mystics, Washington Capitals, Washington Valor, Baltimore Brigade, Capital City Go-Go or Wizards Gaming District.

f) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

g) any transporting vehicle.

TRANSPORTATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured.  Included in the value are accrued costs and charges legally due.  Charges may include the Insured's commission as selling agent.

2) Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount.  Prepaid or advanced freight costs are included.

3) Property not under invoice will be valued:

a) for property of the Insured, at the valuation provisions of this Policy applying at the place from which the property is being transported; or

b) for other property, at the actual cash market value at the destination point on the date of loss,

less any charges saved which would have become due and payable upon arrival at destination.

## TIME ELEMENT

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS of this section of the Policy:

A.    is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION; and

B.    will not increase the Policy limit of liability; and

C.    is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## 1.    LOSS INSURED

A.    This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:

    1)    to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

    2)    used by the Insured, or for which the Insured has contracted use;

    3)    while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or

    4)    while in transit as provided by this Policy, and

    5)    during the Periods of Liability described in this section,

provided such loss or damage is not at a **contingent time element location**.

B.    This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

    1)    the use of any property or service owned or controlled by the Insured;

    2)    the use of any property or service obtainable from other sources;

    3)    working extra time or overtime; or

    4)    the use of inventory,

all whether at an insured **location** or at any other premises. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.

C.     This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy.  The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.     In determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY. The probable experience will consider any increase or decrease in demand for the Insured's goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused physical loss or damage starting the PERIOD OF LIABILITY.

## 2.    TIME ELEMENT COVERAGES

### A.    INSURED OPTION

The Insured has the option to make claim based on either

a)   GROSS EARNINGS and EXTENDED PERIOD OF LIABILITY; or

b)   GROSS PROFIT,

as described in the TIME ELEMENT section of this Policy and subject to the applicable terms and conditions as may be shown elsewhere.

Such option may be exercised at any time prior to the conditions set forth in the SETTLEMENT OF CLAIMS clause in the LOSS ADJUSTMENT AND SETTLEMENT section of this Policy.

If such claim involves more than one insured **location**, including interdependency at one or more insured **locations**, such claim will be adjusted by using the single coverage option chosen above.

### B.    GROSS EARNINGS

Measurement of Loss:

1)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a)   Gross Earnings;

b)   less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

c)   less ordinary payroll; and

d)   plus all other earnings derived from the operation of the business.

45

e) Ordinary Payroll, including taxes and charges dependent on the payment of wages:

    (i) for a period of time of not more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section immediately following the interruption of production or suspension of business operations or services, and

    (ii) only to the extent such payroll continues following the loss and would have been earned had no such interruption happened.

However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

    (i)  providing gainful employment for, or

    (ii) paying less than the normal salary rate to,

all or part of its employees, then the number of consecutive days of Ordinary Payroll may be extended.  However, this provision will not increase the total liability of this Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision. Ordinary Payroll does not cover any portion of salaries or wages included in Gross Earnings.

2) For the purposes of the Measurement of Loss, Gross Earnings is:

for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

Any amount recovered under property damage coverage at selling price will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

3) In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

4) If the Insured would have operated at a deficit had no interruption of production or suspension of business operations or services happened, the following applies:

a) for Gross Earnings, the extent to which charges and expenses would have been earned will be determined by subtracting the operating deficits from the charges and expenses that necessarily continue.

    b)  for Ordinary Payroll, the extent payroll would have been earned will be determined by subtracting the excess, if any, of the operating deficit over the fixed charges that need to continue from such payroll.

5)  There is recovery hereunder to the extent that the Insured is:

    a)  wholly or partially prevented from producing goods or continuing business operations or services;

    b)  unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

    c)  unable to continue such operations or services during the PERIOD OF LIABILITY; and

    d)  able to demonstrate a loss of sales for the operations, services or production prevented.

## C.  GROSS PROFIT

Measurement of Loss:

1)  The recoverable GROSS PROFIT loss is the Actual Loss Sustained by the Insured of the following due to the necessary interruption of business during the PERIOD OF LIABILITY: a) Reduction in Sales, b) Ordinary Payroll and c) Increase in Cost of Doing Business.  The amount payable as indemnity hereunder will be:

    a)  with respect to Reduction in Sales: The sum produced by applying the Rate of Gross Profit to the amount by which the sales during the PERIOD OF LIABILITY will fall short of the Standard Sales.  In determining the Reduction in Sales, any amount recovered under property damage coverage at selling price will be credited against lost sales.

    b)  Ordinary Payroll, including taxes and charges dependent on the payment of wages, during the PERIOD OF LIABILITY only to the extent such payroll would have been earned had such loss not happened.

    However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

    (i)  providing gainful employment for, or

    (ii)  paying less than the normal salary rate to,

    all or part of its employees, the number of consecutive days of Ordinary Payroll may be extended. This provision will not increase the total liability of this Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision.  Ordinary Payroll does not cover any portion of salaries or wages included in Net Profit or fixed charges.

c)   with respect to Increase in Cost of Doing Business:

   (i)   the additional expenditure necessarily and reasonably incurred for the sole
         purpose of avoiding or diminishing the reduction in sales and a loss of Ordinary
         Payroll which, but for that expenditure, would have taken place during the
         PERIOD OF LIABILITY; but

   (ii)  not exceeding the sum produced by applying the Rate of Gross Profit to the
         amount of the reduction thereby avoided,

all less any sum saved during the PERIOD OF LIABILITY with respect to such of the
Insured Fixed Charges as may cease or be reduced because of such interruption of
business.

2)   For the purposes of the Measurement of Loss:

Gross Profit is:

The amount produced by adding to the Net Profit the amount of the Insured Fixed
Charges, or if there be no Net Profit the amount of the Insured Fixed Charges less that
proportion of any loss from business operations as the amount of the Insured Fixed
Charges bears to all fixed charges.

Net Profit is:

The net operating profit (exclusive of all capital receipts and accruals and all outlay
properly chargeable to capital) resulting from the business of the Insured at the insured
**locations** after due provision has been made for all fixed charges and other expenses
including depreciation but before the deduction of any taxes on profits.

Insured Fixed Charges is:

All fixed charges unless specifically excluded herein.  Ordinary Payroll is not an Insured
Fixed Charge.

Sales is:

The money paid or payable to the Insured for goods sold and delivered and for services
rendered in the conduct of the business at an insured **location**.

Rate of Gross Profit is:

The rate of Gross Profit earned on the sales during the twelve full calendar months
immediately before the date of the physical loss or damage to the described property.

Standard Sales is:

The sales during that period in the twelve months immediately before the date of the physical loss or damage to the described property which corresponds with the PERIOD OF LIABILITY.

3) In determining the indemnity payable as the Actual Loss Sustained:

    a) if any fixed charges of the business are not insured hereunder, then, in computing the amount recoverable hereunder as Increase in Cost of Doing Business, that proportion only of the additional expenditure will be recoverable hereunder which the sum of the Net Profit and the Insured Fixed Charges bears to the sum of the Net Profit and all the fixed charges excluding Ordinary Payroll.

    b) if during the PERIOD OF LIABILITY goods will be sold or services will be rendered elsewhere than at the insured **locations** for the benefit of the business, either by the Insured or by others on the Insured's behalf, the money paid or payable in respect of such sales or services will be included in arriving at the amount of sales during the PERIOD OF LIABILITY.

4) The Insured will act with due diligence and dispatch in repairing or replacing physically damaged buildings and equipment to the same or equivalent physical and operating conditions that existed prior to the damage; and take whatever actions are necessary and reasonable to minimize the loss payable hereunder.

GROSS PROFIT Exclusions: As respects GROSS PROFIT, the TIME ELEMENT EXCLUSIONS B and C of this section do not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under GROSS PROFIT for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the PERIOD OF LIABILITY.

**D.**   **EXTRA EXPENSE**

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1) extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2) extra costs of temporarily using property or facilities of the Insured or others; and

3)  costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the INSURED OPTION clause, the PERIOD OF LIABILITY for EXTRA EXPENSE coverage will be the PERIOD OF LIABILITY applicable to the Time Element coverage option selected.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1)  TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)  The following additional exclusions apply:

This Policy does not insure:

a)  any loss of income.

b)  costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c)  costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

d)  any expense recoverable elsewhere in this Policy.

## E.   LEASEHOLD INTEREST

Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

1)  If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

2)  If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

3)  As used above, the following terms mean:

Net Lease Interest:
That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

Lease Interest:
The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, the following applies:

1) This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

2) TIME ELEMENT EXCLUSIONS A, B and C do not apply and the following applies instead:

   This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

**F.    RENTAL INSURANCE**

Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

1) the fair rental value of any portion of the property occupied by the Insured;

2) the income reasonably expected from rentals of unoccupied or unrented portions of such property; and

3) the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.

RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

**3.   PERIOD OF LIABILITY**

A.   The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except GROSS PROFIT and LEASEHOLD INTEREST and as shown below or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

　　1)   For building and equipment, the period:

　　　　a)   starting from the time of physical loss or damage of the type insured; and

　　　　b)   ending when with due diligence and dispatch the building and equipment could be:

　　　　　　(i)   repaired or replaced; and

　　　　　　(ii)   made ready for operations,

　　　　under the same or equivalent physical and operating conditions that existed prior to the damage.

　　　　c)   not to be limited by the expiration of this Policy.

　　2)   For building and equipment under construction:

　　　　a)   the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

　　　　b)   due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

　　3)   For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

　　　　a)   to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

　　　　b)   to replace physically damaged mercantile stock.

　　　　This item does not apply to RENTAL INSURANCE.

　　4)   For raw materials and supplies, the period of time:

　　　　a)   of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

b) limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5) If water:

a) used for any manufacturing purpose, including but not limited to as a raw material or for power;

b) stored behind dams or in reservoirs; and

c) on any insured **location**,

is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6) For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation.  This time does not include research, engineering or any other time necessary to restore or recreate lost information.

This item does not apply to RENTAL INSURANCE.

7) For physically damaged or destroyed property covered under DATA RESTORATION, the period:

a) starting from the time of **physical loss or damage to electronic data, programs or software**; and

b) ending when with due diligence and dispatch the electronic data, programs or software could have been recreated or restored under the same or equivalent physical and operating conditions that existed prior to the physical loss or damage.

This item does not apply to RENTAL INSURANCE.

B.   The PERIOD OF LIABILITY applying to GROSS PROFIT is as follows:

1) The period:

a) starting from the time of physical loss or damage of the type insured; and

b) ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

    c)  not to be limited by the expiration of this Policy.

  2)  For property under construction, the period:

    a)  starting on the date that production, business operation or service would have commenced if physical damage of the type insured had not happened; and

    b)  ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

    c)  not to be limited by the expiration of this Policy.

The Rate of Gross Profit and Standard Sales will be based on the experience of the business after construction is completed and the probable experience during the PERIOD OF LIABILITY.

C.  The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

  1)  making changes to the buildings, structures, machinery or equipment except as provided in the LAW AND ORDINANCE clause in the PROPERTY DAMAGE section.

  2)  restaffing or retraining employees.  However, this item does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is completed within 90 consecutive days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative.

## 4.  TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure:

A.  Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

  1)  physical loss or damage not insured by this Policy on or off of the insured **location**.

    2)   planned or rescheduled shutdown.

    3)   strikes or other work stoppage.

    4)   any other reason other than physical loss or damage insured under this Policy.

B.   Any increase in loss due to:

    1)   suspension, cancellation or lapse of any lease, contract, license or orders.

    2)   damages for breach of contract or for late or noncompletion of orders.

    3)   fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

    4)   any other consequential or remote loss.

C.   Any loss resulting from physical loss or damage to finished goods manufactured by the Insured, or the time required for their reproduction.

D.   Any loss resulting from the **actual cash value** portion of direct physical loss or damage by fire caused by or resulting from **terrorism**.

## 5.   TIME ELEMENT COVERAGE EXTENSIONS

This Policy also insures TIME ELEMENT loss, as provided by the TIME ELEMENT COVERAGES of this Policy, for the TIME ELEMENT COVERAGE EXTENSIONS described below.

### CYBER TIME ELEMENT COVERAGE EXTENSIONS

### A.   DATA SERVICE PROVIDER TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption at an insured **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Extension:

    1)   facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

    2)   an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Extension will apply when the period of interruption of **off-premises data processing or data transmission services** is in excess of 24 hours.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured covered by OWNED NETWORK INTERRUPTION coverage as provided in this section of the Policy.

DATA SERVICE PROVIDER TIME ELEMENT Exclusions: As respects DATA SERVICE PROVIDER TIME ELEMENT, the following applies:

1) Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

    a) incoming electricity, fuel, water, gas, steam or refrigerant; and

    b) outgoing sewerage.

2) The following additional exclusions apply:

    This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

    a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

    b) **terrorism**.

As used above, the period of interruption of **off-premises data processing or data transmission services**:

1) is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2)   is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3)   does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## B.   OWNED NETWORK INTERRUPTION

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption directly resulting from:

1)   the failure of the Insured's **electronic data processing equipment or media** to operate, provided that such failure is the direct result of a **cyber event** directed at the NAMED INSURED; or

2)   the Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending **cyber event** directed at the NAMED INSURED, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

For the purposes of this Extension, the Insured's **electronic data processing equipment or media** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

As respects item 1 above, this Extension will apply when the period of interruption is in excess of 48 hours.

As used above, the period of interruption:

1)   is the period starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure.

2)   does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS

## A.   CIVIL OR MILITARY AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)   starting at the time of such physical damage; and

2)   ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

## B.   CONTINGENT TIME ELEMENT EXTENDED

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1)   Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:

   CIVIL OR MILITARY AUTHORITY
   CONTINGENT TIME ELEMENT EXTENDED
   DATA SERVICE PROVIDER TIME ELEMENT
   DELAY IN STARTUP
   EXTENDED PERIOD OF LIABILITY
   INGRESS/EGRESS
   ON PREMISES SERVICES
   SERVICE INTERRUPTION TIME ELEMENT

2)   The Insured will influence and cooperate with the **contingent time element location** in every way and take any reasonable and necessary action to mitigate the loss payable hereunder.

3)   TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions: As respects CONTINGENT TIME ELEMENT EXTENDED, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing transmission of voice, data or video.

2) **earth movement** as respects a direct or indirect customer, supplier, contract manufacturer or contract service provider located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

3) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

## C.   INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2) picketing or other action by strikers except for physical damage not excluded by this Policy.

3) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### D.   LOGISTICS EXTRA COST

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:

1)   directly between insured **locations**; or

2)   directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,

provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

1)   extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.

This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

LOGISTICS EXTRA COST Exclusions: As respects LOGISTICS EXTRA COST, the following additional exclusions apply:

This Policy does not insure:

1)   any loss resulting from disruption in the movement of goods or materials between **contingent time element locations**.

2)   any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

3)   any loss of income.

4)   costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** movement of goods or materials.

5)   costs of permanent repair or replacement of property that has been damaged or destroyed.

6)   any expense recoverable elsewhere in this Policy.

7)   any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

8) any loss resulting from disruption caused by loss or damage from **earth movement** in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

9) any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of physical loss or damage causing the disruption of the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured, and

2) ending not later than:

   a) when with due diligence and dispatch the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured could be resumed; or

   b) the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## E.   SERVICE INTERRUPTION TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured **location** when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

This Extension will apply when the period of service interruption is in excess of 24 hours.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION TIME ELEMENT Exclusions: As respects SERVICE INTERRUPTION TIME ELEMENT, the following applies:

1) The exclusions in the EXCLUSIONS clause in the PROPERTY DAMAGE section do not apply except for:

   a) A1, A2, A3, A6, B1, B2, and

   b) B4 with respect to incoming or outgoing voice, data or video, and

   c) D1 except with respect to fungus, mold or mildew.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b) **terrorism**.

As used above, the period of service interruption:

1) is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2) is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3) does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS

## A.   ATTRACTION PROPERTY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**.

ATTRACTION PROPERTY Exclusions: As respects ATTRACTION PROPERTY, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**B.   CRISIS MANAGEMENT**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location**, provided such order is a direct result of:

1) a violent crime, suicide, attempted suicide, or armed robbery; or

2) a death or bodily injury caused by a workplace accident;

at such insured **location**.

For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the PERIOD OF LIABILITY is in excess of 4 hours.

CRISIS MANAGEMENT Exclusions: As respects CRISIS MANAGEMENT, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) **terrorism**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)    starting with the time the civil or military authority prohibits access; and

2)    ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

## C.   DELAY IN STARTUP

GROSS EARNINGS or GROSS PROFIT and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

## D.   EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1)    the interruption of business as covered by GROSS EARNINGS;

2)    for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

3)    commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included in this Policy.

However, this Extension does not apply to GROSS EARNINGS loss resulting from physical loss or damage caused by or resulting from **terrorism**.

EXTENDED PERIOD OF LIABILITY Exclusions: As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

### E.   INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)   an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)   a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

2)   loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)   starting at the time of the order of the authorized governmental agency or the Officer of the Insured; and

2)   ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

**F.   ON PREMISES SERVICES**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet/300 metres of the insured **location**:

1)   Electrical equipment and equipment used for the transmission of voice, data or video.

2)   Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

**G.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT**

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Extension does not cover the Actual Loss Sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in the PROPERTY DAMAGE section.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

**H.   RELATED REPORTED VALUES**

If reported TIME ELEMENT values include:

1)   **locations** used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such **locations**,

3)   from insured physical loss or damage at an insured **location**,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such insured **location**.

**I.   RESEARCH AND DEVELOPMENT**

The GROSS EARNINGS and GROSS PROFIT coverages are extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and Ordinary Payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this Extension will be the period from the time of direct physical loss or damage of the type insured to the time when the property could be repaired or replaced and made ready for operations, but as respects GROSS PROFIT and Ordinary Payroll such period of time shall not exceed the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.  Such period of time shall not be limited by the date of expiration of this Policy.

**J.    SOFT COSTS**

This Policy covers the Actual Loss Sustained incurred by the Insured of **soft costs** during the PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

## LOSS ADJUSTMENT AND SETTLEMENT

**1.   REQUIREMENTS IN CASE OF LOSS**

The Insured will:

1)   give immediate written notice to the Company of any loss.

2)   protect the property from further loss or damage.

3)   promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4)   give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company.  The proof of loss must state the knowledge and belief of the Insured as to:

   a)   the time and origin of the loss.

   b)   the Insured's interest and that of all others in the property.

   c)   the **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d)   any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e)   by whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5)   include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6)   further, the Insured, will as often as may be reasonably required:

   a)   exhibit to any person designated by the Company all that remains of any property;

   b)   submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

c)   produce for examination at the request of the Company:

    (i)   all books of accounts, business records, bills, invoices and other vouchers; or

    (ii)   certified copies if originals are lost,

at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## 2.   CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the Insured.

## 3.   PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of insured physical loss or damage determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s), subject to the Policy's provisions.  To obtain such partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.

## 4.   COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 5.   SUBROGATION

The Insured is required to cooperate in any subrogation proceedings.  The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)   any applicable deductible; and/or

2)   any provable uninsured loss,

bears to the entire provable loss amount.

6.  **COMPANY OPTION**

The Company has the option to take all or any part of damaged property at the agreed or appraised value.  The Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

7.  **ABANDONMENT**

There may be no abandonment of any property to the Company.

8.  **APPRAISAL**

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1)  the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2)  the Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire.  If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending.  The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)  pay its chosen appraiser; and

2)  bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

**9.     SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)     the Insured has fully complied with all the provisions of this Policy; and

2)     legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

**10.     SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable will be paid within 30 days after:

A.     proof of loss as described in this Policy is received by the Company; and

B.     when a resolution of the amount of loss is made either by:

1)     written agreement between the Insured and the Company; or

2)     the filing with the Company of an award as provided in the APPRAISAL clause of this section.

## GENERAL PROVISIONS

**1.   CANCELLATION/NON-RENEWAL**

This Policy may be:

A.   cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.   cancelled by the Company by giving the Insured not less than:

   1)   90 days' written notice of cancellation; or

   2)   10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.   non-renewed by the Company by giving the Insured not less than 90 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

**2.   INSPECTIONS**

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.  The Company does not address life, safety or health issues.

The Company's:

A.   right to make inspections;

B.   making of inspections; or

C.   providing recommendations or other information in connection with any inspections,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

3.    **PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS**

A.   If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for insured **locations** within such jurisdictions.

B.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of provinces in Canada.  The endorsements modify this Policy with respect to any insured property located in the province in which the endorsement applies.

C.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America.  The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

D.   As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy shall be considered an act of **terrorism** within the terms of this Policy.  Coverage recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) is excluded from any other coverage under this Policy.  Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) and this Policy is not recoverable under this Policy.

4.    **LIBERALIZATION**

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

5.    **MISREPRESENTATION AND FRAUD**

This entire Policy will be void if, whether before or after a loss, an Insured has:

A.   willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

B.   made any attempt to defraud the Company.

C.   made any false swearing.

## 6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

A.   The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.   The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

1)   any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

2)   foreclosure, notice of sale, or similar proceedings with respect to the property.

3)   change in the title or ownership of the property.

4)   change to a more hazardous occupancy.

The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change.  If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1)   sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2)   this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 90 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment.  If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation.  If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause.  The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension.  The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

F.    If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage.  No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim.  At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

G.    If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.    Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 7.    OTHER INSURANCE

A.    If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.    In no event will this Policy apply as contributing insurance.

C.    The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy.  Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.    The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy.  The existence of such other insurance will not prejudice recovery under this Policy.  If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.    If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with the Company.

## 8.    POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy.  This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.   create a waiver, or change any part of this Policy; or

B.   prevent the Company from asserting any rights under the provisions of this Policy.

## 9.   REDUCTION BY LOSS

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any **annual aggregate** limit.

## 10.   SUSPENSION

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured.  The suspended insurance may be reinstated by the Company.  Any unearned premium resulting from such suspension will be returned by the Company.

## 11.   TITLES

The titles in this Policy are only for reference.  The titles do not in any way affect the provisions of this Policy.

## 12.   ASSIGNMENT

Assignment of this Policy will not be valid except with the written consent of the Company.

## 13.   DEFINITIONS

The following terms when appearing in **boldface** in this Policy mean:

**actual cash value**:
the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**annual aggregate**:
the Company's maximum amount payable during any policy year.

**communicable disease**:
disease which is:

A.   transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B.   Legionellosis.

**contaminant**:
anything that causes **contamination**.

**contamination**:
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

**contingent time element location**:
A.    any **location**:

   1)   of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

   2)   of any company under a royalty, licensing fee or commission agreement with the Insured;

B.    any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**cyber event**:
any act involving the malicious or unauthorized access to, operation of, or use of **electronic data processing equipment or media**, regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **cyber event** will not be considered to be loss by **cyber event** within the terms and conditions of this Policy.

**date or time recognition**:
the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**earth movement**:
any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage, or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media**:
any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts**:

paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

**flood**:

flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.  Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**irreplaceable**:

an item which cannot be replaced with other of like kind and quality.

**location**:

A.     as specified in the Schedule of Locations, or

B.     if not so specified in the Schedule of Locations:

   1)     a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing),

      a)     bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres wide.  Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**New Madrid Seismic Zone**:

Arkansas, United States of America, counties of:

Arkansas, Clay, Craighead, Crittenden, Cross, Fulton, Greene, Independence, Izard, Jackson, Lawrence, Lee, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Randolph, Sharp, St. Francis, White, Woodruff

Illinois, United States of America, counties of:

Alexander, Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jasper, Jefferson, Johnson, Lawrence, Madison, Marion, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Richland, Saline, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson

Indiana, United States of America, counties of:

Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick

Kentucky, United States of America, counties of:
Ballard, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Henderson, Hickman, Hopkins, Livingston, Lyon, Marshall, McCracken, McLean, Muhlenberg, Todd, Trigg, Union, Webster

Mississippi, United States of America, counties of:
Alcorn, Benton, Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tippah, Tunica

Missouri, United States of America, counties of:
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Jefferson, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, St. Francois, St. Louis, City of St. Louis, Ste. Genevieve, Stoddard, Washington, Wayne

Tennessee, United States of America, counties of:
Benton, Carroll, Chester, Crockett, Decatur, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Houston, Humphreys, Lake, Lauderdale, Madison, McNairy, Montgomery, Obion, Perry, Shelby, Stewart, Tipton, Weakley

**normal**:
the condition that would have existed had no physical loss or damage happened.

**normal cost**:
the cost associated with the movement of goods or materials suffering the disruption that the Insured would have incurred had no physical loss or damage causing disruption happened.

**occurrence**:
the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

A.   **terrorism**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

B.   **earth movement**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services**:
the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**Pacific Northwest Seismic Zone**:
Oregon, United States of America, counties of:
Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill

<u>Washington, United States of America, counties of:</u>
Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

<u>British Columbia (includes Vancouver Island), Canada:</u>
South of 50° N latitude and west of 120° W longitude

**period of operational testing**:
the period of time beginning 24 hours prior to the earlier of the following:

A.    introduction, into a system, of feedstock or other materials for processing or handling;

B.    commencement of fuel or energy supply to a system,

and ending with the earlier of the following:

A.    the expiration date or cancellation date of this Policy.

B.    if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**physical loss or damage to electronic data, programs or software**:
the destruction, distortion or corruption of electronic data, programs or software.

**representative company(ies)**:
Factory Mutual Insurance Company, FM Insurance Company Limited or FM Insurance Europe S.A.; Affiliated FM Insurance Company; Appalachian Insurance Company or any other company issuing a local policy at the direction of the Company.

**soft costs**:
costs over and above those that are **normal** at an insured **location** undergoing renovation or in the course of construction, limited to the following:

A.    construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

B.    commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

C.    additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

D.    property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

**terrorism**:
any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

when the effect or apparent purpose is:

A.     to influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

B.     to further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems**:
transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data, and video.  Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records**:
written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

**wind**:
direct action of wind including substance driven by wind.  **Wind** does not mean or include anything defined as **flood** in this Policy.



Account No.    1-34105

Policy No.    1056084

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index Number | Street Address | City | County | State/Province | Postal Code | Country | Name |
|---|---|---|---|---|---|---|---|---|
| 8 | 003618.74 | 1100 Oak Drive SE | Washington | District of Columbia | District of Columbia | 20032 | United States of America | St. Elizabeth's East MedStar Wizards Performance Center |
| 3 | 000142.06 | 601 F Street Northwest | Washington | District of Columbia | District of Columbia | 20004-1605 | United States of America | Capital One Arena |
| 5 | 002055.34 | 700 6th Street Northwest, Suite 410 & 420 | Washington | District of Columbia | District of Columbia | 20002-4324 | United States of America | Office |
| 6 | 043145.52 | 201 West Baltimore Street | Baltimore | Baltimore (City) | Maryland | 21201-2591 | United States of America | Royal Farms Arena |
| 4 | 043436.20 | 7701-7717 Penn Belt Drive & 3905-3917 Penn Belt Place | District Heights | Prince George's | Maryland | 20747-4731 | United States of America | Warehouse |
| 1 | 002147.05 | 627 North Glebe Road | Arlington | Arlington | Virginia | 22203-2144 | United States of America | Medstar Capitals Iceplex |
| 2 | 044443.93 | 4500 Patriot Circle | Fairfax | Fairfax | Virginia | 22030-4468 | United States of America | EagleBank Arena - George Mason University |

Account No. 1-34105
Policy No. 1056084

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured Locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of USD**130,536**, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein. This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed USD100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed USD100,000,000,000. If the aggregate insured losses for all insurers exceed USD100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 85% (and beginning on January 1, 2016, shall then decrease by 1 percentage point per calendar year until equal to 80 percent) of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy. The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application:  The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and

83

extended in 2005, 2007, and in 2015.  The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

    a.   The act resulted in aggregate losses in excess of USD5,000,000; and

    b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.



Account No. 1-34105
Policy No. 1056084

# CYBER OPTIMAL RECOVERY ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein.  All other terms and conditions of the Policy remain unchanged.

INSURED OPTION:

The Insured acknowledges having purchased a cyber policy.

As respects loss or damage that is covered by both this Policy and the cyber policy, and notwithstanding anything contained in the OTHER INSURANCE clause in the GENERAL PROVISIONS section of this Policy, the Insured may elect, within 180 days of notifying this Company of the loss, to apportion the loss between this Policy and the cyber policy and to designate this Policy as primary, excess or contributing insurance to the cyber policy with respect to each portion of the loss, provided designating it as such is necessary to maximize the total indemnity available for the loss under both this Policy and the cyber policy.

This election option shall be subject to the following additional conditions:

ADDITIONAL CONDITIONS

1)  The Insured will provide this Company with a copy of any cyber policy in force at the time of loss.

2)  Any coverage provided by the cyber policy that is not provided by this Policy does not extend to this Policy.

3)  The insolvency, inability or unwillingness to pay of the company issuing the cyber policy shall in no event increase this Company's liability or delay settlement under this Policy.

## VIRGINIA NOTICE

## IMPORTANT INFORMATION REGARDING YOUR INSURANCE

In the event you need to contact someone about this insurance for any reason please contact your agent. If no agent was involved in the sale of this insurance, or if you have additional questions you may contact the insurance company issuing this insurance at the following address and telephone number:

FM Global
P.O. Box 7500 Johnston, RI 02919
Fax: (401) 275-3029
1-800-343-7722

If you have been unable to contact or obtain satisfaction from the company or the agent, you may contact the Virginia State Corporation Commission's Bureau of Insurance at: Property and Casualty Division, Bureau of Insurance, P.O. Box 1157, Richmond, VA 23218. In-state toll-free calls: 1-800-552-7945, Out-of-state calls: (804) 371-9741.

Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company or the Bureau of Insurance, have your policy number available

## FUNCTIONAL REPLACEMENT COST COVERAGE

Following state requirements, we are advising you that the coverage under this policy for certain property as specified in the policy's Valuation clause applies on a functional replacement cost basis which means that, under certain conditions, claims may be settled for less than the actual cash value of the property insured.

# EXHIBIT B



# MUTUAL CORPORATION
# NON-ASSESSABLE POLICY

Factory Mutual Insurance Company
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

**DECLARATIONS**

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| 1068228 | 1056084 | 31 July 2020 |

| Account No. | Replaces Binder No. | |
|---|---|---|
| 1-34105 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

> **INSURED:**
>
> Lincoln Holdings LLC
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the 1st day of August 2020 to the 1st day of August 2021 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this 31st day of July 2020.

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.

1



Factory Mutual Insurance Company
Johnston, Rhode Island
A Mutual Corporation

This policy is Non-Assessable.

It is important that the written
portions of all policies covering
the same property read exactly
alike. If they do not, they should
be made uniform at once.

In case of loss notify the company
or its local agent at once in writing.

7019 (9/01)

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

## EXTRACTS FROM CHARTER OF THIS COMPANY
### Granted by the General Assembly of the State of Rhode Island

SECTION 5:  Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10:  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

## EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
### Adopted July 13, 2000

ARTICLE 1 – MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.

7019 (9/01)

**4**



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

# TABLE OF CONTENTS
## (Order In Which They Appear)

<div align="right">

**Page No.**

</div>

**DECLARATIONS PAGE**

**DECLARATIONS**

1.   NAMED INSURED AND MAILING ADDRESS ....................................................... 1
2.   POLICY DATES ....................................................................................................... 1
3.   INSURANCE PROVIDED ........................................................................................ 1
4.   PREMIUM ................................................................................................................. 2
5.   PREMIUM PAYABLE .............................................................................................. 2
6.   LOSS ADJUSTMENT/PAYABLE ............................................................................ 2
7.   TERRITORY ............................................................................................................. 3
8.   JURISDICTION ......................................................................................................... 3
9.   CURRENCY .............................................................................................................. 4
10.  LIMITS OF LIABILITY ........................................................................................... 4
11.  DEDUCTIBLES ........................................................................................................ 7

**PROPERTY DAMAGE**

1.   INSURED PROPERTY ............................................................................................ 10
2.   EXCLUDED PROPERTY ........................................................................................ 10
3.   EXCLUSIONS .......................................................................................................... 11
4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ..................... 15
5.   VALUATION ............................................................................................................ 16
6.   ADDITIONAL COVERAGES ................................................................................. 18
     CYBER ADDITIONAL COVERAGES ................................................................... 18
     A.   DATA RESTORATION .................................................................................. 18
     B.   DATA SERVICE PROVIDER PROPERTY DAMAGE .................................. 20
     OTHER ADDITIONAL COVERAGES .................................................................... 21
     A.   ACCIDENTAL INTERRUPTION OF SERVICES ......................................... 21
     B.   ACCOUNTS RECEIVABLE .......................................................................... 21
     C.   AUTOMATIC COVERAGE ........................................................................... 22
     D.   BRANDS AND LABELS ................................................................................ 23
     E.   CLAIMS PREPARATION COSTS ................................................................. 23
     F.   COMMUNICABLE DISEASE RESPONSE ................................................... 24
     G.   CONSEQUENTIAL REDUCTION IN VALUE .............................................. 24
     H.   CONTROL OF DAMAGED PROPERTY ....................................................... 25
     I.   DEBRIS REMOVAL ....................................................................................... 25
     J.   DECONTAMINATION COSTS ...................................................................... 25
     K.   ERRORS AND OMISSIONS .......................................................................... 26
     L.   EXPEDITING COSTS .................................................................................... 26
     M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS ............................ 27
     N.   INSTALLMENT OR DEFERRED PAYMENTS ............................................. 28
     O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL ...... 28
     P.   LAW AND ORDINANCE ............................................................................... 29
     Q.   LOSS PAYMENT INCREASED TAX LIABILITY ........................................ 30
     R.   MACHINERY OR EQUIPMENT STARTUP OPTION .................................. 31



# TABLE OF CONTENTS
## (Order In Which They Appear)

**Page No.**

S.  MISCELLANEOUS PROPERTY .................................................................... 31
T.  OPERATIONAL TESTING ........................................................................ 32
U.  PROTECTION AND PRESERVATION OF PROPERTY ...................................... 32
V.  SERVICE INTERRUPTION PROPERTY DAMAGE ........................................ 33
W.  TEMPORARY REMOVAL OF PROPERTY ................................................... 34
X.  TERRORISM ......................................................................................... 34
Y.  TRANSPORTATION ............................................................................... 35

**TIME ELEMENT**

1.  LOSS INSURED .................................................................................... 38
2.  TIME ELEMENT COVERAGES ................................................................ 39
    A.  INSURED OPTION ........................................................................... 39
    B.  GROSS EARNINGS ........................................................................... 39
    C.  GROSS PROFIT ............................................................................... 41
    D.  EXTRA EXPENSE ............................................................................ 43
    E.  LEASEHOLD INTEREST .................................................................... 44
    F.  RENTAL INSURANCE ....................................................................... 45
3.  PERIOD OF LIABILITY .......................................................................... 46
4.  TIME ELEMENT EXCLUSIONS ................................................................ 49
5.  TIME ELEMENT COVERAGE EXTENSIONS ............................................... 49
    CYBER TIME ELEMENT COVERAGE EXTENSIONS ..................................... 50
    A.  DATA SERVICE PROVIDER TIME ELEMENT ........................................ 50
    B.  OWNED NETWORK INTERRUPTION .................................................. 51
    SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS ......................... 52
    A.  CIVIL OR MILITARY AUTHORITY ...................................................... 52
    B.  CONTINGENT TIME ELEMENT EXTENDED .......................................... 52
    C.  INGRESS/EGRESS ........................................................................... 53
    D.  LOGISTICS EXTRA COST .................................................................. 54
    E.  SERVICE INTERRUPTION TIME ELEMENT .......................................... 56
    ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS ............................ 57
    A.  ATTRACTION PROPERTY ................................................................. 57
    B.  CRISIS MANAGEMENT ..................................................................... 58
    C.  DELAY IN STARTUP ........................................................................ 58
    D.  EXTENDED PERIOD OF LIABILITY ..................................................... 59
    E.  INTERRUPTION BY COMMUNICABLE DISEASE ................................... 59
    F.  ON PREMISES SERVICES .................................................................. 60
    G.  PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT ....... 60
    H.  RELATED REPORTED VALUES ........................................................... 61
    I.  RESEARCH AND DEVELOPMENT ....................................................... 61
    J.  SOFT COSTS ................................................................................... 61

**LOSS ADJUSTMENT AND SETTLEMENT**

1.  REQUIREMENTS IN CASE OF LOSS ........................................................ 62
2.  CURRENCY FOR LOSS PAYMENT ........................................................... 63
3.  PARTIAL PAYMENT OF LOSS SETTLEMENT ............................................ 63



Account No.   1-34105
Policy No.   1068228

# TABLE OF CONTENTS
## (Order In Which They Appear)

**Page No.**

| | | |
|---|---|---|
| 4. | COLLECTION FROM OTHERS | 63 |
| 5. | SUBROGATION | 63 |
| 6. | COMPANY OPTION | 63 |
| 7. | ABANDONMENT | 64 |
| 8. | APPRAISAL | 64 |
| 9. | SUIT AGAINST THE COMPANY | 64 |
| 10. | SETTLEMENT OF CLAIMS | 65 |

**GENERAL PROVISIONS**

| | | |
|---|---|---|
| 1. | CANCELLATION/NON-RENEWAL | 66 |
| 2. | INSPECTIONS | 66 |
| 3. | PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS | 67 |
| 4. | LIBERALIZATION | 67 |
| 5. | MISREPRESENTATION AND FRAUD | 67 |
| 6. | LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS | 68 |
| 7. | OTHER INSURANCE | 69 |
| 8. | POLICY MODIFICATION | 69 |
| 9. | REDUCTION BY LOSS | 70 |
| 10. | SUSPENSION | 70 |
| 11. | TITLES | 70 |
| 12. | ASSIGNMENT | 70 |
| 13. | DEFINITIONS | 70 |
| SCHEDULE OF LOCATIONS | | APPENDIX A |

SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, FORM FMG7308
CYBER OPTIMAL RECOVERY ENDORSEMENT, FORM FMG7558



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

# DECLARATIONS

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## 1.   NAMED INSURED AND MAILING ADDRESS

Lincoln Holdings LLC, Lincoln Holdings LLC dba Monumental Sports & Entertainment, Lincoln Holdings LLC dba Monumental Sports* Entertainment, Lincoln Holdings GP LLC, Lincoln Ballston LLC, Lincoln Hockey LLC, Lincoln Mystics LLC, Washington Sports & Entertainment Limited Partnership, Washington Sports & Entertainment, Inc., DC Arena L.P., DC Arena L.P. dba Capital One Arena, Washington Bullets, L.P., Centre Group Limited Partnership, Monumental Ticketing Limited Partnership, AP Tickets, Inc., Lincoln Hockey LLC dba Washington Capitals, Washington Bullets L.P. dba Washington Wizards, Monumental Sports & Entertainment Foundation, Washington Sports LLC, Washington Sports GP LLC, Monumental Sports Network LLC, Washington Capitals Enterprises Company, WAS Club LP GP LLC, WAS Club LP, Anacostia Sports LLC, Monumental RSN LLC, Monumental eSports LLC, Lincoln NBADL LLC, Lincoln NBA2K LLC, Lincoln NBADL LLC dba Capital City Co-Co, Lincoln NBA2K LLC dba Wizards District Gaming, Lincoln Productions, LLC and Lincoln St. E's, LLC and any subsidiary, and Lincoln Holdings LLC's interest in any partnership or joint venture in which Lincoln Holdings LLC has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured," including legal representatives.

627 North Glebe Road
Arlington, Virginia, 22203-2144
United States of America

## 2.   POLICY DATES

The term of this Policy is:

FROM:1 August 2020 at 12:01 a.m., Standard Time;
TO:      1 August 2021 at 12:01 a.m., Standard Time,

at the **location** of property involved as provided in this Policy.

## 3.   INSURANCE PROVIDED

The coverage under this Policy applies to property described on the Schedule of Locations or covered under the terms and conditions of the AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY provisions, unless otherwise provided.

Schedule of Locations are as listed on the Schedule of Locations attached to this Policy.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

4.    **PREMIUM**

This Policy is issued in consideration of an initial premium.

5.    **PREMIUM PAYABLE**

Lincoln Holdings LLC pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of Lincoln Holdings LLC.

6.    **LOSS ADJUSTMENT/PAYABLE**

Loss, if any, will be adjusted with and payable to Lincoln Holdings LLC, or as may be directed by Lincoln Holdings LLC.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.

When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance.  The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

The following additional interest(s) is added to the Policy as Additional Named Insured as their interests may appear.

U.S. Bank Association as Collateral Agent under the Security and Accounts Agreement dated May 24, 2018 with DC Arena L.P.

As respects their interest at the following:

| Location No. | Location Description |
|---|---|
| 3 | UNITED STATES OF AMERICA<br>WASHINGTON, DC, 20004-1605<br>601 F Street Northwest<br>Capital One Arena, Lincoln Holdings LLC |

Arlington County, Virginia
Attn:  Director Department of Management & Finance
#1 Courthouse Plaza, 2100 Clarendon Boulevard, Suite 501
Arlington, Virginia

Industrial Development Authority of Arlington County, Virginia
#1 Courthouse Plaza, 2100 Clarendon Boulevard, Suite 501
Arlington, Virginia



**Account No.   1-34105**
**Policy No.   1068228**

The May Department Stores Company
Attn:  General Counsel
611 Olive Street
St. Louis, Missouri

As respects their interest at the following:

| Location No. | Location Description |
|---|---|
| 1 | UNITED STATES OF AMERICA<br>ARLINGTON, VA, 22203-2144<br>627 North Glebe Road<br>Medstar Capitals Iceplex, Lincoln Holdings LLC |

Adding such additional interest(s) does not amend, extend or alter the terms, conditions or provisions of this Policy.

## 7.  TERRITORY

Coverage as provided under this Policy applies in Canada, the United States of America and the Commonwealth of Puerto Rico.

As respects MISCELLANEOUS PROPERTY, coverage as provided under this Policy coverage applies worldwide except does not apply in:

Afghanistan; Albania; Algeria; Angola; Armenia; Azerbaijan; Bangladesh; Belarus; Belize; Benin; Bhutan; Bolivia; Bosnia and Herzegovina; Botswana; Burkina Faso; Burundi; Cambodia; Cameroon; Central African Republic; Chad; Cote D'Ivoire; Cuba; Democratic Republic of the Congo; Djibouti; Egypt; Equatorial Guinea; Eritrea; Ethiopia; Fiji; Gabon; Gambia; Georgia; Ghana; Grenada; Guatemala; Guinea; Guinea-Bissau; Guyana; Haiti; Honduras; Jammu and Kashmir in India; Iran; Iraq; Israel; Gaza Strip, West Bank and territories north of Latitude 32.80 N in Israel; Kenya; Laos; Lebanon; Lesotho; Liberia; Libya; Madagascar; Malawi; Mali; Mauritania; Mauritius; Moldova; Mongolia; Montenegro; Montserrat; Mozambique; Myanmar; Namibia; Nepal; Niger; Nigeria; North Korea; Pakistan; Papua New Guinea; Aksai Chin and Trans-Karakoram Tract in People's Republic of China; Republic of the Congo; Chechen Republic of the Russian Federation; Rwanda; Senegal; Seychelles; Sierra Leone; Somalia; Sri Lanka; South Sudan; Sudan; Swaziland; Syria; Tajikistan; Tanzania; Timor-Leste; Togo; Tunisia; Agri, Batman, Bingol, Bitlis, Diyarbakir, Elazig, Hakkari, Igdir, Mardin, Mus, Sanliurfa, Siirt, Sirnak and Van in Turkey; Turkmenistan; Uganda; Ukraine; Crimea Region of Ukraine; Uzbekistan; Venezuela; Yemen; Zambia; and Zimbabwe.

## 8.  JURISDICTION

This Policy will be governed by the laws of the United States of America.

Any disputes arising hereunder will be exclusively subject to the jurisdiction of the United States of America.



## 9.    CURRENCY

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Organization for Standardization (ISO) 4217, edition in effect at the inception of this Policy.

## 10.    LIMITS OF LIABILITY

The Company's maximum limit of liability in an occurrence, including any insured TIME ELEMENT loss, will not exceed the Policy limit of liability of USD 1,000,000,000 subject to the following provisions:

A.    Limits of liability and time limits stated below or elsewhere in this Policy are part of, and not in addition to, the Policy limit of liability.

B.    Limits of liability apply per **occurrence**, unless otherwise stated.

C.    Limits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

1)    when a limit of liability applies as an **annual aggregate**, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

2)    when a limit of liability applies to a **location** or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all **locations** arising from physical loss or damage at such **location** or to such other specified property.

D.    Should an **occurrence** result in liability payable under more than one policy issued to the Named Insured by the Company, or its **representative company(ies)**, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy.

Applicable Limits of Liability/Time Limits:

| ATTRACTION PROPERTY | 30 days |
|---|---|
| AUTOMATIC COVERAGE | 90 days, not to exceed USD 10,000,000 per **location** |
| CIVIL OR MILITARY AUTHORITY | 30 days |
| CLAIMS PREPARATION COSTS | USD 50,000 |



**Account No. 1-34105**
**Policy No. 1068228**

| | |
|---|---|
| COMMUNICABLE DISEASE RESPONSE | USD 10,000 **annual aggregate**<br><br>The Company's maximum limit of liability for INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD 10,000 **annual aggregate**. |
| CONTINGENT TIME ELEMENT EXTENDED | USD 25,000,000 |
| CRISIS MANAGEMENT | 30 days |
| **cyber event** | 1. USD 1,000,000 **annual aggregate** for DATA RESTORATION and OWNED NETWORK INTERRUPTION combined<br><br>2. USD 1,000,000 **annual aggregate** for DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined<br><br>3. USD 25,000,000 **annual aggregate** for physical loss or damage to stock in process or finished goods manufactured by or for the Insured caused by or resulting from a **cyber event** that impacts the processing, manufacturing, or testing of such property or while it is otherwise being worked on |
| DATA RESTORATION | USD 10,000,000 **annual aggregate** |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined | USD 5,000,000 **annual aggregate** |
| **earth movement** | USD 250,000,000 **annual aggregate** |
| ERRORS AND OMISSIONS | USD 100,000,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD 100,000,000 |

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



| EXTENDED PERIOD OF LIABILITY | 90 days, not to exceed USD 10,000,000 |
|---|---|
| **fine arts** | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable fine arts** not on a schedule on file with the Company |
| fines or penalties for breach of contract or for late or noncompletion of orders combined | USD 100,000 |
| **flood** | USD 250,000,000 |
| GROSS PROFIT | 12 months, not to exceed 365 days for Ordinary Payroll |
| INGRESS/EGRESS | 30 days |
| INTERRUPTION BY COMMUNICABLE DISEASE | 365 days, not to exceed USD 10,000 **annual aggregate**<br><br>The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD 10,000 **annual aggregate**. |
| LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL | USD 50,000 **annual aggregate** |
| LOGISTICS EXTRA COST | 180 days, not to exceed 200% of the **normal cost** |
| MISCELLANEOUS PROPERTY | 1. USD 10,000,000 per **location** for property at a **location**<br><br>2. USD 10,000,000 for property not at a **location** |
| Ordinary Payroll | 365 days |
| SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined | USD 25,000,000 |



Account No.   1-34105
Policy No.   1068228

| TERRORISM | USD 5,000,000 **annual aggregate**, not to exceed the following:<br><br>1. USD 5,000,000 **annual aggregate** for AUTOMATIC COVERAGE, ERRORS AND OMISSIONS, MISCELLANEOUS PROPERTY and TEMPORARY REMOVAL OF PROPERTY, combined<br><br>2. USD 5,000,000 **annual aggregate** for **flood** when caused by or resulting from **terrorism**<br><br>The limits for TERRORISM shall not include the **actual cash value** portion of fire damage caused by **terrorism**.<br><br>The limits for TERRORISM do not apply to the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S). |
|---|---|
| **valuable papers and records** | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable valuable papers and records** not on a schedule on file with the Company |

## 11.   DEDUCTIBLES

Subject to the deductible general provisions stated below, in each case of loss covered by this Policy the following deductibles apply per **occurrence**, for all coverages involved, unless otherwise stated:

| **cyber event** | USD 250,000 for DATA RESTORATION and OWNED NETWORK INTERRUPTION |
|---|---|
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT | USD 250,000 |
| **flood** | USD 50,000 per **location** |
| LOGISTICS EXTRA COST | USD 50,000 |
| All Other Loss | USD 50,000 |



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

Deductible General Provisions:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified above, and only for its share of that greater amount.

A.   For SERVICE INTERRUPTION loss, when a deductible is not specifically stated as applying to SERVICE INTERRUPTION, the deductible applied to the SERVICE INTERRUPTION loss will be the deductible that would apply if the cause of the interruption happened at the insured **location** that sustains the interruption of the specified services.

B.   For CONTINGENT TIME ELEMENT EXTENDED loss, when a deductible is not specifically stated as applying to CONTINGENT TIME ELEMENT EXTENDED, the deductible for CONTINGENT TIME ELEMENT EXTENDED loss will be determined as though the **contingent time element location** was an insured **location** under this Policy.

C.   The stated earthquake deductible will be applied to earthquake loss.  The stated **flood** deductible will be applied to **flood** loss.  The stated **wind** deductible will be applied to **wind** loss.  The provisions of item E below will also be applied to each.

D.   When this Policy insures more than one **location**, the deductible will apply against the total loss covered by this Policy in an **occurrence** except that a deductible that applies on a per **location** basis, if specified, will apply separately to each **location** where the physical damage happened regardless of the number of **locations** involved in the **occurrence**.

E.   Unless stated otherwise, if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable.  For the purposes of this provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible.  If two or more deductibles apply on a per **location** basis in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**.

F.   When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:

Property Damage – % of the value, per the Valuation clause(s) of the PROPERTY DAMAGE section, of the property insured at the **location** where the physical damage happened.

Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.



G.   For insured physical loss or damage:

   1)   to insured fire protection equipment; or

   2)   from water or other substance discharged from fire protection equipment of the type insured,

the applicable deductible applying to items 1 or 2 above only will be reduced by fifty percent (50%), per **occurrence**.  However, this provision will not apply to loss or damage resulting from fire or **earth movement** regardless of whether claim is made for such fire or **earth movement**.

FM Global

<div align="right">

**Account No. 1-34105**
**Policy No. 1068228**

</div>

# PROPERTY DAMAGE

## 1. INSURED PROPERTY

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, to the extent of the interest of the Insured in such property:

A. Real Property, including new buildings and additions under construction, in which the Insured has an insurable interest.

B. Personal Property:

   1) owned by the Insured.

   2) consisting of the Insured's interest as a tenant in improvements and betterments. In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

   3) of officers and employees of the Insured.

   4) of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

   5) of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to Personal Property. The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage. The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an insured **location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property. Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

## 2. EXCLUDED PROPERTY

The following exclusions apply unless otherwise stated in this Policy:

This Policy excludes:

A. currency, money, notes or securities.

B. precious metal in bullion form.



C.   land and any substance in or on land.  However, this exclusion does not apply to:

    1)   landscape gardening.

    2)   car parks, parking lots, pavement, roadways, railways, transformer enclosures or walkways.

    3)   fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures.

D.   water.  However, this exclusion does not apply to:

    1)   water that is contained within any enclosed tank, piping system or any other processing equipment.

E.   animals, standing timber or growing crops.

F.   watercraft or aircraft, except when unfueled and manufactured by the Insured.

G.   vehicles of officers or employees of the Insured or vehicles otherwise insured for physical loss or damage.

H.   underground mines or mine shafts or any property within such mine or shaft.

I.   dams or dikes.

J.   property in transit, except as otherwise provided by this Policy.

K.   property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the INSTALLMENT OR DEFERRED PAYMENTS coverage of this Policy.

L.   electronic data, programs or software, except when incorporated into physical goods intended to be sold as:

    1)   finished goods manufactured by the Insured; or

    2)   other merchandise not manufactured by the Insured,

or as otherwise provided by the DATA RESTORATION coverage of this Policy.

## 3.   EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

A.   This Policy excludes:

    1)   indirect or remote loss or damage.

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



2)   interruption of business, except to the extent provided by this Policy.

3)   loss of market or loss of use.

4)   loss or damage or deterioration arising from any delay.

5)   mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6)   loss from enforcement of any law or ordinance:

   a)   regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

   b)   requiring the demolition of any property, including the cost in removing its debris;

   except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy.

7)   loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

B.   This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   nuclear reaction or nuclear radiation or radioactive contamination.  However:

   a)   if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

   b)   this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured **location**.  This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

   This exclusion B1 and the exceptions in B1a and B1b do not apply to any act, loss or damage which also comes within the terms of exclusion B2b of this EXCLUSIONS clause.

2)   a)   hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

     (i)   government or sovereign power (de jure or de facto);



(ii)  military, naval or air force; or

(iii) agent or authority of any party specified in i or ii above.

b)  discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

c)  insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d)  seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e)  risks of contraband, or illegal transportation or trade.

f)  **terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the TERRORISM coverage of the Policy.  However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to property insured.  This coverage exception for such resulting fire loss or damage does not apply to:

(i)  direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

(ii)  any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided in this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2b of this EXCLUSIONS clause then item B2b applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2c of this EXCLUSIONS clause then item B2c applies in place of this item B2f exclusion.



If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

3) any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

    a) by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

    b) by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured. This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause. In no event does this Policy cover loss by theft by any individual specified in a or b above.

4) lack of the following services:

    a) incoming electricity, fuel, water, gas, steam or refrigerant;

    b) outgoing sewerage;

    c) incoming or outgoing voice, data or video,

all when caused by an event off the insured **location**, except as provided in the DATA SERVICE PROVIDER and SERVICE INTERRUPTION coverages of this Policy. But, if the lack of such a service directly causes insured physical damage on the insured **location**, then only that resulting damage is insured.

C. This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1) faulty workmanship, material, construction or design from any cause.

2) loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3) deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

4) settling, cracking, shrinking, bulging, or expansion of:

    a) foundations (including any pedestal, pad, platform or other property supporting machinery).



    b)  floors.

    c)  pavements.

    d)  walls.

    e)  ceilings.

    f)  roofs.

5)  a)  changes of temperature damage (except to machinery or equipment); or

    b)  changes in relative humidity damage,

    all whether atmospheric or not.

6)  insect, animal or vermin damage.

7)  loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

D.  This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)  **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

2)  shrinkage.

3)  changes in color, flavor, texture or finish.

## 4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows.

A.  This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



B.   Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage.  This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such covered resulting physical loss or damage does not include any loss, cost or expense described in A or B above.  If such covered resulting physical loss or damage happens, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.

## 5.   VALUATION

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the place of the loss, and for no more than the interest of the Insured.

Unless stated otherwise in an Additional Coverage, adjustment of physical loss to property will be subject to the following:

A.   On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B.   On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.   On raw materials, supplies or other merchandise not manufactured by the Insured:

   1)   if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

   2)   if not repaired or replaced, the **actual cash value**.

D.   On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation.  These costs will not include research, engineering or any costs of restoring or recreating lost information.



E.   On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy and shall be subject to the limit(s) of liability for TERRORISM, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

F.   On all other property, the lesser of the following:

1)   The cost to repair.

2)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)   The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)   The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)   The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)   The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

7)   The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)   The **actual cash value** if such property is:

a)   useless to the Insured; or

b)   not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured **location** under this Policy.  This item does not extend to LAW AND ORDINANCE.

FM Global

## 6.   ADDITIONAL COVERAGES

This Policy includes the following Additional Coverages for insured physical loss or damage.

These Additional Coverages:

1)   are subject to the applicable limit of liability;

2)   will not increase the Policy limit of liability; and

3)   are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## CYBER ADDITIONAL COVERAGES

### A.   DATA RESTORATION

This Policy covers insured **physical loss or damage to electronic data, programs or software**.

With respect to **physical loss or damage to electronic data, programs or software** caused by or resulting from a **cyber event**, this Additional Coverage will apply when the time to recreate or restore such data, programs or software with due diligence and dispatch is in excess of 48 hours.

For the purposes of this Additional Coverage, insured data, programs or software can be anywhere worldwide, including while in transit, except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

This Additional Coverage also covers:

1)   the cost of the following reasonable and necessary actions taken by the Insured provided such actions are taken due to actual insured **physical loss or damage to electronic data, programs or software**:

    a)   actions to temporarily protect and preserve insured electronic data, programs or software.

    b)   actions taken for the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

    c)   actions taken to expedite the permanent repair or replacement of such damaged property.



2) the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**.  In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when incorporated into physical goods intended to be sold as:

1) finished goods manufactured by the Insured; or

2) other merchandise not manufactured by the Insured.

DATA RESTORATION Exclusions: As respects DATA RESTORATION, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, B1, B2, B3a and B4.

2) the following additional exclusions apply:

This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

a) errors or omissions in processing or copying.

b) loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

c) deterioration, inherent vice, vermin or wear and tear.

DATA RESTORATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) the cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2) if not repaired, replaced or restored within two years from the date of loss, the blank value of the media.



<div align="right">

**Account No. 1-34105**
**Policy No. 1068228**

</div>

### B. DATA SERVICE PROVIDER PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Additional Coverage:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Additional Coverage will apply when the period of interruption of **off-premises data processing or data transmission services** as described below is in excess of 24 hours.

The period of interruption of **off-premises data processing or data transmission services** is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

DATA SERVICE PROVIDER PROPERTY DAMAGE Exclusions: As respects DATA SERVICE PROVIDER PROPERTY DAMAGE, the following applies:

1) Items B4 and C5 of the EXCLUSIONS clause in this section do not apply except for B4 with respect to:

   a) incoming electricity, fuel, water, gas, steam or refrigerant; and

   b) outgoing sewerage.



2)   The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b)   **terrorism**.

## OTHER ADDITIONAL COVERAGES

## A.   ACCIDENTAL INTERRUPTION OF SERVICES

This Policy covers physical damage resulting from changes in temperature or relative humidity to insured property at an insured **location** when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at the insured **location**.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

## B.   ACCOUNTS RECEIVABLE

This Policy covers the following directly resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit:

1)   any shortage in the collection of accounts receivable.

2)   the interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum.  Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

3)   the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.



4)   any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

Accounts receivable records will include accounts receivable records stored as electronic data.

In the event of loss, the Insured will:

1)   use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2)   reduce loss by use of any suitable property or service:

   a)   owned or controlled by the Insured; or

   b)   obtainable from other sources.

3)   reconstruct, if possible, accounts receivable records so that no shortage is sustained.

The settlement of loss will be made within 90 days from the date of physical loss or damage. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company.  All recoveries exceeding the amount paid will belong to the Insured.

ACCOUNTS RECEIVABLE Exclusions: As respects ACCOUNTS RECEIVABLE, the following additional exclusions apply:

This Policy does not insure against shortage resulting from:

1)   bookkeeping, accounting or billing errors or omissions; or

2)   a)   alteration, falsification, manipulation; or

   b)   concealment, destruction or disposal,

   of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

## C.   AUTOMATIC COVERAGE

This Policy covers insured physical loss or damage to insured property at any **location** purchased, leased or rented by the Insured after the inception date of this Policy.

This Additional Coverage applies:

1)   from the date of purchase, lease or rental,

FM Global

**Account No.   1-34105**
**Policy No.   1068228**

2)   until the first of the following:

   a)   the **location** is bound by the Company.

   b)   agreement is reached that the **location** will not be insured under this Policy.

   c)   the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The time limit begins on the date of purchase, lease or rental.

## D.   BRANDS AND LABELS

If branded or labeled insured property is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

1)   stamp "salvage" on the property or its containers; or

2)   remove or obliterate the brands or labels,

if doing so will not damage the property.

The Insured must relabel such property or its containers to be in compliance with any applicable law.

## E.   CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1)   of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2)   the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1)   attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2)   loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.



Account No.   1-34105
Policy No.   1068228

### F.   COMMUNICABLE DISEASE RESPONSE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)   an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)   a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1)   cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2)   actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions: As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   **terrorism**.

### G.   CONSEQUENTIAL REDUCTION IN VALUE

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from insured physical loss or damage to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

### H.   CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by the Insured as follows:

1) the Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2) the Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3) property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4) any salvage proceeds received will go to the:

   a) Company at the time of loss settlement; or

   b) Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

### I.   DEBRIS REMOVAL

This Policy covers the reasonable and necessary costs incurred to remove debris from an insured **location** that remains as a direct result of insured physical loss or damage.

This Additional Coverage does not cover the costs of removal of:

1) contaminated uninsured property; or

2) the **contaminant** in or on uninsured property,

whether or not the **contamination** results from insured physical loss or damage.  This Additional Coverage covers the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

### J.   DECONTAMINATION COSTS

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



The Company is not liable for the costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** results from an insured event.

## K.  ERRORS AND OMISSIONS

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1) in the description of where insured property is physically located;

2) to include any **location**:

    a) owned, leased or rented by the Insured on the effective date of this Policy; or

    b) purchased, leased or rented by the Insured during the term of this Policy; or

3) that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## L.  EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1) for the temporary repair of insured physical damage to insured property;

2) for the temporary replacement of insured equipment suffering insured physical damage; and

3) to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.



Account No.  1-34105
Policy No.  1068228

### M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to **fine arts** and **valuable papers and records** while anywhere within this Policy's TERRITORY, including while in transit.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Exclusions: As respects FINE ARTS AND VALUABLE PAPERS AND RECORDS, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, A7, B1, B2, B3a and B4.

2) the following additional exclusions apply:

This Policy excludes:

a) currency, money, securities.

b) errors or omissions in processing or copying of **valuable papers and records**, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

c) deterioration, inherent vice, or wear and tear, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

d) fungus, mold or mildew unless directly resulting from other physical damage not excluded by this Policy.

e) loss or damage to **fine arts** from any repairing, restoration or retouching process.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1) the cost to repair or restore such property to the physical condition that existed on the date of loss.

2) the cost to replace.

3) the value, if any, designated for the item on the schedule on file with the Company.

If a **fine arts** article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.



## N.   INSTALLMENT OR DEFERRED PAYMENTS

This Policy covers insured physical loss or damage to personal property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)   pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)   from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

3)   to the extent the buyer continues payments.

4)   not within the TERRITORY of this Policy.

INSTALLMENT OR DEFERRED PAYMENTS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   total amount of unpaid installments less finance charges.

2)   **actual cash value** of the property at the time of loss.

3)   cost to repair or replace with material of like size, kind and quality.

## O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of the actual not suspected presence of **contaminant(s)** from uninsured property consisting of land, water or any other substance in or on land at the insured **location** if the release, discharge or dispersal of such **contaminant(s)** is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of **contamination** from such property:

1)   at any **location** insured for Personal Property only.



2)   at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY coverage provided by this Policy.

3)   when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

## P.   LAW AND ORDINANCE

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

1)   such law or ordinance is enforced as a direct result of insured physical loss or damage at an insured **location**;

2)   such law or ordinance is in force at the time of such loss or damage; and

3)   such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

1)   demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

2)   repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

The Company's maximum liability for this Coverage A at each insured **location** in any **occurrence** will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

1)   the reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

2)   the cost to rebuild on the same site.



Account No.  1-34105
Policy No.  1068228

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

LAW AND ORDINANCE Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced, the loss amount will be the difference between:

1)  the **actual cash value**; and

2)  the cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

LAW AND ORDINANCE Exclusions: As respects LAW AND ORDINANCE, the following additional exclusions apply:

This Policy does not cover:

1)  any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

2)  any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

## Q.  LOSS PAYMENT INCREASED TAX LIABILITY

This Policy covers the increase in tax liability as described herein incurred by the Insured.

Coverage A:

The increase in tax liability from an insured loss at an insured **location** if the tax treatment of:

1)  the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or

2)  the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss happened.



### R.   MACHINERY OR EQUIPMENT STARTUP OPTION

After insured machinery or equipment that has sustained insured physical loss or damage is repaired or replaced and such machinery or equipment is undergoing startup, the following applies:

If physical loss or damage of the type insured directly results to such machinery or equipment from such startup, the Insured shall have the option of claiming such resulting insured damage as part of the original event of physical loss or damage or as a separate **occurrence**.

This Additional Coverage applies only:

1)   to the first startup event after the original repair or replacement; and

2)   when the first startup event happens during the term of this Policy or its renewal issued by the Company.

For the purposes of this Additional Coverage, startup means:

1)   the introduction into machinery or equipment of feedstock or other materials for processing or handling;

2)   the commencement of fuel or energy supply to machinery or equipment.

### S.   MISCELLANEOUS PROPERTY

This Policy covers insured physical loss or damage to:

1)   insured property;

2)   property of the type insured that is under contract to be used in a construction project at an insured **location**:

    a)   from the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier;

    b)   while such property is located at a storage site; and

    c)   while such property is in transit from a storage site to another storage site or to a construction project at an insured **location**,

that does not include any such property owned or rented by the contractor;

while anywhere within this Policy's TERRITORY, including while in transit.

This Additional Coverage excludes property covered elsewhere in this Policy.



MISCELLANEOUS PROPERTY Exclusions: As respects MISCELLANEOUS PROPERTY, the following additional exclusions apply:

1) This Policy excludes:

   a) **transmission and distribution systems** not at a **location**.

   b) property insured under import or export ocean marine insurance.

   c) property shipped between continents.

   d) airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

   e) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

2) This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

## T.   OPERATIONAL TESTING

This Policy covers insured physical loss or damage to insured property during the **period of operational testing**.

This Additional Coverage excludes property, including stock or material, manufactured or processed by the Insured.

## U.   PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2) reasonable and necessary:

   a) fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

   b) costs incurred of restoring and recharging fire protection systems following an insured loss.



c)   costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in this section of the Policy.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## V.   SERVICE INTERRUPTION PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1)   The Insured will immediately notify the suppliers of services of any interruption of such services.

2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION PROPERTY DAMAGE Exclusions: As respects SERVICE INTERRUPTION PROPERTY DAMAGE, the following applies:

1)   The exclusions in the EXCLUSIONS clause in this section do not apply except for:

a)   A1, A2, A3, A6, B1, B2, and

b)   B4 with respect to incoming or outgoing voice, data or video, and

c)   D1 except with respect to fungus, mold or mildew.



2)   The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b)   **terrorism**.

## W.   TEMPORARY REMOVAL OF PROPERTY

When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

1)   while at the premises to which such property has been moved; and

2)   for physical loss or damage as provided at the insured **location** from which such property was removed.

This Additional Coverage does not apply to property:

1)   insured, in whole or in part, elsewhere in this Policy.

2)   insured, in whole or in part, by any other insurance policy.

3)   removed for normal storage, processing or preparation for sale or delivery.

## X.   TERRORISM

This Policy covers physical loss or damage to property as described in the INSURANCE PROVIDED provision caused by or resulting from **terrorism**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage does not cover loss or damage which also comes within the terms of either item B2a or B2c of the EXCLUSIONS clause in this section of the Policy.



This Additional Coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

1)   that involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, or radioactive force, whether in time of peace or war and regardless of who commits the act; or

2)   that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3)   in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

4)   that involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## Y.   TRANSPORTATION

This Policy covers the following personal property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

1)   owned by the Insured.

2)   shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

3)   of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

4)   of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

   a)   when shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer.

   b)   when shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer.

Coverage Attachment and Duration:

1)   This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.



2) However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

This Additional Coverage:

1) covers general average and salvage charges on shipments covered while waterborne.

2) insures physical loss or damage caused by or resulting from:

   a) unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

   b) improper parties having gained possession of property through fraud or deceit.

Additional General Provisions:

1) This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

2) The Insured has permission, without prejudicing this insurance, to accept:

   a) ordinary bills of lading used by carriers;

   b) released bills of lading;

   c) undervalued bills of lading; and

   d) shipping or messenger receipts.

3) The Insured may waive subrogation against railroads under side track agreements.

Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

TRANSPORTATION Exclusions: As respects TRANSPORTATION, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1 through A4, B1 through B4, C1, C3, C5, C6, D1 through D3.

2) the following additional exclusions apply:

   This Policy excludes:

   a) samples in the custody of salespeople or selling agents.

   b) property insured under import or export ocean marine insurance.



   c)  waterborne shipments, unless:

      (i)  by inland water; or

      (ii)  by coastal shipments.

   d)  waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

   e)  airborne shipments unless by regularly scheduled passenger airlines, air freight carriers or NBA, WNBA, NHL, NBA G-League or NBA 2K League chartered flights that transport basketball, football, gaming, and hockey uniforms, equipment and supplies for the Washington Wizards, Washington Mystics, Washington Capitals, Capital City Go-Go or Wizards District Gaming.

   f)  property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

   g)  any transporting vehicle.

TRANSPORTATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1)  Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured.  Included in the value are accrued costs and charges legally due.  Charges may include the Insured's commission as selling agent.

2)  Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount.  Prepaid or advanced freight costs are included.

3)  Property not under invoice will be valued:

   a)  for property of the Insured, at the valuation provisions of this Policy applying at the place from which the property is being transported; or

   b)  for other property, at the actual cash market value at the destination point on the date of loss,

less any charges saved which would have become due and payable upon arrival at destination.

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



# TIME ELEMENT

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS of this section of the Policy:

A.   is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION; and

B.   will not increase the Policy limit of liability; and

C.   is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## 1.   LOSS INSURED

A.   This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:

    1)   to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

    2)   used by the Insured, or for which the Insured has contracted use;

    3)   while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or

    4)   while in transit as provided by this Policy, and

    5)   during the Periods of Liability described in this section,

provided such loss or damage is not at a **contingent time element location**.

B.   This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

    1)   the use of any property or service owned or controlled by the Insured;

    2)   the use of any property or service obtainable from other sources;

    3)   working extra time or overtime; or

    4)   the use of inventory,

all whether at an insured **location** or at any other premises. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.



C.   This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy.  The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.   In determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY. The probable experience will consider any increase or decrease in demand for the Insured's goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused physical loss or damage starting the PERIOD OF LIABILITY.

## 2.   TIME ELEMENT COVERAGES

### A.   INSURED OPTION

The Insured has the option to make claim based on either

a)   GROSS EARNINGS and EXTENDED PERIOD OF LIABILITY; or

b)   GROSS PROFIT,

as described in the TIME ELEMENT section of this Policy and subject to the applicable terms and conditions as may be shown elsewhere.

Such option may be exercised at any time prior to the conditions set forth in the SETTLEMENT OF CLAIMS clause in the LOSS ADJUSTMENT AND SETTLEMENT section of this Policy.

If such claim involves more than one insured **location**, including interdependency at one or more insured **locations**, such claim will be adjusted by using the single coverage option chosen above.

### B.   GROSS EARNINGS

Measurement of Loss:

1)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a)   Gross Earnings;

b)   less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

c)   less Ordinary Payroll; and

d)   plus all other earnings derived from the operation of the business.



e) Ordinary Payroll, including taxes and charges dependent on the payment of wages:

(i) for a period of time of not more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section immediately following the interruption of production or suspension of business operations or services, and

(ii) only to the extent such payroll continues following the loss and would have been earned had no such interruption happened.

However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

(i) providing gainful employment for, or

(ii) paying less than the normal salary rate to,

all or part of its employees, then the number of consecutive days of Ordinary Payroll may be extended. However, this provision will not increase the total liability of this Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision. Ordinary Payroll does not cover any portion of salaries or wages included in Gross Earnings.

2) For the purposes of the Measurement of Loss, Gross Earnings is:

for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

Any amount recovered under property damage coverage at selling price will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

3) In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

4) If the Insured would have operated at a deficit had no interruption of production or suspension of business operations or services happened, the following applies:

a) for Gross Earnings, the extent to which charges and expenses would have been earned will be determined by subtracting the operating deficits from the charges and expenses that necessarily continue.



   b)  for Ordinary Payroll, the extent payroll would have been earned will be determined
       by subtracting the excess, if any, of the operating deficit over the fixed charges that
       need to continue from such payroll.

5)  There is recovery hereunder to the extent that the Insured is:

   a)  wholly or partially prevented from producing goods or continuing business
       operations or services;

   b)  unable to make up lost production within a reasonable period of time, not limited to
       the period during which production is interrupted;

   c)  unable to continue such operations or services during the PERIOD OF LIABILITY;
       and

   d)  able to demonstrate a loss of sales for the operations, services or production
       prevented.

## C.   GROSS PROFIT

Measurement of Loss:

1)  The recoverable GROSS PROFIT loss is the Actual Loss Sustained by the Insured of the
    following due to the necessary interruption of business during the PERIOD OF
    LIABILITY: a) Reduction in Sales, b) Ordinary Payroll and c) Increase in Cost of Doing
    Business.  The amount payable as indemnity hereunder will be:

   a)  with respect to Reduction in Sales:  The sum produced by applying the Rate of
       Gross Profit to the amount by which the sales during the PERIOD OF LIABILITY
       will fall short of the Standard Sales.  In determining the Reduction in Sales, any
       amount recovered under property damage coverage at selling price will be credited
       against lost sales.

   b)  Ordinary Payroll, including taxes and charges dependent on the payment of wages,
       during the PERIOD OF LIABILITY only to the extent such payroll would have
       been earned had such loss not happened.

       However, if an Insured reduces the daily loss payable under Ordinary Payroll, either
       by:

       (i)  providing gainful employment for, or

       (ii)  paying less than the normal salary rate to,

       all or part of its employees, the number of consecutive days of Ordinary Payroll may
       be extended. This provision will not increase the total liability of this Company
       beyond the amount it would have been liable for Ordinary Payroll costs without this
       provision.  Ordinary Payroll does not cover any portion of salaries or wages
       included in Net Profit or fixed charges.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

   c)  with respect to Increase in Cost of Doing Business:

      (i)  the additional expenditure necessarily and reasonably incurred for the sole purpose of avoiding or diminishing the reduction in sales and a loss of Ordinary Payroll which, but for that expenditure, would have taken place during the PERIOD OF LIABILITY; but

      (ii)  not exceeding the sum produced by applying the Rate of Gross Profit to the amount of the reduction thereby avoided,

all less any sum saved during the PERIOD OF LIABILITY with respect to such of the Insured Fixed Charges as may cease or be reduced because of such interruption of business.

2)  For the purposes of the Measurement of Loss:

Gross Profit is:

The amount produced by adding to the Net Profit the amount of the Insured Fixed Charges, or if there be no Net Profit the amount of the Insured Fixed Charges less that proportion of any loss from business operations as the amount of the Insured Fixed Charges bears to all fixed charges.

Net Profit is:

The net operating profit (exclusive of all capital receipts and accruals and all outlay properly chargeable to capital) resulting from the business of the Insured at the insured **locations** after due provision has been made for all fixed charges and other expenses including depreciation but before the deduction of any taxes on profits.

Insured Fixed Charges is:

All fixed charges unless specifically excluded herein. Ordinary Payroll is not an Insured Fixed Charge.

Sales is:

The money paid or payable to the Insured for goods sold and delivered and for services rendered in the conduct of the business at an insured **location**.

Rate of Gross Profit is:

The rate of Gross Profit earned on the sales during the twelve full calendar months immediately before the date of the physical loss or damage to the described property.

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

Standard Sales is:

The sales during that period in the twelve months immediately before the date of the physical loss or damage to the described property which corresponds with the PERIOD OF LIABILITY.

3)   In determining the indemnity payable as the Actual Loss Sustained:

    a)   if any fixed charges of the business are not insured hereunder, then, in computing the amount recoverable hereunder as Increase in Cost of Doing Business, that proportion only of the additional expenditure will be recoverable hereunder which the sum of the Net Profit and the Insured Fixed Charges bears to the sum of the Net Profit and all the fixed charges excluding Ordinary Payroll.

    b)   if during the PERIOD OF LIABILITY goods will be sold or services will be rendered elsewhere than at the insured **locations** for the benefit of the business, either by the Insured or by others on the Insured's behalf, the money paid or payable in respect of such sales or services will be included in arriving at the amount of sales during the PERIOD OF LIABILITY.

4)   The Insured will act with due diligence and dispatch in repairing or replacing physically damaged buildings and equipment to the same or equivalent physical and operating conditions that existed prior to the damage; and take whatever actions are necessary and reasonable to minimize the loss payable hereunder.

GROSS PROFIT Exclusions: As respects GROSS PROFIT, the TIME ELEMENT EXCLUSIONS B and C of this section do not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under GROSS PROFIT for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the PERIOD OF LIABILITY.

## D.   EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1)   extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2)   extra costs of temporarily using property or facilities of the Insured or others; and



Account No.   1-34105
Policy No.   1068228

3) costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the INSURED OPTION clause, the PERIOD OF LIABILITY for EXTRA EXPENSE coverage will be the PERIOD OF LIABILITY applicable to the Time Element coverage option selected.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1) TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2) The following additional exclusions apply:

This Policy does not insure:

a) any loss of income.

b) costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c) costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

d) any expense recoverable elsewhere in this Policy.

## E.   LEASEHOLD INTEREST

Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

1) If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

2) If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

3) As used above, the following terms mean:

Net Lease Interest:
That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).



Lease Interest:
The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, the following applies:

1)   This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

2)   TIME ELEMENT EXCLUSIONS A, B and C do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

## F.   RENTAL INSURANCE

Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

1)   the fair rental value of any portion of the property occupied by the Insured;

2)   the income reasonably expected from rentals of unoccupied or unrented portions of such property; and

3)   the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.

RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.



## 3.   PERIOD OF LIABILITY

A.   The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except GROSS PROFIT and LEASEHOLD INTEREST and as shown below or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

   1)   For building and equipment, the period:

      a)   starting from the time of physical loss or damage of the type insured; and

      b)   ending when with due diligence and dispatch the building and equipment could be:

         (i)   repaired or replaced; and

         (ii)   made ready for operations,

         under the same or equivalent physical and operating conditions that existed prior to the damage.

      c)   not to be limited by the expiration of this Policy.

   2)   For building and equipment under construction:

      a)   the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

      b)   due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

   3)   For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

      a)   to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

      b)   to replace physically damaged mercantile stock.

      This item does not apply to RENTAL INSURANCE.

   4)   For raw materials and supplies, the period of time:

      a)   of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but



      b)  limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5)  If water:

      a)  used for any manufacturing purpose, including but not limited to as a raw material or for power;

      b)  stored behind dams or in reservoirs; and

      c)  on any insured **location**,

is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6)  For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation.  This time does not include research, engineering or any other time necessary to restore or recreate lost information.

This item does not apply to RENTAL INSURANCE.

7)  For physically damaged or destroyed property covered under DATA RESTORATION, the period:

      a)  starting from the time of **physical loss or damage to electronic data, programs or software**; and

      b)  ending when with due diligence and dispatch the electronic data, programs or software could have been recreated or restored under the same or equivalent physical and operating conditions that existed prior to the physical loss or damage.

This item does not apply to RENTAL INSURANCE.

B.    The PERIOD OF LIABILITY applying to GROSS PROFIT is as follows:

1)  The period:

      a)  starting from the time of physical loss or damage of the type insured; and



      b)  ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

      c)  not to be limited by the expiration of this Policy.

2)  For property under construction, the period:

      a)  starting on the date that production, business operation or service would have commenced if physical damage of the type insured had not happened; and

      b)  ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

      c)  not to be limited by the expiration of this Policy.

The Rate of Gross Profit and Standard Sales will be based on the experience of the business after construction is completed and the probable experience during the PERIOD OF LIABILITY.

C.    The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

1)  making changes to the buildings, structures, machinery or equipment except as provided in the LAW AND ORDINANCE clause in the PROPERTY DAMAGE section.

2)  restaffing or retraining employees.  However, this item does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is completed within 90 consecutive days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

4.   **TIME ELEMENT EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure:

A.   Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

1)   physical loss or damage not insured by this Policy on or off of the insured **location**.

2)   planned or rescheduled shutdown.

3)   strikes or other work stoppage.

4)   any other reason other than physical loss or damage insured under this Policy.

B.   Any increase in loss due to:

1)   suspension, cancellation or lapse of any lease, contract, license or orders.

2)   damages for breach of contract or for late or noncompletion of orders.

3)   fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

4)   any other consequential or remote loss.

C.   Any loss resulting from physical loss or damage to finished goods manufactured by the Insured, or the time required for their reproduction.

D.   Any loss resulting from the **actual cash value** portion of direct physical loss or damage by fire caused by or resulting from **terrorism**.

5.   **TIME ELEMENT COVERAGE EXTENSIONS**

This Policy also insures TIME ELEMENT loss, as provided by the TIME ELEMENT COVERAGES of this Policy, for the TIME ELEMENT COVERAGE EXTENSIONS described below.



Account No.   1-34105
Policy No.   1068228

## CYBER TIME ELEMENT COVERAGE EXTENSIONS

### A.   DATA SERVICE PROVIDER TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption at an insured **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Extension:

1)   facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2)   an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Extension will apply when the period of interruption of **off-premises data processing or data transmission services** is in excess of 24 hours.

Additional General Provisions:

1)   The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured covered by OWNED NETWORK INTERRUPTION coverage as provided in this section of the Policy.

DATA SERVICE PROVIDER TIME ELEMENT Exclusions: As respects DATA SERVICE PROVIDER TIME ELEMENT, the following applies:

1)   Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

a)   incoming electricity, fuel, water, gas, steam or refrigerant; and

b)   outgoing sewerage.



2)   The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b)   **terrorism**.

As used above, the period of interruption of **off-premises data processing or data transmission services**:

1)   is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2)   is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3)   does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## B.   OWNED NETWORK INTERRUPTION

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption directly resulting from:

1)   the failure of the Insured's **electronic data processing equipment or media** to operate, provided that such failure is the direct result of a **cyber event** directed at the NAMED INSURED; or

2)   the Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending **cyber event** directed at the NAMED INSURED, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

For the purposes of this Extension, the Insured's **electronic data processing equipment or media** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

As respects item 1 above, this Extension will apply when the period of interruption is in excess of 48 hours.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

As used above, the period of interruption:

1)  is the period starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure.

2)  does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS

### A.   CIVIL OR MILITARY AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of such physical damage; and

2)  ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### B.   CONTINGENT TIME ELEMENT EXTENDED

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1)  Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:

    CIVIL OR MILITARY AUTHORITY
    CONTINGENT TIME ELEMENT EXTENDED



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

DATA SERVICE PROVIDER TIME ELEMENT
DELAY IN STARTUP
EXTENDED PERIOD OF LIABILITY
INGRESS/EGRESS
ON PREMISES SERVICES
SERVICE INTERRUPTION TIME ELEMENT

2)   The Insured will influence and cooperate with the **contingent time element location** in every way and take any reasonable and necessary action to mitigate the loss payable hereunder.

3)   TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions: As respects CONTINGENT TIME ELEMENT EXTENDED, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing transmission of voice, data or video.

2)   **earth movement** as respects a direct or indirect customer, supplier, contract manufacturer or contract service provider located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

3)   physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

**C.   INGRESS/EGRESS**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2)   picketing or other action by strikers except for physical damage not excluded by this Policy.



3)  physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of such physical damage; and

2)  ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

## D.   LOGISTICS EXTRA COST

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:

1)  directly between insured **locations**; or

2)  directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,

provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

1)  extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.

This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

LOGISTICS EXTRA COST Exclusions: As respects LOGISTICS EXTRA COST, the following additional exclusions apply:

This Policy does not insure:

1)  any loss resulting from disruption in the movement of goods or materials between **contingent time element locations**.



2) any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

3) any loss of income.

4) costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** movement of goods or materials.

5) costs of permanent repair or replacement of property that has been damaged or destroyed.

6) any expense recoverable elsewhere in this Policy.

7) any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

8) any loss resulting from disruption caused by loss or damage from **earth movement** in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

9) any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of physical loss or damage causing the disruption of the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured, and

2) ending not later than:

   a) when with due diligence and dispatch the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured could be resumed; or

   b) the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.



Account No.   1-34105
Policy No.   1068228

### E.   SERVICE INTERRUPTION TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured **location** when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

This Extension will apply when the period of service interruption is in excess of 24 hours.

Additional General Provisions:

1)   The Insured will immediately notify the suppliers of services of any interruption of such services.

2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION TIME ELEMENT Exclusions: As respects SERVICE INTERRUPTION TIME ELEMENT, the following applies:

1)   The exclusions in the EXCLUSIONS clause in the PROPERTY DAMAGE section do not apply except for:

   a)   A1, A2, A3, A6, B1, B2, and

   b)   B4 with respect to incoming or outgoing voice, data or video, and

   c)   D1 except with respect to fungus, mold or mildew.

2)   The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b)   **terrorism**.



As used above, the period of service interruption:

1) is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2) is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3) does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS

### A.   ATTRACTION PROPERTY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**.

ATTRACTION PROPERTY Exclusions: As respects ATTRACTION PROPERTY, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

FM Global

<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

**B.   CRISIS MANAGEMENT**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location**, provided such order is a direct result of:

1)   a violent crime, suicide, attempted suicide, or armed robbery; or

2)   a death or bodily injury caused by a workplace accident;

at such insured **location**.

For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the PERIOD OF LIABILITY is in excess of 4 hours.

CRISIS MANAGEMENT Exclusions: As respects CRISIS MANAGEMENT, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   **terrorism**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)   starting with the time the civil or military authority prohibits access; and

2)   ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**C.   DELAY IN STARTUP**

GROSS EARNINGS or GROSS PROFIT and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.



Account No.  1-34105
Policy No.  1068228

### D.   EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1)   the interruption of business as covered by GROSS EARNINGS;

2)   for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

3)   commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included in this Policy.

However, this Extension does not apply to GROSS EARNINGS loss resulting from physical loss or damage caused by or resulting from **terrorism**.

EXTENDED PERIOD OF LIABILITY Exclusions: As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

### E.   INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)   an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)   a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.



This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

2) loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of the order of the authorized governmental agency or the Officer of the Insured; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### F.    ON PREMISES SERVICES

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet/300 metres of the insured **location**:

1) Electrical equipment and equipment used for the transmission of voice, data or video.

2) Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

### G.    PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.



This Extension does not cover the Actual Loss Sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in the PROPERTY DAMAGE section.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## H.   RELATED REPORTED VALUES

If reported TIME ELEMENT values include:

1)   **locations** used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such **locations**,

3)   from insured physical loss or damage at an insured **location**,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such insured **location**.

## I.   RESEARCH AND DEVELOPMENT

The GROSS EARNINGS and GROSS PROFIT coverages are extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and Ordinary Payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this Extension will be the period from the time of direct physical loss or damage of the type insured to the time when the property could be repaired or replaced and made ready for operations, but as respects GROSS PROFIT and Ordinary Payroll such period of time shall not exceed the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.  Such period of time shall not be limited by the date of expiration of this Policy.

## J.   SOFT COSTS

This Policy covers the Actual Loss Sustained incurred by the Insured of **soft costs** during the PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.



<div align="right">

**Account No. 1-34105**
**Policy No. 1068228**

</div>

## LOSS ADJUSTMENT AND SETTLEMENT

### 1. REQUIREMENTS IN CASE OF LOSS

The Insured will:

1) give immediate written notice to the Company of any loss.

2) protect the property from further loss or damage.

3) promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4) give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company. The proof of loss must state the knowledge and belief of the Insured as to:

   a) the time and origin of the loss.

   b) the Insured's interest and that of all others in the property.

   c) the **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d) any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e) by whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5) include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6) further, the Insured, will as often as may be reasonably required:

   a) exhibit to any person designated by the Company all that remains of any property;

   b) submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c) produce for examination at the request of the Company:

      (i) all books of accounts, business records, bills, invoices and other vouchers; or



(ii) certified copies if originals are lost,

at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## 2.   CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the Insured.

## 3.   PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of insured physical loss or damage determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s), subject to the Policy's provisions.  To obtain such partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.

## 4.   COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 5.   SUBROGATION

The Insured is required to cooperate in any subrogation proceedings.  The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)   any applicable deductible; and/or

2)   any provable uninsured loss,

bears to the entire provable loss amount.

## 6.   COMPANY OPTION

The Company has the option to take all or any part of damaged property at the agreed or appraised value.  The Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.



**Account No. 1-34105**
**Policy No. 1068228**

## 7. ABANDONMENT

There may be no abandonment of any property to the Company.

## 8. APPRAISAL

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1)      the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2)      the Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)      pay its chosen appraiser; and

2)      bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

## 9. SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)      the Insured has fully complied with all the provisions of this Policy; and

2)      legal action is started within twelve months after inception of the loss.



If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

## 10.   SETTLEMENT OF CLAIMS

The amount of loss for which the Company may be liable will be paid within 30 days after:

A.   proof of loss as described in this Policy is received by the Company; and

B.   when a resolution of the amount of loss is made either by:

    1)   written agreement between the Insured and the Company; or

    2)   the filing with the Company of an award as provided in the APPRAISAL clause of this section.

FM Global

**Account No.   1-34105**
**Policy No.   1068228**

# GENERAL PROVISIONS

### 1.   CANCELLATION/NON-RENEWAL

This Policy may be:

A.   cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.   cancelled by the Company by giving the Insured not less than:

    1)   90 days' written notice of cancellation; or

    2)   10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.   non-renewed by the Company by giving the Insured not less than 90 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

### 2.   INSPECTIONS

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.  The Company does not address life, safety or health issues.

The Company's:

A.   right to make inspections;

B.   making of inspections; or

C.   providing recommendations or other information in connection with any inspections,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.



Account No.   1-34105
Policy No.   1068228

3.   **PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS**

   A.   If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for insured **locations** within such jurisdictions.

   B.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of provinces in Canada.  The endorsements modify this Policy with respect to any insured property located in the province in which the endorsement applies.

   C.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America.  The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

   D.   As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy shall be considered an act of **terrorism** within the terms of this Policy.  Coverage recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) is excluded from any other coverage under this Policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) and this Policy is not recoverable under this Policy.

4.   **LIBERALIZATION**

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

5.   **MISREPRESENTATION AND FRAUD**

This entire Policy will be void if, whether before or after a loss, an Insured has:

   A.   willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

   B.   made any attempt to defraud the Company.

   C.   made any false swearing.



## 6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

A.   The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.   The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

   1)   any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

   2)   foreclosure, notice of sale, or similar proceedings with respect to the property.

   3)   change in the title or ownership of the property.

   4)   change to a more hazardous occupancy.

   The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change.  If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

   1)   sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

   2)   this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 90 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment.  If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation.  If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause.  The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension.  The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.



Account No.   1-34105
Policy No.   1068228

F.   If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage.  No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim.  At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

G.   If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.   Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 7.   OTHER INSURANCE

A.   If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.   In no event will this Policy apply as contributing insurance.

C.   The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy.  Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.   The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy.  The existence of such other insurance will not prejudice recovery under this Policy.  If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.   If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with the Company.

## 8.   POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy.  This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

FM Global

**Account No.   1-34105**
**Policy No.   1068228**

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.   create a waiver, or change any part of this Policy; or

B.   prevent the Company from asserting any rights under the provisions of this Policy.

## 9.   REDUCTION BY LOSS

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any **annual aggregate** limit.

## 10.   SUSPENSION

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured.  The suspended insurance may be reinstated by the Company.  Any unearned premium resulting from such suspension will be returned by the Company.

## 11.   TITLES

The titles in this Policy are only for reference.  The titles do not in any way affect the provisions of this Policy.

## 12.   ASSIGNMENT

Assignment of this Policy will not be valid except with the written consent of the Company.

## 13.   DEFINITIONS

The following terms when appearing in **boldface** in this Policy mean:

**actual cash value**:
the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**annual aggregate**:
the Company's maximum amount payable during any policy year.

**communicable disease**:
disease which is:

A.   transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B.   Legionellosis.

**contaminant**:
anything that causes **contamination**.



**contamination**:
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

**contingent time element location**:
A.    any **location**:

     1)  of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

     2)  of any company under a royalty, licensing fee or commission agreement with the Insured;

B.    any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**cyber event**:
any act involving the malicious or unauthorized access to, operation of, or use of **electronic data processing equipment or media**, regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **cyber event** will not be considered to be loss by **cyber event** within the terms and conditions of this Policy.

**date or time recognition**:
the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**earth movement**:
any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage, or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media**:
any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



**fine arts**:
paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

**flood**:
flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.  Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy.  However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**irreplaceable**:
an item which cannot be replaced with other of like kind and quality.

**location**:
A.    as specified in the Schedule of Locations, or

B.    if not so specified in the Schedule of Locations:

    1)    a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing),

        a)    bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres wide.  Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**New Madrid Seismic Zone**:
<u>Arkansas, United States of America, counties of</u>:
Arkansas, Clay, Craighead, Crittenden, Cross, Fulton, Greene, Independence, Izard, Jackson, Lawrence, Lee, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Randolph, Sharp, St. Francis, White, Woodruff

<u>Illinois, United States of America, counties of</u>:
Alexander, Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jasper, Jefferson, Johnson, Lawrence, Madison, Marion, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Richland, Saline, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson

<u>Indiana, United States of America, counties of</u>:
Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick



Kentucky, United States of America, counties of:
Ballard, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Henderson, Hickman, Hopkins, Livingston, Lyon, Marshall, McCracken, McLean, Muhlenberg, Todd, Trigg, Union, Webster

Mississippi, United States of America, counties of:
Alcorn, Benton, Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tippah, Tunica

Missouri, United States of America, counties of:
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Jefferson, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, St. Francois, St. Louis, City of St. Louis, Ste. Genevieve, Stoddard, Washington, Wayne

Tennessee, United States of America, counties of:
Benton, Carroll, Chester, Crockett, Decatur, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Houston, Humphreys, Lake, Lauderdale, Madison, McNairy, Montgomery, Obion, Perry, Shelby, Stewart, Tipton, Weakley

**normal**:
the condition that would have existed had no physical loss or damage happened.

**normal cost**:
the cost associated with the movement of goods or materials suffering the disruption that the Insured would have incurred had no physical loss or damage causing disruption happened.

**occurrence**:
the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

A.     **terrorism**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

B.     **earth movement**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services**:
the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**Pacific Northwest Seismic Zone**:
Oregon, United States of America, counties of:
Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill



<u>Washington, United States of America, counties of:</u>
Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

<u>British Columbia (includes Vancouver Island), Canada:</u>
South of 50° N latitude and west of 120° W longitude

**period of operational testing**:
the period of time beginning 24 hours prior to the earlier of the following:

A.   introduction, into a system, of feedstock or other materials for processing or handling;

B.   commencement of fuel or energy supply to a system,

and ending with the earlier of the following:

A.   the expiration date or cancellation date of this Policy.

B.   if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**physical loss or damage to electronic data, programs or software**:
the destruction, distortion or corruption of electronic data, programs or software.

**representative company(ies)**:
Factory Mutual Insurance Company, FM Insurance Company Limited or FM Insurance Europe S.A.; Affiliated FM Insurance Company; Appalachian Insurance Company or any other company issuing a local policy at the direction of the Company.

**soft costs**:
costs over and above those that are **normal** at an insured **location** undergoing renovation or in the course of construction, limited to the following:

A.   construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

B.   commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

C.   additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

D.   property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

FM Global

**Account No.   1-34105**
**Policy No.   1068228**

**terrorism**:
any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

when the effect or apparent purpose is:

A.  to influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

B.  to further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems**:
transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data, and video.  Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records**:
written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

**wind**:
direct action of wind including substance driven by wind.  **Wind** does not mean or include anything defined as **flood** in this Policy.



# SCHEDULE OF LOCATIONS, APPENDIX A

Account No.   1-34105

Policy No.   1068228

| Location No. | Index No. | Name | Street Address | City | County | State/Province | Postal Code | Country Code |
|---|---|---|---|---|---|---|---|---|
| 8 | 003618.74 | St. Elizabeth's East MedStar Wizards Performance Center | 1100 Oak Drive SE | Washington | District of Columbia | District of Columbia | 20032 | USA |
| 3 | 000142.06 | Capital One Arena | 601 F Street Northwest | Washington | District of Columbia | District of Columbia | 20004-1605 | USA |
| 5 | 002055.34 | Office | 700 6th Street Northwest, Suite 410 & 420 | Washington | District of Columbia | District of Columbia | 20002-4324 | USA |
| 4 | 043436.20 | Warehouse | 7701-7717 Penn Belt Drive & 3905-3917 Penn Belt Place | District Heights | Prince George's | Maryland | 20747-4731 | USA |
| 1 | 002147.05 | Medstar Capitals Iceplex | 627 North Glebe Road | Arlington | Arlington | Virginia | 22203-2144 | USA |
| 2 | 044443.93 | EagleBank Arena - George Mason University | 4500 Patriot Circle | Fairfax | Fairfax | Virginia | 22030-4468 | USA |

Account No. 1-34105
Policy No. 1068228

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured property in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of **USD 130,919**, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein. This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed USD 100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed USD 100,000,000,000. If the aggregate insured losses for all insurers exceed USD 100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 80% of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy. The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

For the purposes of this Endorsement, a "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and extended. The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

A.    The act resulted in aggregate losses in excess of USD 5,000,000; and

B.    The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of

the United States or to influence the policy or affect the conduct of the United States Government by coercion.



<div align="right">

**Account No. 1-34105**
**Policy No. 1068228**

</div>

## CYBER OPTIMAL RECOVERY ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein.  All other terms and conditions of the Policy remain unchanged.

INSURED OPTION:

The Insured acknowledges having purchased a cyber policy.

As respects loss or damage that is covered by both this Policy and the cyber policy, and notwithstanding anything contained in the OTHER INSURANCE clause in the GENERAL PROVISIONS section of this Policy, the Insured may elect, within 180 days of notifying this Company of the loss, to apportion the loss between this Policy and the cyber policy and to designate this Policy as primary, excess or contributing insurance to the cyber policy with respect to each portion of the loss, provided designating it as such is necessary to maximize the total indemnity available for the loss under both this Policy and the cyber policy.

This election option shall be subject to the following additional conditions:

ADDITIONAL CONDITIONS

1) The Insured will provide this Company with a copy of any cyber policy in force at the time of loss.

2) Any coverage provided by the cyber policy that is not provided by this Policy does not extend to this Policy.

3) The insolvency, inability or unwillingness to pay of the company issuing the cyber policy shall in no event increase this Company's liability or delay settlement under this Policy.



**Multistate**
**COMPLAINT NOTICE**

The following states require Factory Mutual Insurance Company to notify insureds that should you have an inquiry or complaint about insurance in one of these states, you may contact your Insurance Company or the State Department of Insurance as listed below:

<u>Insurance Company</u>

FACTORY MUTUAL INSURANCE COMPANY
Corporate Affairs Department
P.O. Box 7500
Johnston, Rhode Island 02919
(800) 343-7722

<u>State Department of Insurance</u>

Arkansas Insurance Department
Consumer Service Division
1 Commerce Way, Suite 102
Little Rock, Arkansas 72202
1-800-852-5494 or (501) 371-2640
E-mail: Insurance.Consumers@Arkansas.gov

Texas Department of Insurance
MC 111-1A, P.O. Box 149091
Austin, TX 78714-9091
1-800-252-3439
http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.texas.gov

Illinois Department of Insurance
Consumer Affairs and Information
320 West Washington Street
Springfield, Illinois 62767-0001
1-866-445-5364
E-mail: consumer_complaints@ins.state.il.us
https://mc.insurance.illinois.gov/messagecenter.nsf

Virginia Bureau of Insurance
PO Box 1157
Richmond, VA 23218
1-877-310-6560 or 1-800-371-9185
www.scc.virginia.gov/boi

Indiana Department of Insurance
Consumer Services Division
311 West Washington Street, Suite 300
Indianapolis, Indiana 46204-2787
1-800-622-4461 or (317) 232-2385
www.in.gov/idoi

Wisconsin Office of the Commissioner
of Insurance
125 South Webster Street
PO Box 7873
Madison, WI 53707-7873
1-800-236-8517
(608) 266-0103 in Madison

*This Notice is provided only for informational purposes. It does not modify, limit or enlarge insurance policy provisions. The actual rights and responsibilities of the insurer and the insured are contained in the policy's terms and conditions.*

FMIC 7166 (06/20)                                                                   Page 1 of 1

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Lincoln Holdings LLC, et al.

Case Number: _____

vs

Date: June 29, 2021 _____

Factory Mutual Insurance Company

☐ One of the defendants is being sued
   in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Matthew J. Schlesinger | Relationship to Lawsuit |
| Firm Name:<br>Covington & Burling LLP | ☒ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.:<br>(202) 662-6000          429689 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:   ☐ Non-Jury        ☐ 6 Person Jury        ☒ 12 Person Jury

Demand: $ in excess of $10,001 _____        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____  Judge: _____  Calendar #:_____

Case No.:_____  Judge: _____  Calendar#:_____

---

**NATURE OF SUIT:**      *(Check One Box Only)*

**A. CONTRACTS**                          **COLLECTION CASES**

☒ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent      ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent       ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation                   ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                Over $25,000 Pltf. Grants Consent             Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation                   ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees           Under $25,000 Pltf. Grants Consent            Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                     Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile              ☐ 03 Destruction of Private Property      ☐ 05 Trespass
☐ 02 Conversion              ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process              ☐ 10 Invasion of Privacy                    ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection       ☐ 11 Libel and Slander                           Not Malpractice)
☐ 03 Assault and Battery           ☐ 12 Malicious Interference                  ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury   ☐ 13 Malicious Prosecution                  ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)    ☐ 14 Malpractice Legal                      ☐ 20 Friendly Suit
☐ 06 False Accusation              ☐ 15 Malpractice Medical (Including Wrongful Death)   ☐ 21 Asbestos
☐ 07 False Arrest                  ☐ 16 Negligence- (Not Automobile,           ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                             Not Malpractice)                        ☐ 23 Tobacco
                                                                               ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10  Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability
- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D.  REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

June 29, 2021
_____
Date

CV-496/ June 2015

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Lincoln Holdings LLC, et al.
_____
                                              Plaintiff

vs.                                           Case Number _____

Factory Mutual Insurance Company
_____
                                              Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Schlesinger (D.C. Bar No. 429689)
_____         _Clerk of the Court_
Name of Plaintiff's Attorney

850 Tenth Street, NW                          By _____
_____
Address                                                       Deputy Clerk
Washington DC, 20001
_____

(202) 662-6000                                Date _____
_____
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화해 주십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




# TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
## DIVISIÓN CIVIL
### Sección de Acciones Civiles
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

Lincoln Holdings LLC, et al.
_____
                                                    Demandante

        contra

                                                                    Número de Caso: _____

Factory Mutual Insurance Company
_____
                                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Matthew J. Schlesinger (D.C. Bar No. 429689)                    *SECRETARIO DEL TRIBUNAL*
_____
Nombre del abogado del Demandante

850 Tenth Street, NW                                        Por: _____
_____
Dirección                                                                        Subsecretario
Washington, DC 20001

(202) 662-6000                                            Fecha _____
_____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 법률 정보를 원하시면 (202)879-4828로 연락하십시오         የአማርኛ ትርጉም ለማግኘት· (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

BENEDICT M. LENHART
MATTHEW J. SCHLESINGER
RUKESH A. KORDE
KRISTIN M. COBB
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5906
Email: blenhart@cov.com
mschlesinger@cov.com
rkorde@cov.com
kcobb@cov.com

Attorneys for Plaintiffs

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINCOLN HOLDINGS LLC, LINCOLN HOCKEY LLC, LINCOLN MYSTICS LLC, WASHINGTON BULLETS L.P., AND DC ARENA L.P., <br><br> 627 North Glebe Road <br> Arlington, Virginia 22203-2144 <br><br>     Plaintiffs, <br><br>     v. <br><br> FACTORY MUTUAL INSURANCE COMPANY, <br><br> 270 Central Ave <br> Johnston, Rhode Island, 02919-4923 <br><br>     Defendant. | Docket No. _____ |

## PLAINTIFFS' CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Superior Court Rule of Civil Procedure 7.1, Plaintiffs hereby certify that

Lincoln Hockey LLC, Lincoln Mystics LLC, Washington Bullets LP, and DC Arena LP are direct

or indirect wholly owned subsidiaries of Lincoln Holdings LLC and that Lincoln Holdings LLC

has no parent corporation and that no publicly held corporation owns 10% or more of the stock of

Lincoln Holdings LLC.

Dated: June 29, 2021

<div style="margin-left:40%">

Respectfully submitted,

By:   _/s/ Matthew J. Schlesinger_
Matthew J. Schlesinger
D.C. Bar No. 429689
Covington & Burling LLP
One CityCenter
850 Tenth Street Northwest
Washington, DC 20001
(202) 662-6000
mschlesinger@cov.com

</div>

**Filed**
**D.C. Superior Court**
**07/02/2021 13:48PM**
**Clerk of the Court**

BENEDICT M. LENHART
MATTHEW J. SCHLESINGER
RUKESH A. KORDE
KRISTIN M. COBB
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5906
Email: blenhart@cov.com
mschlesinger@cov.com
rkorde@cov.com
kcobb@cov.com

Attorneys for Plaintiffs

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINCOLN HOLDINGS LLC, LINCOLN HOCKEY LLC, LINCOLN MYSTICS LLC, WASHINGTON BULLETS L.P., AND DC ARENA L.P., | Docket No. 2021 CA 002196 B |
| | **CIVIL ACTION** |
| 627 North Glebe Road Arlington, Virginia 22203-2144 | |
| | **COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY RELIEF, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND MONEY DAMAGES** |
| Plaintiffs, | |
| v. | |
| FACTORY MUTUAL INSURANCE COMPANY, | **JURY TRIAL DEMANDED** |
| 270 Central Ave Johnston, Rhode Island, 02919-4923 | |
| Defendant. | |

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION .................................................................................. 4

THE PARTIES ..................................................................................................... 10

JURISDICTION AND VENUE ............................................................................ 11

FACTUAL ALLEGATIONS ................................................................................ 12

I.      MONUMENTAL SPORTS PURCHASED INSURANCE TO PROTECT
ITSELF AGAINST CATASTROPHES. ...................................................... 12

II.     COVID-19 AND THE COVID-19 VIRUS CAUSE COVERED PHYSICAL
LOSS AND DAMAGE. .............................................................................. 18

     A.      COVID-19 Is A Deadly Communicable Disease. ............................... 18

     B.      The COVID-19 Virus Can Be Transmitted In Many Ways. .............. 20

     C.      The COVID-19 Virus Causes Physical Loss And Damage, In Part By
Rendering Air And Property Unsafe And Unusable. .......................... 23

III.    MONUMENTAL SPORTS SUFFERED THE TYPES OF LOSSES THE ALL
RISKS POLICIES INSURE AGAINST. ..................................................... 28

     A.      Monumental Sports' Insured Properties Suffered Physical Loss and
Damage ............................................................................................. 30

     B.      The COVID-19 Virus Damage Forced Monumental Sports To Repair And
Restore Its Property And To Take Expensive Measures To Mitigate Its
Losses. ............................................................................................... 33

     C.      Government Orders Resulting From Viral Damage Prevented Fans From
Attending Sporting Events. ................................................................ 35

IV.    MONUMENTAL SPORTS SUFFERED HUNDREDS OF MILLIONS IN
LOSSES. .................................................................................................... 38

V.     THE ALL RISKS POLICIES COVER MONUMENTAL SPORTS' LOSSES. ............. 40

     A.      The All Risks Policies Cover Monumental Sports' Property Damage and
Repair Costs. ..................................................................................... 41

     B.      The All Risks Policies Cover Monumental Sports' Massive Business
Interruption Losses and Extra Expenses. ........................................... 42

# TABLE OF CONTENTS

**Page**

    C.     The All Risks Policies Cover Monumental Sports' "Civil Authority" Losses. ....................................................................................................... 44

    D.     The All Risks Policies Cover The Losses Monumental Sports Sustained Given The Danger Of Accessing Insured Locations Due To Nearby Viral Property Damage And Loss. ........................................................................ 46

    E.     The All Risks Policies Cover Monumental Sports' Communicable Disease Losses. ....................................................................................................... 47

    F.     The All Risks Policies Cover The Losses Monumental Sports Sustained To Protect Its Property And Mitigate Its Losses. ...................................... 49

    G.     Numerous Other Provisions Of The All Risks Policies Cover Monumental Sports' Losses. ...................................................................... 49

VI.    FACTORY MUTUAL FAILED TO HANDLE MONUMENTAL SPORTS' CLAIMS PROPERLY AND REFUSED TO HONOR ITS PROMISE. ......................... 50

FIRST CAUSE OF ACTION (For Breach of Contract Against Factory Mutual) ...................... 52

SECOND CAUSE OF ACTION (For Declaratory Relief Against Factory Mutual) ................. 54

THIRD CAUSE OF ACTION (For Breach of Implied Covenant of Good Faith and Fair Dealing Against Factory Mutual) ......................................................... 56

PRAYER FOR RELIEF .................................................................................................. 57

Plaintiffs, Lincoln Holdings LLC (d/b/a "Monumental Sports & Entertainment"), DC Arena L.P., Lincoln Hockey LLC, Lincoln Mystics LLC, and Washington Bullets L.P. (collectively "Monumental Sports"), bring this action to compel its Insurer, Defendant Factory Mutual Insurance Company ("Factory Mutual"), to honor its promise to protect Monumental Sports against damage to and loss of its property and attendant loss of income resulting from COVID-19.

## NATURE OF THE ACTION

1.       Monumental Sports is in the business of providing live, exciting sports and entertainment experiences for thousands of fans in indoor arenas around Washington, D.C., the nation's capital.  Monumental Sports' primary goal is to entertain and delight the community with professional sports teams to cheer on and support, as well as a variety of other entertainment events to enjoy, from concerts to Monster Trucks to Disney on Ice, in all cases, live and in person, together with thousands of other people.  Monumental Sports owns the National Hockey League's Washington Capitals (the 2018 Stanley Cup Champions), the National Basketball Association's Washington Wizards, the Women's National Basketball Association's Washington Mystics (the 2019 WNBA Champions), as well as Capital One Arena, one of the most important public entertainment spaces in the Washington, D.C. metro area.

2.       In March 2020, due to the COVID-19 virus and COVID-19, the seasons of the Capitals, Wizards, and Mystics were suspended, and all events at Monumental Sports' indoor arenas were canceled or postponed indefinitely.  For over a year, until April 2021, Monumental Sports was prevented from providing its fans with perhaps the most powerful platform sports and entertainment offers:  the opportunity to congregate with one another, to cheer on their favorite team or musician together, and to celebrate shoulder-to-shoulder as one community in a downtown setting.

4

3.       Monumental Sports is not only a brand, but a standard recognized globally in sports, entertainment, and media, with much of its success due to its extraordinary fan base.  Its business is dependent upon bringing tens of thousands of people together in indoor arenas—chief among them Capital One Arena, but also EagleBank Arena (home of George Mason University's men's and women's basketball teams) and D.C.'s Entertainment & Sports Arena (home of the Mystics)—to enjoy professional hockey and basketball, as well as music and other entertainment.  Capital One Arena is home to the Wizards and the Capitals as well as the Georgetown University Hoyas men's basketball team and averages 220 events per year.  Beyond sports, Monumental Sports' arenas host many other entertainment events, including concerts, theatrical performances, children's entertainment activities, conventions, and graduations. Monumental Sports provides first-class customer service to anyone who steps into its arenas, and is committed to innovation, inspiration, and the unification of fans and people from all across the D.C.-metro area and the world.

4.       Monumental Sports bought—at significant expense—best-in-class "all risks" business interruption insurance policies from Factory Mutual (collectively, "the All Risks Policies").  The All Risks Policies broadly cover "All Risk of Physical Loss or Damage."  The All Risks Policies promise to protect Monumental Sports against loss of revenue and certain expenses if it cannot use its arenas or other insured properties due to the impact of some external physical peril.  These covered perils include both known and, more importantly, novel, unknown risks.  COVID-19 and the COVID-19 virus are exactly these types of perils.  In short, Monumental Sports purchased the All Risks Policies to cover precisely the losses that it suffered because of an unimaginable, multi-arena, worldwide, series of physical catastrophes.

5.      COVID-19 and the COVID-19 virus caused unprecedented physical loss and damage to Monumental Sports' properties, at levels far worse than the physical loss and damage caused by many "traditional" natural disasters like hurricanes, floods, or tornadoes.  COVID-19 and the COVID-19 virus caused physical changes to the air, surfaces, and interior spaces of the arenas and other insured properties and rendered such arenas and other insured properties physically unusable for their intended purposes.  COVID-19 and the COVID-19 virus resulted in government orders forbidding access to the arenas or other insured properties due to the damage caused, and risks posed by COVID-19 and the COVID-19 virus.

6.      Factory Mutual sold Monumental Sports expansive coverage specifically designed to cover such losses.  The All Risks Policies cover:  a) lost income resulting from "physical loss or damage of the type insured" to Monumental Sports' properties; b) lost income that Monumental Sports lost as a result of orders of "civil or military authority" that limit, restrict, or prohibit access to arenas and other insured properties such as the arenas because of physical damage—such as that caused by COVID-19—in the vicinity of the insured properties; and c) the costs to "repair" property that is lost or damaged because of physical loss or damage such as COVID-19 and the COVID-19 virus.

7.      In addition to selling broad coverage, Factory Mutual—in an effort to make its policies more marketable—chose not to include the broad virus or pandemic exclusion that most other insurers used to remove coverage for all losses in any way related to viruses or pandemics. Rather, Factory Mutual adopted a narrower and fundamentally different exclusion (called either a "contamination exclusion" or "pollution exclusion") under the All Risks Policies that does not bar the types of COVID-19 losses suffered by Monumental Sports.

8.      As explained below, the COVID-19 virus caused physical loss or damage to
critical, insured properties upon which Monumental Sports' entire business depends.  Until
March 2020, Capital One Arena, for example, routinely hosted more than 18,000 fans at a time
for its events.  Capital One Arena's primary purpose is to host these large numbers of fans
together in a crowded, indoor space to watch and vocally cheer on (with food and beverage)
Washington, D.C.'s Wizards and Capitals and other events night after night.  Abruptly, due to
the COVID-19 virus and COVID-19, hosting fans at Monumental Sports' venues became
physically impossible starting in March 2020.   From that time until April 2021, zero fans or
spectators were allowed in any D.C. venues, including Capital One Arena and the Entertainment
& Sports Arena.  Even after April 2021, when the D.C. government agreed to permit fans to
attend games at Capital One Arena due to the substantial safety measures undertaken by
Monumental Sports, as well as the rapidly increasing availability of the COVID-19 vaccines,
capacity was capped at 10% until it was increased to 25% on May 16 and further increased to
50% on May 28, 2021.  The District's opening was too late for the Capitals, who were eliminated
from the National Hockey League's ("NHL") playoffs on May 23, and barely in time for the
Wizards to play their last two home playoff games on May 29 and May 31 in front of a 50%
capacity crowd before they were eliminated from the National Basketball Association's ("NBA")
playoffs, the result being that the Capitals' and the Wizards' entire 2020-2021 seasons were
essentially played without fans (and without the revenue generated by fan attendance).

9.      Infected individuals spew COVID-19 and the COVID-19 virus into the air where
some hangs in the air and some falls to surfaces.  The presence of COVID-19 and the COVID-19
virus in Capital One Arena, along with a further influx of the COVID-19 virus that would come
with fans (prior to the wide availability of vaccines), made the physical use of that arena

impossible for its intended purpose—to host thousands of fans side by side for sporting and other events. The same is true of other Monumental Sports arenas, such as EagleBank Arena, the home of George Mason University basketball, and D.C.'s Entertainment & Sports Arena, the home of the Washington Mystics.

10.     Additionally, numerous, unprecedented government orders were issued that prohibited fans from entering arenas and attending games, concerts, and other events, due to the presence of the COVID-19 virus and the dangers COVID-19 poses to public health (prior to the wide availability of effective vaccines).

11.     Between Capital One Arena and the other indoor arenas Monumental Sports uses, Monumental Sports had to cancel over 100 events and, when it could eventually hold certain events (such as Wizards and Capitals games), it had to hold them without any fans at all for over 80% of the 2020-21 NBA and NHL seasons. At least approximately over 40% of Monumental Sports' revenue comes from local, ticketed, fan-intensive games, concerts, and other events, and such revenue was practically eliminated from March 2020 to April 2021. Monumental Sports has lost hundreds of millions in revenue as a result of the presence of the COVID-19 virus in its arenas.

12.     At the same time, Monumental Sports had to spend millions physically repairing and restoring the physical damage and physical loss of use COVID-19 caused and to make Capital One Arena, and Monumental Sports' other facilities and arenas, safe to host events and fans. Those repairs include new or modified HVAC systems to reduce the COVID-19 virus spread, Plexiglas barriers, touchless entry and payment systems, significant physical rearrangements of interior spaces, and continuous disinfection.

13.    In selling the All Risks Policies to Monumental Sports, Factory Mutual promised to pay $1 billion for each "occurrence," defined to include the losses "arising out of or caused by one discrete event of physical loss or damage," with no cap on the number of such occurrences.

14.    Factory Mutual also correctly argued in litigation before the pandemic began that the term "physical loss or damage" covers physical loss of use of insured property caused by an unforeseen external peril, even without a physical alteration of that property.  *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 at 3, n.1 ("loss of functionality . . . constitutes physical loss or damage," and "[a]t best for defendant Federal, 'physical loss or damage,' which is undefined, is susceptible of more than one reasonable interpretation and is therefore ambiguous").

15.    However, when called upon to comply with its contractual obligations by Monumental Sports, Factory Mutual took the opposite position, preemptively denying coverage on the flawed view that COVID-19 and the COVID-19 virus do not cause physical loss or damage within Monumental Sports' arenas and other insured properties.  Factory Mutual made this determination precipitously, without adequately investigating the ways in which COVID-19 and the COVID-19 virus caused loss and damage to Monumental Sports' properties.  In so doing, Factory Mutual abandoned its promise to "work closely with [Monumental Sports] *before*, *during*, and *after* a loss."[1]

16.    Because Monumental Sports suffered massive losses covered under the All Risks Policies, and because Factory Mutual refuses to honor its promise, Monumental Sports asks this Court to issue declaratory relief and to award money damages for Factory Mutual's breach of its

---

[1]    FM Global, *Why FM Global? Creating Resilience Means Creating Success*, https://www.fmglobal.com/about-us/why-fm-global (last visited June 28, 2021) (emphasis in original).

contracted commitments and for Factory Mutual's failure to handle its insurance claims in good faith.

## THE PARTIES

17.     Plaintiff Lincoln Holdings LLC, d/b/a Monumental Sports & Entertainment, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the District of Columbia.

18.     Plaintiff Lincoln Hockey LLC (owner of the Washington Capitals, herein referred to as, the "Capitals") is a subsidiary of Monumental Sports & Entertainment and limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Arlington, Virginia.

19.     Plaintiff Lincoln Mystics LLC (owner of the Washington Mystics, herein referred to as, the "Mystics") is a subsidiary of Monumental Sports & Entertainment and a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the District of Columbia.

20.     Plaintiff Washington Bullets L.P. (owner of the Washington Wizards, herein referred to as, the "Wizards") is a subsidiary of Monumental Sports & Entertainment and a limited partnership organized and existing under the laws of the District of Columbia, with its principal place of business in the District of Columbia.

21.     Plaintiff DC Arena L.P. (owner of Capital One Arena) is a subsidiary of Monumental Sports & Entertainment and a limited partnership organized and existing under the laws of the District of Columbia, with its principal place of business in the District of Columbia.

22.     Each Plaintiff, directly or indirectly, has management control over, or an economic interest in, entities that both are also insureds under the All Risks Policies and have suffered covered losses as a result of the events described herein.

23.     Defendant Factory Mutual Insurance Company ("Factory Mutual") is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business in Johnston, Rhode Island.  At all times relevant hereto, Factory Mutual was licensed to do business, and was doing and transacting business in the District of Columbia.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction over the claims asserted in this Complaint pursuant to D.C. Code § 11-921.

25.     The Court has personal jurisdiction over Factory Mutual pursuant to D.C. Code § 13-423 because it is an insurance company registered with the Department of Insurance, Securities, and Banking, licensed to provide insurance in the District of Columbia, and it contracted to provide insurance policies to Monumental Sports, many of which are located in the District of Columbia, and this suit arises from a dispute over those policies.

26.     Factory Mutual also, by the express terms of its All Risks Policies, consented to the jurisdiction of the United States of America, which includes the District of Columbia.

27.     Monumental Sports has suffered substantial losses in the District of Columbia. The Capitals, Wizards, and Mystics all play their home games in the District of Columbia. Because of COVID-19 related cancellations and restrictions in the District of Columbia, each team has suffered substantial amounts of losses in the District of Columbia.

28.     Venue is proper in this Court pursuant to D.C. Code § 31-1303 as the obligations under the contracts at issue were to be performed, the defendants do business, and the events that led to this dispute occurred, in large part, in the District of Columbia.

## FACTUAL ALLEGATIONS

I.   **MONUMENTAL SPORTS PURCHASED INSURANCE TO PROTECT ITSELF AGAINST CATASTROPHES.**

29.   To protect its significant property and business income interests, and in exchange for a very high premium, Monumental Sports purchased best-in-class, all risks policies from Factory Mutual (the "Policies" or the "All Risks Policies") for which Factory Mutual has for many years collected many millions in premiums.   There are two relevant All Risks Policies: Policy Nos. 1056084 and 1068228 (attached to and made part of this Complaint at Exhibits A and B).

30.   Policy No. 1056084 covers the period from August 1, 2019 to July 31, 2020.

31.   Policy No. 1068228 covers the period from August 1, 2020 to July 31, 2021.

32.   The All Risks Policies insure Lincoln Holdings LLC, and its subsidiaries, including each of the other named Plaintiffs.

33.   All Risks insurance policies cover just that:  *all* risks of physical loss or damage, including risks that are, by definition, novel, unknown or unimaginable, unless the policy specifically and conspicuously excludes that risk.  The All Risks Policies cover loss resulting from natural and man-made disasters that physically impair the operations of a business. Monumental Sports' All Risks Policies cover up to $1 billion in losses for any one "occurrence," and cover an unlimited number of "occurrences."[2]  So, each provides significantly more than $1

---

[2]   The All Risks Policies define "occurrence" in pertinent part as "the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage."  Said otherwise, the All Risks Policies' limits of liability apply on a "per occurrence" basis, and if more than one "occurrence" takes place, then Factory Mutual may have to pay up to its full $1 billion in limits for each such occurrence.

billion in coverage assuming more than one event causes physical loss or damage in any particular policy period.

34.     The All Risks Policies expressly promise coverage for the wide array of massive losses Monumental Sports now faces due to COVID-19, including, for example, losses from a communicable disease, losses sustained when a communicable disease physically alters air and surfaces within Monumental Sports' arenas, making them unfit for their intended uses, losses sustained when government orders prohibit fan attendance at games, and losses sustained when viral damage makes travel to or from Monumental Sports' arenas dangerous and difficult.[3]

35.     The All Risks Policies provide a basic coverage grant which "covers [insured] property . . . against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except" as specifically and conspicuously excluded.  Ex. A at 8; Ex. B at 8.  The All Risks Policies nowhere define, and thus nowhere narrow the meaning, of either "ALL RISKS" or "PHYSICAL LOSS OR DAMAGE."  Factory Mutual has argued in litigation that "loss of functionality" constitutes such physical loss or damage, even when the property is not physically altered.  *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 at 3, n.1 ("Numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage."); *see also id.* at 6 ("physical loss or damage" does not require proving "demonstrable structural damage or alteration to property").

36.     The All Risks Policies also cover business interruption losses, in a section captioned "Time Element."  Specifically, the All Risks Policies cover "TIME ELEMENT

---

[3]     Factory Mutual has a long history of offering broad coverage to its members. Particularly during the "soft" markets in the late 1990s and early 2010s, Factory Mutual companies expanded their coverage in many significant ways, including issuing new forms, increasing the limits of liability they were willing to write, and engaging in advertising campaigns touting their broad coverage.

loss . . . directly resulting from physical loss or damage of the type insured[] to," *inter alia*, "Real Property" and "Personal Property."  Ex. A at 44; Ex. B at 45.  This coverage is referred to as Time Element coverage because it covers losses during the time period when, for example, ordinary business operations are curtailed (called "the Period of Liability").

37.     The Period of Liability starts at "the time of physical loss or damage" in question and ends "when with due diligence and dispatch the building and equipment could be: (i) repaired and replaced; and (ii) made ready for operations, *under the same or equivalent physical and operating conditions that existed prior to the damage*."  Ex. A at 52; Ex. B at 53.  (Emphasis added).

38.     The Time Element provision of the All Risks Policies covers Monumental Sports' financial losses due to its inability to operate normally or use Monumental Sports property normally because of physical losses and damage, including the physical damage and loss COVID-19 and the COVID-19 virus cause.

39.     Covered losses include, among others, the "Actual Loss Sustained," that is, the lost "total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured."  Ex. A at 46; Ex. B at 47.  They also include Extra Expense, the "extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business" during the interruption.  Ex. A at 49; Ex. B at 50.

40.     The All Risks Policies also extend Time Element coverage to include losses incurred when, among other things:

- Monumental Sports suffers loss due to an order of ***civil authority*** that limits, restricts, or prohibits partial or total access to an insured location if the order is the direct result of physical damage of the type insured at or within five statute miles of an insured location;

- Monumental Sports suffers loss when ***ingress to or egress from*** insured locations is partially or totally prevented, interrupting Monumental Sports' business "whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to the property of the type insured";

- Monumental Sports must make ***rental payments*** made on property that is wholly or partially untenantable or unusable;

- Monumental Sports incurs ***lost rent***; and

- Monumental Sports suffers loss because of physical loss or damage at the location of customers, suppliers, contract manufacturers or contract service providers, and the location of any company under a royalty, licensing fee, or commission agreement with the Insured (known as "**contingent time element locations**").

41.     Unlike most property policies, the All Risks Policies sold here by Factory Mutual add two additional coverages:  one for costs incurred to clean up "communicable disease," and another for revenue losses resulting from such disease. "Communicable Disease" is defined in part as a disease which is "transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges."  Ex. A at 76; Ex. B at 77.  Factory Mutual has repeatedly conceded that COVID-19 and the COVID-19 virus qualifies as a "Communicable Disease."

42.     Losses that fall under, and are able to satisfy the requirements of, both the coverage for Time Element losses and the coverage for communicable disease are covered by ***both***.  The Communicable Disease coverage extensions have a relatively small sublimit, and some losses would satisfy only that coverage, and would thus be subject to that sublimit.  However, the All Risks Policies nowhere say that the Communicable Disease coverage is the exclusive coverage that applies if particular losses—such as Monumental Sports' COVID-19 losses—satisfy both the Communicable Disease coverage promise and other coverage promises.  Nor do the All Risks Policies state that other coverages do not apply if the Communicable Disease coverage does.

43.     By contrast, Factory Mutual included such limiting language in other provisions within the very same All Risks Policies.  For example, the provisions relating to Data Programs and Software explicitly state that losses covered under that section are "excluded from coverage elsewhere in this Policy."  *See, e.g.,* Exhibit A at 24–25; *see also id.* at 40 (Terrorism coverage including identical language); *id.* at 55–56 (Off Premises Data Services Time Element coverage including identical language).  Factory Mutual chose to omit that limiting language from both Communicable Disease provisions.  Business interruption loss for a communicable disease (if it causes physical loss or damage) is covered under the Time Element provisions even if also covered under the Communicable Disease provisions.

44.     No exclusion in the All Risks Policies precludes coverage for Monumental Sports for losses or damage due to communicable disease, including COVID-19, or due to the virus that causes COVID-19.  In fact, Factory Mutual chose not to use either a pandemic or virus exclusion such as the Insurance Services Office's ("ISO") virus exclusion used by many insurers since 2006.  The ISO exclusion—used by other insurers but deliberately omitted by Factory Mutual from the All Risks Policies—states:  "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."

45.     Another broad virus exclusion—used by other insurance companies but not used by Factory Mutual— removes coverage for "loss, damage, or expense caused directly or indirectly or resulting from . . . disease, sickness, any conditions of health, bacteria, or virus."  *Boulevard Carroll Entm't Grp., Inc. v. Fireman's Fund Ins. Co.*, 2020 WL 7338081, at *1 (D.N.J. Dec. 14, 2020) (internal quotations omitted).  That language further excludes virus-

related losses "regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  *Id.*

46.     Factory Mutual chose not to include the aforementioned exclusionary language in its policies.  As is relevant here, the All Risks Policies contain only a narrow "contamination exclusion," understood by insurers and policyholders alike to apply narrowly and only to "environmental pollution," as that phrase is traditionally understood.  The exclusion provides in relevant part:

> D.     This Policy excludes the following **unless directly resulting from other physical damage not excluded by this Policy:**
>
> 1)     contamination, and any **cost** due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If contamination due only to the actual not suspected presence of contaminant(s) directly results from other physical damage not excluded by this Policy, then only physical damage caused by such contamination may be insured. (Emphasis added.)
>
> Ex. A at 21; Ex. B at 22.

47.     Because the All Risks Policies specifically cover communicable disease (such as COVID-19), this exclusion does not apply to communicable disease or any virus that causes communicable disease (such as the COVID-19 virus).

48.     The All Risks Policies define "contamination" as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."  Ex. A at 77; Ex. B at 78.  While this definition refers to "virus" and "disease causing or illness causing agent," it does not refer to "communicable disease," which is expressly covered by the All Risks Policies.  Indeed, Factory Mutual readily concedes that the exclusion does not apply to communicable diseases.  Thus, the exclusion may apply to non-communicable disease viruses (of which there are many, and which

may cause extensive physical loss or physical damage), but it does not apply to viruses that cause communicable disease (such as COVID-19).

49.     In addition to not applying to communicable disease, the exclusion also does *not* apply to "loss" or lost revenue—the key loss at issue here.  Quoting the Factory Mutual Policies, the exclusion applies to "Contamination, and the cost of contamination . . ."  (The exclusion then goes on to give several examples of "cost of contamination.").  But "costs" refers to amounts incurred or spent, not to revenue that could not be earned.

## II.    COVID-19 AND THE COVID-19 VIRUS CAUSE COVERED PHYSICAL LOSS AND DAMAGE.

50.     Factory Mutual itself acknowledges in its own guidance that a virus can cause physical damage.  In "Talking Points" that Factory Mutual distributed to its claim personnel, Factory Mutual stated that "[a] virus will *typically* not cause physical damage" (emphasis added).  Putting aside the accuracy of this statement, the COVID-19 virus is not typical.  The COVID-19 virus has clearly caused physical loss and damage, and has caused significant physical loss and damage to Monumental Sports' property.

51.     But before even receiving Monumental Sports' insurance claims, Factory Mutual denied that the COVID-19 virus causes physical loss or damage to property.  It did so, upon information and belief, without consulting any epidemiologists, chemists, medical doctors, or specialists in viral disease, or assessing the damage the COVID-19 virus causes to air and surfaces.  Science and plain observation demonstrate that the dangerous and potentially fatal COVID-19 virus damages and alters property, including in indoor air and surfaces, by rendering that property lost, unsafe, and unfit for normal use.

### A.    COVID-19 Is A Deadly Communicable Disease.

52.     COVID-19 is a deadly communicable disease caused by a coronavirus known as SARS-CoV-2 (referred to herein as "SARS-CoV-2" or "the COVID-19 virus").

53.     The COVID-19 virus can cause serious systemic illness and death.[4]  As of June 28, 2021, there have been over 181 million confirmed cases of COVID-19 (over 33 million of them in the United States) and over 3.8 million deaths worldwide.  Due to the rapid spread and pervasive presence of COVID-19 across the planet, the COVID-19 virus was presumed to be present or imminently present everywhere.

54.     Images depict SARS-CoV-2 as looking like a golf ball with protrusions called "spike proteins," which are the main components of the virus that interact with other surfaces.[5]



55.     Not all viruses cause communicable diseases or are even harmful.  Many viruses do not infect humans, and many that do cannot be transmitted from human to human.  Further, not all viruses that cause communicable disease cause the type of loss or damage to property that the COVID-19 virus causes (making common surfaces and indoor air sufficiently dangerous as

---

[4]     *See* John A. Lednicky et al., *Viable SARS CoV-2 in the air of a hospital room with COVID-19 patients*, INTERNATIONAL JOURNAL OF INFECTIOUS DISEASES (Sept. 15, 2020), https://www.ijidonline.com/article/S1201-9712(20)30739-6/fulltext (last visited June 28, 2021).

[5]     *See* Nancy Fliesler, *Capturing SARS-CoV-2's shape-shifting spike protein*, Boston Children's Hospital (July 21, 2020), https://answers.childrenshospital.org/sars-cov-2-spike-protein/ (last visited June 28, 2021).

to make large gatherings unsafe without significant precautions and widely available vaccines), or prompt authorities to issue shelter in place orders or other civil restrictions.  The COVID-19 virus is a rare exception that, because of its particular nature and characteristics, meets all of these criteria:  it causes disease; the disease is communicable; it causes physical loss and damage; and has thereby led to hundreds of orders prohibiting anything other than very small gatherings (prior to the wide availability of effective vaccines).

**B.     The COVID-19 Virus Can Be Transmitted In Many Ways.**

56.     As has become known during the pandemic, the COVID-19 virus is uniquely dangerous, both due to the dangers of exposure and due to the many ways it can be transmitted, and is particularly harmful to indoor air and surfaces—both of which are property capable of being damaged.

57.     Persons with COVID-19 expel the COVID-19 virus as they talk, yell, cheer, sing, cough, sneeze, or even just breathe.  It has been reported that such individuals release tiny virus bearing particles that can remain suspended "for indefinite periods";[6] a single sneeze releases a cloud of viral droplets;[7] and normal breathing and talking can spread the virus six feet or more.[8] Many of these particles make contact, adhere to, and physically alter the surfaces of nearby property, as explained below.  Infected individuals also deposit these particles by touching

---

[6]     Kevin P. Fennelly, *Particle sizes of infectious aerosols: implications for infection control*, 8 LANCET RESPIRATORY MED. 9, P914-24 (Sept. 1, 2020), https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30323-4/fulltext (last visited June 28, 2021).

[7]     *See* Lydia Bourouiba, *Turbulent Gas Clouds and Respiratory Pathogen Emissions,* JAMA Insights (Mar. 26, 2020), https://jamanetwork.com/journals/jama/fullarticle/2763852 (last visited June 28, 2021).

[8]     *See How COVID-19 Spreads*, CDC (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited June 28, 2021).

surfaces after touching their eyes or nose.  Research has shown that because the risk of disease

transmission increases substantially in enclosed environments, the COVID-19 virus poses a

significant risk to indoor spaces.[9]  And because the virus renders otherwise inert materials

dangerous, viral contact with property means significant damage and loss.

58.     Expelled respiratory secretions typically take on two main forms:  (1) droplets of

respiratory fluids containing the virus, and (2) aerosol particles (also called "droplet nuclei") that

likewise contain the virus.  In addition to the virus, both droplets of respiratory fluids and droplet

nuclei largely consist of water and mucus.  Droplet nuclei are usually smaller than 5 microns,

invisible to the naked eye and remain suspended in the air ("aerosolized") for significant periods.

Droplets are similarly invisible to the naked eye, but due to their larger size, they typically come

to rest on nearby surfaces.  We refer herein to droplets of respiratory fluids and droplet nuclei as

"viral droplets."

---

[9]     *See* Jianyun Lu et al., *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China*, 2020, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article (last visited June 28, 2021); *see also* Keun-Sang Kwon et al., *Evidence of Long-Distance Droplet Transmission of SARS-CoV-2 by Direct Air Flow in a Restaurant in Korea*, 35 J. KOREAN MED. SCI. 46 (Nov. 2020), https://pubmed.ncbi.nlm.nih.gov/33258335 (last visited June 28, 2021); Shin Young Park et al., *Coronavirus Disease Outbreak in Call Center, South Korea*, EMERGING INFECTIOUS DISEASES, Vol. 26, No. 8 (Aug. 2020), https://wwwnc.cdc.gov/eid/article/26/8/20-1274_article (last visited June 25, 2021); Lea Hamner et al., *High SARS-CoV-2 Attack Rate Following Exposure at Choir Practice — Skagit County, Washington, March 2020*, MORBIDITY AND MORTALITY WEEKLY REPORT Vol. 69 No. 19 (May 15, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e6.htm (last visited June 28, 2021); Leah F. Moriarty et al., *Public Health Responses to COVID-19 Outbreaks on Cruise Ships—Worldside, February-March 2020*, MORBIDITY AND MORTALITY WEEKLY REPORT VOL. 69 NO. 12 (Mar. 27, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm (last visited June 28, 2021).

59.     It has been reported that the incubation period for COVID-19—*i.e.*, the time between exposure to the COVID-19 virus and symptom onset—can be up to 14 days,[10] and other sources recognize the potential for longer "pre-symptomatic" periods.  Recent studies have found that "viral loads"—that is, the concentration of virus in an infected person—in pre-symptomatic individuals can be even higher than the viral loads among symptomatic individuals.[11]  The CDC estimates that 30% of infected individuals never show symptoms of infection (called "asymptomatic" carriers).[12]  Similar to pre-symptomatic individuals, the viral loads of asymptomatic individuals can be higher than the loads among symptomatic carriers.[13]  The CDC estimates that the majority of COVID-19 transmission results from pre- and asymptomatic carriers.[14]  The CDC estimates that the number of people in the United States who have been infected with COVID-19 is likely to be 10 times higher than the number of reported cases.[15]

---

[10]     *See Coronavirus disease 2019 (COVID-19) Situation Report—73*, World Health Organization (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf (last visited June 28, 2021).

[11]     *See* Melissa M. Arons et al., *Presymptomatic SARS-CoV-2 Infections and Transmission in a Skilled Nursing Facility*, NEW ENGLAND JOURNAL OF MEDICINE (Apr. 24, 2020), https://www.nejm.org/doi/full/10.1056/NEJMoa2008457 (last visited June 25, 2021); Monica Ghandi et al., *Asymptomatic Transmission, the Achilles' Heel of Current Strategies to Control Covid-19* (Apr. 24, 2020), https://www.nejm.org/doi/full/10.1056/nejme2009758 (last visited June 28, 2021).

[12]     *See COVID-19 Pandemic Planning Scenarios*, CDC (Mar. 19, 2021), https://www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html (last visited June 28, 2021).

[13]     *See supra* note 11.

[14]     *See* Michael A. Johansson et al., *SARS-CoV-2 Transmission From People Without COVID-19 Symptoms*, JAMA Network (Jan. 7, 2021), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707 (last visited June 28, 2021); *see also* Seyed M. Moghadas et al., *The Implications of Silent Transmission for the Control of COVID-19 Outbreaks*, 117 PNAS 17,513 (July 28, 2020), https://www.pnas.org/content/117/30/17513 (last visited June 28, 2021).

[15]     Lena H. Sun and Joel Achenbach, *CDC chief says coronavirus cases may be 10 times higher than reported*, WASH. POST (June 28, 2020),

**C.     The COVID-19 Virus Causes Physical Loss And Damage, In Part By Rendering Air And Property Unsafe And Unusable**.

60.     The COVID-19 virus directly causes physical loss and damage to property by, among other things: (1) physically altering both indoor air and property surfaces, making them unfit for their intended use, and (2) altering the molecular structure of, and changing from safe to dangerous, the physical surfaces of otherwise inert property.[16]  COVID-19 and the COVID-19 virus has caused all of these types of physical loss and damage to Monumental Sports' arenas and other insured locations.  As a result, Monumental Sports was unable use its arenas for their intended purpose—to host fans or more than a small number of fans—for significant portions of 2020 and 2021, absent extensive repairs and remedial measures and, now, the wide availability of effective vaccines.  In fact, the presence of COVID-19 and the COVID-19 virus, and the effects they have on closed-air spaces and property, caused civil authorities to impose unprecedented restrictions, prohibiting, among other things, fans from attending hockey games, basketball games, and other live events.

**1.     The COVID-19 Virus Damages Air in Enclosed Spaces.**

61.     As set forth above, studies have shown that the COVID-19 virus physically alters the air—particularly indoor air—rendering it unsafe.  *See supra* Paragraphs 52-59.  Additionally, COVID-19 virus studies have found that virus-laden aerosols can migrate substantial distances

---

https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/ (last visited June 28, 2021).

[16]     Edris Joonaki et al., *Surface Chemistry Can Unlock Drivers of Surface Stability of SARS-CoV-2 in a Variety of Environmental Conditions,* NATIONAL LIBRARY OF MEDICINE (Sept. 10, 2020), https://pubmed.ncbi.nlm.nih.gov/32838053/ (last visited June 28, 2021).

through ventilation systems.[17]  For example, a study found the COVID-19 virus in the HVAC system of a hospital ward, detecting the virus more than 180 feet from the source thereof, patients infected with COVID-19,[18] and another study found that viable particles of the virus were present more than two meters away from the source thereof, patients infected with COVID-19.[19]

62.   COVID-19 virus studies have also found that the virus can spread through the air and settle on surfaces.  One study found that air flow caused by an HVAC system likely led to virus deposits in places where immobile patients did not go, such as under the bed or on the windowsill.[20]  Based on "epidemiological evidence suggestive of [COVID-19 virus] transmission through aerosol,"[21] the Environmental Protection Agency ("EPA"), the Occupational Safety and Health Administration ("OSHA"), and the CDC called for the modification of ventilation and HVAC systems by, for example, increasing ventilation with outdoor air.[22]  Medical researchers have advised that specialized air filtration systems be used to

---

[17]     Karolina Nissen et al., *Long-Distance Airborne Dispersal of SARS-CoV-2 in Covid-19 Wards*, Scientific Reports (Nov. 11, 2020), https://www.nature.com/articles/s41598-020-76442-2 (last visited June 28, 2021); *see supra* Jianyun Lu et al., note 9.

[18]     *See id.*

[19]     *See supra* Lednicky, et al., note 4.

[20]     *See* Joshua L. Santarpia, et al, *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care*, Scientific Reports (July 29, 2020), https://www.nature.com/articles/s41598-020-69286-3 (last visited June 28, 2021); Yuan Liu et al., *Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals*, NATURE (June 25, 2020), https://www.nature.com/articles/s41586-020-2271-3 (last visited June 28, 2021).

[21]     *Indoor Air and COVID-19 Key References and Publications*, United States Environmental Protection Agency (2021), https://www.epa.gov/coronavirus/indoor-air-and-covid-19-key-references-and-publications (last visited June 28, 2021) (capitalization omitted).

[22]     *Indoor Air and Coronavirus* (COVID-19), United States Environmental Protection Agency (2020), https://www.epa.gov/coronavirus/indoor-air-and-coronavirus-covid-19 (last visited June 25, 2021); *COVID-19 Employer Information for Office Buildings*, Centers for Disease Control (Apr. 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/office-

24

restore the air to its pre-COVID-19 infected state.[23]   The purpose of these suggestive measures is to attempt to physically restore the composition of the air by, among other things, diluting the concentration of virus particles or by trapping and removing them.

**2.   The COVID-19 Virus Physically Damages And Alters Otherwise Safe Surfaces.**

63.     The COVID-19 virus damages property by adhering to and altering the structure of its surface.  Specifically, it has been reported that the virus changes the surfaces of that property as its spike proteins become entangled with, bound to, and part of the molecular surface of the materials with which it comes into contact.  When that happens, the surfaces change in scientifically measurable and quantifiable ways.  Moreover, as studies have shown, these materials then become infectious when touched, making them unfit for use.[24]  This is a form of physical damage.

64.     Different surfaces are comprised of different molecules and the differences in the molecular makeup of surfaces impacts the ability, or inability, of viruses in general to interact with, bind to, and physically change the surface itself.  The molecules of the spike protein and its glycan shield —a sugary barrier that helps the virus evade the immune system—however, can interact with and bind to many different types of surfaces, meaning they can impair new surfaces quickly.

---

buildings.html (last visited June. 28, 2021); *Guidance on Preparing Workplaces for COVID-19*, Occupational Safety and Health Administration (2020), https://www.osha.gov/Publications/OSHA3990.pdf (last visited June 28, 2021).

[23]     Zeynep Tufeckci, *We Need to Talk About Ventilation*, THE ATLANTIC (July 30, 2020), https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairbornetransmission/614737/ (last visited June 28, 2021).

[24]     Similar deposits of viral droplets on surfaces could be made by an infected person through touching (e.g., sneezing or coughing into hand and then grabbing a railing).

65.     Studies by the National Institutes of Health ("NIH") and other researchers have found that the COVID-19 virus remains viable—*i.e.*, capable of infecting persons who come in contact with it—for at least seven days on a range of common surfaces (glass, stainless steel, and money) left at room temperature,[25] and parts of the virus can remain for far longer, even after cleaning.

66.     Surfaces already infected by the COVID-19 virus can further spread the virus. This mode of transmission—via objects and surfaces—is known as "fomite transmission." Fomite transmission has been demonstrated as a highly efficient mode of transmission for viruses, to spread both from object-to-hand and from hand-to-mouth.[26]  Studies have shown fomites transform the surface of property into a potentially deadly COVID-19 virus transmission vector.[27]

67.     The WHO has described fomite transmission as follows:

> Respiratory secretions or droplets expelled by infected individuals can contaminate surfaces and objects, creating fomites . . . .  Viable SARS-CoV-2 virus and/or RNA . . . can be found on those surfaces for periods ranging from hours to days, depending on the ambient environment (including temperature and humidity) and the

---

[25]     *See* Shane Riddell et al., *The Effect of Temperature on Persistence of SARS-CoV-2 on Common Surfaces*, 17 VIROLOGY J. 145 (Oct. 7, 2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited June 28, 2021); G. Kampf et al., *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agent*s, J. OF HOSPITAL INFECTION (Feb. 6, 2020), https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3 (last visited June 28, 2021).

[26]     Jing Cai et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020,* 26 EMERGING INFECTIONS DISEASES 6 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article (last visited June 28 2021).

[27]     A. Meiksin, Dynamics of COVID-19 transmission including indirect transmission mechanisms: a mathematical analysis, 148 EPIDEMIOLOGY & INFECTION e257, 1-7 (Oct. 2020), https://www.cambridge.org/core/journals/epidemiology-and-infection/article/dynamics-ofcovid19-transmission-including-indirect-transmission-mechanisms-a-mathematicalanalysis/A134C5182FD44BEC9E2BA6581EF805D3 (last visited June 28, 2021).

type of surface, . . . .  Therefore, transmission may also occur indirectly through touching surfaces in the immediate environment or objects contaminated with virus from an infected person . . . .[28]

68.     In addition to the studies cited by the WHO, numerous other articles have acknowledged fomites as a mode of virus transmission, including:  (1) a study of a COVID-19 outbreak published by the CDC identifying elevator buttons and restroom taps as possible causes of the "rapid spread of SARS-CoV-2" in a shopping mall;[29] (2) a NIH study finding that the COVID-19 virus survives for extended periods on copper, plastic, and stainless steel, and suggesting that people may contract the virus through the air and after touching contaminated objects;[30] and (3) a CDC research letter concluding that "fomite transmission might be an important source of risk for SARS-CoV-2."[31]

69.     While masks and personal protective equipment help prevent fomite transmission, effective prevention or reduction of fomite transmission also requires "a comprehensive package of preventive measures" and "environmental cleaning and disinfection."[32]  CDC guidance recommends the sanitization of public surfaces.[33]  Critically, it has been reported that ordinary

---

[28]     *Transmission of SARS-CoV-2: implications for infection prevention precautions*, World Health Organization (July 9, 2020), https://www.who.int/news-room/commentaries/detail/transmission-of-sars-cov-2-implications-for-infection-prevention-precautions (last visited June 28, 2021).

[29]     Jing Cai *supra* note 26.

[30]     *New coronavirus stable for hours on surfaces*, National Institutes of Health (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited June 28, 2021).

[31]     Alicia Kraaya et al., *Risk for Fomite-Mediated Transmission of SARS-CoV-2 in Child Daycars, Schools, Nursing Homes and Offices*, EMERGING INFECTIOUS DISEASES (Apr. 2021), https://pubmed.ncbi.nlm.nih.gov/33755002/ (last visited June 28, 2021).

[32]     *Supra* note 28.

[33]     *Running Errands and Food Delivery*, Centers for Disease Control (Jan. 8, 2021), https://www.cdc.gov/coronavirus/2019-ncov/easy-to-read/essential-goods-services.html (last visited June 28, 2021).

disinfection aimed at cleaning the virus cannot entirely and adequately remove the virus, as portions of the virus remain, and thus the physical impacts of the virus on surfaces remain.[34]

### III.    MONUMENTAL SPORTS SUFFERED THE TYPES OF LOSSES THE ALL RISKS POLICIES INSURE AGAINST.

70.    Monumental Sports' mission is to provide a wide-variety of indoor sporting events and other entertainment to the Washington, D.C. community and those who visit it. Monumental Sports owns three professional sports teams, the Capitals, Wizards, and Mystics, as well as Capital One Arena, where the Capitals and Wizards play.  Monumental Sports also manages EagleBank Arena, home of George Mason University basketball and host to myriad events.  The Mystics play at a third indoor arena, D.C.'s Entertainment & Sports Arena.  Capital One Arena alone seats 20,000 fans and welcomes nearly 3 million people each year across more than 220 sports and entertainment events.  Monumental Sports' business and revenue, therefore, depends on playing games and booking events for fans to attend at its indoor arenas, and attracting thousands of people to attend those events.

71.    The Capitals are one of the NHL's 32 current professional hockey teams.  The Capitals have consistently been one of the best teams in the NHL, and in 2018 they captured the Stanley Cup—the District's first major professional sports championship in nearly 30 years.  The fan turnout for the championship parade alone—over 100,000 fans and 800,000 metro riders— illustrates the impact the Capitals have on this community.  With their non-stop, physical gameplay and longtime star players, like Alexander Ovechkin, a Capitals player since 2004, the experience the team provides to its fans is unmatched.  The official capacity for hockey games at

---

[34]    Nicolas Castano et al., *Fomite transmission and disinfection strategies for SARS-CoV-2 and related viruses*, Cornell University (May 23, 2020), https://arxiv.org/abs/2005.11443 (last visited June 28, 2021).

Capital One Arena, the Capitals' home venue, is 18,573.  Before the pandemic forced the

postponement of the end of the 2019-2020 season, the previous 492 Capitals home games had

sold out, dating back to 2008.

72.    The Wizards are one of the NBA's 30 professional basketball teams.  Previously

named the Washington Bullets, the Wizards have been Washington, D.C.'s NBA basketball team

since 1973 and in that time have garnered 29 playoff appearances and one NBA Championship

Title.  The Wizards draw basketball fans of all ages to see the team's current playmakers, like

Bradley Beal and Russell Westbrook, both perennial all-stars, battle it out against some of the

nation's top opponents.  Beal and Westbrook embody the high energy, high output work ethic

that Monumental Sports provides across all of its platforms.  Capital One Arena has played host

to legends of the game, including arguably the greatest basketball player ever, Michael Jordan, a

former member of the Wizards.  The official capacity for basketball games at Capital One Arena,

the Wizards home venue, is 20,476.  Prior to the shutdown, over 530,000 fans attended Wizards

home games at Capital One Arena in the 2019-2020 season.

73.    The Mystics are one of the Women's National Basketball Association's

("WNBA") 12 professional basketball teams.  The Mystics have been Washington, D.C.'s

WNBA basketball team since 1998.  Like the Wizards and Capitals, the Mystics are league

champions, winning their first WNBA Championship in 2019, and have appeared in the playoffs

seven times.  Their current roster includes 2019 WNBA MVP Elena Delle Donne, a role model

for young basketball players everywhere.  The official capacity for basketball games at D.C.'s

Entertainment & Sports Arena, the Mystic's home venue, is 4,200.  In only 16 games in 2019,

over 61,000 fans attended Mystics home games at Entertainment & Sports Arena.

74.     Washington, D.C. is one of most cosmopolitan cities in the world; home to diplomats and dignitaries from nearly every nation—and residents who speak nearly 170 different languages.  Monumental Sports' teams reflect the international nature of its community with players from all over the world.  Rising Wizards star Rui Hachimura is the first-ever Japanese-born athlete drafted into the NBA, and Deni Avdija, the highest ranked Israeli player drafted in the NBA, joined the Wizards in December.  Emma Meesseman, the Mystics' WNBA 2019 Finals MVP, is from Belgium.  The Capitals' roster features players from 10 different countries, with Alex Ovechkin leading the team as the first Russian captain in NHL history to win the Stanley Cup.

75.     Monumental Sports uses Capital One Arena, EagleBank Arena, and Entertainment & Sports Arena for more than just games and practices for sports teams—these venues host many other events each year including concerts, conventions, and graduations.

76.     Monumental Sports sustained significant physical damage to and loss of its property as a result of the COVID-19 virus[35] (*see* Section III.A below), and that physical damage and loss resulted in the loss of significant revenue and forced Monumental Sports to undertake significant, costly steps to resume and continue operations (*see* Section III.B below).  In addition, as a result of property damage and loss proximate to Monumental Sports' property, local governments issued orders that prevented or curtailed Monumental Sports' operations (*see* Section III.C below).

**A.     Monumental Sports' Insured Properties Suffered Physical Loss and Damage**

---

[35]     It was only in April 2021, more than one year after Capital One Arena was forced to close due to COVID-19, that Capital One Arena was permitted to host any fans—and then only at 10% of capacity (increasing to 25% on May 14 and 50% on May 28).  Similarly, EagleBank Arena, located in Fairfax, Virginia, a 10,000 seat arena, was allowed to host a mere 250 fans starting in late November 2020.

77.    As detailed below, infectious individuals were present at each of the arenas and properties at issue.  Reported local prevalence rates in D.C. and Virginia reached materially dangerous levels, and, given limited testing and other logistical issues, particularly in the early days of the pandemic, reported prevalence rates significantly understate actual prevalence rates. Since the start of the pandemic in March 2020, the District of Columbia has had over approximately 49,000 reported cases of COVID-19 and over 1,100 deaths; Maryland has had over approximately 462,000 reported cases of COVID-19 and over 9,700 deaths; and Virginia has had over 679,000 reported cases of COVID-19 and over 11,300 deaths.[36]  Accordingly, in addition to confirmed on-site cases, reported statistics—as was learned as the pandemic progressed—demonstrate that infectious individuals were present at each arena and location prior to the closure of the arenas in March 2020.  In addition, upon information and belief, numerous infectious individuals were present at other insured properties owned or used by Monumental Sports, including practice facilities and offices, causing damage to and loss of those properties as well.

78.    In May 2020, a Monumental Sports contractor with COVID-19 was present at Capital One Arena.  Between December 2020 and April 2021, 17 individuals who were tested at Capital One Arena were positive for COVID-19.  In addition, infections among hockey and basketball teams and in Monumental Sports' arenas and adjacent property continue:  in January 2021, six Wizards players tested positive for COVID-19 and another three players were placed under the NBA's COVID-19 protocols.  At that time, those players were playing games at Capital One Arena and practicing at the Wizards practice facility at the Entertainment & Sports

---

[36]    *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. TIMES, https://www.nytimes.com/interactive/2021/us/covid-cases.html (last visited June 28, 2021).

Arena; and four Capitals players, who were playing games at Capital One Arena and practicing at their practice facility, were placed under the NHL's COVID-19 protocols.  In May 2021, two Capitals players were placed under the NHL's COVID-19 protocols.[37]  Further, a number of members of the George Mason men's basketball team and staff, who play at EagleBank Arena, tested positive for COVID-19 in late 2020 and early 2021.

79.     In February and March 2020, approximately 505,000 people attended events at Capital One Arena, including at: eleven Wizards basketball games; eight Capitals hockey games; five Georgetown University Hoyas basketball games; several Disney On Ice events; concert performances by Post Malone, Marc Anthony, Aventura, and The Lumineers; a Worldwide Wrestling Entertainment ("WWE") show; and a comedic performance by Martin Lawrence. Between February and March 2020, when the COVID-19 virus was spreading rapidly throughout the D.C. metro region, EagleBank Arena and Entertainment and Sports Arena hosted thousands of people, including at: eight George Mason basketball games, the First Round of the A10 Women's Basketball Tournament, two performances of Paw Patrol Live and three concerts at EagleBank Arena, and three Capital City Go-Go (NBA G League) games at the Entertainment and Sports Arena.

80.     Additionally, several high traffic, high volume food vendors—McDonalds, Chipotle, and Dunkin' Donuts—and other businesses are or were located in Capital One Arena. And, Capital One Arena is located above one of Washington, D.C.'s busiest metro stations, and access to the metro is located in close proximity to the entrance of the arena.  In February 2020

---

[37]     The NBA and NHL's COVID-19 protocols prevent anyone who has tested positive, or been in contact with someone who tested positive for COVID-19, from attending team workouts, games, or facilities during an extended period of time.

alone, over 23,000 people used this metro stop on a daily basis.[38]  Given their proximity, some air from the metro seeps into Capital One Arena.

81.     Because numerous infectious individuals carried the COVID-19 virus in and onto Monumental Sports' locations, *i.e.*, in and onto insured properties, each of those properties sustained physical loss and damage.  Had Monumental Sports continued to host fans, the air and surfaces in the arenas would have continually been infected and would have been unsafe.  And because until only recently Monumental Sports had not been able to open its arenas to fans, or many fans, without an influx of COVID-19 and the COVID-19 virus, its arenas have been physically harmed and physically unavailable for use for their intended purpose or safe occupancy.

**B.      The COVID-19 Virus Damage Forced Monumental Sports To Repair And Restore Its Property And To Take Expensive Measures To Mitigate Its Losses.**

82.     As discussed above in Section III.C, the EPA and CDC have recommended severe and dramatic interventions to help reduce exposure to the COVID-19 virus.  Further, since the onset of the pandemic Monumental Sports has been working diligently with its League partners, the District of Columbia, and medical experts with MedStar Health to establish and implement health and safety protocols that follow guidelines established by the CDC.  In addition to prohibiting fans from attending games, Monumental Sports had to implement these and other measures to reduce the amount of the COVID-19 virus present in and on its insured properties and attempt to make property safe for its intended use.

---

[38]      *See Rail Ridership Data Viewer,* Washington Metropolitan Area Transit Authority, https://www.wmata.com/initiatives/ridership-portal/Rail-Data-Portal.cfm (last visited June 28, 2021).

83.     Monumental Sports retained the expertise of ME Engineers for a full HVAC study and response plan to upgrade existing arena HVAC systems and recommend improvements for mitigation of spreading airborne infectious diseases.  It implemented those recommendations, installing upgraded air filtration systems (*e.g.*, MERV 13 air filters), deploying portable air cleaners, and increasing outdoor air ventilation.  Because of the physical loss and damage caused by the COVID-19 virus, Capital One Arena could not re-open to the public without these repairs and modifications to its air ventilation systems.

84.     Monumental Sports also physically altered interior spaces at Capital One Arena to mitigate the spread of COVID-19, and attendant property damage and loss, by installing protective Plexiglas partitions at points of sale and limiting access to parts of the arenas.

85.     Additionally, Monumental Sports enhanced its employee training programs to include heightened sanitization procedures, installed hand sanitizer stations stocked with EPA-approved sanitizing products, including over 150 hand sanitizer stations in Capital One Arena, and purchased specialized sanitization equipment to limit potential airborne pathogens, including 47 state-of-the-art air sanitizing ceiling light fixtures in Capital One Arena.

86.     Once it was allowed to have games in late December 2020 (albeit without fans), Monumental Sports issued a number of protocols to help staff, players, and others needed to operate games to stay safe, including:  requiring that face masks be worn inside Capital One Arena; requiring everyone entering Capital One Arena to complete a short, health screening questionnaire prior to admittance; requiring staff to maintain six feet of distance; and requiring testing for certain players based on league requirements. Once it was allowed to host fans at games, Monumental Sports issued additional protocols to help staff, players, and fans stay safe, including:  issuing all tickets electronically; selling tickets in pods of one to four seats and placed

in a staggered manner throughout each seating section to maintain six feet of distance between pods and groups of ticket holders; issuing set windows of time for fans to enter the arena and make their way to their seats; requiring fans to enter Capital One Arena through specific, dedicated points of entry; and restricting concession items.[39]

87.     Monumental Sports has similarly made repairs to EagleBank Arena and the practice facility at Entertainment & Sports Arena by installing Plexiglas partitions at high traffic areas and limiting access to parts of the arenas, as well as installing hand sanitizer stations.

88.     Monumental Sports has incurred substantial expenses to implement such repairs and modifications to its insured properties as a result of the COVID-19 virus.  These extra expenses are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

## C.     Government Orders Resulting From Viral Damage Prevented Fans From Attending Sporting Events.

89.     To protect individuals from coming into contact with surfaces and air damaged by and containing the COVID-19 virus, local governments across the United States issued orders prohibiting or limiting all non-essential public and private gatherings.  Those orders restricted Monumental Sports from hosting basketball and hockey games and other events and restricted the public from attending basketball and hockey games and other events, *i.e.*, from using and accessing Monumental Sports' property as it was intended.  Below is a survey of the orders in D.C. and Virginia.

---

[39]     *Monumental Sports & Entertainment Continues to Focus on Health and Safety as Capital One Arena Opens to Washington capitals and Wizards Fans Beginning Next Week,* Monumental Sports, https://monumentalsports.com/2021/04/monumental-sports-entertainment-continues-focus-on-health-and-safety-as-capital-one-arena-opens-to-washington-capitals-and-wizards-games-fans-beginning-next-week/ (last visited June 28, 2021).

90.     **The District of Columbia**, by March 12, 2020, had ten known positive cases of

COVID-19 (though given significant testing limitations and pre- and asymptomatic carriers,

actual numbers were almost certainly much higher).[40]  On March 13, 2020, the DC Department

of Health prohibited mass gatherings, defined as events bringing more than 250 persons together,

including at stadiums or arenas.[41]  Subsequent orders issued throughout 2020 and continuing into

2021 continued to prohibit mass gatherings, including at stadiums or arenas, and closed all non-

essential businesses.[42]

91.     D.C.'s Mayor, Muriel Bowser, further prohibited mass gatherings because the

scientific evidence showed "that the most effective approach to slowing the community

transmission of communicable diseases like COVID-19 is through limiting public activities and

engaging in social distancing."[43]  The Mayor's March 24, 2020 order required that "essential

businesses" permitted to remain open must follow "Social Distancing Requirements" including

"[r]egular cleaning [of] high-touch surfaces."[44]  That is, restoring damaged, infectious property

to a safe state.  As of March 22, 2021, more than a year after Monumental Sports' venues shut

their doors due to COVID-19, Washington, D.C.'s professional sports teams were finally given

---

[40]     *See* Government of the District of Columbia, *Coronavirus Data Update: March 15*, https://coronavirus.dc.gov/release/coronavirus-data-update-march-15 (last visited June 28, 2021).

[41]     Notice of Emergency Rulemaking, Department of Health, District of Columbia (Mar. 13, 2020), https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/release_content/attachments/DOH_Rulemaking_Mass-Gatherings.pdf (last visited June 28, 2021).

[42]     *See, e.g.,* Mayor's Order 2020-053, District of Columbia (Mar. 24, 2020) https://coronavirus.dc.gov/sites/default/files/dc/sites/mayormb/release_content/attachments/Mayor%27s%20Order%202020-053%20Closure%20of%20Non-Essential%20Businesses%20and%20Prohibiti....pdf (last visited June 28, 2021).

[43]     *Id.*

[44]     *See id.*

the opportunity to apply for a waiver from the city government to grant them the ability to host fans in limited capacity.[45]  On June 11, 2021, large sports and entertainment venues in D.C. were permitted to resume full normal operations.[46]

92.     **Virginia**, by March 22, 2020, had 219 known positive cases of COVID-19.[47]  On March 23, 2020, Governor Northam began closing public access to recreational and entertainment businesses, including indoor sports facilities and hockey rinks.[48]  These orders also required businesses to adhere to "enhanced sanitizing practices on common surfaces"[49] to protect people from touching damaged, infectious surfaces.  It was only as of May 15, 2021, when indoor sports venues were allowed to have 50% percent occupancy or 1,000 persons, whichever was less.[50]  Accordingly, EagleBank Arena, located in Virginia, was permitted to operate at only 10% capacity (1,000 fans for 10,000 seats) one year after shutting down due to COVID-19.

---

[45]     Coronavirus (COVID-19) Situational Update, DC Health, at Slide 23 (Mar. 15, 2021) https://mayor.dc.gov/sites/default/files/dc/sites/coronavirus/release_content/attachments/Situatio nal-Update-Presentation_03-15-21.pdf (last visited June 28, 2021).

[46]     Coronavirus (COVID-19) Situational Update, DC Health, at Slide 4 (May 17, 2021) https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/release_content/attachments/Sit uational-Update-Presentation_May_17_2021_.pdf (last visited June 28, 2021).

[47]     Laura Taylor, *219 total coronavirus cases confirmed in Virginia*, WSET (Mar. 22, 2020), https://wset.com/news/coronavirus/3-deaths-and-219-total-coronavirus-cases-confirmed-in-virginia (last visited June 28, 2021).

[48]     *See, e.g.*, Executive Order Number Fifty-Three (2020), Commonwealth of Virginia Office of the Governor (Mar. 23, 2020) https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf (last visited June 28, 2021).

[49]     *Id.*

[50]     Executive Order Seventh Amended Number Seventy-Two (2021) and Order of Public Health Emergency Nine, Commonwealth of Virginia Office of the Governor (May 14, 2021) https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-72-SEVENTH-AMENDED-and-Order-of-Public-Health-Emergency-Nine-Easing-of-Commonsense-Surge-Restrictions-Due-to-Novel-Coronavirus-(COVID-19).pdf (last visited June 28, 2021).

93.     Each such order was issued to, among other things, keep people from coming into contact with damaged property, *i.e.*, property whose surfaces had been altered by the attachment of the COVID-19 virus or viral droplets, rendering that property unfit for its intended purpose. *See, e.g., supra* Section II.

94.     By March 30, 2020, each of the arenas owned or used by Monumental Sports' was subject to one or more civil authority orders that prohibited, severely impaired, or restricted normal arena operations.

95.     The initial orders shut down Monumental Sports' operations.  Government orders prohibited fans from attending NBA, NHL, or WNBA games in arenas owned or used by Monumental Sports for over a year.  Only in April 2021 did Monumental Sports receive a waiver from the District of Columbia to host fans and then only to operate at 10% of capacity.  These orders, and other orders, have prohibited, limited, restricted, or impaired access to Monumental Sports' arenas and other insured properties, precluding its teams from playing hockey and basketball and precluding any other events from occurring under pre-COVID-19 conditions.

96.     Damage caused by COVID-19 and the COVID-19 virus to property in and around Monumental Sports' insured properties, including the Gallery Place metro stop at Capital One Arena, made travel difficult and dangerous in and around the arenas.  In particular, the risk of coming into contact with property that had COVID-19 and the COVID-19 virus on its surface created meaningful risks and made traveling to and from Monumental Sports' property nearly impossible.

## IV.     MONUMENTAL SPORTS SUFFERED HUNDREDS OF MILLIONS IN LOSSES.

97.     COVID-19 and the COVID-19 virus devastated Monumental Sports, causing widespread physical loss and damage that resulted in hundreds of millions of dollars in losses. Because its business depends upon using its arenas to host fans, Monumental Sports bought

insurance to protect itself against the financial consequences (including the loss of revenue and extra expenses) resulting from the inability to operate after loss or damage sustained at their properties *and* against the costs of restoring such damaged property.

98.     Monumental Sports earns revenue from arena-related activities, such as ticket sales, concessions, parking, and in-arena merchandise sales—all of which rely on fans attending games or events.  These revenues make up a significant portion of Monumental Sports' income.

99.     The COVID-19 virus—and the damage to and loss of property it caused—forced Monumental Sports to cancel or postpone at least 60 events at Capital One Arena in 2020, including dozens of Capitals and Wizards games, dozens of concerts (*e.g.*, Billie Eilish, Harry Styles, Janet Jackson, The Weeknd, Rage Against the Machine, Bon Jovi), and other entertainment events, like WWE and Dude Perfect.

100.     Likewise, Monumental Sports was forced to cancel or postpone at least 40 events at the EagleBank Arena in 2020.  Those cancellations included numerous performances of Sesame Street Live, Disney On Ice, Harlem Globetrotters, WWE, and many high school graduations

101.     The COVID-19 virus—and the damage to and loss of property it caused—forced the NHL, NBA, and WNBA to cancel a significant number of games during the 2019-2020 season—games that were to be played at Monumental Sports' insured arenas, including the entire 2020 Mystics season that was to be played at D.C.'s Entertainment & Sports Arena.  These cancellations caused Monumental Sports to lose substantial income and incur material expenses. The losses and expenses extended into 2021 as the NHL had to limit its 2020-2021 season to 56 rather than the traditional 82 games, and the NBA had to limit its 2020-2021 season to 72 instead of the usual 82 games—with home games planned to be played at Capital One Arena.

102.     Because of COVID-19 and the COVID-19 virus, the resulting difficulty and dangers traveling to or from Monumental Sports' arenas and the associated government orders, Monumental Sports could not open its doors in Washington, D.C. to any fans for over 13 months——from March 12, 2020 through April 21, 2021.

103.     When Monumental Sports was finally able to host fans at Capital One Arena, it was limited to 10% capacity, or approximately 2,100 fans.  This 10% capacity limit allowed Entertainment & Sports Arena to hold only around 400  people.  EagleBank Arena was able to host 250 fans for the George Mason University men's basketball team's games for its 2020-2021 season, but was unable to schedule other events for 2021 while capacity restrictions were in place.

104.     In addition to Monumental Sports' inability to conduct normal arena operations, upon information and belief, its suppliers, licensees, and others also have suffered their own physical loss or damage at their premises resulting from the COVID-19 virus that in turn led to additional losses to Monumental Sports.

## V.     THE ALL RISKS POLICIES COVER MONUMENTAL SPORTS' LOSSES.

105.     As set forth in the attached copies of the All Risks Policies, Monumental Sports and its subsidiaries are insured under the All Risks Policies.  *See* Ex. A at 8; Ex. B at 8.

106.     Each entity seeking insurance coverage with respect to insured properties is covered under the All Risks Policies.

107.     As described above, Monumental Sports suffered material physical loss and damage to property insured by the All Risks Policies.  As explained in Sections V.A to V.G below, these losses fall within the coverage promises of the All Risks Policies.

108.     Monumental Sports gave timely notice of its claims under Policy No. 1056084.

109.     Monumental Sports gave timely notice of its claims under Policy No. 1068228.

110.    Monumental Sports paid the full premium for Policy No. 1056084.

111.    Monumental Sports paid the full premium for Policy No. 1068228.

112.    Monumental Sports has satisfied, is excused from performing, or Factory Mutual has waived or is estopped from insistence upon performance of, all conditions of the All Risks Policies, including but not limited to payment of required premiums, provision of timely notice of claim, and submission of a Proof of Loss.

113.    The All Risks Policies provide several types of coverage that insure Monumental Sports' massive losses relating to COVID-19.  As detailed below, these include coverages for: a) property damage and for the costs to repair property; b) lost income (called Time Element) losses and extra expenses resulting from physical loss or damage to property; c) losses due to orders of civil authority issued due to COVID-19; d) losses caused by the inability to access insured properties due to nearby viral property damage and loss; e) losses covered under the Communicable Disease coverage; and f) losses covered by other provisions of the All Risks Policies.

**A.      The All Risks Policies Cover Monumental Sports' Property Damage and Repair Costs.**

114.    The All Risks Policies specifically "insure[]" the "Real Property" and "Personal Property" of Monumental Sports and its entities "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE."  As explained above, the COVID-19 virus caused physical loss and damage to both real and personal property of Monumental Sports.

115.    In the event of such damage to or loss of insured property, the All Risks Policies promise to pay Monumental Sports "the cost to repair" that property or alternatively, to pay Monumental Sports the "actual cash value" of such property if it "is useless to the Insured," *i.e.*, the policyholders.  In addition, the All Risks Policies promise to pay for the "reasonable and

necessary costs incurred for the temporary repair of insured physical damage to insured property . . . and to expedite the permanent repair or replacement" thereof.  As explained above, the COVID-19 virus caused physical loss and damage to both real and personal property of Monumental Sports.

116.    Monumental Sports incurred costs to repair physical damage and loss caused to its arenas and other insured locations including by, among other things, installing upgraded air filtration systems and implementing additional and heightened sanitization procedures.  The latter required purchasing specialized sanitization equipment to limit potential airborne pathogens (including ultraviolet germicidal irradiation equipment).

117.    Monumental Sports' repair costs are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

**B.      The All Risks Policies Cover Monumental Sports' Massive Business Interruption Losses and Extra Expenses.**

118.    The All Risks Policies "insure[] TIME ELEMENT loss . . . directly resulting from physical loss or damage of the type insured" both to insured property and to property "used by the Insured."  Each Policy computes the Policyholder's TIME ELEMENT loss as the amount that it would have earned had no loss occurred less the amount it did in fact earn.  Time Element losses are covered during the PERIOD OF LIABILITY, which for "building and equipment" starts "from the time of physical loss or damage of the type insured," and ends "when with due diligence and dispatch the building and equipment could be: (i) repaired and replaced; and (ii)

made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage."[51]

119.     Despite the fact that the term "TIME ELEMENT" appears in all capital letters, the All Risks Policies nowhere define that term.

120.     The All Risks Policies also cover "reasonable and necessary extra costs incurred by the Insured . . . during the PERIOD OF LIABILITY . . . to temporarily continue as nearly normal as practicable the conduct of the Insured's business; [and to] temporarily us[e] property or facilities of the Insured or others".

121.     As shown in Section III.A above, Monumental Sports has suffered direct physical loss and damage of the type insured under the All Risks Policies to property insured by those policies.

122.     As explained in Section IV above, due directly to physical loss to its insured properties, Monumental Sports sustained losses of gross earnings, losses of other operational earnings, losses of gross profits, diminished sales, and incurred additional operating expenses, extra expenses, increases in the cost of doing business, costs to prevent or mitigate losses, claim preparation costs, leasehold and rental losses, and other covered losses.

123.     Monumental Sports has undertaken numerous measures to repair and replace building and equipment and make Monumental Sports facilities ready for operations, in response to the presence of the COVID-19 virus.  Some of these measures include modifications to its

---

[51]     The PERIOD OF LIABILITY applies to "all TIME ELEMENT COVERAGES" with certain exceptions, including for GROSS PROFIT Time Element coverage, which starts "from the time of physical loss or damage of the type insured," and ends "not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section," or a 12 month period for most properties, "during which period the results of the business shall be directly affected by such damage."

HVAC systems; Plexiglas barriers; touchless entry and payment systems; revised arrangements of interior spaces, revised interior traffic flows; and continuous deep cleaning.  These alterations and modifications are ongoing, but have not yet allowed Monumental Sports to resume operations "under the same or equivalent physical and operating conditions that existed prior to the damage."

124.  While Monumental Sports took steps to reduce and mitigate its losses, damages and expenses, it has not been able to further and materially do so through the use of property or services owned or controlled by others, the use of property or services obtainable from other sources, working extra time or overtime, or the use of inventory.

125.  Monumental Sports' Business Interruption losses are ongoing and continuing.

126.  Monumental Sports has incurred reasonable and necessary extra expenses to temporarily continue as nearly normal as practicable the conduct of its business due to the suspension of operations, including but not limited to extra expenses for COVID-19 screening and testing, housing, sanitizing supplies, physical and structural modifications, security at facilities, and other operational changes.  These expenses were above and beyond those that usually would have been incurred in conducting Monumental Sports' business during the same period had no physical loss or damage occurred.

C.    **The All Risks Policies Cover Monumental Sports' "Civil Authority" Losses**.

127.  The All Risks Policies "cover[] the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured location provided such order is the direct result of physical damage of the type insured at the insured location or within five statute miles/eight kilometres of it."

128.    As set forth in Section III.C above, state and local authorities in each city and/or state where Monumental Sports property is located, including without limitation the District of Columbia and Virginia, issued orders that "limit[ed], restrict[ed] or prohibit[ed] partial or total access to insured location[s]."  As set forth in Section III.C. above, each such order was issued as "the direct result of physical damage of the type insured" either at insured locations or within five or fewer statute miles of such locations.

129.    The governmental orders limiting, restricting, and prohibiting access to Monumental Sports' insured locations were issued because of physical and structural damage caused by the physical presence of the COVID-19 virus on furniture, doors, floors, bathroom facilities, and other surfaces; and in the air within offices, restrooms, shops, concourses, and HVAC systems at properties within one to five miles of Monumental Sports' insured locations..

130.    Many of these orders refer to the COVID-19 virus as a basis for prohibiting access to businesses, including hockey and basketball arenas and other facilities at issue here. *See supra* Section III.C.  All such orders were issued to, in part, prevent people from coming into contact with and touching damaged property, the surfaces of which had been altered by the adherence of COVID-19 viruses, and air, the composition of which had been and would be significantly altered by aerosolized viral droplets.  The physical loss and damage caused by COVID-19 is of the type insured by the All Risks Policies generally as well as by the Communicable Disease provision specifically.

131.    Monumental Sports has sustained actual losses due to the orders of civil authority described in Section III.C above.  Monumental Sports has incurred reasonable and necessary expenses, due to the orders of civil authority described in Section III.C above, to temporarily continue as nearly normal as practicable the conduct of its business.

132.    Monumental Sports' expenses due to orders of civil authority are other than those that usually would have been incurred in conducting its business during the same period had no physical loss or damage occurred.

**D.      The All Risks Policies Cover The Losses Monumental Sports Sustained Given The Danger Of Accessing Insured Locations Due To Nearby Viral Property Damage And Loss.**

133.    The All Risks Policies "cover[] the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured."

134.    The widespread presence of COVID-19 and the COVID-19 virus, fomites, and respiratory droplets or droplet nuclei made traveling to or from Monumental Sports' facilities significantly more difficult and dangerous, and damaged, among other things, real and personal property necessary for safe travel to and from Monumental Sports' facilities.

135.    Said otherwise, due to physical damage—the alteration and damage to surfaces as described above (*see* Section II)—to everything from door knobs and elevator buttons to seats in subways, busses and cars, travel to and from Monumental Sports' arenas became quite dangerous.  Likewise, air in subway cars, busses, taxis and ride-sharing vehicles was similarly and significantly altered—damaged—by aerosolized viral droplets.  Travel became quite dangerous and difficult given this damage.

136.    As a result of these partial or total preventions or impairments of ingress to and egress from Monumental Sports' facilities, the operations and business of each Monumental Sports insured entity was interrupted.

137.     As explained in Section IV above, Monumental Sports has sustained actual losses and has incurred extra expenses due to the necessary interruption of its business because of the partial or total physical prevention and impairment of ingress to or egress from insured property as a result of physical damage to the type insured by the policy (including, *inter alia*, the actual presence of communicable disease) to property of the type insured by the policy, namely real and other property, among other things.

138.     Monumental Sports' extra expenses due to prevention of ingress/egress are other than those that usually would have been incurred in conducting business during the same period had no physical loss or damage occurred.

**E.      The All Risks Policies Cover Monumental Sports' Communicable Disease Losses.**

139.     As explained in Section I above, the All Risks Policies provide explicit coverage for Communicable Disease.  The All Risks Policies contain two grants of coverage related to Communicable Disease.

140.     The All Risks Policies extend coverage to COMMUNICABLE DISEASE RESPONSE COSTS if any "location owned, leased, or rented by the Insured has the actual not suspected presence of communicable disease and access to such location is limited, restricted, or prohibited by: 1) an order of an authorized governmental agency regulating the actual not suspected presence of communicable disease; or 2) a decision of an Officer of the Insured as a result of the actual not suspected presence of communicable disease," the All Risks Policies cover the "reasonable and necessary costs incurred by the Insured at such location with the actual not suspected presence of communicable disease" including for the "cleanup, removal and disposal of the actual not suspected presence of communicable diseases from insured property."

141.    The All Risks Policies also include a coverage extension for INTERRUPTION

BY COMMUNICABLE DISEASE, which "covers the Actual Loss Sustained and EXTRA

EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such location with the

actual not suspected presence of communicable disease" and "access to such location is limited,

restricted or prohibited [for more than 48 hours] by: 1) an order of an authorized governmental

agency regulating the actual not suspected presence of communicable disease; or 2) a decision of

an Officer of the Insured as a result of the actual not suspected presence of communicable

disease."

142.    The communicable disease COVID-19 and the COVID-19 virus (the disease

causing agent) was actually present at Monumental Sports' locations because hockey and

basketball players, coaches, staff, employees, contractors, vendors, and/or patrons carrying the

communicable disease COVID-19 were present at one or more insured properties during the

period of liability.

143.    Access to one or more insured properties was limited, restricted, or prohibited as a

result of orders of authorized governmental agencies regulating the actual presence of the

communicable disease COVID-19 and the COVID-19 virus, and the decisions of an officer of

Monumental Sports as a result of the actual presence of the communicable disease COVID-19

and the COVID-19 virus at insured properties for a period of more than 48 hours.

144.    Monumental Sports sustained actual loss and incurred extra expense during the

period when its insured property was inaccessible due to the actual presence of COVID-19 on

the property.  Such extra expenses were other than those that usually would have been incurred

in conducting Monumental Sports' business during the same period had no loss occurred.

145.    Monumental Sports incurred reasonable and necessary costs for the cleanup, removal, and disposal of the actual presence of the communicable disease COVID-19, including the cleanup, removal, and disposal of materials contaminated with the COVID-19 virus.

146.    Monumental Sports incurred reasonable and necessary costs for public relations and related services resulting from the presence of COVID-19 on insured property.

**F.      The All Risks Policies Cover The Losses Monumental Sports Sustained To Protect Its Property And Mitigate Its Losses.**

147.    The All Risks Policies cover "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property."

148.    Monumental Sports incurred reasonable and necessary costs for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage from the COVID-19 virus and COVID-19 to such insured property.

149.    Monumental Sports sustained actual loss during the period beginning 48 hours before and lasting until 48 hours after the need to take reasonable action for the temporary protection and preservation of property insured by the All Risks Policies to prevent impending physical loss or damage to such property, including the cost of and losses caused by closing arenas, protecting and preserving property at arenas, and ensuring that arena property is not damaged by the COVID-19 virus or COVID-19.

**G.      Numerous Other Provisions Of The All Risks Policies Cover Monumental Sports' Losses.**

150.    In addition to the losses and coverages described above, Monumental Sports' COVID-19 losses are covered under any and all other coverages under the All Risks Policies that

49

may apply. These include but are not limited to Contingent Time Element and Claims Preparation Cost coverage.

151.     DC Arena L.P. has sustained actual loss of rental income for leases at properties that have become wholly or partially untenantable or unusable due to impairment by the COVID-19 virus and COVID-19 and related concerns, including but not limited to the fair rental value of properties they occupy, reasonably expected rental income from unoccupied or unrented portions of properties, and rental income from the rented portions of such property under leases, contracts or agreements in force at the time of the loss.  Several Monumental Sports insured entities have also sustained losses in the form of rent paid for facilities they have been unable to use because of orders, physical damage, or physical loss, as described more fully above.

152.     Monumental Sports sustained actual loss and incurred extra expense directly resulting from physical loss or damage of the type insured to property of the type insured at locations of direct customers, suppliers, contract manufacturers or contract service providers, and/or companies under a royalty, licensing fee or commission agreement.  For example, Monumental Sports relies on several suppliers to deliver food and drinks, equipment and more to its properties.  The physical loss or damage to the suppliers' properties disrupted service and delivery to Monumental Sports causing them to suffer losses.

## VI.     FACTORY MUTUAL FAILED TO HANDLE MONUMENTAL SPORTS' CLAIMS PROPERLY AND REFUSED TO HONOR ITS PROMISE.

153.     On April 23, 2020, Monumental Sports reported to Factory Mutual that it had experienced a loss at all locations provided on the Schedule of Locations (Exhibit A, at Appendix A).

154.     Factory Mutual has not acknowledged coverage for the general business interruption, civil authority or other claims like those presented here by Monumental Sports.

For example, on September 16, 2020, Factory Mutual wrote to Monumental Sports stating that "[t]he presence of COVID-19 at an insured location does not constitute 'physical damage of the type insured' as required under this provision. Accordingly, the Policy's Civil or Military Authority provision (and other Policy provisions requiring physical loss or damage of the type insured) do not respond based on the information presented."

155.     Factory Mutual took the position that COVID-19 and the COVID-19 virus do not cause "physical loss or damage" despite the fact that the virus rendered Monumental Sports' insured arenas and other properties unfit for their intended use.  Factory Mutual also took that position notwithstanding that that it argued in litigation that a mold infestation that "rendered" insured property "unfit for its intended use" constituted "physical loss or damage. *See Factory Mut. Ins. Co. v. Federal Ins. Co.*, 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 at 3.  In that case, Factory Mutual went on to assert that "[a]t best," the term "'physical loss or damage,' which is undefined, is susceptible of more than one reasonable interpretation and is therefore ambiguous." *Id.* at 3 n.1.  Now Factory Mutual is taking the contrary position that "physical loss or damage" is unambiguous and that COVID-19 and the COVID-19 virus do not constitute insured physical loss or damage, even when they render properties—such as Monumental Sports' arenas—unfit for their intended use.

156.     Additionally, upon information and belief, Factory Mutual failed to conduct a medical, chemical, chemical engineering, civil engineering, statistical, or biostatistical investigation before taking the position that impairment of property by the COVID-19 virus did not constitute physical loss or damage under the policies it had sold to many policyholders, including Monumental Sports.

157.    Upon information and belief, Factory Mutual also did not consult any medical doctors, infectious disease experts, biologists, chemists, civil or building engineers or other relevant experts prior to publicly saying that COVID-19 or the COVID-19 virus do not cause physical loss or damage or denying Monumental Sports' claims.

158.    Further, Factory Mutual arrived at the conclusion that COVID-19 and the COVID-19 virus do not cause physical loss or damage despite never sending an adjuster to inspect or visit any of Monumental Sports' properties to investigate its claims.

159.    Factory Mutual's September 16, 2020 letter to Monumental Sports is consistent with a set of "Talking Points" prepared by Factory Mutual to ensure that Factory Mutual's adjusters shunt all COVID-19 claims into limited Communicable Disease Coverage, despite the realities of the harm caused by COVID-19 and the COVID-19 virus.

160.    Upon information and belief, Factory Mutual failed to properly investigate whether Monumental Sports' property was lost or damaged because it already had decided—without considering sufficient scientific evidence—that viruses do not cause physical loss or damage.  This decision, without facts or analysis, contradicts settled, proper insurance claim-handling procedures and represents Factory Mutual's negligent conduct in handling Monumental Sports' claims.  Moreover, Factory Mutual, knowing it had already decided that COVID-19 and the COVID-19 virus do not cause "physical loss or damage," nonetheless sent Monumental Sports letter after letter asking for information about the basis for Monumental Sports' claims.

### FIRST CAUSE OF ACTION
### (For Breach of Contract Against Factory Mutual)

161.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 160 of this Complaint, inclusive, as though set forth fully herein.

162.    Factory Mutual's All Risks Policies are valid and enforceable contracts between Plaintiffs and Factory Mutual.

163.    Plaintiffs have satisfied, are excused from performing, or Factory Mutual has waived or is estopped from insistence upon performance of, all conditions of the All Risks Policies, including but not limited to payment of required premiums, provision of timely notice of claim, and submission of a Proof of Loss.

164.    Factory Mutual agreed in its insurance contract to provide insurance coverage for all risks of physical loss or damage not otherwise excluded.

165.    The COVID-19 virus have caused and continues to cause physical loss and/or damage to Plaintiffs' properties and to properties within five miles of Plaintiffs' insured locations.

166.    The Plaintiffs have suffered actual losses and incurred extra expense due to physical loss and damage caused by the COVID-19 virus, a risk not excluded by the All Risks Policies.

167.    No exclusion in the All Risks Policies applies to preclude or limit coverage.

168.    As is set forth more fully above, Factory Mutual is contractually obligated under the All Risks Policies to indemnify Plaintiffs for the full amount of their losses.

169.    Factory Mutual refused to indemnify Plaintiffs' for their losses and expenses in breach of the All Risks Policies.

170.    As a direct and proximate result of its breaches of contract, Factory Mutual has deprived Plaintiffs of the benefits of the insurance contracts for which substantial premiums were paid, which entitles Plaintiffs to money damages, including interest according to law.

171.   Plaintiffs' losses as a result of Factory Mutual's breaches of contract are continuing, and Plaintiffs reserve the right to seek the full and exact amount of its damages at the time of trial.

## SECOND CAUSE OF ACTION
### (For Declaratory Relief Against Factory Mutual)

172.   Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 160 of this Complaint, inclusive, as though set forth fully herein.

173.   Plaintiffs seek a declaration of the parties' rights and duties under Factory Mutual's All Risks Policies in accordance with D.C. Super. Ct. R. Civ. Pro. 57.

174.   An actual and justiciable controversy exists between Plaintiffs and Factory Mutual concerning Factory Mutual's contractual duties to indemnify Plaintiffs' claims for real property losses, time element losses, and other losses, costs, and expenses under Factory Mutual's All Risks Policies.

175.   The controversy between Plaintiffs and Factory Mutual is ripe for judicial review.

176.   The controversy is of sufficient immediacy to justify the issuance of declaratory relief.

177.   Plaintiffs accordingly seek a declaration from the Court that:

- Each coverage provision identified in the Complaint is triggered by Plaintiffs' claims;

- No exclusion in the All Risks Policies apply to preclude or limit coverage for Plaintiffs' claims;

- Plaintiffs have satisfied or been excused from satisfying, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the All Risks Policies;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their claims of real property losses, time element losses, extra expense, and other losses sustained as a result of direct loss or damage to property due to the COVID-19 virus and/or COVID-19;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for GROSS EARNINGS or GROSS PROFITS loss, at Plaintiffs' election, during the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for EXTRA EXPENSE incurred to continue business during the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their time element losses and extra expense as a result of orders of civil authority that have limited, restricted, or prohibited access to insured properties as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations within five miles therof;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their time element losses and extra expense wherever ingress to or egress from insured property has been partially or totally prevented as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their lost rent and actual loss sustained with respect to rental properties;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their lost GROSS EARNINGS incurring during the Extended Period of Liability after the end of the Period of Liability;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for losses and extra expense associated with physical loss of or damage to contingent time element properties;

- Factory Mutual is contractually obligated under its U.S. All Risks Policies to indemnify Plaintiffs for response costs and time element losses and extra expense as a result of the actual presence of communicable disease at insured locations;

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for actual loss sustained to prevent and costs incurred to temporarily protect actual or impending physical loss or damage to insured property; and

- Factory Mutual is contractually obligated under its All Risks Policies to indemnify Plaintiffs for their claims preparation costs.

**THIRD CAUSE OF ACTION**
**(For Breach of Implied Covenant of Good Faith and Fair Dealing Against Factory Mutual)**

178.    Plaintiffs repeat and incorporate by reference the allegations set forth in Paragraphs 1 through 160 of this Complaint, inclusive, as though set forth fully herein.

179.    Parties to every commercial contract, including insurance contracts, owe each other a duty of good faith and fair dealing. Accordingly, Factory Mutual agreed to act in good faith and deal fairly with Monumental Sports when it entered into the insurance contract and accepted its premium payments.

180.    The totality of the circumstances relevant to this matter reflect that Factory Mutual's conduct has been in violation of the implied covenant of good faith and fair dealing inherent in that contract.

181.    Factory Mutual had no valid reason to deny Monumental Sports coverage or refuse to pay Monumental Sports' claims.

182.    Factory Mutual knew or recklessly disregarded the fact that no reasonable basis for denying Monumental Sports coverage existed.

183.    Factory Mutual acted unreasonably in denying Monumental Sports coverage and knew of or was conscious of the fact that its conduct was unreasonable.

184.    Among other things, Factory Mutual:

- presumptively denied coverage for losses clearly covered by the All Risks Policies; and

- disregarded facts and evidence showing that the COVID-19 virus causes direct physical loss or damage to property.

185.    Factory Mutual's conduct is unreasonable because of the specific All Risks Policies it sold Monumental Sports. Factory Mutual knew viruses cause direct physical loss or damage to property within the meaning of its All Risks Policies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

(1)     A declaratory judgment in favor of Plaintiffs and against Factory Mutual declaring that:

    a)  Each coverage provision identified in the Complaint is triggered by Plaintiffs' claims;

    b)  No exclusion in the All Risks Policies applies to preclude or limit coverage for Plaintiffs' claims;

    c)  Plaintiffs have satisfied or been excused from satisfying, or Factory Mutual has waived or is estopped from enforcing, all conditions precedent under the All Risks Policies;

    d)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their real property losses, time element losses, extra expense, and other losses sustained as a result of direct loss or damage to property due to the COVID-19 virus and/or COVID-19;

    e)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for GROSS EARNINGS or GROSS PROFITS loss, at Plaintiffs' election, during the Period of Liability;

    f)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for EXTRA EXPENSE incurred to continue business during the Period of Liability;

    g)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their time element losses and extra expense as a result of orders of civil authority that have impaired, limited, restricted, or prohibited access to insured properties as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations within five miles;

    h)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their time element losses and extra expense wherever ingress or access to, or egress from, insured property has been impaired or partially or totally prevented as a result of the COVID-19 virus and/or COVID-19 at insured property or other locations;

    i)  Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their lost rent and actual loss sustained with respect to rental properties;

j) Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their lost GROSS EARNINGS incurring during the Extended Period of Liability after the end of the Period of Liability;

k) Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for losses and extra expense associated with physical loss or damage to contingent time element properties;

l) Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for response costs and time element losses and extra expense as a result of the actual presence of communicable disease at insured locations;

m) Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for actual loss sustained to prevent and costs incurred to temporarily protect actual or impending physical loss or damage to insured property; and

n) Factory Mutual is contractually obligated under their All Risks Policies to indemnify Plaintiffs for their claims preparation costs;

(2) Compensatory and consequential damages in an amount to be proven at trial;

(3) Pre-judgment and post-judgment interest as provided by law;

(4) An award of court costs and attorneys' fees;

(5) Interest on such court costs and attorneys' fees and costs;

(6) Exemplary and punitive damages; and

(7) Such other and further relief as this Court finds just and proper.

Dated:  June 29, 2021          COVINGTON & BURLING LLP


By:   _/s/ Matthew J. Schlesinger_____
      Matthew J. Schlesinger
      D.C. Bar No. 429689
      Covington & Burling LLP
      One CityCenter
      850 Tenth Street Northwest
      Washington, DC 20001
      (202) 662-6000
      mschlesinger@cov.com


      Attorneys for Plaintiffs

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial of all issues so triable pursuant to D.C. Super. Ct. R.

Civ. Pro. 38.

Dated:  June 29, 2021                          COVINGTON & BURLING LLP


                                               By:   _/s/ Matthew J. Schlesinger_____
                                                     Matthew J. Schlesinger

                                               Attorneys for Plaintiffs

# EXHIBIT A



# MUTUAL CORPORATION
# NON-ASSESSABLE POLICY

Factory Mutual Insurance Company
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

**DECLARATIONS**

| **Policy No.** | **Previous Policy No.** | **DATE OF ISSUE** |
|---|---|---|
| 1056084 | 1040235 | 31 July 2019 |
| **Account No.** | **Replaces Binder No.** | |
| 1-34105 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

> **INSURED:**
>
> Lincoln Holdings LLC
>
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the 1st day of August 2019 to the 1st day of August 2020 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this  31st day of  July 2019.

_____
Authorized Signature

Secretary

President

Countersigned (if required) this        day of

_____
Agent

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.



Factory Mutual Insurance Company
Johnston, Rhode Island
A Mutual Corporation

This policy is Non-Assessable.

It is important that the written
portions of all policies covering
the same property read exactly
alike. If they do not, they should
be made uniform at once.

In case of loss notify the company
or its local agent at once in writing.

7019 (9/01)

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

## EXTRACTS FROM CHARTER OF THIS COMPANY
### Granted by the General Assembly of the State of Rhode Island

SECTION 5:  Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10:  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

## EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
### Adopted July 13, 2000

ARTICLE 1 – MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.

7019 (9/01)

DECLARATIONS PAGE

DECLARATIONS

1.  NAMED INSURED AND MAILING ADDRESS ..................................................... 1
2.  POLICY DATES .................................................................................................... 1
3.  INSURANCE PROVIDED ...................................................................................... 1
4.  PREMIUM ............................................................................................................. 2
5.  PREMIUM PAYABLE ........................................................................................... 2
6.  LOSS ADJUSTMENT/PAYABLE .......................................................................... 2
7.  TERRITORY .......................................................................................................... 3
8.  JURISDICTION ..................................................................................................... 3
9.  CURRENCY ........................................................................................................... 3
10. LIMITS OF LIABILITY ......................................................................................... 3
11. DEDUCTIBLES ..................................................................................................... 7

PROPERTY DAMAGE

1.  INSURED PROPERTY ........................................................................................... 9
2.  EXCLUDED PROPERTY ....................................................................................... 9
3.  EXCLUSIONS ...................................................................................................... 10
4.  APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ...................... 14
5.  VALUATION ........................................................................................................ 15
6.  ADDITIONAL COVERAGES ............................................................................... 17
    CYBER ADDITIONAL COVERAGES .................................................................. 17
    A.  DATA RESTORATION ................................................................................. 17
    B.  DATA SERVICE PROVIDER PROPERTY DAMAGE ................................... 19
    OTHER ADDITIONAL COVERAGES .................................................................. 20
    A.  ACCIDENTAL INTERRUPTION OF SERVICES .......................................... 20
    B.  ACCOUNTS RECEIVABLE .......................................................................... 20
    C.  AUTOMATIC COVERAGE .......................................................................... 21
    D.  BRANDS AND LABELS ............................................................................... 22
    E.  CLAIMS PREPARATION COSTS ................................................................. 22
    F.  COMMUNICABLE DISEASE RESPONSE .................................................... 23
    G.  CONSEQUENTIAL REDUCTION IN VALUE ............................................. 23
    H.  CONTROL OF DAMAGED PROPERTY ....................................................... 24
    I.  DEBRIS REMOVAL ..................................................................................... 24
    J.  DECONTAMINATION COSTS ..................................................................... 24
    K.  ERRORS AND OMISSIONS ......................................................................... 25
    L.  EXPEDITING COSTS ................................................................................... 25
    M.  FINE ARTS AND VALUABLE PAPERS AND RECORDS ............................ 26
    N.  INSTALLMENT OR DEFERRED PAYMENTS ............................................ 27
    O.  LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL ...... 27
    P.  LAW AND ORDINANCE .............................................................................. 28
    Q.  LOSS PAYMENT INCREASED TAX LIABILITY ........................................ 29

R.      MACHINERY OR EQUIPMENT STARTUP OPTION .......................................................29
S.      MISCELLANEOUS PROPERTY ...........................................................................................30
T.      OPERATIONAL TESTING ...................................................................................................31
U.      PROTECTION AND PRESERVATION OF PROPERTY ...................................................31
V.      SERVICE INTERRUPTION PROPERTY DAMAGE .........................................................32
W.      TEMPORARY REMOVAL OF PROPERTY .......................................................................33
X.      TERRORISM ..........................................................................................................................33
Y.      TRANSPORTATION .............................................................................................................34

**TIME ELEMENT**

1.   LOSS INSURED ...............................................................................................................................37
2.   TIME ELEMENT COVERAGES .....................................................................................................38
     A.      INSURED OPTION ...............................................................................................................38
     B.      GROSS EARNINGS ..............................................................................................................38
     C.      GROSS PROFIT .....................................................................................................................40
     D.      EXTRA EXPENSE ................................................................................................................42
     E.      LEASEHOLD INTEREST .....................................................................................................43
     F.      RENTAL INSURANCE .........................................................................................................44
3.   PERIOD OF LIABILITY ..................................................................................................................45
4.   TIME ELEMENT EXCLUSIONS ....................................................................................................47
5.   TIME ELEMENT COVERAGE EXTENSIONS ..............................................................................48
     CYBER TIME ELEMENT COVERAGE EXTENSIONS ................................................................48
     A.      DATA SERVICE PROVIDER TIME ELEMENT ...............................................................48
     B.      OWNED NETWORK INTERRUPTION .............................................................................50
     SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS .................................................50
     A.      CIVIL OR MILITARY AUTHORITY .................................................................................50
     B.      CONTINGENT TIME ELEMENT EXTENDED .................................................................51
     C.      INGRESS/EGRESS ...............................................................................................................52
     D.      LOGISTICS EXTRA COST ..................................................................................................53
     E.      SERVICE INTERRUPTION TIME ELEMENT .................................................................54
     ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS .....................................................55
     A.      ATTRACTION PROPERTY .................................................................................................55
     B.      CRISIS MANAGEMENT ......................................................................................................56
     C.      DELAY IN STARTUP ..........................................................................................................57
     D.      EXTENDED PERIOD OF LIABILITY ...............................................................................57
     E.      INTERRUPTION BY COMMUNICABLE DISEASE ........................................................58
     F.      ON PREMISES SERVICES ..................................................................................................59
     G.      PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT ....................59
     H.      RELATED REPORTED VALUES .......................................................................................59
     I.      RESEARCH AND DEVELOPMENT ..................................................................................59
     J.      SOFT COSTS .........................................................................................................................60

**LOSS ADJUSTMENT AND SETTLEMENT**

1.   REQUIREMENTS IN CASE OF LOSS ...........................................................................................61
2.   CURRENCY FOR LOSS PAYMENT ..............................................................................................62

3.    PARTIAL PAYMENT OF LOSS SETTLEMENT ...................................................................62
4.    COLLECTION FROM OTHERS ...........................................................................................62
5.    SUBROGATION ....................................................................................................................62
6.    COMPANY OPTION .............................................................................................................63
7.    ABANDONMENT ..................................................................................................................63
8.    APPRAISAL ..........................................................................................................................63
9.    SUIT AGAINST THE COMPANY .......................................................................................64
10.   SETTLEMENT OF CLAIMS ...............................................................................................64

**GENERAL PROVISIONS**

1.    CANCELLATION/NON-RENEWAL .....................................................................................65
2.    INSPECTIONS ......................................................................................................................65
3.    PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS ...........................................66
4.    LIBERALIZATION ...............................................................................................................66
5.    MISREPRESENTATION AND FRAUD ...............................................................................66
6.    LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS ..............67
7.    OTHER INSURANCE ...........................................................................................................68
8.    POLICY MODIFICATION ....................................................................................................68
9.    REDUCTION BY LOSS ........................................................................................................69
10.   SUSPENSION .......................................................................................................................69
11.   TITLES .................................................................................................................................69
12.   ASSIGNMENT .....................................................................................................................69
13.   DEFINITIONS .....................................................................................................................69
SCHEDULE OF LOCATIONS ......................................................................................... APPENDIX A
SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, FORM
FMG7308
CYBER OPTIMAL RECOVERY ENDORSEMENT

## DECLARATIONS

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## 1.   NAMED INSURED AND MAILING ADDRESS

Lincoln Holdings LLC, Lincoln Holdings LLC dba Monumental Sports & Entertainment, Lincoln Holdings LLC dba Monumental Sports* Entertainment, Lincoln Holdings GP LLC, Lincoln Ballston LLC, Lincoln Hockey LLC, Lincoln Mystics LLC, Washington Sports & Entertainment Limited Partnership, Washington Sports & Entertainment, Inc., DC Arena L.P., DC Arena L.P. dba Capital One Arena, Washington Bullets, L.P., Centre Group Limited Partnership, Monumental Ticketing Limited Partnership, AP Tickets, Inc., Lincoln Hockey LLC dba Washington Capitals, Washington Bullets L.P. dba Washington Wizards, Monumental Sports & Entertainment Foundation, Washington Sports LLC, Washington Sports GP LLC, Monumental Sports Network LLC, Washington Capitals Enterprises Company, WAS Club LP GP LLC, WAS Club LP, Anacostia Sports LLC, Monumental RSN LLC, Monumental eSports LLC, Lincoln NBADL LLC, Lincoln NBA2K LLC, Lincoln NBADL LLC dba Capital City Co-Co, Lincoln NBA2K LLC dba Wizards District Gaming, Lincoln Productions, LLC and Lincoln St. E's, LLC and any subsidiary, and Lincoln Holdings LLC's interest in any partnership or joint venture in which Lincoln Holdings LLC has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured," including legal representatives.

627 North Glebe Road
Arlington, Virginia 22203-2144

## 2.   POLICY DATES

The term of this Policy is:

FROM: 01 August 2019 at 12:01 a.m., Standard Time;
TO:      01 August 2020 at 12:01 a.m., Standard Time,

at the **location** of property involved as provided in this Policy.

## 3.   INSURANCE PROVIDED

The coverage under this Policy applies to property described on the Schedule of Locations or covered under the terms and conditions of the AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY provisions, unless otherwise provided.

Schedule of Locations are as listed on the Schedule of Locations attached to this Policy.

**4.    PREMIUM**

This Policy is issued in consideration of an initial premium.

**5.    PREMIUM PAYABLE**

Lincoln Holdings LLC pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of Lincoln Holdings LLC.

**6.    LOSS ADJUSTMENT/PAYABLE**

Loss, if any, will be adjusted with and payable to Lincoln Holdings LLC, or as may be directed by Lincoln Holdings LLC.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.

U.S. Bank Association as Collateral Agent under the Security and Accounts Agreement dated May 24, 2018 with DC Arena L.P.

As respects the Medstar Capitals Iceplex at 627 North Glebe Road, Arlington, Virginia the following are named as additional named insureds as their interests may appear:

Arlington County, Virginia
Attn:  Director Department of Management & Finance
#1 Courthouse Plaza, 2100 Clarendon Boulevard, Suite 501
Arlington, Virginia

Industrial Development Authority of Arlington County, Virginia
#1 Courthouse Plaza, 2100 Clarendon Boulevard, Suite 501
Arlington, Virginia

The May Department Stores Company
Attn:  General Counsel
611 Olive Street
St. Louis, Missouri

When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance.  The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

7.    **TERRITORY**

Coverage as provided under this Policy applies in Canada, the United States of America and the Commonwealth of Puerto Rico.

As respects MISCELLANEOUS PROPERTY, coverage as provided under this Policy coverage applies worldwide except does not apply in:

Afghanistan; Albania; Algeria; Angola; Armenia; Azerbaijan; Bangladesh; Belarus; Belize; Benin; Bhutan; Bolivia; Bosnia and Herzegovina; Botswana; Burkina Faso; Burundi; Cambodia; Cameroon; Central African Republic; Chad; Cote D'Ivoire; Cuba; Democratic Republic of the Congo; Djibouti; Egypt; Equatorial Guinea; Eritrea; Ethiopia; Fiji; Gabon; Gambia; Georgia; Ghana; Grenada; Guatemala; Guinea; Guinea-Bissau; Guyana; Haiti; Honduras; Jammu and Kashmir in India; Iran; Iraq; Israel; Gaza Strip, West Bank and territories north of Latitude 32.80 N in Israel; Kenya; Laos; Lebanon; Lesotho; Liberia; Libya; Madagascar; Malawi; Mali; Mauritania; Mauritius; Moldova; Mongolia; Montenegro; Montserrat; Mozambique; Myanmar; Namibia; Nepal; Niger; Nigeria; North Korea; Pakistan; Papua New Guinea; Aksai Chin and Trans-Karakoram Tract in People's Republic of China; Republic of the Congo; Chechen Republic of the Russian Federation; Rwanda; Senegal; Seychelles; Sierra Leone; Somalia; Sri Lanka; South Sudan; Sudan; Swaziland; Syria; Tajikistan; Tanzania; Timor-Leste; Togo; Tunisia; Agri, Batman, Bingol, Bitlis, Diyarbakir, Elazig, Hakkari, Igdir, Mardin, Mus, Sanliurfa, Siirt, Sirnak and Van in Turkey; Turkmenistan; Uganda; Ukraine; Crimea Region of Ukraine; Uzbekistan; Venezuela; Yemen; Zambia; and Zimbabwe.

8.    **JURISDICTION**

This Policy will be governed by the laws of the United States of America.

Any disputes arising hereunder will be exclusively subject to the jurisdiction of the United States of America.

9.    **CURRENCY**

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Organization for Standardization (ISO) 4217, edition in effect at the inception of this Policy.

10.   **LIMITS OF LIABILITY**

The Company's maximum limit of liability in an **occurrence**, including any insured TIME ELEMENT loss, will not exceed the Policy limit of liability of USD 1,000,000,000 subject to the following provisions:

A.    Limits of liability and time limits stated below or elsewhere in this Policy are part of, and not in addition to, the Policy limit of liability.

B.    Limits of liability apply per **occurrence**, unless otherwise stated.

C.  Limits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

1) when a limit of liability applies as an **annual aggregate**, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

2) when a limit of liability applies to a **location** or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all **locations** arising from physical loss or damage at such **location** or to such other specified property.

D.  Should an **occurrence** result in liability payable under more than one policy issued to the Named Insured by the Company, or its **representative company(ies)**, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy.

Applicable Limits of Liability/Time Limits:

| | |
|---|---|
| ATTRACTION PROPERTY | 30 days |
| AUTOMATIC COVERAGE | 90 days, not to exceed USD 10,000,000 per **location** |
| CIVIL OR MILITARY AUTHORITY | 30 days |
| CLAIMS PREPARATION COSTS | USD 50,000 |
| COMMUNICABLE DISEASE RESPONSE | USD 1,000,000 **annual aggregate**<br><br>The Company's maximum limit of liability for INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD 1,000,000 **annual aggregate**. |
| CONTINGENT TIME ELEMENT EXTENDED | USD 25,000,000 |
| CRISIS MANAGEMENT | 30 days |

| | |
|---|---|
| **cyber event** | 1. USD 1,000,000 **annual aggregate** for DATA RESTORATION and OWNED NETWORK INTERRUPTION combined<br><br>2. USD 1,000,000 **annual aggregate** for DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined<br><br>3. USD 25,000,000 **annual aggregate** for physical loss or damage to stock in process or finished goods manufactured by or for the Insured caused by or resulting from a **cyber event** that impacts the processing, manufacturing, or testing of such property or while it is otherwise being worked on |
| DATA RESTORATION | USD 10,000,000 **annual aggregate** |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined | USD 5,000,000 **annual aggregate** |
| **earth movement** | USD 250,000,000 **annual aggregate** |
| ERRORS AND OMISSIONS | USD 100,000,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD 100,000,000 |
| EXTENDED PERIOD OF LIABILITY | 90 days, not to exceed USD 10,000,000 |
| **fine arts** | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable fine arts** not on a schedule on file with the Company |
| fines or penalties for breach of contract or for late or noncompletion of orders combined | USD 100,000 |
| **flood** | USD 250,000,000 |
| GROSS PROFIT | 12 months, not to exceed 365 days for Ordinary Payroll |

| INGRESS/EGRESS | 30 days |
|---|---|
| INTERRUPTION BY COMMUNICABLE DISEASE | 365 days, not to exceed USD 1,000,000 **annual aggregate**<br><br>The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD 1,000,000 **annual aggregate**. |
| LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL | USD 50,000 **annual aggregate** |
| LOGISTICS EXTRA COST | 180 days, not to exceed 200% of the **normal cost** |
| MISCELLANEOUS PROPERTY | 1.  USD 10,000,000 per **location** for property at a **location**<br><br>2.  USD 10,000,000 for property not at a **location** |
| Ordinary Payroll | 365 days |
| SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined | USD 25,000,000 |
| TERRORISM | USD 5,000,000 **annual aggregate**, not to exceed the following:<br><br>1.  USD 5,000,000 **annual aggregate** for AUTOMATIC COVERAGE, ERRORS AND OMISSIONS, MISCELLANEOUS PROPERTY and TEMPORARY REMOVAL OF PROPERTY combined<br><br>2.  USD 5,000,000 **annual aggregate** for **flood** when caused by or resulting from **terrorism**<br><br>The limits for TERRORISM shall not include the **actual cash value** portion of fire damage caused by **terrorism**.<br><br>The limits for TERRORISM do not apply to the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S). |

| valuable papers and records | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable valuable papers and records** not on a schedule on file with the Company |
| --- | --- |

## 11.  DEDUCTIBLES

Subject to the deductible general provisions stated below, in each case of loss covered by this Policy the following deductibles apply per **occurrence**, for all coverages involved, unless otherwise stated:

| cyber event | USD 250,000 for DATA RESTORATION and OWNED NETWORK INTERRUPTION |
| --- | --- |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT | USD 250,000 |
| **flood** | USD 50,000 per **location** |
| LOGISTICS EXTRA COST | USD 25,000 |
| All Other Loss | USD 25,000 |

Deductible General Provisions:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified above, and only for its share of that greater amount.

A.  For SERVICE INTERRUPTION loss, when a deductible is not specifically stated as applying to SERVICE INTERRUPTION, the deductible applied to the SERVICE INTERRUPTION loss will be the deductible that would apply if the cause of the interruption happened at the insured **location** that sustains the interruption of the specified services.

B.  For CONTINGENT TIME ELEMENT EXTENDED loss, when a deductible is not specifically stated as applying to CONTINGENT TIME ELEMENT EXTENDED, the deductible for CONTINGENT TIME ELEMENT EXTENDED loss will be determined as though the **contingent time element location** was an insured **location** under this Policy.

C.  The stated earthquake deductible will be applied to earthquake loss.  The stated **flood** deductible will be applied to **flood** loss.  The stated **wind** deductible will be applied to **wind** loss.  The provisions of item E below will also be applied to each.

D.  When this Policy insures more than one **location**, the deductible will apply against the total loss covered by this Policy in an **occurrence** except that a deductible that applies on a per **location** basis, if specified, will apply separately to each **location** where the physical damage happened regardless of the number of **locations** involved in the **occurrence**.

E.  Unless stated otherwise, if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable.  For the purposes of this provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible.  If two or more deductibles apply on a per **location** basis in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**.

F.  When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:

Property Damage – % of the value, per the Valuation clause(s) of the PROPERTY DAMAGE section, of the property insured at the **location** where the physical damage happened.

Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.

G.  For insured physical loss or damage:

1)  to insured fire protection equipment; or

2)  from water or other substance discharged from fire protection equipment of the type insured,

the applicable deductible applying to items 1 or 2 above only will be reduced by fifty percent (50%), per **occurrence**.  However, this provision will not apply to loss or damage resulting from fire or **earth movement** regardless of whether claim is made for such fire or **earth movement**.

# PROPERTY DAMAGE

### 1.    INSURED PROPERTY

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, to the extent of the interest of the Insured in such property:

A.    Real Property, including new buildings and additions under construction, in which the Insured has an insurable interest.

B.    Personal Property:

    1)    owned by the Insured.

    2)    consisting of the Insured's interest as a tenant in improvements and betterments.  In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

    3)    of officers and employees of the Insured.

    4)    of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

    5)    of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to Personal Property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an insured **location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

### 2.    EXCLUDED PROPERTY

The following exclusions apply unless otherwise stated in this Policy:

This Policy excludes:

A.    currency, money, notes or securities.

B.    precious metal in bullion form.

C.    land and any substance in or on land.  However, this exclusion does not apply to:

    1)   landscape gardening.

    2)   car parks, parking lots, pavement, roadways, railways, transformer enclosures or walkways.

    3)   fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures.

D.    water.  However, this exclusion does not apply to:

    1)   water that is contained within any enclosed tank, piping system or any other processing equipment.

E.    animals, standing timber or growing crops.

F.    watercraft or aircraft, except when unfueled and manufactured by the Insured.

G.    vehicles of officers or employees of the Insured or vehicles otherwise insured for physical loss or damage.

H.    underground mines or mine shafts or any property within such mine or shaft.

I.    dams or dikes.

J.    property in transit, except as otherwise provided by this Policy.

K.    property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the INSTALLMENT OR DEFERRED PAYMENTS coverage of this Policy.

L.    electronic data, programs or software, except when incorporated into physical goods intended to be sold as:

    1)   finished goods manufactured by the Insured; or

    2)   other merchandise not manufactured by the Insured,

or as otherwise provided by the DATA RESTORATION coverage of this Policy.

**3.    EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

A.    This Policy excludes:

    1)   indirect or remote loss or damage.

2)   interruption of business, except to the extent provided by this Policy.

3)   loss of market or loss of use.

4)   loss or damage or deterioration arising from any delay.

5)   mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6)   loss from enforcement of any law or ordinance:

    a)   regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

    b)   requiring the demolition of any property, including the cost in removing its debris;

except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy.

7)   loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

B.   This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   nuclear reaction or nuclear radiation or radioactive contamination.  However:

    a)   if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

    b)   this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured **location**.  This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

This exclusion B1 and the exceptions in B1a and B1b do not apply to any act, loss or damage which also comes within the terms of exclusion B2b of this EXCLUSIONS clause.

2)   a)   hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

    (i)   government or sovereign power (de jure or de facto);

**18**

(ii)  military, naval or air force; or

(iii) agent or authority of any party specified in i or ii above.

b)  discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

c)  insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d)  seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e)  risks of contraband, or illegal transportation or trade.

f)  **terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the TERRORISM coverage of the Policy.  However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to property insured.  This coverage exception for such resulting fire loss or damage does not apply to:

(i)  direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

(ii)  any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided in this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2b of this EXCLUSIONS clause then item B2b applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2c of this EXCLUSIONS clause then item B2c applies in place of this item B2f exclusion.

If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

3) any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

   a) by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

   b) by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

   This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured.  This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause.  In no event does this Policy cover loss by theft by any individual specified in a or b above.

4) lack of the following services:

   a) incoming electricity, fuel, water, gas, steam or refrigerant;

   b) outgoing sewerage;

   c) incoming or outgoing voice, data or video,

   all when caused by an event off the insured **location**, except as provided in the DATA SERVICE PROVIDER and SERVICE INTERRUPTION coverages of this Policy.  But, if the lack of such a service directly causes insured physical damage on the insured **location**, then only that resulting damage is insured.

C.  This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1) faulty workmanship, material, construction or design from any cause.

2) loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3) deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

4) settling, cracking, shrinking, bulging, or expansion of:

   a) foundations (including any pedestal, pad, platform or other property supporting machinery).

      b)  floors.

      c)  pavements.

      d)  walls.

      e)  ceilings.

      f)  roofs.

5)  a)  changes of temperature damage (except to machinery or equipment); or

      b)  changes in relative humidity damage,

      all whether atmospheric or not.

6)  insect, animal or vermin damage.

7)  loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

D.   This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)  **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

2)  shrinkage.

3)  changes in color, flavor, texture or finish.

## 4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows.

A.   This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

B.   Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage.  This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such covered resulting physical loss or damage does not include any loss, cost or expense described in A or B above.  If such covered resulting physical loss or damage happens, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.

## 5.   VALUATION

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the place of the loss, and for no more than the interest of the Insured.

Unless stated otherwise in an Additional Coverage, adjustment of physical loss to property will be subject to the following:

A.   On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B.   On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.   On raw materials, supplies or other merchandise not manufactured by the Insured:

1)   if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

2)   if not repaired or replaced, the **actual cash value**.

D.   On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation.  These costs will not include research, engineering or any costs of restoring or recreating lost information.

E.   On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy and shall be subject to the limit(s) of liability for TERRORISM, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

F.   On all other property, the lesser of the following:

1)   The cost to repair.

2)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)   The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)   The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)   The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)   The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

7)   The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)   The **actual cash value** if such property is:

     a)   useless to the Insured; or

     b)   not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured **location** under this Policy.  This item does not extend to LAW AND ORDINANCE.

23

6.    **ADDITIONAL COVERAGES**

This Policy includes the following Additional Coverages for insured physical loss or damage.

These Additional Coverages:

1)    are subject to the applicable limit of liability;

2)    will not increase the Policy limit of liability; and

3)    are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## CYBER ADDITIONAL COVERAGES

### A.    DATA RESTORATION

This Policy covers insured **physical loss or damage to electronic data, programs or software**.

With respect to **physical loss or damage to electronic data, programs or software** caused by or resulting from a **cyber event**, this Additional Coverage will apply when the time to recreate or restore such data, programs or software with due diligence and dispatch is in excess of 48 hours.

For the purposes of this Additional Coverage, insured data, programs or software can be anywhere worldwide, including while in transit, except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

This Additional Coverage also covers:

1)    the cost of the following reasonable and necessary actions taken by the Insured provided such actions are taken due to actual insured **physical loss or damage to electronic data, programs or software**:

   a)    actions to temporarily protect and preserve insured electronic data, programs or software.

   b)    actions taken for the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   c)    actions taken to expedite the permanent repair or replacement of such damaged property.

2)   the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**.  In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when incorporated into physical goods intended to be sold as:

1)   finished goods manufactured by the Insured; or

2)   other merchandise not manufactured by the Insured.

DATA RESTORATION Exclusions: As respects DATA RESTORATION, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, B1, B2, B3a and B4.

2)   the following additional exclusions apply:

This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

a)   errors or omissions in processing or copying.

b)   loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

c)   deterioration, inherent vice, vermin or wear and tear.

DATA RESTORATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1)   the cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2)   if not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

B. **DATA SERVICE PROVIDER PROPERTY DAMAGE**

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Additional Coverage:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Additional Coverage will apply when the period of interruption of **off-premises data processing or data transmission services** as described below is in excess of 24 hours.

The period of interruption of **off-premises data processing or data transmission services** is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

DATA SERVICE PROVIDER PROPERTY DAMAGE Exclusions: As respects DATA SERVICE PROVIDER PROPERTY DAMAGE, the following applies:

1) Items B4 and C5 of the EXCLUSIONS clause in this section do not apply except for B4 with respect to:

   a) incoming electricity, fuel, water, gas, steam or refrigerant; and

   b) outgoing sewerage.

2)   The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b)   **terrorism**.

## OTHER ADDITIONAL COVERAGES

## A.   ACCIDENTAL INTERRUPTION OF SERVICES

This Policy covers physical damage resulting from changes in temperature or relative humidity to insured property at an insured **location** when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at the insured **location**.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

## B.   ACCOUNTS RECEIVABLE

This Policy covers the following directly resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit:

1)   any shortage in the collection of accounts receivable.

2)   the interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum.  Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

3)   the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.

4)   any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

Accounts receivable records will include accounts receivable records stored as electronic data.

In the event of loss, the Insured will:

1) use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2) reduce loss by use of any suitable property or service:

    a) owned or controlled by the Insured; or

    b) obtainable from other sources.

3) reconstruct, if possible, accounts receivable records so that no shortage is sustained.

The settlement of loss will be made within 90 days from the date of physical loss or damage. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company. All recoveries exceeding the amount paid will belong to the Insured.

ACCOUNTS RECEIVABLE Exclusions: As respects ACCOUNTS RECEIVABLE, the following additional exclusions apply:

This Policy does not insure against shortage resulting from:

1) bookkeeping, accounting or billing errors or omissions; or

2) a) alteration, falsification, manipulation; or

    b) concealment, destruction or disposal,

of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

## C. AUTOMATIC COVERAGE

This Policy covers insured physical loss or damage to insured property at any **location** purchased, leased or rented by the Insured after the inception date of this Policy.

This Additional Coverage applies:

1) from the date of purchase, lease or rental,

2) until the first of the following:

    a) the **location** is bound by the Company.

b) agreement is reached that the **location** will not be insured under this Policy.

c) the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The time limit begins on the date of purchase, lease or rental.

## D.  BRANDS AND LABELS

If branded or labeled insured property is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

1) stamp "salvage" on the property or its containers; or

2) remove or obliterate the brands or labels,

if doing so will not damage the property.

The Insured must relabel such property or its containers to be in compliance with any applicable law.

## E.  CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1) of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2) the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1) attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2) loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.

F.    **COMMUNICABLE DISEASE RESPONSE**

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)   an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)   a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1)   cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2)   actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions: As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)   **terrorism**.

G.    **CONSEQUENTIAL REDUCTION IN VALUE**

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from insured physical loss or damage to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

### H.   CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by the Insured as follows:

1) the Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2) the Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3) property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4) any salvage proceeds received will go to the:

   a)  Company at the time of loss settlement; or

   b)  Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

### I.   DEBRIS REMOVAL

This Policy covers the reasonable and necessary costs incurred to remove debris from an insured **location** that remains as a direct result of insured physical loss or damage.

This Additional Coverage does not cover the costs of removal of:

1) contaminated uninsured property; or

2) the **contaminant** in or on uninsured property,

whether or not the **contamination** results from insured physical loss or damage.  This Additional Coverage covers the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

### J.   DECONTAMINATION COSTS

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.

The Company is not liable for the costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** results from an insured event.

## K.   ERRORS AND OMISSIONS

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1) in the description of where insured property is physically located;

2) to include any **location**:

   a) owned, leased or rented by the Insured on the effective date of this Policy; or

   b) purchased, leased or rented by the Insured during the term of this Policy; or

3) that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## L.   EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1) for the temporary repair of insured physical damage to insured property;

2) for the temporary replacement of insured equipment suffering insured physical damage; and

3) to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.

### M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to **fine arts** and **valuable papers and records** while anywhere within this Policy's TERRITORY, including while in transit.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Exclusions: As respects FINE ARTS AND VALUABLE PAPERS AND RECORDS, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, A7, B1, B2, B3a and B4.

2) the following additional exclusions apply:

This Policy excludes:

a) currency, money, securities.

b) errors or omissions in processing or copying of **valuable papers and records**, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

c) deterioration, inherent vice, or wear and tear, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

d) fungus, mold or mildew unless directly resulting from other physical damage not excluded by this Policy.

e) loss or damage to **fine arts** from any repairing, restoration or retouching process.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1) the cost to repair or restore such property to the physical condition that existed on the date of loss.

2) the cost to replace.

3) the value, if any, designated for the item on the schedule on file with the Company.

If a **fine arts** article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.

**N.     INSTALLMENT OR DEFERRED PAYMENTS**

This Policy covers insured physical loss or damage to personal property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)   pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)   from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

3)   to the extent the buyer continues payments.

4)   not within the TERRITORY of this Policy.

INSTALLMENT OR DEFERRED PAYMENTS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)   total amount of unpaid installments less finance charges.

2)   **actual cash value** of the property at the time of loss.

3)   cost to repair or replace with material of like size, kind and quality.

**O.     LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL**

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of the actual not suspected presence of **contaminant(s)** from uninsured property consisting of land, water or any other substance in or on land at the insured **location** if the release, discharge or dispersal of such **contaminant(s)** is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of **contamination** from such property:

1)   at any **location** insured for Personal Property only.

2)   at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY coverage provided by this Policy.

3)   when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

## P.   LAW AND ORDINANCE

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

1)   such law or ordinance is enforced as a direct result of insured physical loss or damage at an insured **location**;

2)   such law or ordinance is in force at the time of such loss or damage; and

3)   such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

1)   demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

2)   repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

The Company's maximum liability for this Coverage A at each insured **location** in any **occurrence** will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

1)   the reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

2)   the cost to rebuild on the same site.

Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

LAW AND ORDINANCE Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced, the loss amount will be the difference between:

1) the **actual cash value**; and

2) the cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

LAW AND ORDINANCE Exclusions: As respects LAW AND ORDINANCE, the following additional exclusions apply:

This Policy does not cover:

1) any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

2) any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

## Q.   LOSS PAYMENT INCREASED TAX LIABILITY

This Policy covers the increase in tax liability as described herein incurred by the Insured.

Coverage A:

The increase in tax liability from an insured loss at an insured **location** if the tax treatment of:

1) the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or

2) the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss happened.

## R.   MACHINERY OR EQUIPMENT STARTUP OPTION

After insured machinery or equipment that has sustained insured physical loss or damage is repaired or replaced and such machinery or equipment is undergoing startup, the following applies:

If physical loss or damage of the type insured directly results to such machinery or equipment from such startup, the Insured shall have the option of claiming such resulting insured damage as part of the original event of physical loss or damage or as a separate **occurrence**.

This Additional Coverage applies only:

1) to the first startup event after the original repair or replacement; and

2) when the first startup event happens during the term of this Policy or its renewal issued by the Company.

For the purposes of this Additional Coverage, startup means:

1) the introduction into machinery or equipment of feedstock or other materials for processing or handling;

2) the commencement of fuel or energy supply to machinery or equipment.

**S.      MISCELLANEOUS PROPERTY**

This Policy covers insured physical loss or damage to:

1) insured property;

2) property of the type insured that is under contract to be used in a construction project at an insured **location**:

   a) from the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier;

   b) while such property is located at a storage site; and

   c) while such property is in transit from a storage site to another storage site or to a construction project at an insured **location**,

that does not include any such property owned or rented by the contractor;

while anywhere within this Policy's TERRITORY, including while in transit.

This Additional Coverage excludes property covered elsewhere in this Policy.

MISCELLANEOUS PROPERTY Exclusions: As respects MISCELLANEOUS PROPERTY, the following additional exclusions apply:

1) This Policy excludes:

   a) **transmission and distribution systems** not at a **location**.

   b) property insured under import or export ocean marine insurance.

   c) property shipped between continents.

    d)  airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

    e)  property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

2)  This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

    a)  **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

## T.   OPERATIONAL TESTING

This Policy covers insured physical loss or damage to insured property during the **period of operational testing**.

This Additional Coverage excludes property, including stock or material, manufactured or processed by the Insured.

## U.   PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:

1)  reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2)  reasonable and necessary:

    a)  fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

    b)  costs incurred of restoring and recharging fire protection systems following an insured loss.

    c)  costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in this section of the Policy.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## V.   SERVICE INTERRUPTION PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION PROPERTY DAMAGE Exclusions: As respects SERVICE INTERRUPTION PROPERTY DAMAGE, the following applies:

1) The exclusions in the EXCLUSIONS clause in this section do not apply except for:

   a)  A1, A2, A3, A6, B1, B2, and

   b)  B4 with respect to incoming or outgoing voice, data or video, and

   c)  D1 except with respect to fungus, mold or mildew.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a)  **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b)  **terrorism**.

## W.    TEMPORARY REMOVAL OF PROPERTY

When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

1)    while at the premises to which such property has been moved; and

2)    for physical loss or damage as provided at the insured **location** from which such property was removed.

This Additional Coverage does not apply to property:

1)    insured, in whole or in part, elsewhere in this Policy.

2)    insured, in whole or in part, by any other insurance policy.

3)    removed for normal storage, processing or preparation for sale or delivery.

## X.    TERRORISM

This Policy covers physical loss or damage to property as described in the INSURANCE PROVIDED provision caused by or resulting from **terrorism**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage does not cover loss or damage which also comes within the terms of either item B2a or B2c of the EXCLUSIONS clause in this section of the Policy.

This Additional Coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

1)    that involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, or radioactive force, whether in time of peace or war and regardless of who commits the act; or

2)    that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3)   in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

4)   that involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## Y.   TRANSPORTATION

This Policy covers the following personal property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

1)   owned by the Insured.

2)   shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

3)   of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

4)   of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

a)   when shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer.

b)   when shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer.

Coverage Attachment and Duration:

1)   This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.

2)   However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

This Additional Coverage:

1)   covers general average and salvage charges on shipments covered while waterborne.

2)   insures physical loss or damage caused by or resulting from:

a)   unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

b)   improper parties having gained possession of property through fraud or deceit.

Additional General Provisions:

1) This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

2) The Insured has permission, without prejudicing this insurance, to accept:

    a) ordinary bills of lading used by carriers;

    b) released bills of lading;

    c) undervalued bills of lading; and

    d) shipping or messenger receipts.

3) The Insured may waive subrogation against railroads under side track agreements.

Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

TRANSPORTATION Exclusions: As respects TRANSPORTATION, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1 through A4, B1 through B4, C1, C3, C5, C6, D1 through D3.

2) the following additional exclusions apply:

This Policy excludes:

    a) samples in the custody of salespeople or selling agents.

    b) property insured under import or export ocean marine insurance.

    c) waterborne shipments, unless:

        (i) by inland water; or

        (ii) by coastal shipments.

    d) waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

    e) airborne shipments unless by regularly scheduled passenger airlines, air freight carriers or NBA, WNBA, NHL, NBA G-League, NBA 2K League, Washington Valor or Baltimore Brigade chartered flights that transport basketball, football, gaming, and hockey uniforms, equipment and supplies for the Washington Wizards, Washington Mystics, Washington Capitals, Washington Valor, Baltimore Brigade, Capital City Go-Go or Wizards Gaming District.

f) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

g) any transporting vehicle.

TRANSPORTATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1) Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured.  Included in the value are accrued costs and charges legally due.  Charges may include the Insured's commission as selling agent.

2) Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount.  Prepaid or advanced freight costs are included.

3) Property not under invoice will be valued:

a) for property of the Insured, at the valuation provisions of this Policy applying at the place from which the property is being transported; or

b) for other property, at the actual cash market value at the destination point on the date of loss,

less any charges saved which would have become due and payable upon arrival at destination.

## TIME ELEMENT

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS of this section of the Policy:

A.      is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION; and

B.      will not increase the Policy limit of liability; and

C.      is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## 1.      LOSS INSURED

A.      This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:

    1)      to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

    2)      used by the Insured, or for which the Insured has contracted use;

    3)      while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or

    4)      while in transit as provided by this Policy, and

    5)      during the Periods of Liability described in this section,

provided such loss or damage is not at a **contingent time element location**.

B.      This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

    1)      the use of any property or service owned or controlled by the Insured;

    2)      the use of any property or service obtainable from other sources;

    3)      working extra time or overtime; or

    4)      the use of inventory,

all whether at an insured **location** or at any other premises. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.

C. This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D. In determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY. The probable experience will consider any increase or decrease in demand for the Insured's goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused physical loss or damage starting the PERIOD OF LIABILITY.

## 2. TIME ELEMENT COVERAGES

### A. INSURED OPTION

The Insured has the option to make claim based on either

a) GROSS EARNINGS and EXTENDED PERIOD OF LIABILITY; or

b) GROSS PROFIT,

as described in the TIME ELEMENT section of this Policy and subject to the applicable terms and conditions as may be shown elsewhere.

Such option may be exercised at any time prior to the conditions set forth in the SETTLEMENT OF CLAIMS clause in the LOSS ADJUSTMENT AND SETTLEMENT section of this Policy.

If such claim involves more than one insured **location**, including interdependency at one or more insured **locations**, such claim will be adjusted by using the single coverage option chosen above.

### B. GROSS EARNINGS

Measurement of Loss:

1) The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a) Gross Earnings;

b) less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

c) less ordinary payroll; and

d) plus all other earnings derived from the operation of the business.

e) Ordinary Payroll, including taxes and charges dependent on the payment of wages:

   (i) for a period of time of not more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section immediately following the interruption of production or suspension of business operations or services, and

   (ii) only to the extent such payroll continues following the loss and would have been earned had no such interruption happened.

   However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

   (i) providing gainful employment for, or

   (ii) paying less than the normal salary rate to,

   all or part of its employees, then the number of consecutive days of Ordinary Payroll may be extended.  However, this provision will not increase the total liability of this Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision. Ordinary Payroll does not cover any portion of salaries or wages included in Gross Earnings.

2) For the purposes of the Measurement of Loss, Gross Earnings is:

   for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

   for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

   Any amount recovered under property damage coverage at selling price will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

3) In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

4) If the Insured would have operated at a deficit had no interruption of production or suspension of business operations or services happened, the following applies:

   a) for Gross Earnings, the extent to which charges and expenses would have been earned will be determined by subtracting the operating deficits from the charges and expenses that necessarily continue.

b) for Ordinary Payroll, the extent payroll would have been earned will be determined by subtracting the excess, if any, of the operating deficit over the fixed charges that need to continue from such payroll.

5) There is recovery hereunder to the extent that the Insured is:

a) wholly or partially prevented from producing goods or continuing business operations or services;

b) unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

c) unable to continue such operations or services during the PERIOD OF LIABILITY; and

d) able to demonstrate a loss of sales for the operations, services or production prevented.

## C.   GROSS PROFIT

Measurement of Loss:

1) The recoverable GROSS PROFIT loss is the Actual Loss Sustained by the Insured of the following due to the necessary interruption of business during the PERIOD OF LIABILITY: a) Reduction in Sales, b) Ordinary Payroll and c) Increase in Cost of Doing Business.  The amount payable as indemnity hereunder will be:

a) with respect to Reduction in Sales: The sum produced by applying the Rate of Gross Profit to the amount by which the sales during the PERIOD OF LIABILITY will fall short of the Standard Sales.  In determining the Reduction in Sales, any amount recovered under property damage coverage at selling price will be credited against lost sales.

b) Ordinary Payroll, including taxes and charges dependent on the payment of wages, during the PERIOD OF LIABILITY only to the extent such payroll would have been earned had such loss not happened.

However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

(i)  providing gainful employment for, or

(ii)  paying less than the normal salary rate to,

all or part of its employees, the number of consecutive days of Ordinary Payroll may be extended. This provision will not increase the total liability of this Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision.  Ordinary Payroll does not cover any portion of salaries or wages included in Net Profit or fixed charges.

    c)  with respect to Increase in Cost of Doing Business:

       (i)  the additional expenditure necessarily and reasonably incurred for the sole purpose of avoiding or diminishing the reduction in sales and a loss of Ordinary Payroll which, but for that expenditure, would have taken place during the PERIOD OF LIABILITY; but

      (ii)  not exceeding the sum produced by applying the Rate of Gross Profit to the amount of the reduction thereby avoided,

all less any sum saved during the PERIOD OF LIABILITY with respect to such of the Insured Fixed Charges as may cease or be reduced because of such interruption of business.

2)  For the purposes of the Measurement of Loss:

Gross Profit is:

The amount produced by adding to the Net Profit the amount of the Insured Fixed Charges, or if there be no Net Profit the amount of the Insured Fixed Charges less that proportion of any loss from business operations as the amount of the Insured Fixed Charges bears to all fixed charges.

Net Profit is:

The net operating profit (exclusive of all capital receipts and accruals and all outlay properly chargeable to capital) resulting from the business of the Insured at the insured **locations** after due provision has been made for all fixed charges and other expenses including depreciation but before the deduction of any taxes on profits.

Insured Fixed Charges is:

All fixed charges unless specifically excluded herein.  Ordinary Payroll is not an Insured Fixed Charge.

Sales is:

The money paid or payable to the Insured for goods sold and delivered and for services rendered in the conduct of the business at an insured **location**.

Rate of Gross Profit is:

The rate of Gross Profit earned on the sales during the twelve full calendar months immediately before the date of the physical loss or damage to the described property.

Standard Sales is:

The sales during that period in the twelve months immediately before the date of the physical loss or damage to the described property which corresponds with the PERIOD OF LIABILITY.

3) In determining the indemnity payable as the Actual Loss Sustained:

    a) if any fixed charges of the business are not insured hereunder, then, in computing the amount recoverable hereunder as Increase in Cost of Doing Business, that proportion only of the additional expenditure will be recoverable hereunder which the sum of the Net Profit and the Insured Fixed Charges bears to the sum of the Net Profit and all the fixed charges excluding Ordinary Payroll.

    b) if during the PERIOD OF LIABILITY goods will be sold or services will be rendered elsewhere than at the insured **locations** for the benefit of the business, either by the Insured or by others on the Insured's behalf, the money paid or payable in respect of such sales or services will be included in arriving at the amount of sales during the PERIOD OF LIABILITY.

4) The Insured will act with due diligence and dispatch in repairing or replacing physically damaged buildings and equipment to the same or equivalent physical and operating conditions that existed prior to the damage; and take whatever actions are necessary and reasonable to minimize the loss payable hereunder.

GROSS PROFIT Exclusions: As respects GROSS PROFIT, the TIME ELEMENT EXCLUSIONS B and C of this section do not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under GROSS PROFIT for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the PERIOD OF LIABILITY.

## D. EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1) extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2) extra costs of temporarily using property or facilities of the Insured or others; and

3)  costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the INSURED OPTION clause, the PERIOD OF LIABILITY for EXTRA EXPENSE coverage will be the PERIOD OF LIABILITY applicable to the Time Element coverage option selected.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1)  TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)  The following additional exclusions apply:

This Policy does not insure:

a)  any loss of income.

b)  costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c)  costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

d)  any expense recoverable elsewhere in this Policy.

## E.   LEASEHOLD INTEREST

Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

1)  If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

2)  If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

3)  As used above, the following terms mean:

Net Lease Interest:
That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

Lease Interest:
The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, the following applies:

1) This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

2) TIME ELEMENT EXCLUSIONS A, B and C do not apply and the following applies instead:

   This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

## F.   RENTAL INSURANCE

Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

1) the fair rental value of any portion of the property occupied by the Insured;

2) the income reasonably expected from rentals of unoccupied or unrented portions of such property; and

3) the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.

RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

**3.   PERIOD OF LIABILITY**

A.   The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except GROSS PROFIT and LEASEHOLD INTEREST and as shown below or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

   1)   For building and equipment, the period:

      a)   starting from the time of physical loss or damage of the type insured; and

      b)   ending when with due diligence and dispatch the building and equipment could be:

         (i)   repaired or replaced; and

         (ii)  made ready for operations,

         under the same or equivalent physical and operating conditions that existed prior to the damage.

      c)   not to be limited by the expiration of this Policy.

   2)   For building and equipment under construction:

      a)   the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

      b)   due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

   3)   For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

      a)   to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

      b)   to replace physically damaged mercantile stock.

      This item does not apply to RENTAL INSURANCE.

   4)   For raw materials and supplies, the period of time:

      a)   of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

      b) limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5) If water:

      a) used for any manufacturing purpose, including but not limited to as a raw material or for power;

      b) stored behind dams or in reservoirs; and

      c) on any insured **location**,

is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6) For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation.  This time does not include research, engineering or any other time necessary to restore or recreate lost information.

This item does not apply to RENTAL INSURANCE.

7) For physically damaged or destroyed property covered under DATA RESTORATION, the period:

      a) starting from the time of **physical loss or damage to electronic data, programs or software**; and

      b) ending when with due diligence and dispatch the electronic data, programs or software could have been recreated or restored under the same or equivalent physical and operating conditions that existed prior to the physical loss or damage.

This item does not apply to RENTAL INSURANCE.

B. The PERIOD OF LIABILITY applying to GROSS PROFIT is as follows:

1) The period:

      a) starting from the time of physical loss or damage of the type insured; and

      b) ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

    c)   not to be limited by the expiration of this Policy.

  2)   For property under construction, the period:

    a)   starting on the date that production, business operation or service would have commenced if physical damage of the type insured had not happened; and

    b)   ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

    c)   not to be limited by the expiration of this Policy.

The Rate of Gross Profit and Standard Sales will be based on the experience of the business after construction is completed and the probable experience during the PERIOD OF LIABILITY.

C.   The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

  1)   making changes to the buildings, structures, machinery or equipment except as provided in the LAW AND ORDINANCE clause in the PROPERTY DAMAGE section.

  2)   restaffing or retraining employees.  However, this item does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is completed within 90 consecutive days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative.

## 4.   TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure:

A.   Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

  1)   physical loss or damage not insured by this Policy on or off of the insured **location**.

    2)  planned or rescheduled shutdown.

    3)  strikes or other work stoppage.

    4)  any other reason other than physical loss or damage insured under this Policy.

B.  Any increase in loss due to:

    1)  suspension, cancellation or lapse of any lease, contract, license or orders.

    2)  damages for breach of contract or for late or noncompletion of orders.

    3)  fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

    4)  any other consequential or remote loss.

C.  Any loss resulting from physical loss or damage to finished goods manufactured by the Insured, or the time required for their reproduction.

D.  Any loss resulting from the **actual cash value** portion of direct physical loss or damage by fire caused by or resulting from **terrorism**.

## 5.   TIME ELEMENT COVERAGE EXTENSIONS

This Policy also insures TIME ELEMENT loss, as provided by the TIME ELEMENT COVERAGES of this Policy, for the TIME ELEMENT COVERAGE EXTENSIONS described below.

### CYBER TIME ELEMENT COVERAGE EXTENSIONS

### A.   DATA SERVICE PROVIDER TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption at an insured **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Extension:

    1)  facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

    2)  an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Extension will apply when the period of interruption of **off-premises data processing or data transmission services** is in excess of 24 hours.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured covered by OWNED NETWORK INTERRUPTION coverage as provided in this section of the Policy.

DATA SERVICE PROVIDER TIME ELEMENT Exclusions: As respects DATA SERVICE PROVIDER TIME ELEMENT, the following applies:

1) Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

   a) incoming electricity, fuel, water, gas, steam or refrigerant; and

   b) outgoing sewerage.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b) **terrorism**.

As used above, the period of interruption of **off-premises data processing or data transmission services**:

1) is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2)   is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3)   does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## B.   OWNED NETWORK INTERRUPTION

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption directly resulting from:

1)   the failure of the Insured's **electronic data processing equipment or media** to operate, provided that such failure is the direct result of a **cyber event** directed at the NAMED INSURED; or

2)   the Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending **cyber event** directed at the NAMED INSURED, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

For the purposes of this Extension, the Insured's **electronic data processing equipment or media** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

As respects item 1 above, this Extension will apply when the period of interruption is in excess of 48 hours.

As used above, the period of interruption:

1)   is the period starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure.

2)   does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS

## A.   CIVIL OR MILITARY AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

## B.  CONTINGENT TIME ELEMENT EXTENDED

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1) Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:

   CIVIL OR MILITARY AUTHORITY
   CONTINGENT TIME ELEMENT EXTENDED
   DATA SERVICE PROVIDER TIME ELEMENT
   DELAY IN STARTUP
   EXTENDED PERIOD OF LIABILITY
   INGRESS/EGRESS
   ON PREMISES SERVICES
   SERVICE INTERRUPTION TIME ELEMENT

2) The Insured will influence and cooperate with the **contingent time element location** in every way and take any reasonable and necessary action to mitigate the loss payable hereunder.

3) TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions: As respects CONTINGENT TIME ELEMENT EXTENDED, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) lack of incoming or outgoing transmission of voice, data or video.

2) **earth movement** as respects a direct or indirect customer, supplier, contract manufacturer or contract service provider located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

3) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

## C.   INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2) picketing or other action by strikers except for physical damage not excluded by this Policy.

3) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### D.   LOGISTICS EXTRA COST

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:

1)   directly between insured **locations**; or

2)   directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,

provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

1)   extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.

This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

LOGISTICS EXTRA COST Exclusions: As respects LOGISTICS EXTRA COST, the following additional exclusions apply:

This Policy does not insure:

1)   any loss resulting from disruption in the movement of goods or materials between **contingent time element locations**.

2)   any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

3)   any loss of income.

4)   costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** movement of goods or materials.

5)   costs of permanent repair or replacement of property that has been damaged or destroyed.

6)   any expense recoverable elsewhere in this Policy.

7)   any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

8) any loss resulting from disruption caused by loss or damage from **earth movement** in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

9) any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of physical loss or damage causing the disruption of the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured, and

2) ending not later than:

   a) when with due diligence and dispatch the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured could be resumed; or

   b) the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## E.   SERVICE INTERRUPTION TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured **location** when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

This Extension will apply when the period of service interruption is in excess of 24 hours.

Additional General Provisions:

1) The Insured will immediately notify the suppliers of services of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION TIME ELEMENT Exclusions: As respects SERVICE INTERRUPTION TIME ELEMENT, the following applies:

1) The exclusions in the EXCLUSIONS clause in the PROPERTY DAMAGE section do not apply except for:

   a) A1, A2, A3, A6, B1, B2, and

   b) B4 with respect to incoming or outgoing voice, data or video, and

   c) D1 except with respect to fungus, mold or mildew.

2) The following additional exclusions apply:

   This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

   b) **terrorism**.

As used above, the period of service interruption:

1) is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2) is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3) does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS

## A.   ATTRACTION PROPERTY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**.

ATTRACTION PROPERTY Exclusions: As respects ATTRACTION PROPERTY, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**B. CRISIS MANAGEMENT**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location**, provided such order is a direct result of:

1) a violent crime, suicide, attempted suicide, or armed robbery; or

2) a death or bodily injury caused by a workplace accident;

at such insured **location**.

For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the PERIOD OF LIABILITY is in excess of 4 hours.

CRISIS MANAGEMENT Exclusions: As respects CRISIS MANAGEMENT, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) **terrorism**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting with the time the civil or military authority prohibits access; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

## C.   DELAY IN STARTUP

GROSS EARNINGS or GROSS PROFIT and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

## D.   EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1) the interruption of business as covered by GROSS EARNINGS;

2) for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

3) commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included in this Policy.

However, this Extension does not apply to GROSS EARNINGS loss resulting from physical loss or damage caused by or resulting from **terrorism**.

EXTENDED PERIOD OF LIABILITY Exclusions: As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## E.   INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

2) loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of the order of the authorized governmental agency or the Officer of the Insured; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### F.   ON PREMISES SERVICES

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet/300 metres of the insured **location**:

1)   Electrical equipment and equipment used for the transmission of voice, data or video.

2)   Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

### G.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

This Extension does not cover the Actual Loss Sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in the PROPERTY DAMAGE section.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

### H.   RELATED REPORTED VALUES

If reported TIME ELEMENT values include:

1)   **locations** used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such **locations**,

3)   from insured physical loss or damage at an insured **location**,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such insured **location**.

### I.   RESEARCH AND DEVELOPMENT

The GROSS EARNINGS and GROSS PROFIT coverages are extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and Ordinary Payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this Extension will be the period from the time of direct physical loss or damage of the type insured to the time when the property could be repaired or replaced and made ready for operations, but as respects GROSS PROFIT and Ordinary Payroll such period of time shall not exceed the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.  Such period of time shall not be limited by the date of expiration of this Policy.

**J.      SOFT COSTS**

This Policy covers the Actual Loss Sustained incurred by the Insured of **soft costs** during the PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

## LOSS ADJUSTMENT AND SETTLEMENT

**1.    REQUIREMENTS IN CASE OF LOSS**

The Insured will:

1)    give immediate written notice to the Company of any loss.

2)    protect the property from further loss or damage.

3)    promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4)    give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company.  The proof of loss must state the knowledge and belief of the Insured as to:

 a)   the time and origin of the loss.

 b)   the Insured's interest and that of all others in the property.

 c)   the **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

 d)   any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

 e)   by whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5)    include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6)    further, the Insured, will as often as may be reasonably required:

 a)   exhibit to any person designated by the Company all that remains of any property;

 b)   submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c) produce for examination at the request of the Company:

      (i) all books of accounts, business records, bills, invoices and other vouchers; or

      (ii) certified copies if originals are lost,

at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## 2.   CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the Insured.

## 3.   PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of insured physical loss or damage determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s), subject to the Policy's provisions. To obtain such partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.

## 4.   COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 5.   SUBROGATION

The Insured is required to cooperate in any subrogation proceedings. The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)    any applicable deductible; and/or

2)    any provable uninsured loss,

bears to the entire provable loss amount.

**6.    COMPANY OPTION**

The Company has the option to take all or any part of damaged property at the agreed or appraised value.  The Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.

**7.    ABANDONMENT**

There may be no abandonment of any property to the Company.

**8.    APPRAISAL**

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1)    the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2)    the Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire.  If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending.  The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire.  An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)    pay its chosen appraiser; and

2)    bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

70

9.   **SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)   the Insured has fully complied with all the provisions of this Policy; and

2)   legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

10.   **SETTLEMENT OF CLAIMS**

The amount of loss for which the Company may be liable will be paid within 30 days after:

A.   proof of loss as described in this Policy is received by the Company; and

B.   when a resolution of the amount of loss is made either by:

1)   written agreement between the Insured and the Company; or

2)   the filing with the Company of an award as provided in the APPRAISAL clause of this section.

## GENERAL PROVISIONS

1. **CANCELLATION/NON-RENEWAL**

This Policy may be:

A.   cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.   cancelled by the Company by giving the Insured not less than:

   1)   90 days' written notice of cancellation; or

   2)   10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.   non-renewed by the Company by giving the Insured not less than 90 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

2. **INSPECTIONS**

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.  The Company does not address life, safety or health issues.

The Company's:

A.   right to make inspections;

B.   making of inspections; or

C.   providing recommendations or other information in connection with any inspections,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

**3.     PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS**

A.     If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for insured **locations** within such jurisdictions.

B.     The Company will provide to the Insured copies of endorsements mandated for use by the laws of provinces in Canada.  The endorsements modify this Policy with respect to any insured property located in the province in which the endorsement applies.

C.     The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America.  The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

D.     As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy shall be considered an act of **terrorism** within the terms of this Policy.  Coverage recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) is excluded from any other coverage under this Policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) and this Policy is not recoverable under this Policy.

**4.     LIBERALIZATION**

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

**5.     MISREPRESENTATION AND FRAUD**

This entire Policy will be void if, whether before or after a loss, an Insured has:

A.     willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

B.     made any attempt to defraud the Company.

C.     made any false swearing.

## 6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

A.   The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.   The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

1)   any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

2)   foreclosure, notice of sale, or similar proceedings with respect to the property.

3)   change in the title or ownership of the property.

4)   change to a more hazardous occupancy.

The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change.  If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1)   sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2)   this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 90 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment.  If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation.  If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause.  The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension.  The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

F.  If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage.  No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim.  At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

G.  If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.  Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 7.  OTHER INSURANCE

A.  If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.  In no event will this Policy apply as contributing insurance.

C.  The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy.  Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.  The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy.  The existence of such other insurance will not prejudice recovery under this Policy.  If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.  If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with the Company.

## 8.  POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy.  This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.   create a waiver, or change any part of this Policy; or

B.   prevent the Company from asserting any rights under the provisions of this Policy.

**9.   REDUCTION BY LOSS**

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any **annual aggregate** limit.

**10.   SUSPENSION**

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured.  The suspended insurance may be reinstated by the Company.  Any unearned premium resulting from such suspension will be returned by the Company.

**11.   TITLES**

The titles in this Policy are only for reference.  The titles do not in any way affect the provisions of this Policy.

**12.   ASSIGNMENT**

Assignment of this Policy will not be valid except with the written consent of the Company.

**13.   DEFINITIONS**

The following terms when appearing in **boldface** in this Policy mean:

**actual cash value**:
the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**annual aggregate**:
the Company's maximum amount payable during any policy year.

**communicable disease**:
disease which is:

A.   transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B.   Legionellosis.

**contaminant**:
anything that causes **contamination**.

**contamination**:
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

**contingent time element location**:
A.    any **location**:

    1)   of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

    2)   of any company under a royalty, licensing fee or commission agreement with the Insured;

B.    any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**cyber event**:
any act involving the malicious or unauthorized access to, operation of, or use of **electronic data processing equipment or media**, regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **cyber event** will not be considered to be loss by **cyber event** within the terms and conditions of this Policy.

**date or time recognition**:
the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**earth movement**:
any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage, or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media**:
any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

**fine arts**:
paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

**flood**:
flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss.  Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**irreplaceable**:
an item which cannot be replaced with other of like kind and quality.

**location**:
A.   as specified in the Schedule of Locations, or

B.   if not so specified in the Schedule of Locations:

    1)   a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing),

        a)   bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres wide.  Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**New Madrid Seismic Zone**:
Arkansas, United States of America, counties of:
Arkansas, Clay, Craighead, Crittenden, Cross, Fulton, Greene, Independence, Izard, Jackson, Lawrence, Lee, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Randolph, Sharp, St. Francis, White, Woodruff

Illinois, United States of America, counties of:
Alexander, Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jasper, Jefferson, Johnson, Lawrence, Madison, Marion, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Richland, Saline, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson

Indiana, United States of America, counties of:
Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick

Kentucky, United States of America, counties of:
Ballard, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Henderson, Hickman, Hopkins, Livingston, Lyon, Marshall, McCracken, McLean, Muhlenberg, Todd, Trigg, Union, Webster

Mississippi, United States of America, counties of:
Alcorn, Benton, Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tippah, Tunica

Missouri, United States of America, counties of:
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Jefferson, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, St. Francois, St. Louis, City of St. Louis, Ste. Genevieve, Stoddard, Washington, Wayne

Tennessee, United States of America, counties of:
Benton, Carroll, Chester, Crockett, Decatur, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Houston, Humphreys, Lake, Lauderdale, Madison, McNairy, Montgomery, Obion, Perry, Shelby, Stewart, Tipton, Weakley

**normal**:
the condition that would have existed had no physical loss or damage happened.

**normal cost**:
the cost associated with the movement of goods or materials suffering the disruption that the Insured would have incurred had no physical loss or damage causing disruption happened.

**occurrence**:
the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

A.    **terrorism**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

B.    **earth movement**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services**:
the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**Pacific Northwest Seismic Zone**:
Oregon, United States of America, counties of:
Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill

<u>Washington, United States of America, counties of:</u>
Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

<u>British Columbia (includes Vancouver Island), Canada:</u>
South of 50° N latitude and west of 120° W longitude

**period of operational testing**:
the period of time beginning 24 hours prior to the earlier of the following:

A.    introduction, into a system, of feedstock or other materials for processing or handling;

B.    commencement of fuel or energy supply to a system,

and ending with the earlier of the following:

A.    the expiration date or cancellation date of this Policy.

B.    if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**physical loss or damage to electronic data, programs or software**:
the destruction, distortion or corruption of electronic data, programs or software.

**representative company(ies)**:
Factory Mutual Insurance Company, FM Insurance Company Limited or FM Insurance Europe S.A.; Affiliated FM Insurance Company; Appalachian Insurance Company or any other company issuing a local policy at the direction of the Company.

**soft costs**:
costs over and above those that are **normal** at an insured **location** undergoing renovation or in the course of construction, limited to the following:

A.    construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

B.    commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

C.    additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

D.    property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

**terrorism**:
any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

when the effect or apparent purpose is:

A.    to influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

B.    to further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems**:
transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data, and video.  Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records**:
written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

**wind**:
direct action of wind including substance driven by wind.  **Wind** does not mean or include anything defined as **flood** in this Policy.



Account No.   1-34105

Policy No.    1056084

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index Number | Street Address | City | County | State/Province | Postal Code | Country | Name |
|---|---|---|---|---|---|---|---|---|
| 8 | 003618.74 | 1100 Oak Drive SE | Washington | District of Columbia | District of Columbia | 20032 | United States of America | St. Elizabeth's East MedStar Wizards Performance Center |
| 3 | 000142.06 | 601 F Street Northwest | Washington | District of Columbia | District of Columbia | 20004-1605 | United States of America | Capital One Arena |
| 5 | 002055.34 | 700 6th Street Northwest, Suite 410 & 420 | Washington | District of Columbia | District of Columbia | 20002-4324 | United States of America | Office |
| 6 | 043145.52 | 201 West Baltimore Street | Baltimore | Baltimore (City) | Maryland | 21201-2591 | United States of America | Royal Farms Arena |
| 4 | 043436.20 | 7701-7717 Penn Belt Drive & 3905-3917 Penn Belt Place | District Heights | Prince George's | Maryland | 20747-4731 | United States of America | Warehouse |
| 1 | 002147.05 | 627 North Glebe Road | Arlington | Arlington | Virginia | 22203-2144 | United States of America | Medstar Capitals Iceplex |
| 2 | 044443.93 | 4500 Patriot Circle | Fairfax | Fairfax | Virginia | 22030-4468 | United States of America | EagleBank Arena - George Mason University |

Account No. 1-34105
Policy No. 1056084

# SUPPLEMENTAL UNITED STATES
# CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured Locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of USD**130,536**, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein. This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed USD100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed USD100,000,000,000.  If the aggregate insured losses for all insurers exceed USD100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 85% (and beginning on January 1, 2016, shall then decrease by 1 percentage point per calendar year until equal to 80 percent) of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy.  The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application:  The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and

extended in 2005, 2007, and in 2015.  The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

a.   The act resulted in aggregate losses in excess of USD5,000,000; and

b.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.



**Account No. 1-34105**
**Policy No. 1056084**

# CYBER OPTIMAL RECOVERY ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein.  All other terms and conditions of the Policy remain unchanged.

INSURED OPTION:

The Insured acknowledges having purchased a cyber policy.

As respects loss or damage that is covered by both this Policy and the cyber policy, and notwithstanding anything contained in the OTHER INSURANCE clause in the GENERAL PROVISIONS section of this Policy, the Insured may elect, within 180 days of notifying this Company of the loss, to apportion the loss between this Policy and the cyber policy and to designate this Policy as primary, excess or contributing insurance to the cyber policy with respect to each portion of the loss, provided designating it as such is necessary to maximize the total indemnity available for the loss under both this Policy and the cyber policy.

This election option shall be subject to the following additional conditions:

ADDITIONAL CONDITIONS

1)  The Insured will provide this Company with a copy of any cyber policy in force at the time of loss.

2)  Any coverage provided by the cyber policy that is not provided by this Policy does not extend to this Policy.

3)  The insolvency, inability or unwillingness to pay of the company issuing the cyber policy shall in no event increase this Company's liability or delay settlement under this Policy.

VIRGINIA NOTICE

IMPORTANT INFORMATION REGARDING YOUR INSURANCE

In the event you need to contact someone about this insurance for any reason please contact your agent. If no agent was involved in the sale of this insurance, or if you have additional questions you may contact the insurance company issuing this insurance at the following address and telephone number:

FM Global
P.O. Box 7500 Johnston, RI 02919
Fax: (401) 275-3029
1-800-343-7722

If you have been unable to contact or obtain satisfaction from the company or the agent, you may contact the Virginia State Corporation Commission's Bureau of Insurance at: Property and Casualty Division, Bureau of Insurance, P.O. Box 1157, Richmond, VA 23218. In-state toll-free calls: 1-800-552-7945, Out-of-state calls: (804) 371-9741.

Written correspondence is preferable so that a record of your inquiry is maintained. When contacting your agent, company or the Bureau of Insurance, have your policy number available

FUNCTIONAL REPLACEMENT COST COVERAGE

Following state requirements, we are advising you that the coverage under this policy for certain property as specified in the policy's Valuation clause applies on a functional replacement cost basis which means that, under certain conditions, claims may be settled for less than the actual cash value of the property insured.

# EXHIBIT B



**MUTUAL CORPORATION
NON-ASSESSABLE POLICY**

Factory Mutual Insurance Company
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

**DECLARATIONS**

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| 1068228 | 1056084 | 31 July 2020 |

| Account No. | Replaces Binder No. | |
|---|---|---|
| 1-34105 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

> **INSURED:**
>
> Lincoln Holdings LLC
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the 1st day of August 2020 to the 1st day of August 2021 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this  31st day of  July 2020.

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.



Factory Mutual Insurance Company
Johnston, Rhode Island
A Mutual Corporation

This policy is Non-Assessable.

It is important that the written
portions of all policies covering
the same property read exactly
alike. If they do not, they should
be made uniform at once.

In case of loss notify the company
or its local agent at once in writing.

7019 (9/01)

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

## EXTRACTS FROM CHARTER OF THIS COMPANY
### Granted by the General Assembly of the State of Rhode Island

SECTION 5:  Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10:  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

## EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
### Adopted July 13, 2000

ARTICLE 1 – MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.

7019 (9/01)

**4**



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

# TABLE OF CONTENTS
## (Order In Which They Appear)

<div align="right">

**Page No.**

</div>

**DECLARATIONS PAGE**

**DECLARATIONS**

1.   NAMED INSURED AND MAILING ADDRESS ................................................................ 1
2.   POLICY DATES ................................................................................................................ 1
3.   INSURANCE PROVIDED ................................................................................................ 1
4.   PREMIUM ........................................................................................................................ 2
5.   PREMIUM PAYABLE ...................................................................................................... 2
6.   LOSS ADJUSTMENT/PAYABLE .................................................................................... 2
7.   TERRITORY .................................................................................................................... 3
8.   JURISDICTION ............................................................................................................... 3
9.   CURRENCY .................................................................................................................... 4
10.  LIMITS OF LIABILITY .................................................................................................. 4
11.  DEDUCTIBLES ............................................................................................................... 7

**PROPERTY DAMAGE**

1.   INSURED PROPERTY ..................................................................................................... 10
2.   EXCLUDED PROPERTY ................................................................................................. 10
3.   EXCLUSIONS .................................................................................................................. 11
4.   APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ............................. 15
5.   VALUATION .................................................................................................................... 16
6.   ADDITIONAL COVERAGES ......................................................................................... 18
     CYBER ADDITIONAL COVERAGES ........................................................................... 18
     A.   DATA RESTORATION ........................................................................................... 18
     B.   DATA SERVICE PROVIDER PROPERTY DAMAGE ........................................... 20
     OTHER ADDITIONAL COVERAGES ........................................................................... 21
     A.   ACCIDENTAL INTERRUPTION OF SERVICES ................................................. 21
     B.   ACCOUNTS RECEIVABLE ................................................................................... 21
     C.   AUTOMATIC COVERAGE .................................................................................... 22
     D.   BRANDS AND LABELS ......................................................................................... 23
     E.   CLAIMS PREPARATION COSTS .......................................................................... 23
     F.   COMMUNICABLE DISEASE RESPONSE ........................................................... 24
     G.   CONSEQUENTIAL REDUCTION IN VALUE ...................................................... 24
     H.   CONTROL OF DAMAGED PROPERTY ............................................................... 25
     I.   DEBRIS REMOVAL ............................................................................................... 25
     J.   DECONTAMINATION COSTS .............................................................................. 25
     K.   ERRORS AND OMISSIONS ................................................................................... 26
     L.   EXPEDITING COSTS ............................................................................................. 26
     M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS .................................... 27
     N.   INSTALLMENT OR DEFERRED PAYMENTS ..................................................... 28
     O.   LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL ...... 28
     P.   LAW AND ORDINANCE ........................................................................................ 29
     Q.   LOSS PAYMENT INCREASED TAX LIABILITY ................................................ 30
     R.   MACHINERY OR EQUIPMENT STARTUP OPTION ........................................... 31



# TABLE OF CONTENTS
## (Order In Which They Appear)

**Page No.**

| | | |
|---|---|---|
| S. | MISCELLANEOUS PROPERTY | 31 |
| T. | OPERATIONAL TESTING | 32 |
| U. | PROTECTION AND PRESERVATION OF PROPERTY | 32 |
| V. | SERVICE INTERRUPTION PROPERTY DAMAGE | 33 |
| W. | TEMPORARY REMOVAL OF PROPERTY | 34 |
| X. | TERRORISM | 34 |
| Y. | TRANSPORTATION | 35 |

**TIME ELEMENT**

| | | |
|---|---|---|
| 1. | LOSS INSURED | 38 |
| 2. | TIME ELEMENT COVERAGES | 39 |
| | A. | INSURED OPTION | 39 |
| | B. | GROSS EARNINGS | 39 |
| | C. | GROSS PROFIT | 41 |
| | D. | EXTRA EXPENSE | 43 |
| | E. | LEASEHOLD INTEREST | 44 |
| | F. | RENTAL INSURANCE | 45 |
| 3. | PERIOD OF LIABILITY | 46 |
| 4. | TIME ELEMENT EXCLUSIONS | 49 |
| 5. | TIME ELEMENT COVERAGE EXTENSIONS | 49 |
| | CYBER TIME ELEMENT COVERAGE EXTENSIONS | 50 |
| | A. | DATA SERVICE PROVIDER TIME ELEMENT | 50 |
| | B. | OWNED NETWORK INTERRUPTION | 51 |
| | SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS | 52 |
| | A. | CIVIL OR MILITARY AUTHORITY | 52 |
| | B. | CONTINGENT TIME ELEMENT EXTENDED | 52 |
| | C. | INGRESS/EGRESS | 53 |
| | D. | LOGISTICS EXTRA COST | 54 |
| | E. | SERVICE INTERRUPTION TIME ELEMENT | 56 |
| | ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS | 57 |
| | A. | ATTRACTION PROPERTY | 57 |
| | B. | CRISIS MANAGEMENT | 58 |
| | C. | DELAY IN STARTUP | 58 |
| | D. | EXTENDED PERIOD OF LIABILITY | 59 |
| | E. | INTERRUPTION BY COMMUNICABLE DISEASE | 59 |
| | F. | ON PREMISES SERVICES | 60 |
| | G. | PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT | 60 |
| | H. | RELATED REPORTED VALUES | 61 |
| | I. | RESEARCH AND DEVELOPMENT | 61 |
| | J. | SOFT COSTS | 61 |

**LOSS ADJUSTMENT AND SETTLEMENT**

| | | |
|---|---|---|
| 1. | REQUIREMENTS IN CASE OF LOSS | 62 |
| 2. | CURRENCY FOR LOSS PAYMENT | 63 |
| 3. | PARTIAL PAYMENT OF LOSS SETTLEMENT | 63 |



Account No.  1-34105
Policy No.  1068228

## TABLE OF CONTENTS
### (Order In Which They Appear)

**Page No.**

4. COLLECTION FROM OTHERS ................................................................................................ 63
5. SUBROGATION ..................................................................................................................... 63
6. COMPANY OPTION ............................................................................................................... 63
7. ABANDONMENT ................................................................................................................... 64
8. APPRAISAL ........................................................................................................................... 64
9. SUIT AGAINST THE COMPANY ............................................................................................ 64
10. SETTLEMENT OF CLAIMS ................................................................................................... 65

**GENERAL PROVISIONS**

1. CANCELLATION/NON-RENEWAL ......................................................................................... 66
2. INSPECTIONS ....................................................................................................................... 66
3. PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS .................................................. 67
4. LIBERALIZATION ................................................................................................................. 67
5. MISREPRESENTATION AND FRAUD .................................................................................... 67
6. LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS ................... 68
7. OTHER INSURANCE ............................................................................................................. 69
8. POLICY MODIFICATION ....................................................................................................... 69
9. REDUCTION BY LOSS .......................................................................................................... 70
10. SUSPENSION ........................................................................................................................ 70
11. TITLES .................................................................................................................................. 70
12. ASSIGNMENT ....................................................................................................................... 70
13. DEFINITIONS ........................................................................................................................ 70
SCHEDULE OF LOCATIONS ............................................................................................ APPENDIX A
SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, FORM
FMG7308
CYBER OPTIMAL RECOVERY ENDORSEMENT, FORM FMG7558



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

# DECLARATIONS

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

## 1.   NAMED INSURED AND MAILING ADDRESS

Lincoln Holdings LLC, Lincoln Holdings LLC dba Monumental Sports & Entertainment, Lincoln Holdings LLC dba Monumental Sports* Entertainment, Lincoln Holdings GP LLC, Lincoln Ballston LLC, Lincoln Hockey LLC, Lincoln Mystics LLC, Washington Sports & Entertainment Limited Partnership, Washington Sports & Entertainment, Inc., DC Arena L.P., DC Arena L.P. dba Capital One Arena, Washington Bullets, L.P., Centre Group Limited Partnership, Monumental Ticketing Limited Partnership, AP Tickets, Inc., Lincoln Hockey LLC dba Washington Capitals, Washington Bullets L.P. dba Washington Wizards, Monumental Sports & Entertainment Foundation, Washington Sports LLC, Washington Sports GP LLC, Monumental Sports Network LLC, Washington Capitals Enterprises Company, WAS Club LP GP LLC, WAS Club LP, Anacostia Sports LLC, Monumental RSN LLC, Monumental eSports LLC, Lincoln NBADL LLC, Lincoln NBA2K LLC, Lincoln NBADL LLC dba Capital City Co-Co, Lincoln NBA2K LLC dba Wizards District Gaming, Lincoln Productions, LLC and Lincoln St. E's, LLC and any subsidiary, and Lincoln Holdings LLC's interest in any partnership or joint venture in which Lincoln Holdings LLC has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured," including legal representatives.

627 North Glebe Road
Arlington, Virginia, 22203-2144
United States of America

## 2.   POLICY DATES

The term of this Policy is:

FROM: 1 August 2020 at 12:01 a.m., Standard Time;
TO:      1 August 2021 at 12:01 a.m., Standard Time,

at the **location** of property involved as provided in this Policy.

## 3.   INSURANCE PROVIDED

The coverage under this Policy applies to property described on the Schedule of Locations or covered under the terms and conditions of the AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY provisions, unless otherwise provided.

Schedule of Locations are as listed on the Schedule of Locations attached to this Policy.

FM Global

**Account No.   1-34105**
**Policy No.   1068228**

## 4.    PREMIUM

This Policy is issued in consideration of an initial premium.

## 5.    PREMIUM PAYABLE

Lincoln Holdings LLC pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of Lincoln Holdings LLC.

## 6.    LOSS ADJUSTMENT/PAYABLE

Loss, if any, will be adjusted with and payable to Lincoln Holdings LLC, or as may be directed by Lincoln Holdings LLC.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.

When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance.  The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

The following additional interest(s) is added to the Policy as Additional Named Insured as their interests may appear.

U.S. Bank Association as Collateral Agent under the Security and Accounts Agreement dated May 24, 2018 with DC Arena L.P.

As respects their interest at the following:

| Location No. | Location Description |
|---|---|
| 3 | UNITED STATES OF AMERICA WASHINGTON, DC, 20004-1605 601 F Street Northwest Capital One Arena, Lincoln Holdings LLC |

Arlington County, Virginia
Attn:  Director Department of Management & Finance
#1 Courthouse Plaza, 2100 Clarendon Boulevard, Suite 501
Arlington, Virginia

Industrial Development Authority of Arlington County, Virginia
#1 Courthouse Plaza, 2100 Clarendon Boulevard, Suite 501
Arlington, Virginia



Account No.  1-34105
Policy No.  1068228

The May Department Stores Company
Attn:  General Counsel
611 Olive Street
St. Louis, Missouri

As respects their interest at the following:

| Location No. | Location Description |
|---|---|
| 1 | UNITED STATES OF AMERICA<br>ARLINGTON, VA, 22203-2144<br>627 North Glebe Road<br>Medstar Capitals Iceplex, Lincoln Holdings LLC |

Adding such additional interest(s) does not amend, extend or alter the terms, conditions or provisions of this Policy.

## 7.   TERRITORY

Coverage as provided under this Policy applies in Canada, the United States of America and the Commonwealth of Puerto Rico.

As respects MISCELLANEOUS PROPERTY, coverage as provided under this Policy coverage applies worldwide except does not apply in:

Afghanistan; Albania; Algeria; Angola; Armenia; Azerbaijan; Bangladesh; Belarus; Belize; Benin; Bhutan; Bolivia; Bosnia and Herzegovina; Botswana; Burkina Faso; Burundi; Cambodia; Cameroon; Central African Republic; Chad; Cote D'Ivoire; Cuba; Democratic Republic of the Congo; Djibouti; Egypt; Equatorial Guinea; Eritrea; Ethiopia; Fiji; Gabon; Gambia; Georgia; Ghana; Grenada; Guatemala; Guinea; Guinea-Bissau; Guyana; Haiti; Honduras; Jammu and Kashmir in India; Iran; Iraq; Israel; Gaza Strip, West Bank and territories north of Latitude 32.80 N in Israel; Kenya; Laos; Lebanon; Lesotho; Liberia; Libya; Madagascar; Malawi; Mali; Mauritania; Mauritius; Moldova; Mongolia; Montenegro; Montserrat; Mozambique; Myanmar; Namibia; Nepal; Niger; Nigeria; North Korea; Pakistan; Papua New Guinea; Aksai Chin and Trans-Karakoram Tract in People's Republic of China; Republic of the Congo; Chechen Republic of the Russian Federation; Rwanda; Senegal; Seychelles; Sierra Leone; Somalia; Sri Lanka; South Sudan; Sudan; Swaziland; Syria; Tajikistan; Tanzania; Timor-Leste; Togo; Tunisia; Agri, Batman, Bingol, Bitlis, Diyarbakir, Elazig, Hakkari, Igdir, Mardin, Mus, Sanliurfa, Siirt, Sirnak and Van in Turkey; Turkmenistan; Uganda; Ukraine; Crimea Region of Ukraine; Uzbekistan; Venezuela; Yemen; Zambia; and Zimbabwe.

## 8.   JURISDICTION

This Policy will be governed by the laws of the United States of America.

Any disputes arising hereunder will be exclusively subject to the jurisdiction of the United States of America.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

## 9.    CURRENCY

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Organization for Standardization (ISO) 4217, edition in effect at the inception of this Policy.

## 10.    LIMITS OF LIABILITY

The Company's maximum limit of liability in an occurrence, including any insured TIME ELEMENT loss, will not exceed the Policy limit of liability of USD 1,000,000,000 subject to the following provisions:

A.    Limits of liability and time limits stated below or elsewhere in this Policy are part of, and not in addition to, the Policy limit of liability.

B.    Limits of liability apply per **occurrence**, unless otherwise stated.

C.    Limits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss, subject to the following provisions:

1)    when a limit of liability applies as an **annual aggregate**, the Company's maximum amount payable will not exceed such limit of liability during any policy year.

2)    when a limit of liability applies to a **location** or other specified property, such limit of liability will be the maximum amount payable for all loss or damage at all **locations** arising from physical loss or damage at such **location** or to such other specified property.

D.    Should an **occurrence** result in liability payable under more than one policy issued to the Named Insured by the Company, or its **representative company(ies)**, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy.

Applicable Limits of Liability/Time Limits:

| | |
|---|---|
| ATTRACTION PROPERTY | 30 days |
| AUTOMATIC COVERAGE | 90 days, not to exceed USD 10,000,000 per **location** |
| CIVIL OR MILITARY AUTHORITY | 30 days |
| CLAIMS PREPARATION COSTS | USD 50,000 |



**Account No.   1-34105**
**Policy No.   1068228**

| COMMUNICABLE DISEASE RESPONSE | USD 10,000 **annual aggregate**<br><br>The Company's maximum limit of liability for INTERRUPTION BY COMMUNICABLE DISEASE and this coverage combined shall not exceed USD 10,000 **annual aggregate**. |
|---|---|
| CONTINGENT TIME ELEMENT EXTENDED | USD 25,000,000 |
| CRISIS MANAGEMENT | 30 days |
| **cyber event** | 1. USD 1,000,000 **annual aggregate** for DATA RESTORATION and OWNED NETWORK INTERRUPTION combined<br><br>2. USD 1,000,000 **annual aggregate** for DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined<br><br>3. USD 25,000,000 **annual aggregate** for physical loss or damage to stock in process or finished goods manufactured by or for the Insured caused by or resulting from a **cyber event** that impacts the processing, manufacturing, or testing of such property or while it is otherwise being worked on |
| DATA RESTORATION | USD 10,000,000 **annual aggregate** |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT combined | USD 5,000,000 **annual aggregate** |
| **earth movement** | USD 250,000,000 **annual aggregate** |
| ERRORS AND OMISSIONS | USD 100,000,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD 100,000,000 |



Account No.   1-34105
Policy No.   1068228

| | |
|---|---|
| EXTENDED PERIOD OF LIABILITY | 90 days, not to exceed USD 10,000,000 |
| **fine arts** | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable fine arts** not on a schedule on file with the Company |
| fines or penalties for breach of contract or for late or noncompletion of orders combined | USD 100,000 |
| **flood** | USD 250,000,000 |
| GROSS PROFIT | 12 months, not to exceed 365 days for Ordinary Payroll |
| INGRESS/EGRESS | 30 days |
| INTERRUPTION BY COMMUNICABLE DISEASE | 365 days, not to exceed USD 10,000 **annual aggregate** <br><br> The Company's maximum limit of liability for COMMUNICABLE DISEASE RESPONSE and this coverage combined shall not exceed USD 10,000 **annual aggregate**. |
| LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL | USD 50,000 **annual aggregate** |
| LOGISTICS EXTRA COST | 180 days, not to exceed 200% of the **normal cost** |
| MISCELLANEOUS PROPERTY | 1.   USD 10,000,000 per **location** for property at a **location** <br><br> 2.   USD 10,000,000 for property not at a **location** |
| Ordinary Payroll | 365 days |
| SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined | USD 25,000,000 |



**Account No.   1-34105**
**Policy No.   1068228**

| TERRORISM | USD 5,000,000 **annual aggregate**, not to exceed the following:<br><br>1. USD 5,000,000 **annual aggregate** for AUTOMATIC COVERAGE, ERRORS AND OMISSIONS, MISCELLANEOUS PROPERTY and TEMPORARY REMOVAL OF PROPERTY, combined<br><br>2. USD 5,000,000 **annual aggregate** for **flood** when caused by or resulting from **terrorism**<br><br>The limits for TERRORISM shall not include the **actual cash value** portion of fire damage caused by **terrorism**.<br><br>The limits for TERRORISM do not apply to the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S). |
| --- | --- |
| **valuable papers and records** | USD 100,000,000, not to exceed USD 10,000 per item for **irreplaceable valuable papers and records** not on a schedule on file with the Company |

## 11.   DEDUCTIBLES

Subject to the deductible general provisions stated below, in each case of loss covered by this Policy the following deductibles apply per **occurrence**, for all coverages involved, unless otherwise stated:

| **cyber event** | USD 250,000 for DATA RESTORATION and OWNED NETWORK INTERRUPTION |
| --- | --- |
| DATA SERVICE PROVIDER PROPERTY DAMAGE and DATA SERVICE PROVIDER TIME ELEMENT | USD 250,000 |
| **flood** | USD 50,000 per **location** |
| LOGISTICS EXTRA COST | USD 50,000 |
| All Other Loss | USD 50,000 |



Deductible General Provisions:

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss, including any insured TIME ELEMENT loss, in a single **occurrence** greater than the applicable deductible specified above, and only for its share of that greater amount.

A.   For SERVICE INTERRUPTION loss, when a deductible is not specifically stated as applying to SERVICE INTERRUPTION, the deductible applied to the SERVICE INTERRUPTION loss will be the deductible that would apply if the cause of the interruption happened at the insured **location** that sustains the interruption of the specified services.

B.   For CONTINGENT TIME ELEMENT EXTENDED loss, when a deductible is not specifically stated as applying to CONTINGENT TIME ELEMENT EXTENDED, the deductible for CONTINGENT TIME ELEMENT EXTENDED loss will be determined as though the **contingent time element location** was an insured **location** under this Policy.

C.   The stated earthquake deductible will be applied to earthquake loss.  The stated **flood** deductible will be applied to **flood** loss.  The stated **wind** deductible will be applied to **wind** loss.  The provisions of item E below will also be applied to each.

D.   When this Policy insures more than one **location**, the deductible will apply against the total loss covered by this Policy in an **occurrence** except that a deductible that applies on a per **location** basis, if specified, will apply separately to each **location** where the physical damage happened regardless of the number of **locations** involved in the **occurrence**.

E.   Unless stated otherwise, if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable.  For the purposes of this provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible.  If two or more deductibles apply on a per **location** basis in an **occurrence**, the largest deductible applying to each **location** will be applied separately to each such **location**.

F.   When a % deductible is stated above, whether separately or combined, the deductible is calculated as follows:

Property Damage – % of the value, per the Valuation clause(s) of the PROPERTY DAMAGE section, of the property insured at the **location** where the physical damage happened.

Time Element – % of the full Time Element values that would have been earned in the 12 month period following the **occurrence** by use of the facilities at the **location** where the physical damage happened, plus that proportion of the full Time Element values at all other **locations** where TIME ELEMENT loss ensues that was directly affected by use of such facilities and that would have been earned in the 12 month period following the **occurrence**.



Account No.   1-34105
Policy No.   1068228

G.   For insured physical loss or damage:

1)   to insured fire protection equipment; or

2)   from water or other substance discharged from fire protection equipment of the type insured,

the applicable deductible applying to items 1 or 2 above only will be reduced by fifty percent (50%), per **occurrence**.  However, this provision will not apply to loss or damage resulting from fire or **earth movement** regardless of whether claim is made for such fire or **earth movement**.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

## PROPERTY DAMAGE

### 1.   INSURED PROPERTY

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, to the extent of the interest of the Insured in such property:

A.   Real Property, including new buildings and additions under construction, in which the Insured has an insurable interest.

B.   Personal Property:

  1)   owned by the Insured.

  2)   consisting of the Insured's interest as a tenant in improvements and betterments.  In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

  3)   of officers and employees of the Insured.

  4)   of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

  5)   of others in the Insured's custody to the extent of the Insured's legal liability for insured physical loss or damage to Personal Property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an insured **location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

### 2.   EXCLUDED PROPERTY

The following exclusions apply unless otherwise stated in this Policy:

This Policy excludes:

A.   currency, money, notes or securities.

B.   precious metal in bullion form.



**Account No.   1-34105**
**Policy No.   1068228**

C.    land and any substance in or on land.  However, this exclusion does not apply to:

    1)    landscape gardening.

    2)    car parks, parking lots, pavement, roadways, railways, transformer enclosures or walkways.

    3)    fill beneath car parks, parking lots, pavement, roadways, railways, transformer enclosures, walkways, or buildings and structures.

D.    water.  However, this exclusion does not apply to:

    1)    water that is contained within any enclosed tank, piping system or any other processing equipment.

E.    animals, standing timber or growing crops.

F.    watercraft or aircraft, except when unfueled and manufactured by the Insured.

G.    vehicles of officers or employees of the Insured or vehicles otherwise insured for physical loss or damage.

H.    underground mines or mine shafts or any property within such mine or shaft.

I.    dams or dikes.

J.    property in transit, except as otherwise provided by this Policy.

K.    property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the INSTALLMENT OR DEFERRED PAYMENTS coverage of this Policy.

L.    electronic data, programs or software, except when incorporated into physical goods intended to be sold as:

    1)    finished goods manufactured by the Insured; or

    2)    other merchandise not manufactured by the Insured,

    or as otherwise provided by the DATA RESTORATION coverage of this Policy.

## 3.    EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:

A.    This Policy excludes:

    1)    indirect or remote loss or damage.



2) interruption of business, except to the extent provided by this Policy.

3) loss of market or loss of use.

4) loss or damage or deterioration arising from any delay.

5) mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6) loss from enforcement of any law or ordinance:

   a) regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

   b) requiring the demolition of any property, including the cost in removing its debris;

   except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy.

7) loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

B. This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) nuclear reaction or nuclear radiation or radioactive contamination.  However:

   a) if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

   b) this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the insured **location**, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the insured **location**.  This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

   This exclusion B1 and the exceptions in B1a and B1b do not apply to any act, loss or damage which also comes within the terms of exclusion B2b of this EXCLUSIONS clause.

2) a) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

   (i) government or sovereign power (de jure or de facto);



(ii)  military, naval or air force; or

(iii) agent or authority of any party specified in i or ii above.

b)   discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

c)   insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d)   seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e)   risks of contraband, or illegal transportation or trade.

f)   **terrorism**, including action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**, except to the extent provided in the TERRORISM coverage of the Policy.  However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the **actual cash value** of the resulting direct loss or damage by fire to property insured.  This coverage exception for such resulting fire loss or damage does not apply to:

(i)  direct loss or damage by fire which results from any other applicable exclusion in the Policy, including the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

(ii) any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided in this Policy.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2b of this EXCLUSIONS clause then item B2b applies in place of this item B2f exclusion.

If any act which satisfies the definition of **terrorism** also comes within the terms of item B2c of this EXCLUSIONS clause then item B2c applies in place of this item B2f exclusion.



If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

3)   any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

    a)   by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

    b)   by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured.  This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause.  In no event does this Policy cover loss by theft by any individual specified in a or b above.

4)   lack of the following services:

    a)   incoming electricity, fuel, water, gas, steam or refrigerant;

    b)   outgoing sewerage;

    c)   incoming or outgoing voice, data or video,

all when caused by an event off the insured **location**, except as provided in the DATA SERVICE PROVIDER and SERVICE INTERRUPTION coverages of this Policy.  But, if the lack of such a service directly causes insured physical damage on the insured **location**, then only that resulting damage is insured.

C.   This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1)   faulty workmanship, material, construction or design from any cause.

2)   loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3)   deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

4)   settling, cracking, shrinking, bulging, or expansion of:

    a)   foundations (including any pedestal, pad, platform or other property supporting machinery).



    b)  floors.

    c)  pavements.

    d)  walls.

    e)  ceilings.

    f)  roofs.

5)  a)  changes of temperature damage (except to machinery or equipment); or

    b)  changes in relative humidity damage,

    all whether atmospheric or not.

6)  insect, animal or vermin damage.

7)  loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind, when the installation of the roof, walls or windows of such buildings has not been completed.

D.    This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

1)  **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured.  This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

2)  shrinkage.

3)  changes in color, flavor, texture or finish.

## 4.    APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

With respect to situations caused by any **date or time recognition** problem by **electronic data processing equipment or media** (such as the so-called Year 2000 problem), this Policy applies as follows.

A.    This Policy does not pay for remediation, change, correction, repair or assessment of any **date or time recognition** problem, including the Year 2000 problem, in any **electronic data processing equipment or media**, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.



<div align="right">
Account No.   1-34105<br>
Policy No.   1068228
</div>

B.   Failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not insured physical loss or damage.  This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of **electronic data processing equipment or media** to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such covered resulting physical loss or damage does not include any loss, cost or expense described in A or B above.  If such covered resulting physical loss or damage happens, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.

## 5.   VALUATION

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the place of the loss, and for no more than the interest of the Insured.

Unless stated otherwise in an Additional Coverage, adjustment of physical loss to property will be subject to the following:

A.   On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B.   On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.   On raw materials, supplies or other merchandise not manufactured by the Insured:

1)   if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

2)   if not repaired or replaced, the **actual cash value**.

D.   On exposed films, records, manuscripts and drawings that are not **valuable papers and records**, the value blank plus the cost of copying information from back-up or from originals of a previous generation.  These costs will not include research, engineering or any costs of restoring or recreating lost information.



E.   On property that is damaged by fire and such fire is the result of **terrorism**, the **actual cash value** of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the Valuation clause(s) in this section of the Policy and shall be subject to the limit(s) of liability for TERRORISM, and if stated the limit of liability for SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S), as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

F.   On all other property, the lesser of the following:

1)   The cost to repair.

2)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)   The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)   The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)   The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)   The increased cost of demolition, if any, directly resulting from insured loss, if such property is scheduled for demolition.

7)   The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)   The **actual cash value** if such property is:

   a)   useless to the Insured; or

   b)   not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company.

The Insured may elect not to repair or replace the insured real or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an insured **location** under this Policy.  This item does not extend to LAW AND ORDINANCE.



6.   **ADDITIONAL COVERAGES**

This Policy includes the following Additional Coverages for insured physical loss or damage.

These Additional Coverages:

1)    are subject to the applicable limit of liability;

2)    will not increase the Policy limit of liability; and

3)    are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## CYBER ADDITIONAL COVERAGES

### A.   DATA RESTORATION

This Policy covers insured **physical loss or damage to electronic data, programs or software**.

With respect to **physical loss or damage to electronic data, programs or software** caused by or resulting from a **cyber event**, this Additional Coverage will apply when the time to recreate or restore such data, programs or software with due diligence and dispatch is in excess of 48 hours.

For the purposes of this Additional Coverage, insured data, programs or software can be anywhere worldwide, including while in transit, except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

This Additional Coverage also covers:

1)    the cost of the following reasonable and necessary actions taken by the Insured provided such actions are taken due to actual insured **physical loss or damage to electronic data, programs or software**:

   a)    actions to temporarily protect and preserve insured electronic data, programs or software.

   b)    actions taken for the temporary repair of insured **physical loss or damage to electronic data, programs or software**.

   c)    actions taken to expedite the permanent repair or replacement of such damaged property.



2)  the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured **physical loss or damage to electronic data, programs or software**.  In the event that there is no physical loss or damage, the costs covered under this item will be subject to the deductible that would have applied had there been such physical loss or damage.

Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage excludes loss or damage to data, programs or software when incorporated into physical goods intended to be sold as:

1)  finished goods manufactured by the Insured; or

2)  other merchandise not manufactured by the Insured.

DATA RESTORATION Exclusions: As respects DATA RESTORATION, the following applies:

1)  the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, B1, B2, B3a and B4.

2)  the following additional exclusions apply:

This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

a)  errors or omissions in processing or copying.

b)  loss or damage to data, programs or software from errors or omissions in programming or machine instructions.

c)  deterioration, inherent vice, vermin or wear and tear.

DATA RESTORATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1)  the cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2)  if not repaired, replaced or restored within two years from the date of loss, the blank value of the media.



Account No. 1-34105
Policy No. 1068228

### B. DATA SERVICE PROVIDER PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of **off-premises data processing or data transmission services** by reason of any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Additional Coverage:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Additional Coverage will apply when the period of interruption of **off-premises data processing or data transmission services** as described below is in excess of 24 hours.

The period of interruption of **off-premises data processing or data transmission services** is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

DATA SERVICE PROVIDER PROPERTY DAMAGE Exclusions: As respects DATA SERVICE PROVIDER PROPERTY DAMAGE, the following applies:

1) Items B4 and C5 of the EXCLUSIONS clause in this section do not apply except for B4 with respect to:

    a) incoming electricity, fuel, water, gas, steam or refrigerant; and

    b) outgoing sewerage.



2)   The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b)   **terrorism**.

## OTHER ADDITIONAL COVERAGES

## A.   ACCIDENTAL INTERRUPTION OF SERVICES

This Policy covers physical damage resulting from changes in temperature or relative humidity to insured property at an insured **location** when such changes in temperature or relative humidity result from the interruption of services consisting of electricity, gas, fuel, steam, water or refrigeration by reason of any accidental event, other than insured physical loss or damage, at the insured **location**.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

## B.   ACCOUNTS RECEIVABLE

This Policy covers the following directly resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit:

1)   any shortage in the collection of accounts receivable.

2)   the interest charges on any loan to offset such impaired collection pending repayment of such uncollectible sum.  Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the amount recoverable.

3)   the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct accounts receivable records excluding any costs covered by any other insurance.



4) any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

Accounts receivable records will include accounts receivable records stored as electronic data.

In the event of loss, the Insured will:

1) use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2) reduce loss by use of any suitable property or service:

    a) owned or controlled by the Insured; or

    b) obtainable from other sources.

3) reconstruct, if possible, accounts receivable records so that no shortage is sustained.

The settlement of loss will be made within 90 days from the date of physical loss or damage. All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company. All recoveries exceeding the amount paid will belong to the Insured.

ACCOUNTS RECEIVABLE Exclusions: As respects ACCOUNTS RECEIVABLE, the following additional exclusions apply:

This Policy does not insure against shortage resulting from:

1) bookkeeping, accounting or billing errors or omissions; or

2) a) alteration, falsification, manipulation; or

    b) concealment, destruction or disposal,

of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

## C.   AUTOMATIC COVERAGE

This Policy covers insured physical loss or damage to insured property at any **location** purchased, leased or rented by the Insured after the inception date of this Policy.

This Additional Coverage applies:

1) from the date of purchase, lease or rental,



2)   until the first of the following:

   a)   the **location** is bound by the Company.

   b)   agreement is reached that the **location** will not be insured under this Policy.

   c)   the time limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The time limit begins on the date of purchase, lease or rental.

## D.   BRANDS AND LABELS

If branded or labeled insured property is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

1)   stamp "salvage" on the property or its containers; or

2)   remove or obliterate the brands or labels,

if doing so will not damage the property.

The Insured must relabel such property or its containers to be in compliance with any applicable law.

## E.   CLAIMS PREPARATION COSTS

This Policy covers the actual costs incurred by the Insured:

1)   of reasonable fees payable to the Insured's: accountants, architects, auditors, engineers, or other professionals; and

2)   the cost of using the Insured's employees,

for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

This Additional Coverage will not cover the fees and costs of:

1)   attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them,

2)   loss consultants who provide consultation on coverage or negotiate claims.

This Additional Coverage is subject to the deductible that applies to the loss.



Account No.   1-34105
Policy No.   1068228

### F.   COMMUNICABLE DISEASE RESPONSE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1) an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2) a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:

1) cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and

2) actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.

This Additional Coverage will apply when access to such **location** is limited, restricted or prohibited in excess of 48 hours.

This Additional Coverage does not cover any costs incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the actual not suspected presence of **communicable disease**.

COMMUNICABLE DISEASE RESPONSE Exclusions: As respects COMMUNICABLE DISEASE RESPONSE, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) **terrorism**.

### G.   CONSEQUENTIAL REDUCTION IN VALUE

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from insured physical loss or damage to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.



### H.   CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by the Insured as follows:

1) the Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2) the Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3) property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4) any salvage proceeds received will go to the:

   a) Company at the time of loss settlement; or

   b) Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

### I.   DEBRIS REMOVAL

This Policy covers the reasonable and necessary costs incurred to remove debris from an insured **location** that remains as a direct result of insured physical loss or damage.

This Additional Coverage does not cover the costs of removal of:

1) contaminated uninsured property; or

2) the **contaminant** in or on uninsured property,

whether or not the **contamination** results from insured physical loss or damage.  This Additional Coverage covers the costs of removal of contaminated insured property or the **contaminant** in or on insured property only if the **contamination**, due to the actual not suspected presence of **contaminant(s)**, of the debris resulted directly from other physical damage not excluded by the Policy.

### J.   DECONTAMINATION COSTS

If insured property is contaminated as a direct result of insured physical damage and there is in force at the time of the loss any law or ordinance regulating **contamination** due to the actual not suspected presence of **contaminant(s)**, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated due to the actual not suspected presence of **contaminant(s)** as a direct result of insured physical damage.



The Company is not liable for the costs required for removing contaminated uninsured property or the **contaminant** therein or thereon, whether or not the **contamination** results from an insured event.

### K.   ERRORS AND OMISSIONS

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1)   in the description of where insured property is physically located;

2)   to include any **location**:

    a)   owned, leased or rented by the Insured on the effective date of this Policy; or

    b)   purchased, leased or rented by the Insured during the term of this Policy; or

3)   that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

### L.   EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred:

1)   for the temporary repair of insured physical damage to insured property;

2)   for the temporary replacement of insured equipment suffering insured physical damage; and

3)   to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs recoverable elsewhere in this Policy, including the cost of permanent repair or replacement of damaged property.



### M.   FINE ARTS AND VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to **fine arts** and **valuable papers and records** while anywhere within this Policy's TERRITORY, including while in transit.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Exclusions: As respects FINE ARTS AND VALUABLE PAPERS AND RECORDS, the following applies:

1) the exclusions in the EXCLUSIONS clause of this section do not apply except for A1, A2, A6, A7, B1, B2, B3a and B4.

2) the following additional exclusions apply:

   This Policy excludes:

   a) currency, money, securities.

   b) errors or omissions in processing or copying of **valuable papers and records**, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

   c) deterioration, inherent vice, or wear and tear, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured.

   d) fungus, mold or mildew unless directly resulting from other physical damage not excluded by this Policy.

   e) loss or damage to **fine arts** from any repairing, restoration or retouching process.

FINE ARTS AND VALUABLE PAPERS AND RECORDS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1) the cost to repair or restore such property to the physical condition that existed on the date of loss.

2) the cost to replace.

3) the value, if any, designated for the item on the schedule on file with the Company.

If a **fine arts** article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.



### N.  INSTALLMENT OR DEFERRED PAYMENTS

This Policy covers insured physical loss or damage to personal property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)  pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)  from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

3)  to the extent the buyer continues payments.

4)  not within the TERRITORY of this Policy.

INSTALLMENT OR DEFERRED PAYMENTS Valuation: On property covered under this Additional Coverage the loss amount will not exceed the lesser of the following:

1)  total amount of unpaid installments less finance charges.

2)  **actual cash value** of the property at the time of loss.

3)  cost to repair or replace with material of like size, kind and quality.

### O.  LAND AND WATER CONTAMINANT CLEANUP, REMOVAL AND DISPOSAL

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of the actual not suspected presence of **contaminant(s)** from uninsured property consisting of land, water or any other substance in or on land at the insured **location** if the release, discharge or dispersal of such **contaminant(s)** is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of **contamination** from such property:

1)  at any **location** insured for Personal Property only.



2) at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or MISCELLANEOUS PROPERTY coverage provided by this Policy.

3) when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

## P. LAW AND ORDINANCE

This Policy covers the costs as described herein resulting from the Insured's obligation to comply with a law or ordinance, provided that:

1) such law or ordinance is enforced as a direct result of insured physical loss or damage at an insured **location**;

2) such law or ordinance is in force at the time of such loss or damage; and

3) such **location** was not required to be in compliance with such law or ordinance prior to the happening of the insured physical loss or damage.

Coverage A:

The reasonable and necessary costs incurred by the Insured to comply with the enforcement of the minimum requirements of any law or ordinance that regulates the demolition, construction, repair, replacement or use of buildings, structures, machinery or equipment.

As respects insured property, this Coverage A covers the reasonable and necessary costs to:

1) demolish any physically damaged and undamaged portions of the insured buildings, structures, machinery or equipment.

2) repair or rebuild the physically damaged and undamaged portions, whether or not demolition is required, of such insured buildings, structures, machinery or equipment.

The Company's maximum liability for this Coverage A at each insured **location** in any **occurrence** will not exceed the actual costs incurred in demolishing the physically damaged and undamaged portions of the insured property plus the lesser of:

1) the reasonable and necessary cost, excluding the cost of land, to rebuild on another site; or

2) the cost to rebuild on the same site.



Coverage B:

The reasonable estimated cost to repair, replace or rebuild insured property consisting of buildings, structures, machinery or equipment that the Insured is legally prohibited from repairing, replacing or rebuilding to the same height, floor area, number of units, configuration, occupancy or operating capacity, because of the enforcement of any law or ordinance that regulates the construction, repair, replacement or use of buildings, structures, machinery or equipment.

LAW AND ORDINANCE Coverage B Valuation: On property covered under this Coverage B that cannot legally be repaired or replaced**,** the loss amount will be the difference between:

1)   the **actual cash value**; and

2)   the cost that would have been incurred to repair, replace or rebuild such lost or damaged property had such law or ordinance not been enforced at the time of loss.

LAW AND ORDINANCE Exclusions: As respects LAW AND ORDINANCE, the following additional exclusions apply:

This Policy does not cover:

1)   any cost incurred as a direct or indirect result of enforcement of any law or ordinance regulating any form of **contamination**.

2)   any machinery or equipment manufactured by or for the Insured, unless used by the Insured in its operation at the **location** suffering the physical loss or damage.

## Q.   LOSS PAYMENT INCREASED TAX LIABILITY

This Policy covers the increase in tax liability as described herein incurred by the Insured.

Coverage A:

The increase in tax liability from an insured loss at an insured **location** if the tax treatment of:

1)   the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or

2)   the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss happened.



Account No.   1-34105
Policy No.   1068228

### R.    MACHINERY OR EQUIPMENT STARTUP OPTION

After insured machinery or equipment that has sustained insured physical loss or damage is repaired or replaced and such machinery or equipment is undergoing startup, the following applies:

If physical loss or damage of the type insured directly results to such machinery or equipment from such startup, the Insured shall have the option of claiming such resulting insured damage as part of the original event of physical loss or damage or as a separate **occurrence**.

This Additional Coverage applies only:

1)   to the first startup event after the original repair or replacement; and

2)   when the first startup event happens during the term of this Policy or its renewal issued by the Company.

For the purposes of this Additional Coverage, startup means:

1)   the introduction into machinery or equipment of feedstock or other materials for processing or handling;

2)   the commencement of fuel or energy supply to machinery or equipment.

### S.    MISCELLANEOUS PROPERTY

This Policy covers insured physical loss or damage to:

1)   insured property;

2)   property of the type insured that is under contract to be used in a construction project at an insured **location**:

    a)   from the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier;

    b)   while such property is located at a storage site; and

    c)   while such property is in transit from a storage site to another storage site or to a construction project at an insured **location**,

that does not include any such property owned or rented by the contractor;

while anywhere within this Policy's TERRITORY, including while in transit.

This Additional Coverage excludes property covered elsewhere in this Policy.



MISCELLANEOUS PROPERTY Exclusions: As respects MISCELLANEOUS PROPERTY, the following additional exclusions apply:

1) This Policy excludes:

   a) **transmission and distribution systems** not at a **location**.

   b) property insured under import or export ocean marine insurance.

   c) property shipped between continents.

   d) airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

   e) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

2) This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

   a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

## T.   OPERATIONAL TESTING

This Policy covers insured physical loss or damage to insured property during the **period of operational testing**.

This Additional Coverage excludes property, including stock or material, manufactured or processed by the Insured.

## U.   PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2) reasonable and necessary:

   a) fire department firefighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

   b) costs incurred of restoring and recharging fire protection systems following an insured loss.



   c)  costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in this section of the Policy.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## V.   SERVICE INTERRUPTION PROPERTY DAMAGE

This Policy covers insured physical loss or damage to insured property at an insured **location** when such physical loss or damage results from the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

This Additional Coverage will apply when the period of service interruption as described below is in excess of 24 hours.

The period of service interruption is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored.

Additional General Provisions:

1)   The Insured will immediately notify the suppliers of services of any interruption of such services.

2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION PROPERTY DAMAGE Exclusions: As respects SERVICE INTERRUPTION PROPERTY DAMAGE, the following applies:

1)   The exclusions in the EXCLUSIONS clause in this section do not apply except for:

   a)  A1, A2, A3, A6, B1, B2, and

   b)  B4 with respect to incoming or outgoing voice, data or video, and

   c)  D1 except with respect to fungus, mold or mildew.



2) The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a) **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b) **terrorism**.

## W.   TEMPORARY REMOVAL OF PROPERTY

When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

1) while at the premises to which such property has been moved; and

2) for physical loss or damage as provided at the insured **location** from which such property was removed.

This Additional Coverage does not apply to property:

1) insured, in whole or in part, elsewhere in this Policy.

2) insured, in whole or in part, by any other insurance policy.

3) removed for normal storage, processing or preparation for sale or delivery.

## X.   TERRORISM

This Policy covers physical loss or damage to property as described in the INSURANCE PROVIDED provision caused by or resulting from **terrorism**.

Any act which satisfies the definition of **terrorism** shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage does not cover loss or damage which also comes within the terms of either item B2a or B2c of the EXCLUSIONS clause in this section of the Policy.



This Additional Coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

1) that involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination or that involves the discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion, or radioactive force, whether in time of peace or war and regardless of who commits the act; or

2) that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3) in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

4) that involves action taken to prevent, defend against, respond to or retaliate against **terrorism** or suspected **terrorism**.

## Y.   TRANSPORTATION

This Policy covers the following personal property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

1) owned by the Insured.

2) shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

3) of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

4) of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery including:

   a) when shipped by the Insured's direct contract service provider or by the Insured's direct contract manufacturer to the Insured or to the Insured's customer.

   b) when shipped by the Insured's customer to the Insured or to the Insured's contract service provider or to the Insured's contract manufacturer.

Coverage Attachment and Duration:

1) This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.



2)   However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft.  Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

This Additional Coverage:

1)   covers general average and salvage charges on shipments covered while waterborne.

2)   insures physical loss or damage caused by or resulting from:

    a)   unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

    b)   improper parties having gained possession of property through fraud or deceit.

Additional General Provisions:

1)   This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

2)   The Insured has permission, without prejudicing this insurance, to accept:

    a)   ordinary bills of lading used by carriers;

    b)   released bills of lading;

    c)   undervalued bills of lading; and

    d)   shipping or messenger receipts.

3)   The Insured may waive subrogation against railroads under side track agreements.

Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

TRANSPORTATION Exclusions: As respects TRANSPORTATION, the following applies:

1)   the exclusions in the EXCLUSIONS clause of this section do not apply except for A1 through A4, B1 through B4, C1, C3, C5, C6, D1 through D3.

2)   the following additional exclusions apply:

This Policy excludes:

    a)   samples in the custody of salespeople or selling agents.

    b)   property insured under import or export ocean marine insurance.



**Account No.   1-34105**
**Policy No.   1068228**

   c)  waterborne shipments, unless:

      (i)  by inland water; or

      (ii) by coastal shipments.

   d)  waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

   e)  airborne shipments unless by regularly scheduled passenger airlines, air freight carriers or NBA, WNBA, NHL, NBA G-League or NBA 2K League chartered flights that transport basketball, football, gaming, and hockey uniforms, equipment and supplies for the Washington Wizards, Washington Mystics, Washington Capitals, Capital City Go-Go or Wizards District Gaming.

   f)  property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

   g)  any transporting vehicle.

TRANSPORTATION Valuation: On property covered under this Additional Coverage the loss amount will not exceed:

1)  Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured.  Included in the value are accrued costs and charges legally due.  Charges may include the Insured's commission as selling agent.

2)  Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount.  Prepaid or advanced freight costs are included.

3)  Property not under invoice will be valued:

   a)  for property of the Insured, at the valuation provisions of this Policy applying at the place from which the property is being transported; or

   b)  for other property, at the actual cash market value at the destination point on the date of loss,

less any charges saved which would have become due and payable upon arrival at destination.

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved

FM Global

**Account No.   1-34105**
**Policy No.   1068228**

## TIME ELEMENT

TIME ELEMENT loss as provided in the TIME ELEMENT COVERAGES and TIME ELEMENT COVERAGE EXTENSIONS of this section of the Policy:

A.   is subject to the applicable limit of liability that applies to the insured physical loss or damage but in no event for more than any limit of liability that is stated as applying to the specific TIME ELEMENT COVERAGE and/or TIME ELEMENT COVERAGE EXTENSION; and

B.   will not increase the Policy limit of liability; and

C.   is subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## 1.   LOSS INSURED

A.   This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:

   1)   to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

   2)   used by the Insured, or for which the Insured has contracted use;

   3)   while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; or

   4)   while in transit as provided by this Policy, and

   5)   during the Periods of Liability described in this section,

   provided such loss or damage is not at a **contingent time element location**.

B.   This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

   1)   the use of any property or service owned or controlled by the Insured;

   2)   the use of any property or service obtainable from other sources;

   3)   working extra time or overtime; or

   4)   the use of inventory,

   all whether at an insured **location** or at any other premises. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

C.   This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy.  The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.   In determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY. The probable experience will consider any increase or decrease in demand for the Insured's goods or services during the PERIOD OF LIABILITY, even if such increase or decrease is from the same event that caused physical loss or damage starting the PERIOD OF LIABILITY.

## 2.   TIME ELEMENT COVERAGES

### A.   INSURED OPTION

The Insured has the option to make claim based on either

a)   GROSS EARNINGS and EXTENDED PERIOD OF LIABILITY; or

b)   GROSS PROFIT,

as described in the TIME ELEMENT section of this Policy and subject to the applicable terms and conditions as may be shown elsewhere.

Such option may be exercised at any time prior to the conditions set forth in the SETTLEMENT OF CLAIMS clause in the LOSS ADJUSTMENT AND SETTLEMENT section of this Policy.

If such claim involves more than one insured **location**, including interdependency at one or more insured **locations**, such claim will be adjusted by using the single coverage option chosen above.

### B.   GROSS EARNINGS

Measurement of Loss:

1)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a)   Gross Earnings;

b)   less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

c)   less Ordinary Payroll; and

d)   plus all other earnings derived from the operation of the business.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

e)  Ordinary Payroll, including taxes and charges dependent on the payment of wages:

(i)  for a period of time of not more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section immediately following the interruption of production or suspension of business operations or services, and

(ii) only to the extent such payroll continues following the loss and would have been earned had no such interruption happened.

However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

(i)  providing gainful employment for, or

(ii) paying less than the normal salary rate to,

all or part of its employees, then the number of consecutive days of Ordinary Payroll may be extended.  However, this provision will not increase the total liability of this Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision. Ordinary Payroll does not cover any portion of salaries or wages included in Gross Earnings.

2)  For the purposes of the Measurement of Loss, Gross Earnings is:

for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

Any amount recovered under property damage coverage at selling price will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

3)  In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

4)  If the Insured would have operated at a deficit had no interruption of production or suspension of business operations or services happened, the following applies:

a)  for Gross Earnings, the extent to which charges and expenses would have been earned will be determined by subtracting the operating deficits from the charges and expenses that necessarily continue.



    b)   for Ordinary Payroll, the extent payroll would have been earned will be determined by subtracting the excess, if any, of the operating deficit over the fixed charges that need to continue from such payroll.

5)   There is recovery hereunder to the extent that the Insured is:

    a)   wholly or partially prevented from producing goods or continuing business operations or services;

    b)   unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

    c)   unable to continue such operations or services during the PERIOD OF LIABILITY; and

    d)   able to demonstrate a loss of sales for the operations, services or production prevented.

## C.   GROSS PROFIT

Measurement of Loss:

1)   The recoverable GROSS PROFIT loss is the Actual Loss Sustained by the Insured of the following due to the necessary interruption of business during the PERIOD OF LIABILITY: a) Reduction in Sales, b) Ordinary Payroll and c) Increase in Cost of Doing Business.  The amount payable as indemnity hereunder will be:

    a)   with respect to Reduction in Sales:  The sum produced by applying the Rate of Gross Profit to the amount by which the sales during the PERIOD OF LIABILITY will fall short of the Standard Sales.  In determining the Reduction in Sales, any amount recovered under property damage coverage at selling price will be credited against lost sales.

    b)   Ordinary Payroll, including taxes and charges dependent on the payment of wages, during the PERIOD OF LIABILITY only to the extent such payroll would have been earned had such loss not happened.

    However, if an Insured reduces the daily loss payable under Ordinary Payroll, either by:

    (i)  providing gainful employment for, or

    (ii)  paying less than the normal salary rate to,

    all or part of its employees, the number of consecutive days of Ordinary Payroll may be extended. This provision will not increase the total liability of this Company beyond the amount it would have been liable for Ordinary Payroll costs without this provision.  Ordinary Payroll does not cover any portion of salaries or wages included in Net Profit or fixed charges.



c)   with respect to Increase in Cost of Doing Business:

(i)   the additional expenditure necessarily and reasonably incurred for the sole purpose of avoiding or diminishing the reduction in sales and a loss of Ordinary Payroll which, but for that expenditure, would have taken place during the PERIOD OF LIABILITY; but

(ii)   not exceeding the sum produced by applying the Rate of Gross Profit to the amount of the reduction thereby avoided,

all less any sum saved during the PERIOD OF LIABILITY with respect to such of the Insured Fixed Charges as may cease or be reduced because of such interruption of business.

2)   For the purposes of the Measurement of Loss:

Gross Profit is:

The amount produced by adding to the Net Profit the amount of the Insured Fixed Charges, or if there be no Net Profit the amount of the Insured Fixed Charges less that proportion of any loss from business operations as the amount of the Insured Fixed Charges bears to all fixed charges.

Net Profit is:

The net operating profit (exclusive of all capital receipts and accruals and all outlay properly chargeable to capital) resulting from the business of the Insured at the insured **locations** after due provision has been made for all fixed charges and other expenses including depreciation but before the deduction of any taxes on profits.

Insured Fixed Charges is:

All fixed charges unless specifically excluded herein. Ordinary Payroll is not an Insured Fixed Charge.

Sales is:

The money paid or payable to the Insured for goods sold and delivered and for services rendered in the conduct of the business at an insured **location**.

Rate of Gross Profit is:

The rate of Gross Profit earned on the sales during the twelve full calendar months immediately before the date of the physical loss or damage to the described property.



Standard Sales is:

The sales during that period in the twelve months immediately before the date of the physical loss or damage to the described property which corresponds with the PERIOD OF LIABILITY.

3) In determining the indemnity payable as the Actual Loss Sustained:

   a) if any fixed charges of the business are not insured hereunder, then, in computing the amount recoverable hereunder as Increase in Cost of Doing Business, that proportion only of the additional expenditure will be recoverable hereunder which the sum of the Net Profit and the Insured Fixed Charges bears to the sum of the Net Profit and all the fixed charges excluding Ordinary Payroll.

   b) if during the PERIOD OF LIABILITY goods will be sold or services will be rendered elsewhere than at the insured **locations** for the benefit of the business, either by the Insured or by others on the Insured's behalf, the money paid or payable in respect of such sales or services will be included in arriving at the amount of sales during the PERIOD OF LIABILITY.

4) The Insured will act with due diligence and dispatch in repairing or replacing physically damaged buildings and equipment to the same or equivalent physical and operating conditions that existed prior to the damage; and take whatever actions are necessary and reasonable to minimize the loss payable hereunder.

GROSS PROFIT Exclusions: As respects GROSS PROFIT, the TIME ELEMENT EXCLUSIONS B and C of this section do not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under GROSS PROFIT for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the PERIOD OF LIABILITY.

## D.   EXTRA EXPENSE

Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

1) extra expenses to temporarily continue as nearly **normal** as practicable the conduct of the Insured's business;

2) extra costs of temporarily using property or facilities of the Insured or others; and



3)   costs to purchase finished goods from third parties to fulfill orders when such orders cannot be met due to physical loss or damage to the Insured's finished goods, less payment received for the sale of such finished goods.

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

If the Insured makes claim in accordance with the terms and conditions of the INSURED OPTION clause, the PERIOD OF LIABILITY for EXTRA EXPENSE coverage will be the PERIOD OF LIABILITY applicable to the Time Element coverage option selected.

EXTRA EXPENSE Exclusions: As respects EXTRA EXPENSE, the following applies:

1)   TIME ELEMENT EXCLUSIONS C does not apply to item 3 above.

2)   The following additional exclusions apply:

This Policy does not insure:

a)   any loss of income.

b)   costs that usually would have been incurred in conducting the business during the same period had no physical loss or damage happened.

c)   costs of permanent repair or replacement of property that has been damaged or destroyed.  However, this exclusion does not apply to item 3 above.

d)   any expense recoverable elsewhere in this Policy.

## E.   LEASEHOLD INTEREST

Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

1)   If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

2)   If the lease is cancelled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

3)   As used above, the following terms mean:

Net Lease Interest:
That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).



Lease Interest:
The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, the following applies:

1) This Policy does not insure loss directly resulting from physical loss or damage to Personal Property.

2) TIME ELEMENT EXCLUSIONS A, B and C do not apply and the following applies instead:

   This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

## F.   RENTAL INSURANCE

Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

1) the fair rental value of any portion of the property occupied by the Insured;

2) the income reasonably expected from rentals of unoccupied or unrented portions of such property; and

3) the rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.

RENTAL INSURANCE Exclusions: As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

## 3.   PERIOD OF LIABILITY

A.   The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except GROSS PROFIT and LEASEHOLD INTEREST and as shown below or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

1)   For building and equipment, the period:

    a)   starting from the time of physical loss or damage of the type insured; and

    b)   ending when with due diligence and dispatch the building and equipment could be:

        (i)   repaired or replaced; and

        (ii)  made ready for operations,

        under the same or equivalent physical and operating conditions that existed prior to the damage.

    c)   not to be limited by the expiration of this Policy.

2)   For building and equipment under construction:

    a)   the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

    b)   due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

3)   For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

    a)   to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

    b)   to replace physically damaged mercantile stock.

    This item does not apply to RENTAL INSURANCE.

4)   For raw materials and supplies, the period of time:

    a)   of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved

**53**



     b)  limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5)  If water:

     a)  used for any manufacturing purpose, including but not limited to as a raw material or for power;

     b)  stored behind dams or in reservoirs; and

     c)  on any insured **location**,

is released as the result of physical damage of the type insured to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6)  For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation.  This time does not include research, engineering or any other time necessary to restore or recreate lost information.

This item does not apply to RENTAL INSURANCE.

7)  For physically damaged or destroyed property covered under DATA RESTORATION, the period:

     a)  starting from the time of **physical loss or damage to electronic data, programs or software**; and

     b)  ending when with due diligence and dispatch the electronic data, programs or software could have been recreated or restored under the same or equivalent physical and operating conditions that existed prior to the physical loss or damage.

This item does not apply to RENTAL INSURANCE.

B.  The PERIOD OF LIABILITY applying to GROSS PROFIT is as follows:

1)  The period:

     a)  starting from the time of physical loss or damage of the type insured; and



    b)  ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

    c)  not to be limited by the expiration of this Policy.

2)  For property under construction, the period:

    a)  starting on the date that production, business operation or service would have commenced if physical damage of the type insured had not happened; and

    b)  ending not later than the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section,

during which period the results of the business shall be directly affected by such damage.

    c)  not to be limited by the expiration of this Policy.

The Rate of Gross Profit and Standard Sales will be based on the experience of the business after construction is completed and the probable experience during the PERIOD OF LIABILITY.

C.  The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

1)  making changes to the buildings, structures, machinery or equipment except as provided in the LAW AND ORDINANCE clause in the PROPERTY DAMAGE section.

2)  restaffing or retraining employees.  However, this item does not apply to additional time needed to train staff to use new machinery or equipment that replaces machinery or equipment that suffered insured physical loss or damage, provided such training is completed within 90 consecutive days after the new machinery or equipment has been installed.

If two or more Periods of Liability apply such periods will not be cumulative.



Account No.   1-34105
Policy No.   1068228

4.   **TIME ELEMENT EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure:

A.   Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

   1)   physical loss or damage not insured by this Policy on or off of the insured **location**.

   2)   planned or rescheduled shutdown.

   3)   strikes or other work stoppage.

   4)   any other reason other than physical loss or damage insured under this Policy.

B.   Any increase in loss due to:

   1)   suspension, cancellation or lapse of any lease, contract, license or orders.

   2)   damages for breach of contract or for late or noncompletion of orders.

   3)   fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

   4)   any other consequential or remote loss.

C.   Any loss resulting from physical loss or damage to finished goods manufactured by the Insured, or the time required for their reproduction.

D.   Any loss resulting from the **actual cash value** portion of direct physical loss or damage by fire caused by or resulting from **terrorism**.

5.   **TIME ELEMENT COVERAGE EXTENSIONS**

This Policy also insures TIME ELEMENT loss, as provided by the TIME ELEMENT COVERAGES of this Policy, for the TIME ELEMENT COVERAGE EXTENSIONS described below.



Account No. 1-34105
Policy No. 1068228

## CYBER TIME ELEMENT COVERAGE EXTENSIONS

### A. DATA SERVICE PROVIDER TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption at an insured **location** of **off-premises data processing or data transmission services**, when the interruption is caused by any accidental event at the facilities of the provider of such services that immediately prevents in whole or in part the delivery of such provided services.

For the purposes of this Extension:

1) facilities of the provider of **off-premises data processing or data transmission services** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine, and

2) an accidental event to satellites will be considered an accidental event at the facilities of the provider.

This Extension will apply when the period of interruption of **off-premises data processing or data transmission services** is in excess of 24 hours.

Additional General Provisions:

1) The Insured will immediately notify the company providing **off-premises data processing or data transmission services** of any interruption of such services.

2) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has entered into for such specified services.

Coverage provided in this Extension is excluded from coverage elsewhere in this Policy.

This Extension does not cover Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured covered by OWNED NETWORK INTERRUPTION coverage as provided in this section of the Policy.

DATA SERVICE PROVIDER TIME ELEMENT Exclusions: As respects DATA SERVICE PROVIDER TIME ELEMENT, the following applies:

1) Item B4 of the EXCLUSIONS clause in the PROPERTY DAMAGE section does not apply except for B4 with respect to:

　　a) incoming electricity, fuel, water, gas, steam or refrigerant; and

　　b) outgoing sewerage.



<div align="right">

**Account No.  1-34105**
**Policy No.  1068228**

</div>

2)  The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a)  **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

b)  **terrorism**.

As used above, the period of interruption of **off-premises data processing or data transmission services**:

1)  is the period starting with the time when an interruption of provided services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2)  is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3)  does not extend to include the interruption of operations caused by any reason other than interruption of the provided service(s).

## B.  OWNED NETWORK INTERRUPTION

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of interruption directly resulting from:

1)  the failure of the Insured's **electronic data processing equipment or media** to operate, provided that such failure is the direct result of a **cyber event** directed at the NAMED INSURED; or

2)  the Insured's reasonable action to temporarily protect the Insured's **electronic data processing equipment or media** against an actual or immediately impending **cyber event** directed at the NAMED INSURED, provided such action is necessary to prevent failure of the Insured's **electronic data processing equipment or media** to operate.

For the purposes of this Extension, the Insured's **electronic data processing equipment or media** can be located worldwide except in Cuba, Iran, North Korea, Sudan, Syria or Crimea Region of Ukraine.

As respects item 1 above, this Extension will apply when the period of interruption is in excess of 48 hours.



As used above, the period of interruption:

1)  is the period starting when the Insured's **electronic data processing equipment or media** fails to operate and ending when with due diligence and dispatch, the Insured's **electronic data processing equipment or media** could be restored to the same or equivalent operating condition that existed prior to the failure.

2)  does not include the additional time to make changes to the Insured's **electronic data processing equipment or media**.

## SUPPLY CHAIN TIME ELEMENT COVERAGE EXTENSIONS

### A.    CIVIL OR MILITARY AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location** provided such order is the direct result of physical damage of the type insured at the insured **location** or within five statute miles/eight kilometres of it.

This Extension does not apply to LEASEHOLD INTEREST.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of such physical damage; and

2)  ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### B.    CONTINGENT TIME ELEMENT EXTENDED

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at **contingent time element locations** located within the TERRITORY of this Policy.

As respects CONTINGENT TIME ELEMENT EXTENDED:

1)  Time Element loss recoverable under this Extension is extended to include the following TIME ELEMENT COVERAGE EXTENSIONS:

    CIVIL OR MILITARY AUTHORITY
    CONTINGENT TIME ELEMENT EXTENDED



Account No.   1-34105
Policy No.   1068228

DATA SERVICE PROVIDER TIME ELEMENT
DELAY IN STARTUP
EXTENDED PERIOD OF LIABILITY
INGRESS/EGRESS
ON PREMISES SERVICES
SERVICE INTERRUPTION TIME ELEMENT

2)   The Insured will influence and cooperate with the **contingent time element location** in every way and take any reasonable and necessary action to mitigate the loss payable hereunder.

3)   TIME ELEMENT EXCLUSIONS C does not apply.

CONTINGENT TIME ELEMENT EXTENDED Exclusions: As respects CONTINGENT TIME ELEMENT EXTENDED, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing transmission of voice, data or video.

2)   **earth movement** as respects a direct or indirect customer, supplier, contract manufacturer or contract service provider located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

3)   physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

## C.   INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to partial or total physical prevention of ingress to or egress from an insured **location**, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured to property of the type insured.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1)   lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2)   picketing or other action by strikers except for physical damage not excluded by this Policy.



3)  physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of such physical damage; and

2)  ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

### D.  LOGISTICS EXTRA COST

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials:

1)  directly between insured **locations**; or

2)  directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured,

provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.

Measurement of Loss:

The recoverable extra cost loss will be the reasonable and necessary extra costs incurred by the Insured of the following:

1)  extra costs to temporarily continue as nearly **normal** as practicable the movement of goods or materials.

This Extension will apply when the PERIOD OF LIABILITY is in excess of 48 hours except 168 hours applies for **earth movement** and/or **flood** and/or **wind**.

LOGISTICS EXTRA COST Exclusions: As respects LOGISTICS EXTRA COST, the following additional exclusions apply:

This Policy does not insure:

1)  any loss resulting from disruption in the movement of goods or materials between **contingent time element locations**.



2)  any loss resulting from disruption of incoming or outgoing services consisting of electricity, gas, fuel, steam, water, refrigeration, sewerage and voice, data or video.

3)  any loss of income.

4)  costs that usually would have been incurred in conducting the business during the same period had there been no disruption of **normal** movement of goods or materials.

5)  costs of permanent repair or replacement of property that has been damaged or destroyed.

6)  any expense recoverable elsewhere in this Policy.

7)  any loss resulting from disruption caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

8)  any loss resulting from disruption caused by loss or damage from **earth movement** in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

9)  any loss resulting from disruption caused by physical loss or damage to personal property of the Insured while in transit.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of physical loss or damage causing the disruption of the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured, and

2)  ending not later than:

   a)  when with due diligence and dispatch the **normal** movement of goods or materials directly between insured **locations**; or directly between the insured **location** and the **location** of the direct customer, supplier, contract manufacturer or contract service provider to the Insured could be resumed; or

   b)  the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

### E.   SERVICE INTERRUPTION TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the period of service interruption at an insured **location** when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental event at the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

This Extension will apply when the period of service interruption is in excess of 24 hours.

Additional General Provisions:

1)   The Insured will immediately notify the suppliers of services of any interruption of such services.

2)   The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

SERVICE INTERRUPTION TIME ELEMENT Exclusions: As respects SERVICE INTERRUPTION TIME ELEMENT, the following applies:

1)   The exclusions in the EXCLUSIONS clause in the PROPERTY DAMAGE section do not apply except for:

    a)   A1, A2, A3, A6, B1, B2, and

    b)   B4 with respect to incoming or outgoing voice, data or video, and

    c)   D1 except with respect to fungus, mold or mildew.

2)   The following additional exclusions apply:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

    a)   **earth movement** for property located in California, in the **New Madrid Seismic Zone** or in the **Pacific Northwest Seismic Zone**.

    b)   **terrorism**.



As used above, the period of service interruption:

1) is the period starting with the time when an interruption of specified services happens; and ending when with due diligence and dispatch the service could be wholly restored and the **location** receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

2) is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

3) does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## ADDITIONAL TIME ELEMENT COVERAGE EXTENSIONS

## A.   ATTRACTION PROPERTY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**.

ATTRACTION PROPERTY Exclusions: As respects ATTRACTION PROPERTY, the following additional exclusion applies:

This Policy does not insure loss resulting from:

1) physical loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of such physical damage; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

FM Global

<div align="right">

**Account No.  1-34105**
**Policy No.  1068228**

</div>

### B.  CRISIS MANAGEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil or military authority limits, restricts or prohibits partial or total access to an insured **location**, provided such order is a direct result of:

1)  a violent crime, suicide, attempted suicide, or armed robbery; or

2)  a death or bodily injury caused by a workplace accident;

at such insured **location**.

For the purposes of this Extension only, a workplace accident shall be considered a sudden, fortuitous event that happens during working hours and arises out of work performed in the course and the scope of employment.

This Extension of coverage will apply when the PERIOD OF LIABILITY is in excess of 4 hours.

CRISIS MANAGEMENT Exclusions: As respects CRISIS MANAGEMENT, the following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1)  **terrorism**.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting with the time the civil or military authority prohibits access; and

2)  ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

### C.  DELAY IN STARTUP

GROSS EARNINGS or GROSS PROFIT and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.



**Account No.  1-34105**
**Policy No.  1068228**

### D.    EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1)   the interruption of business as covered by GROSS EARNINGS;

2)   for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss happened; and

3)   commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included in this Policy.

However, this Extension does not apply to GROSS EARNINGS loss resulting from physical loss or damage caused by or resulting from **terrorism**.

EXTENDED PERIOD OF LIABILITY Exclusions: As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to damages for breach of contract or for late or noncompletion of orders, or fines or penalties of any nature except fines or penalties for breach of contract or for late or noncompletion of orders.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

### E.    INTERRUPTION BY COMMUNICABLE DISEASE

If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:

1)   an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or

2)   a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,

this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.



This Extension will apply when access to such **location** is limited, restricted, or prohibited in excess of 48 hours.

INTERRUPTION BY COMMUNICABLE DISEASE Exclusions: As respects INTERRUPTION BY COMMUNICABLE DISEASE, the following additional exclusions apply:

This Policy does not insure loss resulting from:

1) the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

2) loss or damage caused by or resulting from **terrorism**, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any sequence of loss.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1) starting at the time of the order of the authorized governmental agency or the Officer of the Insured; and

2) ending not later than the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

## F.   ON PREMISES SERVICES

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet/300 metres of the insured **location**:

1) Electrical equipment and equipment used for the transmission of voice, data or video.

2) Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

## G.   PROTECTION AND PRESERVATION OF PROPERTY TIME ELEMENT

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.



<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

This Extension does not cover the Actual Loss Sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in the PROPERTY DAMAGE section.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage happened.

## H.   RELATED REPORTED VALUES

If reported TIME ELEMENT values include:

1)   **locations** used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such **locations**,

3)   from insured physical loss or damage at an insured **location**,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such insured **location**.

## I.   RESEARCH AND DEVELOPMENT

The GROSS EARNINGS and GROSS PROFIT coverages are extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and Ordinary Payroll directly attributable to the interruption of research and development activities that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this Extension will be the period from the time of direct physical loss or damage of the type insured to the time when the property could be repaired or replaced and made ready for operations, but as respects GROSS PROFIT and Ordinary Payroll such period of time shall not exceed the period of time shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.  Such period of time shall not be limited by the date of expiration of this Policy.

## J.   SOFT COSTS

This Policy covers the Actual Loss Sustained incurred by the Insured of **soft costs** during the PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.



<div align="right">

**Account No. 1-34105**
**Policy No. 1068228**

</div>

## LOSS ADJUSTMENT AND SETTLEMENT

**1. REQUIREMENTS IN CASE OF LOSS**

The Insured will:

1) give immediate written notice to the Company of any loss.

2) protect the property from further loss or damage.

3) promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, **actual cash value**, replacement value and amount of loss claimed.

4) give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company. The proof of loss must state the knowledge and belief of the Insured as to:

   a) the time and origin of the loss.

   b) the Insured's interest and that of all others in the property.

   c) the **actual cash value** and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d) any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e) by whom and for what purpose any **location** insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5) include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6) further, the Insured, will as often as may be reasonably required:

   a) exhibit to any person designated by the Company all that remains of any property;

   b) submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

   c) produce for examination at the request of the Company:

      (i) all books of accounts, business records, bills, invoices and other vouchers; or



**Account No.  1-34105**
**Policy No.  1068228**

(ii) certified copies if originals are lost,

at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## 2.   CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America, except in Canada where losses will be paid in Canadian currency, unless directed otherwise by the Insured.

## 3.   PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of insured physical loss or damage determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s), subject to the Policy's provisions.  To obtain such partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.

## 4.   COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 5.   SUBROGATION

The Insured is required to cooperate in any subrogation proceedings.  The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)   any applicable deductible; and/or

2)   any provable uninsured loss,

bears to the entire provable loss amount.

## 6.   COMPANY OPTION

The Company has the option to take all or any part of damaged property at the agreed or appraised value.  The Company must give notice to the Insured of its intention to do so within 30 days after receipt of Proof of Loss.



7. **ABANDONMENT**

There may be no abandonment of any property to the Company.

8. **APPRAISAL**

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1) the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2) the Company has received a signed and sworn Proof of Loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the **actual cash value** and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1) pay its chosen appraiser; and

2) bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

9. **SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1) the Insured has fully complied with all the provisions of this Policy; and

2) legal action is started within twelve months after inception of the loss.



**Account No.  1-34105**
**Policy No.  1068228**

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action must be started within the shortest limit of time permitted by such laws.

## 10.   SETTLEMENT OF CLAIMS

The amount of loss for which the Company may be liable will be paid within 30 days after:

A.    proof of loss as described in this Policy is received by the Company; and

B.    when a resolution of the amount of loss is made either by:

　　 1)   written agreement between the Insured and the Company; or

　　 2)   the filing with the Company of an award as provided in the APPRAISAL clause of this section.

FM Global

**Account No.  1-34105**
**Policy No.  1068228**

# GENERAL PROVISIONS

## 1.  CANCELLATION/NON-RENEWAL

This Policy may be:

A.  cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.  cancelled by the Company by giving the Insured not less than:

 1)  90 days' written notice of cancellation; or

 2)  10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.  non-renewed by the Company by giving the Insured not less than 90 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

## 2.  INSPECTIONS

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.  The Company does not address life, safety or health issues.

The Company's:

A.  right to make inspections;

B.  making of inspections; or

C.  providing recommendations or other information in connection with any inspections,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others.  The Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.



Account No.  1-34105
Policy No.  1068228

3.  **PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS**

A.  If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for insured **locations** within such jurisdictions.

B.  The Company will provide to the Insured copies of endorsements mandated for use by the laws of provinces in Canada.  The endorsements modify this Policy with respect to any insured property located in the province in which the endorsement applies.

C.  The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America.  The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

D.  As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico, the definition of **terrorism** is declared null and void and it is agreed that an event defined as a Certified Act of Terrorism under the terms of the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) attached to this Policy shall be considered an act of **terrorism** within the terms of this Policy.  Coverage recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) is excluded from any other coverage under this Policy. Any difference in limit between loss recoverable under the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT(S) and this Policy is not recoverable under this Policy.

4.  **LIBERALIZATION**

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

5.  **MISREPRESENTATION AND FRAUD**

This entire Policy will be void if, whether before or after a loss, an Insured has:

A.  willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

B.  made any attempt to defraud the Company.

C.  made any false swearing.



## 6.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

A.   The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.   The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

   1)   any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

   2)   foreclosure, notice of sale, or similar proceedings with respect to the property.

   3)   change in the title or ownership of the property.

   4)   change to a more hazardous occupancy.

   The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change.  If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

   1)   sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

   2)   this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 90 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment.  If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation.  If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause.  The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension.  The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.



Account No.  1-34105
Policy No.  1068228

F.   If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage.  No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim.  At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest.  In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

G.   If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.   Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 7.   OTHER INSURANCE

A.   If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.   In no event will this Policy apply as contributing insurance.

C.   The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy.  The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy.  Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.   The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy.  The existence of such other insurance will not prejudice recovery under this Policy.  If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.   If this Policy is deemed to contribute with other insurance, the limit of liability applicable at each **location**, for the purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest **location** value on file with the Company.

## 8.   POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance.  The Insured and the Company may request changes to this Policy.  This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

FM Global

<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.   create a waiver, or change any part of this Policy; or

B.   prevent the Company from asserting any rights under the provisions of this Policy.

## 9.   REDUCTION BY LOSS

Claims paid under this Policy will not reduce its limit of liability, except claims paid will reduce any **annual aggregate** limit.

## 10.   SUSPENSION

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured.  The suspended insurance may be reinstated by the Company.  Any unearned premium resulting from such suspension will be returned by the Company.

## 11.   TITLES

The titles in this Policy are only for reference.  The titles do not in any way affect the provisions of this Policy.

## 12.   ASSIGNMENT

Assignment of this Policy will not be valid except with the written consent of the Company.

## 13.   DEFINITIONS

The following terms when appearing in **boldface** in this Policy mean:

**actual cash value**:
the amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**annual aggregate**:
the Company's maximum amount payable during any policy year.

**communicable disease**:
disease which is:

A.   transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or

B.   Legionellosis.

**contaminant**:
anything that causes **contamination**.



**contamination**:
any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

**contingent time element location**:
A.    any **location**:

   1)   of a direct customer, supplier, contract manufacturer or contract service provider to the Insured;

   2)   of any company under a royalty, licensing fee or commission agreement with the Insured;

B.    any **location** of a company that is a direct or indirect customer, supplier, contract manufacturer or contract service provider to a **location** described in A1 above,

not including **locations** of any company directly or indirectly supplying to, or receiving from, the Insured, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

**cyber event**:
any act involving the malicious or unauthorized access to, operation of, or use of **electronic data processing equipment or media**, regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **cyber event** will not be considered to be loss by **cyber event** within the terms and conditions of this Policy.

**date or time recognition**:
the recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

**earth movement**:
any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical loss or damage by fire, explosion, sprinkler leakage, or **flood** resulting from **earth movement** will not be considered to be loss by **earth movement** within the terms and conditions of this Policy.

**electronic data processing equipment or media**:
any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

Advantage - TE Select - US North America - 2016 (2019 update) ©2019 FM Global. All rights reserved



**fine arts**:
paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

**flood**:
flood; surface waters; rising waters; storm surge, sea surge, wave wash; waves; tsunami; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; all whether driven by wind or not; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event, whether natural or man-made, contributing concurrently or in any other sequence of loss. Physical loss or damage from **flood** associated with a storm or weather disturbance whether or not identified by name by any meteorological authority, is considered to be **flood** within the terms of this Policy. However, physical loss or damage by fire, explosion or sprinkler leakage resulting from **flood** is not considered to be loss by **flood** within the terms and conditions of this Policy.

**irreplaceable**:
an item which cannot be replaced with other of like kind and quality.

**location**:
A.   as specified in the Schedule of Locations, or

B.   if not so specified in the Schedule of Locations:

　　1)   a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing),

　　　　a)   bounded on all sides by public streets, clear land space or open waterways, each not less than 50 feet/15 metres wide. Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this definition.

**New Madrid Seismic Zone**:
Arkansas, United States of America, counties of:
Arkansas, Clay, Craighead, Crittenden, Cross, Fulton, Greene, Independence, Izard, Jackson, Lawrence, Lee, Lonoke, Mississippi, Monroe, Phillips, Poinsett, Prairie, Randolph, Sharp, St. Francis, White, Woodruff

Illinois, United States of America, counties of:
Alexander, Bond, Clay, Clinton, Crawford, Edwards, Effingham, Fayette, Franklin, Gallatin, Hamilton, Hardin, Jackson, Jasper, Jefferson, Johnson, Lawrence, Madison, Marion, Massac, Monroe, Perry, Pope, Pulaski, Randolph, Richland, Saline, St. Clair, Union, Wabash, Washington, Wayne, White, Williamson

Indiana, United States of America, counties of:
Gibson, Knox, Pike, Posey, Spencer, Vanderburgh, Warrick



<u>Kentucky, United States of America, counties of</u>:
Ballard, Caldwell, Calloway, Carlisle, Christian, Crittenden, Daviess, Fulton, Graves, Henderson, Hickman, Hopkins, Livingston, Lyon, Marshall, McCracken, McLean, Muhlenberg, Todd, Trigg, Union, Webster

<u>Mississippi, United States of America, counties of</u>:
Alcorn, Benton, Coahoma, De Soto, Lafayette, Marshall, Panola, Quitman, Tate, Tippah, Tunica

<u>Missouri, United States of America, counties of</u>:
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Jefferson, Madison, Mississippi, New Madrid, Oregon, Pemiscot, Perry, Reynolds, Ripley, Scott, Shannon, St. Francois, St. Louis, City of St. Louis, Ste. Genevieve, Stoddard, Washington, Wayne

<u>Tennessee, United States of America, counties of</u>:
Benton, Carroll, Chester, Crockett, Decatur, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Houston, Humphreys, Lake, Lauderdale, Madison, McNairy, Montgomery, Obion, Perry, Shelby, Stewart, Tipton, Weakley

**normal**:
the condition that would have existed had no physical loss or damage happened.

**normal cost**:
the cost associated with the movement of goods or materials suffering the disruption that the Insured would have incurred had no physical loss or damage causing disruption happened.

**occurrence**:
the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage, except as respects the following:

A.   **terrorism**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all acts of **terrorism** during a continuous period of seventy-two (72) hours.

B.   **earth movement**: **occurrence** shall mean the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by all **earth movement(s)** during a continuous period of seventy-two (72) hours.

**off-premises data processing or data transmission services**:
the storage or processing of data performed off-premises of the Insured's property, including the transmission of voice, data or video over a single, or combination of, computer or communication networks.

**Pacific Northwest Seismic Zone**:
<u>Oregon, United States of America, counties of</u>:
Benton, Clackamas, Clatsop, Columbia, Coos, Curry, Douglas, Hood River, Jackson, Josephine, Klamath, Lane, Lincoln, Linn, Marion, Multnomah, Polk, Tillamook, Washington, Yamhill



<u>Washington, United States of America, counties of:</u>
Chelan, Clallam, Clark, Cowlitz, Grays Harbor, Island, Jefferson, King, Kitsap, Kittitas, Lewis, Mason, Pacific, Pierce, San Juan, Skagit, Skamania, Snohomish, Thurston, Wahkiakum, Whatcom

<u>British Columbia (includes Vancouver Island), Canada:</u>
South of 50° N latitude and west of 120° W longitude

**period of operational testing**:
the period of time beginning 24 hours prior to the earlier of the following:

A.    introduction, into a system, of feedstock or other materials for processing or handling;

B.    commencement of fuel or energy supply to a system,

and ending with the earlier of the following:

A.    the expiration date or cancellation date of this Policy.

B.    if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

**physical loss or damage to electronic data, programs or software**:
the destruction, distortion or corruption of electronic data, programs or software.

**representative company(ies)**:
Factory Mutual Insurance Company, FM Insurance Company Limited or FM Insurance Europe S.A.; Affiliated FM Insurance Company; Appalachian Insurance Company or any other company issuing a local policy at the direction of the Company.

**soft costs**:
costs over and above those that are **normal** at an insured **location** undergoing renovation or in the course of construction, limited to the following:

A.    construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

B.    commitment fees, leasing and marketing expenses - the cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

C.    additional fees for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

D.    property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

FM Global

<div align="right">

**Account No.   1-34105**
**Policy No.   1068228**

</div>

**terrorism**:
any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

when the effect or apparent purpose is:

A.   to influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

B.   to further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

**transmission and distribution systems**:
transmission and distribution systems including but not limited to electricity, gas, fuel, steam, water, refrigeration, sewerage, voice, data, and video.  Such systems shall include poles, towers and fixtures, overhead conductors and devices, underground and underwater conduit, underground and underwater conductors and devices, line transformers, service meters, street lighting and signal systems.

**valuable papers and records**:
written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

**wind**:
direct action of wind including substance driven by wind.  **Wind** does not mean or include anything defined as **flood** in this Policy.



**SCHEDULE OF LOCATIONS, APPENDIX A**

Account No.   1-34105

Policy No.   1068228

| Location No. | Index No. | Name | Street Address | City | County | State/Province | Postal Code | Country Code |
|---|---|---|---|---|---|---|---|---|
| 8 | 003618.74 | St. Elizabeth's East MedStar Wizards Performance Center | 1100 Oak Drive SE | Washington | District of Columbia | District of Columbia | 20032 | USA |
| 3 | 000142.06 | Capital One Arena | 601 F Street Northwest | Washington | District of Columbia | District of Columbia | 20004-1605 | USA |
| 5 | 002055.34 | Office | 700 6th Street Northwest, Suite 410 & 420 | Washington | District of Columbia | District of Columbia | 20002-4324 | USA |
| 4 | 043436.20 | Warehouse | 7701-7717 Penn Belt Drive & 3905-3917 Penn Belt Place | District Heights | Prince George's | Maryland | 20747-4731 | USA |
| 1 | 002147.05 | Medstar Capitals Iceplex | 627 North Glebe Road | Arlington | Arlington | Virginia | 22203-2144 | USA |
| 2 | 044443.93 | EagleBank Arena - George Mason University | 4500 Patriot Circle | Fairfax | Fairfax | Virginia | 22030-4468 | USA |

Account No. 1-34105
Policy No. 1068228

## SUPPLEMENTAL UNITED STATES
## CERTIFIED ACT OF TERRORISM ENDORSEMENT

**This Endorsement is applicable to all insured property in the United States, its territories and possessions and the Commonwealth of Puerto Rico.**

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002, as amended.**

In consideration of a premium charged of **USD 130,919**, this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein. This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act) which includes a provision stating that if the aggregate insured losses exceed USD 100,000,000,000 during any calendar year, neither the United States Government nor any insurer that has met its insurer deductible shall be liable for the payment of any portion of the amount of such losses that exceed USD 100,000,000,000.  If the aggregate insured losses for all insurers exceed USD 100,000,000,000, your coverage may be reduced.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 80% of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy.  The premium charged for this coverage is provided above.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

For the purposes of this Endorsement, a "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002 as amended and extended.  The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

A.     The act resulted in aggregate losses in excess of USD 5,000,000; and

B.     The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of

the United States or to influence the policy or affect the conduct of the United States Government by coercion.



**Account No. 1-34105**
**Policy No. 1068228**

## CYBER OPTIMAL RECOVERY ENDORSEMENT

It is agreed that this Endorsement is a part of the Policy and that the terms and conditions of the Policy are amended as described herein. All other terms and conditions of the Policy remain unchanged.

INSURED OPTION:

The Insured acknowledges having purchased a cyber policy.

As respects loss or damage that is covered by both this Policy and the cyber policy, and notwithstanding anything contained in the OTHER INSURANCE clause in the GENERAL PROVISIONS section of this Policy, the Insured may elect, within 180 days of notifying this Company of the loss, to apportion the loss between this Policy and the cyber policy and to designate this Policy as primary, excess or contributing insurance to the cyber policy with respect to each portion of the loss, provided designating it as such is necessary to maximize the total indemnity available for the loss under both this Policy and the cyber policy.

This election option shall be subject to the following additional conditions:

ADDITIONAL CONDITIONS

1) The Insured will provide this Company with a copy of any cyber policy in force at the time of loss.

2) Any coverage provided by the cyber policy that is not provided by this Policy does not extend to this Policy.

3) The insolvency, inability or unwillingness to pay of the company issuing the cyber policy shall in no event increase this Company's liability or delay settlement under this Policy.



**Multistate**
**COMPLAINT NOTICE**

The following states require Factory Mutual Insurance Company to notify insureds that should you have an inquiry or complaint about insurance in one of these states, you may contact your Insurance Company or the State Department of Insurance as listed below:

<u>Insurance Company</u>

FACTORY MUTUAL INSURANCE COMPANY
Corporate Affairs Department
P.O. Box 7500
Johnston, Rhode Island 02919
(800) 343-7722

<u>State Department of Insurance</u>

Arkansas Insurance Department
Consumer Service Division
1 Commerce Way, Suite 102
Little Rock, Arkansas 72202
1-800-852-5494 or (501) 371-2640
E-mail: Insurance.Consumers@Arkansas.gov

Texas Department of Insurance
MC 111-1A, P.O. Box 149091
Austin, TX 78714-9091
1-800-252-3439
http://www.tdi.texas.gov
E-mail: ConsumerProtection@tdi.texas.gov

Illinois Department of Insurance
Consumer Affairs and Information
320 West Washington Street
Springfield, Illinois 62767-0001
1-866-445-5364
E-mail: consumer_complaints@ins.state.il.us
https://mc.insurance.illinois.gov/messagecenter.nsf

Virginia Bureau of Insurance
PO Box 1157
Richmond, VA 23218
1-877-310-6560 or 1-800-371-9185
www.scc.virginia.gov/boi

Indiana Department of Insurance
Consumer Services Division
311 West Washington Street, Suite 300
Indianapolis, Indiana 46204-2787
1-800-622-4461 or (317) 232-2385
www.in.gov/idoi

Wisconsin Office of the Commissioner
of Insurance
125 South Webster Street
PO Box 7873
Madison, WI 53707-7873
1-800-236-8517
(608) 266-0103 in Madison

*This Notice is provided only for informational purposes. It does not modify, limit or enlarge insurance policy provisions. The actual rights and responsibilities of the insurer and the insured are contained in the policy's terms and conditions.*

FMIC 7166 (06/20)

Page 1 of 1

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

Lincoln Holdings LLC, et al.

Case Number: __2021 CA 002196 B__

vs

Date: __June 29, 2021__

Factory Mutual Insurance Company

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Matthew J. Schlesinger | Relationship to Lawsuit |
| Firm Name:<br>Covington & Burling LLP | ☒ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.:<br> (202) 662-6000            429689 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:  ☐ Non-Jury          ☐ 6 Person Jury          ☒ 12 Person Jury

Demand: $ __in excess of $10,001__          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

**NATURE OF SUIT:**     *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☒ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent    ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent     ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation                 ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                 Over $25,000 Pltf. Grants Consent          Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation                 ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees            Under $25,000 Pltf. Grants Consent         Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                       Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile                  ☐ 03 Destruction of Private Property    ☐ 05 Trespass
☐ 02 Conversion                  ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process            ☐ 10 Invasion of Privacy              ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 11 Libel and Slander                      Not Malpractice)
☐ 03 Assault and Battery         ☐ 12 Malicious Interference           ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution            ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)  ☐ 14 Malpractice Legal                ☐ 20 Friendly Suit
☐ 06 False Accusation            ☐ 15 Malpractice Medical (Including Wrongful Death)  ☐ 21 Asbestos
☐ 07 False Arrest                ☐ 16 Negligence- (Not Automobile,     ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                             Not Malpractice)                ☐ 23 Tobacco
                                                                       ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

☐ 01 Accounting
☐ 02 Att. Before Judgment
☐ 05 Ejectment
☐ 09 Special Writ/Warrants
    (DC Code § 11-941)
☐ 10  Traffic Adjudication
☐ 11 Writ of Replevin
☐ 12 Enforce Mechanics Lien
☐ 16 Declaratory Judgment

☐ 17 Merit Personnel Act (OEA)
    (D.C. Code Title 1, Chapter 6)
☐ 18 Product Liability

☐ 24 Application to Confirm, Modify,
    Vacate Arbitration Award (DC Code § 16-4401)
☐ 29 Merit Personnel Act (OHR)
☐ 31 Housing Code Regulations
☐ 32 Qui Tam
☐ 33 Whistleblower

## II.

☐ 03 Change of Name
☐ 06 Foreign Judgment/Domestic
☐ 08 Foreign Judgment/International
☐ 13 Correction of Birth Certificate
☐ 14 Correction of Marriage
    Certificate
☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
☐ 27 Petition for Civil Asset Forfeiture (Currency)
☐ 28 Petition for Civil Asset Forfeiture (Other)

☐ 15 Libel of Information
☐ 19 Enter Administrative Order as
    Judgment [ D.C. Code §
    2-1802.03 (h) or 32-151 9 (a)]
☐ 20 Master Meter (D.C. Code §
    42-3301, et seq.)

☐ 21 Petition for Subpoena
    [Rule 28-I (b)]
☐ 22 Release Mechanics Lien
☐ 23 Rule 27(a)(1)
    (Perpetuate Testimony)
☐ 24 Petition for Structured Settlement
☐ 25 Petition for Liquidation

## D.  REAL PROPERTY

☐ 09 Real Property-Real Estate
☐ 12 Specific Performance
☐ 04 Condemnation (Eminent Domain)
☐ 10 Mortgage Foreclosure/Judicial Sale
☐ 11 Petition for Civil Asset Forfeiture (RP)

☐ 08 Quiet Title
☐ 25 Liens: Tax / Water Consent Granted
☐ 30 Liens: Tax / Water Consent Denied
☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____

Attorney's Signature

June 29, 2021
_____

Date

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Lincoln Holdings LLC, et al.
_____
                                    Plaintiff

vs.                                                    Case Number  2021 CA 002196 B

Factory Mutual Insurance Company
_____
                                    Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Matthew J. Schlesinger (D.C. Bar No. 429689)
_____
Name of Plaintiff's Attorney

850 Tenth Street, NW                         By _____
_____
Address                                                                       Deputy Clerk
Washington DC, 20001

(202) 662-6000                                 Date  7/2/2021
_____
Telephone

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오     ያማርኛ ትርጉም አማራጭ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME_.

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
DIVISIÓN CIVIL
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

Lincoln Holdings LLC, et al.
_____
                                                     Demandante

contra

Factory Mutual Insurance Company                Número de Caso: **2021 CA 002196 B**
_____
                                                     Demandado

### CITATORIO

Al susodicho Demandado:

   Por la presente se le cita a comparecer y se le requiere entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

   A usted también se le requiere presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

Matthew J. Schlesinger (D.C. Bar No. 429689)
_____            *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

850 Tenth Street, NW
_____   Por: _____
Dirección                                                          Subsecretario
Washington, DC 20001
_____

(202) 662-6000
_____   Fecha   **7/2/2021**
Teléfono

如需翻译, 请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

한국어로 번역을 원하시면 (202) 879-4828 로 연락하십시오    ?ﺑﺎﻣ?? ???? ??????? (202) 879-4828 ?????

   IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

   Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                              Super. Ct. Civ. R. 4

BENEDICT M. LENHART
MATTHEW J. SCHLESINGER
RUKESH A. KORDE
KRISTIN M. COBB
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5906
Email: blenhart@cov.com
mschlesinger@cov.com
rkorde@cov.com
kcobb@cov.com

Attorneys for Plaintiffs

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LINCOLN HOLDINGS LLC, LINCOLN HOCKEY LLC, LINCOLN MYSTICS LLC, WASHINGTON BULLETS L.P., AND DC ARENA L.P., 627 North Glebe Road Arlington, Virginia 22203-2144 Plaintiffs, v. FACTORY MUTUAL INSURANCE COMPANY, 270 Central Ave Johnston, Rhode Island, 02919-4923 Defendant. | Docket No. 2021 CA 002196 B |

### PLAINTIFFS' CORPORATE DISCLOSURE STATEMENT

Pursuant to D.C. Superior Court Rule of Civil Procedure 7.1, Plaintiffs hereby certify that

Lincoln Hockey LLC, Lincoln Mystics LLC, Washington Bullets LP, and DC Arena LP are direct

or indirect wholly owned subsidiaries of Lincoln Holdings LLC and that Lincoln Holdings LLC

has no parent corporation and that no publicly held corporation owns 10% or more of the stock of

Lincoln Holdings LLC.

Dated: June 29, 2021

<div style="text-align: right">

Respectfully submitted,

By:   /s/ Matthew J. Schlesinger
Matthew J. Schlesinger
D.C. Bar No. 429689
Covington & Burling LLP
One CityCenter
850 Tenth Street Northwest
Washington, DC 20001
(202) 662-6000
mschlesinger@cov.com

</div>



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

LINCOLN HOLDINGS LLC et al
    Vs.                                C.A. No.      2021 CA 002196 B
FACTORY MUTUAL INSURANCE COMPANY

## INITIAL ORDER AND ADDENDUM

**Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby** ORDERED **as follows:**

(1) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

**Chief Judge Anita M. Josey-Herring**

Case Assigned to: Judge FERN FLANAGAN SADDLER
Date:       July 2, 2021
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, October 01, 2021
Location:   Courtroom 100
             500 Indiana Avenue N.W.
             WASHINGTON, DC 20001

                CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,   "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.   The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.   Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

**Civil Remote Hearing Instructions for Participants**

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**

**Option1:  (AUDIO ONLY/Dial-in by Phone):**

Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.

> ❧ *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise.  If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the Audio Alternative

**Option 2: (LAPTOP/ DESKTOP USERS 1):**

Open Web Browser in Google Chrome and copy and paste following address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX

**Option 3: (LAPTOP/ DESKTOP USERS 2):**

Open Web Browser in Google Chrome and copy and paste following address https://dccourts.webex.com   Select **Join**, enter the Meeting ID from the next page

AUDIO ALTERNATIVE:  Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window.  Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video. 

**Option 4: (Ipad/SMART PHONE/TABLET):**

- Go to App Store, Download WebEx App (Cisco WebEx Meetings)
- Sign into the App with your Name and Email Address
- Select Join Meeting
- Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
- Click join and make sure your microphone is muted and your video is unmuted (if you need to be
- seen). If you only need to speak and do not need to be seen, use the audio only option.
- When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #2**

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726 (toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom. Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | **WebEx Direct URL** | **WebEx Meeting ID** |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

| 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|---|---|---|---|
| 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
| 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
| 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
| 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
| 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
| JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
| A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
| B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
| B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
| B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
| B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |

CAIO-60



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

LINCOLN HOLDINGS LLC et al
    Vs.                                  C.A. No.       2021 CA 002196 B
FACTORY MUTUAL INSURANCE COMPANY

## INITIAL ORDER AND ADDENDUM

**Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby** ORDERED **as follows:**

(3) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(4) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

**Chief Judge Anita M. Josey-Herring**

Case Assigned to: Judge FERN FLANAGAN SADDLER
Date:       July 2, 2021
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, October 01, 2021
Location:   Courtroom 100
           500 Indiana Avenue N.W.
           WASHINGTON, DC 20001

          CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,   "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.   The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.   Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

CAIO-60

Civil Remote Hearing Instructions for Participants

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**

**Option1:** **(AUDIO ONLY/Dial-in by Phone):**

Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.

> ❧ *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise.  If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the Audio Alternative

**Option 2: (LAPTOP/ DESKTOP USERS 1):**

Open Web Browser in Google Chrome and copy and paste following address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX

**Option 3: (LAPTOP/ DESKTOP USERS 2):**

Open Web Browser in Google Chrome and copy and paste following address https://dccourts.webex.com   Select **Join**, enter the Meeting ID from the next page

AUDIO ALTERNATIVE**:**  Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window.  Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video.



**Option 4: (Ipad/SMART PHONE/TABLET):**

- Go to App Store, Download WebEx App (Cisco WebEx Meetings)
- Sign into the App with your Name and Email Address
- Select Join Meeting
- Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
- Click join and make sure your microphone is muted and your video is unmuted (if you need to be
- seen). If you only need to speak and do not need to be seen, use the audio only option.
- When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #2**

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726 (toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom. Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | **WebEx Direct URL** | **WebEx Meeting ID** |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

| 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|-----|---|---|---|
| 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
| 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
| 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
| 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
| 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
| JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
| A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
| B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
| B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
| B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
| B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |

CAIO-60

SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA - CIVIL DIVISION

Filed
D.C. Superior Court
07/09/2021 18:18PM
Clerk of the Court

**Lincoln Holdings LLC, et al.**

                              Plaintiff(s)

                                                      Case No.: 2021 CA 002196 B

                                    *vs.*

**Factory Mutual Insurance Company**

                              Defendant

## AFFIDAVIT OF SERVICE

I, Raymond Hyson, a Private Process Server, being duly sworn, depose and say:

That I have been duly authorized to make service of the Initial Order and Addendum, Summons; Information Sheet; Plaintiffs' Corporate Disclosure Statement; and Complaint for Breach of Contract, Declaratory Relief, Breach of Implied Covenant of Good Faith and Fair Dealing, and Money Damages with Exhibits  in the above entitled case.

That I am over the age of eighteen years and not a party to or otherwise interested in this action.

That on 07/02/2021 at 2:08 PM, I served Factory Mutual Insurance Company c/o CT Corporation System, Registered Agent at 1015 15th Street, NW, Suite 1000, Washington, DC 20005 with the Initial Order and Addendum, Summons; Information Sheet; Plaintiffs' Corporate Disclosure Statement; and Complaint for Breach of Contract, Declaratory Relief, Breach of Implied Covenant of Good Faith and Fair Dealing, and Money Damages with Exhibits  by serving Codi Jones, Agent, authorized to accept service on behalf of CT Corporation System.

Codi Jones is described herein as:

Gender: Male    Race/Skin: White    Age: 25    Weight: 190    Height: 5'11"    Hair: Brown    Glasses: Yes

I declare under penalty of perjury that this information is true and correct.

Sworn to before me on 07/07/2021

_Angela H. Oroson_
Angela H. Oroson
Notary Public District of Columbia
My Commission Expires: March 31, 2024

_Raymond Hyson_
Raymond Hyson

Client Ref Number:039862.00003
Job #: 1591261

Capitol Process Services, Inc. | 1827 18th Street, NW, Washington, DC 20009 | (202) 667-0050